1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                       --oOo--

4

5    GEORGE GONZALEZ,

6             Plaintiff,

7    v.                    Case No.  5:25-cv-00331-KK-DTB

8    STATE OF CALIFORNIA; CITY OF
     HEMET; PATRICK SOBASZEK;
9    ANDREW REYNOSO; SEAN IRICK;
     and DOES 1-10, inclusive,
10
              Defendants.
11   _____/

12

13

14

15

16         STENOGRAPHIC REPORTER'S TRANSCRIPT OF

17      REMOTE VIDEO DEPOSITION OF ANDREW REYNOSO

18            THURSDAY, AUGUST 14, 2025

19

20

21

22   Reported Stenographically by:

23   KIMBERLY D'URSO, CSR 11372, RPR

24   Job No.  18115

25

```
 1                   APPEARANCES (Remote)

 2    FOR THE PLAINTIFFS:

 3            LAW OFFICES OF DALE K. GALIPO
              BY:  DALE K. GALIPO, ESQ.
 4            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 5            818.347.3333
              dalekgalipo@yahoo.com
 6
      FOR THE DEFENDANTS CITY OF HEMET, PATRICK SOBASZEK, and
 7    ANDREW REYNOSO:

 8            MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
              BY:  ANDREA KORNBLAU, ESQ.
 9            801 S. Figueroa St, 15th Floor
              Los Angeles, California 90017
10            213.624.6900
              andrea.kornblau@manningkass.com
11
      FOR THE DEFENDANT STATE OF CALIFORNIA,
12    ACTING BY AND THROUGH THE CALIFORNIA HIGHWAY
      PATROL, AND OFFICER SEAN IRICK:
13
              ATTORNEY GENERAL OF CALIFORNIA
14            BY:  MARIO E. GARCIA, ESQ.
              Deputy Attorney General
15            State Bar No. 312120
              2550 Mariposa Mall, Room 5090
16            Fresno, CA 93721-2271
              559.705.2312
17            mario.garcia@doj.ca.gov

18

19    ALSO PRESENT:  Said Hofiani, Videographer
                     Alejandro Monguia, Paralegal
20
                      --oOo--
21

22

23

24

25
```

INDEX OF EXAMINATION

WITNESS:  ANDREW REYNOSO

EXAMINATION BY                                          PAGE

          MR. GALIPO..............................5

          MS. KORNBLAU..........................83

                    EXHIBITS FOR REFERENCE

EXHIBIT                 DESCRIPTION                PAGE

Ex 1   Portion of Sergeant Reynoso's
       body-worn camera............................67

Ex 2   Portion of Detective Sobaszek's body-worn
       camera......................................75

                         --oOo--

1                          --oOo--

2                  BE IT REMEMBERED, that set on Thursday, the

3     14th day of August, 2025, commencing at the hour of

4     10:04 a.m., thereof, ANDREW REYNOSO appeared remotely in

5     Hemet, California, before me, Kimberly E. D'Urso, an RPR

6     and Certified Shorthand Reporter of the State of

7     California, the following deposition was stenographically

8     reported by me:

9                  THE VIDEOGRAPHER:  Good morning.  We're on

10    record at 10:04 a.m.  Today's date is August 14th, 2025.

11    This is the recorded remote deposition of Andrew Reynoso,

12    in the matter of George Gonzalez versus the State of

13    California, et al.  Case number 5:25-cv-00331-KK-DTB.

14                 This deposition is being held via web

15    conference.  My name is Said Hofiani.  I'm the

16    videographer with Focus Litigation Solutions.  The court

17    reporter is Kimberly D'Urso.

18                 Counsel, please introduce yourselves and state

19    whom you represent, after which the court reporter will

20    state her CSR license number and swear in the witness.

21                 MR. GALIPO:  Dale Galipo, for the plaintiff.

22                 MS. KORNBLAU:  Andrea Kornblau, on behalf of

23    the defendants.

24                 MR. GARCIA:  Mario Garcia, on behalf of the

25    State of California and combined through the California

1    Highway Patrol, as well as CHP Officer Sean Irick.

2              (Whereby the oath was administered to the

3              deponent by the Certified Shorthand Reporter.)

4              THE WITNESS:  I do.

5              MR. GALIPO:  Thank you.

6                        EXAMINATION

7    BY MR. GALIPO:

8         Q.   Can you please state your name for the record?

9         A.   First name is Andrew, A-N-D-R-E-W.  Last is

10   Reynoso, R-E-Y-N-O-S-O.

11        Q.   Who do you current work for?

12        A.   Currently employed with the City of Hemet

13   Police Department.

14        Q.   How long have you been employed with the City

15   of Hemet?

16        A.   Approximately, eleven and a half years.

17        Q.   What is your current assignment?

18        A.   Currently, I am the training sergeant.

19        Q.   What do you do in that assignment?

20        A.   I help facilitate training standards according

21   to POST, as well as internal training standards

22   according to the department.

23        Q.   Are you involved in writing or helping to write

24   any department policies?

25        A.   I do not author department policies.  No, sir.

1    Q.    Are you, yourself, involved in training the

2    officers on different topics?

3    A.    At times, yes.

4    Q.    So is part of your position to make sure the

5    department has training standards or materials that are

6    consistent with POST?

7    A.    Part of my job, yes.

8    Q.    And do you become familiar with POST by

9    reviewing it from time to time?

10   A.    I become familiar with certain policies and

11   procedures, yes, that come down from POST.

12   Q.    For example, I think Learning Domain 20 deals

13   with use of force.  Are you familiar with that?

14   A.    I'm familiar with use of force policies in

15   accordance with the City of Hemet Police Department.

16   Q.    And that would include less lethal force and

17   lethal force?

18   A.    Yes, sir.

19   Q.    In the incident we're here to talk about, do

20   you recall the date of the incident?

21   A.    January 24th, sir.

22   Q.    Of what year?

23   A.    2024.

24   Q.    Do you know the name of the person that you

25   shot at?

Andrew Reynoso

1      A.    The suspect in this case was George Gonzalez.

2      Q.    To your knowledge, had you ever seen

3  Mr. Gonzalez in person before that day?

4      A.    Not to my recollection.

5      Q.    How many shots did you fire?

6      A.    During this incident, I discharged my firearm

7  six times.

8      Q.    What type of firearm did you discharge?

9      A.    A GLOCK 17, semi-automatic firearm.

10     Q.    Is that a 9-millimeter?

11     A.    Yes, sir.

12     Q.    It's a semi-automatic weapon?

13     A.    Yes, sir.

14     Q.    You have to press the trigger for each shot?

15     A.    Correct, sir.

16     Q.    Were you intentionally pressing the trigger

17  while you were shooting?

18     A.    Yes, sir.

19     Q.    So you would have intentionally pressed the

20  trigger six times?

21     A.    Correct, sir.

22     Q.    And the person you were shooting at, obviously

23  that would be Mr. Gonzalez?

24     A.    Yes, sir.

25     Q.    What would you estimate your distance to be

1    from Mr. Gonzalez when you were firing?

2        A.    At the time of discharging my firearm,

3    Mr. Gonzalez was in motion, but approximately 20 to 25

4    yards.

5        Q.    And I know football season's getting ready to

6    start in a little bit, but just to make sure we're on

7    the same page -- and I'm multiplying by three -- that

8    would be 60 to 75 feet, approximately?

9        A.    I'd have to do the math, sir.  Just -- that's

10   what my reference is, 20, 25 yards, sir.

11       Q.    Okay.  The only reason I followed up is I had a

12   case recently where the officer was given the estimates

13   in his deposition in yards, and then by the time we got

14   trial he said he meant feet.

15           But you're meaning yards, understanding that

16   there's 3 feet in a yard, approximately?

17       A.    Yes, sir.

18       Q.    And you say that Mr. Gonzalez was in motion.

19   Was he moving towards you, away from you, or in some

20   other manner?

21       A.    So in the -- in this incident, Mr. Gonzalez was

22   moving in several different directions.  But at the time

23   of my first shot, Mr. Gonzalez had a firearm in his

24   right hand, had looked to his left, and then turned back

25   towards my partners and I; and that was the first

1    instance.

2           And I apologize.  Just prior to that, there was

3    a gunshot fired that I believed Mr. Gonzalez had fired.

4    That all occurred prior to my first shot.  And then as

5    the incident continued, Mr. Gonzalez was continuing in

6    motion.

7           Q.   Continuing which way in motion?

8           A.   He was moving around, so at times looking back

9    still, and at times still moving forward.

10          Q.   And when he was moving forward, was he walking

11   or running?  How would you describe his gait?

12          A.   He was not walking.  I don't know if that would

13   be considered a jog or a run.  I don't want to guess on

14   that.  But he was just moving at a faster than a walk

15   pace.

16          Q.   You would say it was either a jog or a run, but

17   not walking?

18          A.   Correct.

19          Q.   And do you know which direction he was jogging

20   or running in, compass direction?

21          A.   He still was fleeing away from officers.  But

22   again, his body was still moving around side to side,

23   and he was looking back throughout this incident.

24          Q.   Right.  I'm trying to figure out when he was

25   jogging or running, whether it was east, west, north, or

Andrew Reynoso

1    south, if you know?

2        A.    Generally, away from officers.  That would be

3    the best.  I don't know the true direction of north,

4    west, east, or south.

5        Q.    Okay.  And when you say he was running

6    generally away from the officers, would that include you

7    and the two other officers who were present?

8        A.    Yes.

9        Q.    When you fired your first shot, could you see

10   the gun?

11       A.    Yes.

12       Q.    When you fired your second shot, could you see

13   the gun?

14       A.    At the time of firing every single round, I was

15   able to assess and see a firearm, which posed an

16   imminent threat to my partners and I, that Mr. Gonzalez

17   possessed in his right hand.

18       Q.    So you're saying you could see the firearm in

19   his right hand for your first shot, your second shot,

20   your third shot, your fourth shot, your fifth shot, and

21   your sixth shot?

22       A.    Correct.

23       Q.    Where was the firearm, relative to his body, at

24   the time of your fourth shot, for example?

25       A.    It was in his right hand, sir.

1    Q.   Right.  But where was his right hand?

2    A.   It was visible to me, sir.  I would be guessing

3    if I told you know high, low, medium.  It was just

4    visible to me in his right hand.

5    Q.   Do you know where his right hand was at the

6    time of your first shot?

7    A.   His right hand had presented a firearm, a GLOCK

8    semi-automatic handgun.  And then as he turned to his

9    left while looking back at officers, the firearm was

10   transitioning towards our officers, and then I heard a

11   gunshot.  And that's that the time I discharged my first

12   round.

13   Q.   Okay.  I'm trying to foc- -- I understand

14   there's things that happened before you fired your first

15   round -- and I'm going to go through that with you.

16   A.   Yes, sir.

17   Q.   But I'm trying to ask you when you fired your

18   first shot.  At the time you fired your first shot,

19   could you see the firearm as you were firing your first

20   shot?

21   A.   I had seen the firearm in his hand, sir.  And

22   as he turned around, I did not need to wait, after

23   hearing the first gunshot, to see the muzzle directly

24   pointed at my face.  No, sir.

25   Q.   So are you saying you could or could not see

 1  the firearm at the time of your first shot?

 2      A.  I'm saying, sir, that I saw the firearm in his

 3  hand, and as he -- this is happening in rapid

 4  succession, sir, as this is a tense, uncertain,

 5  rapidly-evolving situation.  So all of this is happening

 6  in split seconds.  I observed the firearm as he turned

 7  towards my partners and I, and then I heard a loud --

 8          (Noise interruption.)

 9          (Pause.)

10          THE VIDEOGRAPHER:  Going off the record at

11  10:16 a.m.

12          (Pause.)

13  BY MR. GALIPO:

14      Q.  Do you want to complete your answer, or would

15  you rather I just ask a new question?

16      A.  You can just ask a new question, if that's

17  okay, sir.

18      Q.  Sure.  I'll ask the same one and make it easy.

19  At the time you fired --

20          THE VIDEOGRAPHER:  We're not on record.

21          MR. GALIPO:  Said, go ahead.  I'm sorry.

22          THE VIDEOGRAPHER:  We're back on record at

23  10:18 a.m.

24  BY MR. GALIPO:

25      Q.  So just so my question is clear for the record,

1  I understand there's things that happened before you

2  fired your first shot, and I'm going to ask you about

3  those in a little bit.

4          Right now I'm asking, at the time you fired

5  your first shot -- not before, but at the time you fired

6  your first shot, could you see the gun in his hand?

7      A.   At the time of firing the first round, again,

8  based on the totality of the circumstances, I observed

9  him with that firearm in his hand, turning, yes.

10     Q.   Okay.  So you're saying that you could see the

11  gun in his hand, and he was turning, at the time you

12  fired the first shot?  Do I have your testimony correct?

13     A.   Minus the part, sir, where I say I heard -- I

14  heard a gunshot prior to me firing.

15     Q.   Okay.  And so which -- where was the gun in his

16  hand at the time you fired the first shot?

17     A.   The gun was in his right hand, sir, at the time

18  of me firing my first shot.

19     Q.   Okay.  Where on his body was his right hand?

20  That's what I'm trying to find out.

21     A.   I understand, sir.  Again, I would be guessing

22  if I were to tell you specifically, you know,

23  "Approximately, 45-degree angle here or there."  So it

24  was in his right hand, sir, as he had turned towards my

25  partners and I.

1    Q.   Okay.  And would that be your same answer for

2    shots two, three, four, five, and six?  You don't know

3    exactly where it was, just that you're saying it was in

4    his right hand?

5              MS. KORNBLAU:  Objection.  Misstates testimony.

6              Go ahead.

7              THE WITNESS:  My testimony was that he had the

8    firearm in his right hand that I was able to see and

9    perceive as an imminent threat after -- or before every

10   shot.  And then when I no longer received an imminent

11   threat, I no longer discharged my firearm.  That's my

12   testimony.

13   BY MR. GALIPO:

14   Q.   So you're saying you assessed for each shot?

15   A.   Yes, sir.

16   Q.   And you're saying, prior to firing each shot,

17   you observed the firearm in his right hand?

18   A.   Correct.

19   Q.   You just don't know exactly where it was on his

20   body; is that what you're saying, other than in his

21   hand?

22             MS. KORNBLAU:  Objection.  Vague.  Misstates

23   testimony.

24             Go ahead.

25             THE WITNESS:  Again, reiterating what I said

 1   before, sir, it was visible to me.  And I would be

 2   guessing if I were to say, "Exactly this place, this

 3   place on his person."  It just was visible to me in his

 4   right hand.

 5   BY MR. GALIPO:

 6        Q.   And are you saying he was turned towards you

 7    during your six shots?

 8        A.   Again, sir, after the initial turning -- so

 9    again, I apologize if I'm saying the same thing, but

10    this is exactly what took place.  He presented a firearm

11    in his right hand, showed it to my partners and I, and

12    he turned on his left.  And has he turned to his left,

13    he also looked back, and I heard a loud pop, a gunshot.

14          At that point, I began discharging my firearm.

15   He still continued in motion to flee from officers, but

16    he still posed an imminent threat.  Every time I

17    discharged my firearm, which was a total of six times, I

18    was able to see the firearm in his hand, right hand.

19    And he posed an imminent threat.

20          I stopped discharging my firearm when I no

21    longer received an imminent threat.

22        Q.   Was he fleeing from the officers during your

23   six shots?

24        A.   He was in motion, moving forward.

25        Q.   Would that be away from the officers?

```
 1          A.    Yes.

 2                MS. KORNBLAU:  Objection.  Vague -- vague as to

 3   time.

 4   BY MR. GALIPO:

 5     Q.    You understand I'm asking you during your six

 6    shots; correct?

 7                MS. KORNBLAU:  Objection.  Vague.  Compound.

 8   BY MR. GALIPO:

 9     Q.    You may answer.

10     A.    Okay.  So he -- I -- I -- sir, I can't testify

11    that -- what exactly he was doing.  He was moving in a

12    forward motion.

13     Q.    Okay.  I thought -- maybe I misunderstood you.

14    I thought you said before that he was moving away from

15    the officers, not walking.  It was jogging or running.

16    You weren't sure which one.

17                Did I misunderstand that?

18                MS. KORNBLAU:  Objection.  Vague.

19                THE WITNESS:  No, sir.  I had stated that he

20   was not walking, jogging, or running away -- yes, away

21   from officers, including me.  Again, that's a forward

22   motion, so it's the same thing, just forward motion.

23   BY MR. GALIPO:

24     Q.    And I guess what I was asking -- because you

25    indicated he made a turning motion at some point; is
```

1   that correct?

2        A.   Yes, sir.

3        Q.   I'm asking was he in this turning motion when

4   you were firing?

5        A.   He was -- he had turned after -- again, I don't

6   need to keep repeat -- keep beating a dead horse, sir --

7   armed with a firearm in his hand, and had turned to the

8   left.  I perceived that threat as he was facing towards

9   my partners and I.  And after hearing the gunshot, that

10  is when I discharged my firearm the first time.

11       Q.   Right.  I totally get that.

12            I guess you're telling me that you were

13  assessing for each shot; is that correct?

14       A.   Yes, sir.

15       Q.   I'm simply asking you, was he turning towards

16  you when you were firing, during your shooting -- during

17  your shots, not before -- as you were assessing?

18            MS. KORNBLAU:  Objection.  Vague.  Compound.

19            MR. GARCIA:  Join.

20            THE WITNESS:  Again, sir, the best way I can

21  answer is he -- initially, he turned towards my partners

22  and I with a firearm in his hand.  I hear an audible pop,

23  a gunshot, I perceive it as, from Mr. Gonzalez.

24            And as he continued to flee, he's not walking.

25  He's moving at a fast pace.  Walking -- or I mean jogging

 1   or running.  And, at times, he's still moving left and

 2   right.  He's not static.  He's not stopping.  He's not

 3   walking at a slow pace, so there's movement.  He's in

 4   motion, moving.

 5   BY MR. GALIPO:

 6       Q.   I understand.  I'm asking a very simple

 7    question.  Was he turning towards you when you were

 8    firing?  When you were firing?

 9            MS. KORNBLAU:  Objection.  Asked and answered.

10   Vague.  Compound.

11            THE WITNESS:  Again, sir, no disrespect, I'm

12   going to answer the same way.  Just that when he -- when

13   I first discharged my firearm, he was -- had turned

14   towards my partners and I, with the gun in his hand, and

15   then I heard a gunshot.  That was when I discharged my

16   firearm the first time.

17   BY MR. GALIPO:

18       Q.   Okay.  And was he also turned towards you for

19    shots two through six?

20       A.   I was not paying attention to exactly where his

21    body placement was at that.  I was focused on the

22    firearm in his right hand, which was the immediate and

23    imminent threat.  And based off of that imminent threat,

24    I was focused on the gun and aiming center mass, to stop

25    the threat.

Andrew Reynoso

1    Q.    How many shots did you hear before you fired?

2    A.    I recall hearing one shot that I perceived was

3    from Mr. Gonzalez.

4    Q.    Two of the other officers were closer to

5    Mr. Gonzalez than you were; is that correct?

6    A.    Yes, sir.

7    Q.    And which officers were closer to him than you

8    were?

9    A.    You had Detective Sobaszek and Officer Irick.

10    Q.    And what would you estimate the distance they

11    were from you, these other officers, when you fired?

12    A.    I'd say approximately 7 yards.

13    Q.    Do you know if they had their guns out as they

14    were chasing Mr. Gonzalez?

15         MS. KORNBLAU:  Objection.  Calls for

16    speculation.

17         MR. GARCIA:  Join.

18         MR. GALIPO:  That's why I said "if you know."

19         But go ahead.

20         THE WITNESS:  I do not know, sir.

21    BY MR. GALIPO:

22    Q.    Did you have your gun out as you were chasing

23    Mr. Gonzalez?

24    A.    I did not have my firearm out in the entirety

25    of the foot pursuit.  At the end, I did pull my firearm

 1   out, prior to discharging my firearm.

 2       Q.   How much time passed from you pulling your

 3   firearm out to you discharging?

 4       A.   I would be guessing, sir, if I gave you an

 5   exact time frame, but it was within seconds.

 6       Q.   I don't want you to guess.  Obviously, you were

 7   there and we weren't.

 8            Have you watched some body-worn camera footage?

 9       A.   Yes, sir.

10       Q.   Whose body-worn camera footage have you

11   watched?

12       A.   My footage, sir.

13       Q.   Anybody else's?

14       A.   No, sir.

15       Q.   How many times do you think you've watched your

16   body-worn camera footage?

17       A.   It's been a total of four times, sir.

18       Q.   Have you ever watched it slowed down?

19       A.   No, sir.

20       Q.   Have you ever watched it frame by frame?

21       A.   No, sir.

22       Q.   Have you ever looked at it in any enhanced

23   form?

24       A.   No, sir.

25       Q.   I guess what I'm wondering -- and maybe you

Andrew Reynoso

1    can't give an estimate -- do you know if you pulled out

2    your firearm immediately before you shot, or pulled it

3    out three seconds, five seconds, five to ten seconds

4    before?  Whatever you're comfortable with.

5         A.   My comfortable answer, sir, would just be it

6    was within seconds; but I would be guessing if I gave

7    you specific numbers.

8         Q.   In the five seconds before you fired, did you

9    give any commands to Mr. Gonzalez?

10        A.   I did not give any commands.  No, sir.

11        Q.   In the five seconds before you fired, did you

12   give a verbal warning that you were going to shoot?

13        A.   I did not specifically, sir.  But it should be

14   noted that my partners, who were closer to Mr. Gonzalez,

15   were giving repeated commands to "Stop."  "Get on the

16   ground."  Similar commands like that, through the

17   entirety of the foot pursuit.

18        Q.   Right now I'm just focused on last five

19   seconds.

20             Did you hear anybody give a verbal warning in

21   the last five seconds that they were going to shoot?

22        A.   I cannot specifically recall within that five

23   seconds.  No, sir.

24        Q.   Your backdrop -- at the time when you were

25   shooting, were there any individuals that you could see

1   in your backdrop?

2       A.   So per your question, at the time of my

3   shooting, there was no individuals in my backdrop at the

4   time of me discharging my firearm; but prior to, there

5   were subjects observed in the immediate area.

6       Q.   Did you see any individuals, other than

7   Mr. Gonzalez and the two other officers, at the time of

8   your shooting?

9       A.   During the shooting itself, I did not observe

10  anyone in the back drop area.  No, sir.

11      Q.   When you initially saw Mr. Gonzalez, was he in

12  a vehicle or outside of the vehicle that day?

13      A.   So at -- the first time I was seeing

14  Mr. Gonzalez, throughout the entire day of January 24th,

15  he was first observed outside of the vehicle, in the

16  driveway of 40525 Whittier Avenue.

17      Q.   And you do generally recall what type of

18  vehicle that was?

19      A.   There were three vehicles present during that;

20  but specifically, the vehicle he ran into, prior to

21  our -- or I apologize.  The vehicle he ran into was a

22  black Hyundai.

23      Q.   And when you first saw him, was that black

24  Hyundai parked in the driveway or somewhere else?

25      A.   The black Hyundai was parked in the driveway.

1   It was faced to the north, with the engine; and the

2   trunk was to the south.

3       Q.   And where was Mr. Gonzalez in relation to that

4   black Hyundai, when you first saw him?

5       A.   He was within close proximity.  The vehicle was

6   parked on the western driveway, and he was towards the

7   center of the yard, close to the front door.

8       Q.   Was he on the driver's side or passenger's

9   side?

10      A.   He would have been on the passenger's side of

11  the vehicle, sir.

12      Q.   And at some point did you see Mr. Gonzalez get

13  in the vehicle?

14      A.   Yes, sir.

15      Q.   And approximately how much time passed from you

16  first seeing him to him getting in the car?  Can you

17  give me any general estimate?

18      A.   It was -- upon arriving on scene and seeing

19  him, it was within 20 seconds or less that he was

20  getting into the actual vehicle.

21      Q.   And where were you positioned during that time

22  frame?

23      A.   Upon arrival to this residence, I was passenger

24  in a gray -- a gray police vehicle, driven by Riverside

25  Sheriff's Deputy Dillon Keller.

Andrew Donoso

1       And as we approached from South Girard over --

2  driving eastbound towards the western driveway of the

3  listed address, we stopped on the west side of the

4  property.

5       And to be fur- -- a little more clear, on the

6  north side -- north of the vehicle, facing southbound.

7       Q.   During the approximate 20 seconds that you saw

8  Mr. Gonzalez outside of that vehicle, did you see any

9  object in either one of his hands?

10      A.   I don't recall specifically seeing an object in

11 his hand at that immediate time.

12      Q.   Did he appear to you that he was trying to

13 shoot anyone at that time, during that initial 20

14 seconds?

15      A.   The first time I'm observing him, all I

16 observed was him fleeing to the vehicle.

17      Q.   Did you hear him verbally threaten to harm

18 anyone during that initial 20 seconds?

19      A.   From my vantage point, I was not able to hear

20 anything that he was saying.

21      Q.   To your knowledge, were any shots fired by any

22 law enforcement during that time frame?

23      A.   To my knowledge, no, sir.

24      Q.   And then, was Mr. Gonzalez inside the vehicle

25 for some period of time before the vehicle fleed?

1    A.    Yes, sir.

2    Q.    And can you give me a time estimate as to how

3    long he was in the vehicle?

4    A.    In total, approximately nine to ten minutes.

5    Q.    And during that time frame, where were you

6    positioned?

7    A.    As previously stated, sir, I was on the

8    northwest part of the property, facing south.  So I

9    would be on the passenger's side of the police vehicle,

10   which lined up with the driver's side of the suspect

11   vehicle.

12   Q.    And do you have an estimate as to how far you

13   were from the vehicle?

14   A.    Within -- within 2 to 3 yards of the vehicle,

15   sir.

16   Q.    During that approximate nine to ten minutes,

17   did -- based on your observations, did Mr. Gonzalez ever

18   point a gun at anyone?

19   A.    So I'd like to give some context to that, sir,

20   so -- because I think the totality of the circumstances

21   is relevant in this.

22   Q.    Well, it might be, but right now, I want you to

23   focus on my questions so we can get through this.  I'll

24   let you know, I have read your statement, so I

25   understand the background.

1          And I'm trying to ask very specific questions.

2    So, right now, I'm just wanting to know whether you

3    observed him point a gun at anyone during that nine or

4    ten minutes?

5          A.    Again, based on the totality of the

6    circumstances, Mr. Gonzalez was acting erratic, had a

7    lot of furtive movements, based on my knowledge of him

8    from family members, of him being "strapped," which is

9    layman's terms of firearm.  Me observing a black -- or

10   correction, a dark -- a dark item in his hand that I

11   perceived to be a gun, and the way he was manipulating

12   it at times, it could be perceived that he was pointing

13   a firearm at officers during that time.

14        Q.    And for how long a period did you see this

15   black object that you thought was possibly a gun?

16        A.    To clarify, sir, I made a mistake.  When I said

17   "black," I corrected it with "dark."  So the dark object

18   in his hand -- in his hand, specifically his left hand,

19   I had observed him intermittently.

20          It -- it -- because of his actions and, again,

21   if you observed the body-worn camera footage, you know

22   that he's not stationary.  He's hopping around.  He's

23   moving around erratic, nonsensical behavior.

24        Q.    How many times do you think you saw this dark

25   object in his hand that you believed was a gun?

Andres Reynoso

1    A.    More than once.  But I would be guessing if I

2    gave you -- if I gave you a specific number.  It was

3    definitely more than once.

4    Q.    Did you yell out "Gun" to your fellow officers,

5    to let them know that you observed what you thought was

6    a gun?

7    A.    What I specifically said, sir, is that, "He has

8    something in his hands."  I repeated that numerous

9    times.  I stated that he specifically has something in

10   his left hand.  And I also stated to Mr. Gonzalez

11   himself that, "I believe you're armed," numerous times.

12   Q.    I guess what I'm wondering is, if you ever

13   specifically said "Gun," or words to effect that, to

14   your fellow officers?

15       MS. KORNBLAU:  Objection.  Asked and answered.

16       THE WITNESS:  Again, the terminology I used,

17   sir, was "armed," and the reason why I said it loud

18   enough was for my partners to hear.

19   BY MR. GALIPO:

20   Q.    Were any shots fired at Mr. Gonzalez during the

21   nine or ten minutes he was in the police vehicle?

22   A.    Mr. Gonzalez, as he was in the suspect Hyundai,

23   he was not shot at during that time.

24   Q.    Did you think it would have been appropriate to

25   shoot him at that time?

1     A.   Not the entirety of the nine to ten minutes,

2     sir.  But when I perceived that he was pointing a --

3     what I believed to be a firearm, absolutely.

4          But I chose not to, based on the totality of

5     the circumstances, which was, there was cover available;

6     there was also women and children inside of the house

7     that were relevant to this incident; and there were

8     numerous windows on the property, to include in his

9     immediate backdrop, which made me concerned, because I

10    don't know where the children or women are at in the

11    house, specifically.

12    Q.   Where was Mr. Gonzalez in the vehicle when you

13    are saying he was pointing what you believed to be a

14    firearm at the officers?

15    A.   He was -- I couldn't tell you specifically if

16    he was totally in the back seat or the front seat.  But

17    there was no tint on the vehicle, sir, so I had a clear

18    and unobstructed view into the vehicle as he was moving

19    front to back, side to side, numerous times throughout

20    the nine to ten minutes being inside this vehicle.

21    Q.   So you're saying you saw this dark object that

22    you believed to be a gun more than once; is that

23    correct?

24    A.   What I'm saying is, sir -- is that I observed

25    the dark object in his hands, yes.  And did I observe

1   him in what I perceived to be pointing that object,

2   which I believed was a firearm towards officers, yes.

3          But I can't specifically say he was fully in

4   the front compartment or fully in the backseat.  I just

5   know that I focused in on what I believed to be an

6   imminent threat.

7   Q.   Right.  I'm just wondering if you saw that once

8   or more than once?

9   A.   Again, sir, as I stated previously, it was more

10  than once, but I would be guessing to tell you a

11  specific number, sir.

12  Q.   Did you ever tell him to, "Drop it," or words

13  to that effect, while he was in the car?

14  A.   I didn't specifically say, "Drop it," sir.  But

15  what I did say is, "Don't do it.  Don't do it," as I

16  continued to move back for cover, again, perceiving it

17  was a firearm.

18  Q.   Was there any verbal warning that you heard

19  given by any of the officers to Mr. Gonzalez, that they

20  were going to shoot him, potentially, while he was in

21  car?

22  A.   One of the assisting officers, I don't know

23  specifically who, had mentioned something to the effect

24  that, "You're going to be shot" or "You could be shot."

25  Again, you would have to listen to the body-worn camera

1  for a verbatim statement.

2      Q.    And is that your body-worn camera or someone

3  else's that you're referring to?

4      A.    No.  You can hear on it mine, sir.

5      Q.    And on your body-worn camera, can you see

6  Mr. Gonzalez pointing a dark object at the officers

7  while he's in the car?

8      A.    I don't specifically know if you can see the

9  dark object, again, that I perceived to be a gun,

10  specifically based on my distance and the angle and the

11  windshield.  But, again, I observed it.  I -- I don't

12  know specifically if the body-worn camera observed it.

13      Q.    And I think you've already answered this, but

14  did you tell any of your fellow officers that you

15  thought he had a gun in his left hand?

16          MS. KORNBLAU:  Objection.  Asked and answered.

17          THE WITNESS:  Again, sir, specifically, what I

18  had stated was that I told Mr. Gonzalez in a loud enough

19  voice so my partners could hear, that I believed he was

20  armed.  And I said it more than once.

21  BY MR. GALIPO:

22      Q.    At some point the vehicle left that area; is

23  that correct?

24      A.    Yes, sir.

25      Q.    And there was a pursuit that went on?

1          A.    Correct, sir.

2          Q.    Were you the second vehicle back in the

3     pursuit?

4          A.    Yes, sir.

5          Q.    And at some point, did the vehicle at the end

6     of the pursuit become disabled near some railroad

7     tracks?

8          A.    The suspect vehicle did become disabled, sir,

9     yes, near some railroad tracks.

10          Q.    During the pursuit, did you see any gun in the

11     car during the pursuit?

12          A.    During the pursuit, no, sir.  We were number

13     two.  I couldn't -- I didn't have a clear view of the

14     vehicle during the entirety of the vehicle pursuit.

15          Q.    At some point, did you see the vehicle come to

16     a stop, after it had crashed by the railroad tracks or

17     become disabled?

18          A.    Sir, at the termination point of the vehicle

19     pursuit, I observed it stopped.  Yes, sir.

20          Q.    And did you observe Mr. Gonzalez get out the

21     vehicle?

22          A.    Yes, sir.

23          Q.    Where were you when Mr. Gonzalez got out of the

24     vehicle?

25          A.    I was in the passenger seat of the previously

 1    described Riverside Sheriff's Department police vehicle,

 2    as I perceived a foot bail was imminent, which the

 3    suspect did flee on foot.  So I was already exiting the

 4    vehicle as he fled on foot.

 5        Q.    Did you think it was appropriate to shoot

 6    Mr. Gonzalez as he was getting out of the car?

 7        A.    At that particular moment, sir, although I did

 8    perceive he was a danger, again, believing that he was

 9    armed with a firearm, and based on the totality of the

10    circumstances with the family, and statements he was

11    making, the vehicle pursuit, which was wild, was he a

12    danger?  Absolutely.  But I did not perceive an imminent

13    threat at that point in time.

14            So, no, I would not have shot him at that point

15    in time.

16        Q.    Okay.  And when he started running away, did

17    you think it was appropriate to shoot him?

18        A.    Again, sir, so based on his initial flight from

19    the vehicle and proximity to that car, as I previously

20    stated, I believed he was absolutely a danger, based on

21    aforementioned statements.  But I did not perceive an

22    imminent threat when he immediately fled from the

23    vehicle.

24        Q.    And based on your training, there has to being

25    an imminent threat of death or serious bodily injury to

 1    use deadly force; is that fair?

 2        A.   So based on my training, there has to be the

 3    apparent ability, the opportunity, and the intent for

 4    deadly force application; so, yes.  And that can be in

 5    defense of others or myself.

 6        Q.   Right.  So based on the training -- and I think

 7    this is probably in the POST standards and also the

 8    Revised Penal Code Section 835(a) -- in order for there

 9    to be an imminent threat of death or serious bodily

10    injury, the person has to have the ability, opportunity,

11    and apparent intent to immediately cause death or

12    serious bodily injury.

13             Is that your general understanding?

14        A.   Yes.

15        Q.   And you would agree, based on your training,

16    seeing a firearm in someone's hand, that fact alone,

17    with nothing else, is not necessarily enough to use

18    deadly force?  Would you agree?

19             MS. KORNBLAU:  Objection.  Incomplete

20    hypothetical.

21             But go ahead.

22             MR. GARCIA:  Join.

23             THE WITNESS:  Okay.  So I just want to preface,

24    sir, that I believe -- obviously, I understand --

25             (Reporter clarification.)

1            THE WITNESS:  -- there is some missing context

2    with this.  But based on that specific statement you're

3    saying on just holding a firearm alone, with no other

4    context, no, we are not trained in that capacity.

5    BY MR. GALIPO:

6        Q.   Prior to the day of the incident with

7    Mr. Gonzalez, had you ever seen a suspect with a gun in

8    their hand before?

9        A.   Yes, sir.

10       Q.   On how many occasions, approximately?

11       A.   Approximately, 25.

12       Q.   And that would be a gun in the hand; is that

13   correct?

14       A.   Sir -- yes, sir.

15       Q.   How many prior officer-involved shootings had

16   you been involved in when you actually were one of the

17   officers who fired?

18       A.   Prior to this incident, sir?

19       Q.   Yes.

20       A.   It's been a total of four prior

21   officer-involved shootings.

22       Q.   Okay.  Have you been involved in any

23   officer-involved shootings since this incident?

24       A.   No, sir.

25       Q.   So the first one would have happened in what

1   year, approximately?

2        A.   I don't recall specifically, sir.

3   Approximately, 2017.  It could be late 2016 -- or

4   approximately.

5        Q.   How long had you been a police officer at that

6   time?

7        A.   Since February, March of 2014, sir.

8        Q.   Were you assigned to Patrol at that time?

9        A.   I was assigned to Patrol as a canine handler;

10  yes, sir.

11       Q.   How many shots did you fire in that incident?

12       A.   There was one round that I discharged during

13  that incident, sir.

14       Q.   Do you remember the name of the person that you

15  shot?

16            MS. KORNBLAU:  Objection.  Vague.

17            THE WITNESS:  I don't recall the name of the

18  subject or suspect involved in that incident.

19  BY MR. GALIPO:

20       Q.   Did you deploy your canine at that subject?

21       A.   No, sir.

22       Q.   And do you know if your round struck the

23  suspect or not?

24       A.   I did not strike the suspect in that one, sir.

25       Q.   And did that suspect have a weapon in their

1   hand?

2       A.   I don't specifically recall if the suspect had

3   a weapon in their hand at that time, sir.

4       Q.   How about the second shooting you were involved

5   in, when was that?

6       A.   Approximately, 2017, sir.

7       Q.   How many shots did you fire in that incident?

8       A.   I don't recall specifically, sir, but more than

9   one.

10      Q.   Do you recall the name of the person that you

11  fired shots at in that incident?

12      A.   I don't recall the name specifically, sir.

13      Q.   Did you deploy your canine in that incident?

14      A.   No, sir.

15      Q.   Do you know whether your shots struck the

16  person or not?

17      A.   Yes, sir.

18      Q.   And do you believe they did?

19      A.   Oh, I apologize, sir.  I would be misspeaking.

20  I don't know specifically if my rounds struck that

21  person.  There was no way to determine that.  The

22  suspect in that was struck by gunfire, but I wasn't a

23  sole shooter in that, so there's no way to know if it

24  was me or not.

25      Q.   Did that suspect survive, if you know?

1    A.    Yes, sir.

2    Q.    You just don't recall the name?

3    A.    Correct, sir.

4    Q.    When was your third shooting -- oh, did that

5    suspect have a weapon in their hand?

6    A.    Yes, sir.

7    Q.    What was the weapon?

8    A.    A knife.

9    Q.    Do you have a recollection of how far you were

10    from this person with the knife when you fired?

11    A.    I -- I do not, sir.

12    Q.    When was your third shooting?

13    A.    Approximately, beginning of 2018.  Maybe the

14    end of 2017, sir.  I'm not sure.

15    Q.    How many shots did you fire in that incident?

16    A.    I don't recall specifically, sir, but it was

17    more than one.

18    Q.    Do you have any estimate other than "more than

19    one"?

20    A.    I would be lying, sir -- or guessing at that

21    point.

22    Q.    Did you deploy your canine in that incident?

23    A.    Yes, I did.

24    Q.    Do you recall the name of the person you shot

25    at?

1      A.    I -- I don't recall, sir.

2      Q.    Was that a Mr. Acosta?

3      A.    I -- I don't recall, sir.

4      Q.    Was a lawsuit filed in that case, to your

5  knowledge?

6      A.    Yes, sir.

7      Q.    Were you named as a defendant in that case?

8      A.    Yes, sir.

9      Q.    Do you recall if I was the attorney

10  representing the person who was shot?

11      A.    I do.

12      Q.    And was I?

13      A.    Yes.

14      Q.    And if you recall, did I take your deposition

15  in that case?

16      A.    Yes, sir.

17      Q.    And that case did not go to trial.  Is that

18  your understanding?  It was resolved in some way?

19      A.    I believe so.  I didn't testify federally, no,

20  sir.

21      Q.    And then when was your fourth shooting?

22      A.    I believe the end of -- approximately, the end

23  of 2018.

24      Q.    So between 2016 and the end of 2018, you would

25  have had four shootings; is that approximately correct?

 1          A.   Yes, sir.

 2          Q.   When were you promoted to sergeant?  In what

 3     year?

 4          A.   I was promoted to sergeant in 2022 -- or

 5     actually, I apologize, 2022 or 2023, sir.

 6          Q.   And then in your shooting in 2018, do you

 7     recall how many rounds you fired in that shooting?

 8          A.   I don't, sir.  But again, more than one.  But I

 9     would be guessing if I gave you a round count, sir.

10          Q.   And in the 2018 shooting, when you deployed

11     your dog, did you see a weapon in that person's hand

12     when you fired?

13          A.   So the weapon used against me in that, sir, was

14     a vehicle.  So there was a weapon in his hand, yes, the

15     vehicle.

16          Q.   The vehicle.

17               And then this fourth shooting you had towards

18     the end of 2018, did that person have a weapon in their

19     hand?

20          A.   Yes, sir.

21          Q.   What was that weapon?

22          A.   That individual had two firearms, one in each

23     hand.

24          Q.   And do you know if you struck that person?

25          A.   I do not, sir.

1     Q.    Was that person running away from you when you

2     fired?

3     A.    That individual was in a doorway of a

4     residence.

5     Q.    So the shooting we're here to talk about would

6     actually be your fifth shooting?  Do I have that

7     correct?

8     A.    Yeah.  The fifth shooting of where I discharged

9     my firearm, yes.  There was an incident prior to this

10    where I was shot at, in a vehicle pursuit, but I did not

11    shoot back.

12    Q.    And how many officer-involved shootings had you

13    been present for where you heard shots fired but didn't

14    fire yourself?

15    A.    It would be a total of -- actually, I

16    apologize.

17          Can you ask that question one more time, sir?

18    Q.    Sure.  How many officer-involved shootings had

19    you been present for when you heard the shots but you

20    didn't -- you weren't one of the shooting officers?

21    A.    There's only one that comes to mind, sir, when

22    I was a supervisor on Patrol.

23    Q.    Do you know the name of the person that was

24    shot in that case?

25    A.    I do not, sir.

Andrew Reynoso

```
 1        Q.    Was that a case where you were looking for a
 2    suspect, and you went to the front door and talked to
 3    the wife, and then the individual ended up being shot in
 4    the backyard?
 5        A.    There was an individual shot in the backyard
 6    while looking for a suspect; yes, sir.
 7        Q.    Was that a Mr. Drye, if you know?
 8        A.    Again, sir, I would be lying if I agreed with
 9    that.  I don't recall the name.
10            (Reporter clarification.)
11    BY MR. GALIPO:
12        Q.    Other than the one case that you referenced
13    that you were aware that I represented the individual
14    shot by you, were you aware of any of the other
15    shootings that you had, or were involved in, where my
16    office represented the person or the family?
17            MS. KORNBLAU:  Objection.  May misstate
18    testimony.
19            But go ahead.
20            THE WITNESS:  The only time I was made aware of
21    you being involved, sir, the other one would be the one
22    you just referenced for the backyard, sir.
23    BY MR. GALIPO:
24        Q.    Okay.  During the foot pursuit -- I'm going
25    back to the case with Mr. Gonzalez now -- there were
```

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 41

Andrew Reynoso

```
1    some corners or turns during the foot pursuit.  Is that
2    a fair statement?
3         A.    We had some turns during the foot pursuit.
4    Yes, sir.
5         Q.    And do you have an estimate as to how many
6    different turns you recall?
7         A.    It would be two, 90-degrees, that we had to
8    articulate, sir, during the foot pursuit.
9         Q.    And do you have any estimate how long the foot
10   pursuit was, distance-wise or time-wise, before that
11   first 90-degree turn?
12        A.    I do not, sir.
13        Q.    Do you know if it was more or less than a
14   football field?
15        A.    I -- I would be guessing, sir, if I gave you
16   the distance.  I -- I don't know.
17        Q.    Did you see Mr. Gonzalez with a firearm in his
18   hand at any time before the first turn?
19        A.    As previously stated, in front of the
20   residence, I perceived he had a firearm in his hand,
21   sir.
22        Q.    Okay.  So let me be more precise.  After he got
23   back out of the car, up until the time he made the first
24   turn, did you see what you believed to be a firearm in
25   either one of his hands?
```

1    A.    I did not observe a firearm in his hands at

2    that time.

3    Q.    Did he turn either over his right shoulder or

4    left shoulder, that you recall, prior to that first

5    90-degree turn?

6    A.    I don't specifically recall where it was during

7    the foot pursuit, sir, at the -- in the city of

8    Beaumont, no -- or I apologize -- near that factory.

9    But he did look over his left shoulder while we were

10   pursuing him; I just don't recall if it was first turn

11   or second turn.

12   Q.    And how many times, approximately, do you

13   recall Mr. Gonzalez looking over his left shoulder?

14   A.    At least twice, possibly more, but I would be

15   guessing if I gave you a number more than two, sir.

16   Q.    And then the distance between the first

17   90-degree turn and the second 90-degree turn, do you

18   have any estimate as to that?

19   A.    I do not, sir.

20   Q.    Prior to that second 90-degree turn, after or

21   during the foot pursuit, did you see what you believed

22   to be a firearm in either one of Mr. Gonzalez's hands?

23   A.    At that particular time, sir, I did not observe

24   a firearm in Mr. Gonzalez's hands.

25   Q.    As Mr. Gonzalez was running up to the first

Andrew Reynoso

1  90-degree turn, or all the way up to the second

2  90-degree turn, did you think, based on your training,

3  it would have been appropriate to shoot him?

4      A.   So based on my vantage point, and also being

5  number three in the foot pursuit, sir, I did not

6  perceive an imminent threat from where I was.

7      Q.   And am I correct that the imminent threat has

8  to be an imminent threat of death or serious bodily

9  injury to yourself or others?

10      A.   Again, as what we previously discussed, yes,

11  sir:  apparent opportunity, ability, and intent, sir.

12      Q.   And is it your understanding from your

13  training, all three of those are required?

14      A.   Those are -- those are the definitions of an

15  imminent threat, according to the law.

16      Q.   And are you generally trained that you should

17  only use deadly force when it's immediately

18  life-threatening?

19      A.   So in order to preserve the life of others and

20  yourself, as long as it's imminent is -- can be

21  articulated, then, yes.

22      Q.   And are you generally trained that you should

23  only use deadly force when it's necessary to immediately

24  defend life?

25      A.   When it's objectively reasonable under the

Andrew Reynoso

1   totality of the circumstances.

2        Q.   Okay.  And then after that second 90-degree

3   turn, at some point, did you go through an area that was

4   a little more narrow?

5        A.   Yes, sir.

6        Q.   And what would you describe that area as?

7   Because different people have described it differently.

8   How would you describe it?

9        A.   I -- I perceived it as a vehicle maintenance

10  area.

11       Q.   Okay.  And was -- and how long was that

12  stretch?  Do you have any estimate, that narrow stretch

13  by the vehicle maintenance area?

14       A.   I don't.  I don't have a -- I would be

15  guessing, sir.  I don't have a guess.

16       Q.   Okay.  Was Mr. Gonzalez in that narrow stretch

17  when the shooting occurred, or had he already passed it?

18       A.   He was out of that narrow area, sir.

19       Q.   Okay.  And was he out of that narrow area when

20  you first observed the firearm during the foot pursuit?

21       A.   I don't recall specifically if he was partially

22  in it or not when I first observed the firearm, sir.

23       Q.   Did you think, based on your training, it was

24  appropriate to shoot Mr. Gonzalez when he was in this

25  narrow area, before he got out?

Andrew Reynoso

1    A.    So based on my previous statement, sir, or

2   answer, I don't specifically recall if he presented the

3   firearm as he had just exited or was just about to exit.

4   It was appropriate to shoot at Mr. Gonzalez when he

5   presented the firearm, and all at the same time,

6   simultaneously, looked to his left and looked back.

7   That's when it was appropriate.

8    Q.    Okay.  And if -- hypothetically, if you had

9   seen a firearm in his hand, but he had not turned or

10  looked back, would you then still have the imminency,

11  based on your training?

12          MS. KORNBLAU:  Objection.  Incomplete

13  hypothetical.

14          But go ahead.

15          THE WITNESS:  Sir, I'm going to answer that

16  with, I have experience and observed people shoot while

17  running away from officers, by simple motion of just

18  tilting the gun back or over their shoulder.  So

19  absolutely he could -- it could be a hundred percent

20  perceived as an imminent threat, and he could be shot at

21  that point in time.

22  BY MR. GALIPO:

23    Q.    Even without turning towards you or looking at

24  you?

25    A.    It is just as easy to discharge a firearm, sir,

Andrew Reynoso

1  by tilting it back a split second, and pulling that

2  trigger, or putting it over your shoulder and squeezing

3  the trigger.  That's just as deadly as a weapon as it is

4  facing somebody.

5      Q.   So are you saying that under this set of facts,

6  once you saw the firearm in his hand, even if he hadn't

7  turned or looked at you, you believe it would be

8  appropriate to shoot him as he was running away?

9      A.   I'm saying, sir, based on the totality of the

10  circumstances, we can't just -- again, that is super

11  important into everything that's going on.  The women

12  and children in danger at the house.  The perception

13  he's armed during the car -- the erratic, evading and

14  endangering officers in public for that time.  And now,

15  running through an occupied business.

16          And at this time it should be noted, I

17  perceived where he's running, towards a dead-end, into a

18  building where I am seeing a person.  So, absolutely,

19  him possessing that firearm, and having more than 27

20  minutes, approximately, to surrender peacefully and

21  stop, he, a hundred percent, is an imminent threat.

22      Q.   So you're saying that even without him turning

23  towards you or looking at you, based on your training,

24  you thought it was appropriate to shoot him at that

25  point, under the totality of the circumstances, for

 1    running away and you seeing the firearm.  Am I

 2    understanding you correctly?

 3              (Simultaneous speakers.)

 4              MS. KORNBLAU:  Objection.  Asked and answered.

 5              But go ahead.

 6              THE WITNESS:  Sorry, ma'am.  I apologize,

 7    ma'am.

 8              MS. KORNBLAU:  That's okay.

 9              THE WITNESS:  I'm saying, sir, that he posed an

10    imminent threat at that point in time.  But based on what

11    actually transpired here, there were other factors that

12    came into play.  But I'm just merely stating he posed an

13    imminent threat the second that firearm was presented.

14    BY MR. GALIPO:

15        Q.   Right.  But it would have to be an imminent

16    threat of death or serious bodily injury, like we talked

17    about before, with the opportunity, ability, and intent;

18    correct?

19        A.   Yes, sir.

20              MR. GALIPO:  Okay.  I think we've been going a

21    little over an hour.  Is this a good time for everyone

22    for a ten-minute break?

23              MS. KORNBLAU:  Sure.

24              MR. GARCIA:  Ayes.

25              MR. GALIPO:  Okay.  Thank you, all.

1            Said.

2            THE VIDEOGRAPHER:  Yep.  Going off the record

3    at 11:08 a.m.

4            (Break taken.)

5            THE VIDEOGRAPHER:  We're back on record at

6    11:24 a.m.

7    BY MR. GALIPO:

8        Q.    Okay.  So the one shooting you told me about

9    with the person with the knife, do you recall us talking

10    about that to some extent --

11        A.    Previously just -- yes.

12        Q.    -- today?

13        A.    Yes, sir.

14        Q.    Was that person's name Martin?  Does that ring

15    a bell?

16        A.    Michael Martin.  Yes, sir.

17        Q.    Do you recall that I took your deposition in

18    that case, as well?

19        A.    I didn't specifically recall that, sir.

20        Q.    Do you remember that there was a lawsuit filed

21    in that case, where you were named as a defendant?

22        A.    Yes, sir.

23        Q.    And the case with Mr. Acosta where you, in

24    addition to shooting, deployed your canine, you remember

25    you were named as a defendant in that case; is that

1    correct?

2         A.    If that's the Florida incident, then, yes, sir.

3         Q.    Okay.  And you do remember me taking your

4    deposition in that case?

5         A.    Yes, sir.  I do.

6         Q.    Were you named a defendant in any other case,

7    other than those two and this one?

8         A.    Not that I'm recalling offhand, sir.

9         Q.    Now, with respect to Mr. Gonzalez, did you have

10   any specific information before that day, that

11   Mr. Gonzalez had ever shot anyone?

12        A.    Before January 24th, sir, I did not have any

13   knowledge of Mr. Gonzalez, that I recall.

14        Q.    Okay.  Any specific information, for example,

15   that he had ever seriously injured or killed someone?

16        A.    No, sir.

17        Q.    Did you have any specific information that he

18   had ever specifically physically injured anyone?

19        A.    There -- the day of, there was a restraining

20   order that was mentioned, and a hit in relation -- I

21   apologize -- "hit" being layman terms for a match to his

22   name and the ex, Yvette.  I don't recall her name.

23             So there was a domestic violence restraining

24   order that populated when she was ran as a protected

25   party, and he was restrained.

1      Q.   Okay.  I'm just wondering if you had any

2   specific information about the nature of any injury, if

3   any?

4           MS. KORNBLAU:   Objection.  Asked and answered.

5   BY MR. GALIPO:

6      Q.   You may answer.

7      A.   I'm not aware of any specific details of the

8   incident.

9      Q.   Did you have any specific information of any

10  criminal convictions as opposed to arrests?

11     A.   I was told that he was a felon out -- the day

12  of the incident, by Detective Sobaszek.

13     Q.   Do you know specifically what he was convicted

14  of?

15     A.   I do not know that, specifically.  No, sir.

16     Q.   Did you have any information, on the day of the

17  incident, that he -- on that day, in other words, that

18  he had seriously injured anybody on that day?

19     A.   I had no knowledge that he specifically had

20  physically injured anybody that day.

21     Q.   Okay.  Do you have any time estimate as to how

22  long the foot pursuit lasted, before the shots?

23     A.   I don't, sir.  I don't.  I would be guessing,

24  sir.

25     Q.   Okay.  Do you know if it was more or less than

Andrea Reynoso

1  a minute, for example?

2     A.   I -- I could be wrong if I answer that, and I

3  don't want to guess.  I apologize.

4     Q.   That's okay.  If you're not comfortable giving

5  an estimate, that's okay.

6     A.   Yes, sir.

7     Q.   Did you ever hear Mr. Gonzalez verbally

8  threaten to harm any of the officers?

9     A.   Mr. Gonzalez -- the only verbal communication I

10  had with him was during the initial part of the incident

11  where he and I were corresponding, as he was barricaded

12  in the vehicle, sir.  He was making statements that,

13  "You're going to have to kill me," no, he's not leaving.

14  Things of that nature.

15     Q.   Okay.  But you didn't hear him say that he was

16  going kill someone or verbally threaten that he was

17  going to harm an officer, did you?

18     A.   No, I did not specifically hear those things.

19  No, sir.

20     Q.   At some point while he is running away -- we

21  talked about this narrow area -- was that near some

22  parked commercial vehicles?

23     A.   I remember one vehicle that was partially up on

24  that -- it almost was like a ramp.  But that's about it,

25  sir.

Andrew Reynoso

1   Q.   And when you were running through that narrow

2   area, would this vehicle that you recall be to your

3   right?

4   A.   Correct, sir.

5   Q.   As he's running, are you starting to think

6   about "a line in the sand," so to speak, where at some

7   point you're not going to let him get past?

8   A.   That is something that I did say in my summary

9   transcript, that based on the totality of the

10  circumstances, everything that had been presented thus

11  far, his refusal to obey lawful commands, his refusal to

12  peacefully surrender, which those words were

13  specifically given to him, "to peacefully surrender,"

14  him believed to be armed with a firearm.

15      And then, obviously endangering officers, the

16  community, and now an occupied building, yes.  And there

17  were people present.  And when the firearm became

18  visible, we could -- I could not allow him to go into an

19  occupied building and potentially take anybody hostage

20  or cause them great bodily injury or harm.

21  Q.   Were you thinking about a line in the sand

22  before you saw the firearm?

23  A.   I had -- throughout the summary of the

24  transcript, there were a few lines in the sand that were

25  drawn; for instance, at the house.  He was not going to

1    make it back into the house to harm those women and

2    children.  And then through this incident, I don't

3    specifically recall when I drew the line, whether it was

4    moments before or moments after the firearm

5    presentation.

6         But in my mind, he could not make it into that

7    occupied building to take anyone hostage again or cause

8    anyone great bodily injury or harm.

9    Q.    Did you have any information that he had taken

10    anyone hostage before?

11    A.    Actually, sir, it goes into, again, my summary

12    of my transcript.  I believed that there was potentially

13    a kidnapping or false imprisonment crime that had

14    occurred or was occurring, and the build-up on the onset

15    of this incident.

16         So during this time, Deputy Sobaszek had

17    received a phone call from family members who were

18    present at that 40525 Whittier Avenue address, and they

19    had relayed to Deputy Sobaszek, who was now on

20    speakerphone with me.  Again, all of that is laid out in

21    this summary of transcripts -- but had relayed that

22    Mr. Gonzalez was present, and in their words,

23    "strapped," laymen terms for being armed with a firearm.

24         And he appeared agitated and was not allowing

25    the children or the ex, Yvette, to leave the front yard,

1    where he was at.  So I, a hundred percent, believed that

2    there was a false imprisonment or potential kidnapping

3    afoot.

4        Q.    And when you reference this "line in the sand,"

5    are you saying that you're not going to let him get past

6    this line in the sand?  Is that what you're meaning?

7        A.    What I'm saying, sir, is that we have to do

8    everything within our -- our power.  And, again, as law

9    enforcement officers, we always want to use the lowest

10   level of force possible.  That's how we are trained and

11   that's how we should be, to not allow him to harm

12   others.  So it was not a physical line of like, "Hey, if

13   you passes both barrels; it was just a mental thought

14   that we cannot allow him to physically enter a building.

15       Q.    I understand that.  I guess what I'm asking,

16   when you come up with this line in the sand, are you

17   saying, in this case, you're thinking if he gets past

18   that line in the sand, or to it, you would use deadly

19   force to stop him?

20       A.    So I'm saying, sir, that we would utilize every

21   option available, and we are hoping, and I am praying,

22   that it is the least dangerous for everyone involved, to

23   include Mr. Gonzalez.  That's what I'm saying, sir.

24       Q.    And what other options did you feel that you

25   had, other than deadly force, from him crossing that

Andrew Reynoso

1   line in the sand?

2        A.   So initially, sir, upon the onset of this

3   incident, we had -- I requested canine.  As a former

4   canine handler, I know that just the mere presence alone

5   can be a safe de-escalation tool.  We also had

6   less-lethal force options to include a 40-millimeter

7   launcher.

8             There were some people with a Taser that were

9   present during the initial onset.  And then, to include

10  during the foot pursuit, I had a Taser on my side, as

11  well, as a less lethal force option.  But unfortunately,

12  based on Mr. Gonzalez's actions, there was not an

13  opportunity to utilize that, and we had to meet force

14  with force, based on his actions with the firearm.

15       Q.   I guess what I'm asking, if he -- if you were

16  unable to use less lethal, either because the canine

17  wasn't there, or the Taser, it was too far of a

18  distance, and he got past this line in the sand you're

19  referencing, were you then thinking about using deadly

20  force --

21       A.   So, sir, I --

22       Q.   -- to keep him from getting in the building,

23  for example, and taking a potential hostage?

24       A.   Yes, sir.  I understand what you're asking,

25  sir.  And the best way I can answer is, just based on

1    the totality of the circumstances, sir, as I previously

2    stated, he was an imminent threat the second that

3    firearm came out.  So deadly force is a viable option,

4    and unfortunately, determined to be the only option

5    viable later on, based on his actions.

6            But the second he presented that firearm,

7    absolutely, he's an imminent to threat to my partners

8    and I, as well as the other people present.

9        Q.   Because you recall the portion of your

10   statement -- and it sounds like you're pretty familiar

11   with it -- where you say:  "So now I'm drawing a line in

12   the sand.  He's not going to get into that warehouse

13   that's occupied."  And then you continue:  "And I'm

14   thinking, I'm drawing -- I'm deciding that I'm going to

15   start getting ready to draw my firearm out."

16           Do you recall that?

17       A.   Could you reference -- I have a copy of the

18   transcript, sir.  Could you reference where that's at?

19       Q.   Absolutely.  If you look at the bottom of page

20   16 and the top of page 17.  Take a moment just to look,

21   starting at the last two lines of 16, going to the first

22   two lines of 17.

23           (Pause.)

24           THE WITNESS:  Okay.  Yes, sir.  I read that.

25   BY MR. GALIPO:

Andrew Reynoso

 1        Q.    Do you see that section?

 2        A.    Yes, sir.

 3        Q.    And so is that when you were drawing your

 4   firearm out, initially, when you were thinking about

 5   this line in the sand?

 6        A.    So at that moment in time, sir, I began to draw

 7   my firearm, again, based on the totality of the

 8   circumstances, and believing he's armed, based on

 9   everything I had observed and had already previously

10   described at the beginning of this incident, at the

11   onset.

12            I believed he still possessed that firearm.  So

13   I began to draw my firearm as an option that was

14   available, if needed.  Again --

15        Q.    Okay.

16        A.    It wasn't the only decision.  It just was an

17   option that was available.

18        Q.    So I guess what I'm asking, your mind frame,

19   let's say you hadn't seen a firearm and he hadn't

20   turned, just kept running past your line in the sand.

21   You're drawing out your firearm.  Are you thinking that

22   you were going to shoot him, whether you saw a firearm

23   or not?

24            MS. KORNBLAU:  Objection.  Incomplete

25   hypothetical.

```
 1              But go ahead.
 2              THE WITNESS:  Sir, honestly, I don't feel
 3    comfortable answering -- I know what you're getting at.
 4    All I'm going to do is just reference the facts.  The
 5    facts are he did present a firearm.  He did pose an
 6    imminent threat.  And all of that is going on with the
 7    totality of the circumstances of the event, so...
 8    BY MR. GALIPO:
 9         Q.   Okay.  But the reason I'm asking, in your
10     statement you're saying:  "I'm drawing a line in the
11     sand, and I start drawing my firearm."  And it appears
12     that that happened before you saw him with the firearm.
13     Is that fair?
14         A.   I -- I would disagree with that, sir.  All of
15     this is -- again, a tense, uncertain, rapidly-evolving
16     situation.  And although I may have said that in the
17     summary up here, I do have an opportunity to elaborate.
18     All of this is happening simultaneously.  The very next
19     statement is that:  "He has a firearm in his hand,"
20     according to my summary transcript.  So all of this is
21     happening rapidly.
22              THE WITNESS:  I apologize, ma'am, if I'm
23     talking too fast.
24              THE CERTIFIED STENOGRAPHER:  You are a little
25     bit.  Thank you.  Just slow down a little bit.  Thank
```

1   you.

2          THE WITNESS:  Yes, ma'am.

3          THE CERTIFIED STENOGRAPHER:  Thanks.

4   BY MR. GALIPO:

5      Q.   How would you describe the lighting in the area

6   immediately before and at the time of the shooting?

7      A.   It was not a well-lit area, but it was -- I

8   apologize -- well-lit in the -- regards to comparing it

9   to daylight.  But there was plenty of illumination from

10  exterior lighting from the business itself, as well as

11  our -- at the time of the actual shooting itself, our

12  tactical lights on our firearms.

13     Q.   And could you look -- I think you said you do

14  have your statement in front of you?

15     A.   Correct, sir.

16     Q.   Okay.  And it is a word-by-word transcription,

17  as you understand it; is that correct?

18     A.   Yes.  There's a summary of my statement or of

19  the events that took place, and it is word by word.  But

20  obviously, there's a few, like, grammatical things in

21  here that maybe, like, for instance, "DV holster,"

22  that's not what it is.  But, generally speaking, yes,

23  sir, word by word, accurate.

24     Q.   Okay.  And can you look at the bottom of page

25  20, please.

1    A.    Yes, sir.

2    Q.    You see on line 35:  "Master Investigator

3    Alfaro"?

4    A.    Yes, sir.

5    Q.    I haven't heard of a "master investigator"

6    before, but maybe he has a degree that I'm unaware of.

7          But had you met Master Investigator Alfaro

8    before that day?

9    A.    Sir, if you can't tell, I'm not the best with

10   names.  I very well may have, as I had some time in the

11   Detective Bureau, but I don't specifically recall.

12   Q.    If it makes you feel any better, I had a case

13   with Master Investigator Alfaro, so I do remember -- I

14   remember him.

15         But in any event, do you see, on line 35, where

16   he's asking you where you were aiming?  And I'm kind

17   paraphrasing.

18   A.    Yes, sir.

19   Q.    And then the discussion, you're trying to get

20   clarification.  You say:  "The suspect."

21         He says, at line 40:  "At center mass or

22   where?"

23         Do you see that, on line 40, at the bottom of

24   page 20?

25   A.    Yes, sir.

1    Q.   Okay.  And then looking at the top of page 21,

2    you're saying:  "Center mass, towards -- yes, sir, as --

3    as far as -- it end up being -- as he's running, he's

4    kind of running, bladed a little bit to the left, if

5    that makes sense, co I'm aiming center mass on him."

6         Do you see that part of your answer?

7    A.   Yes, sir.

8    Q.   So does that refresh your recollection that

9    when you were firing he was running?

10        MS. KORNBLAU:  Objection.  Vague as to time.

11        Go ahead.

12        THE WITNESS:  Well, sir, you're taking one

13   snippet out of the whole context of that statement.  So

14   he's bladed to the left, which means, as I previously

15   stated in this narrative, that he had already turned into

16   the left, so facing officers with that gun, prior to

17   hearing the gunshot.

18        So all of that in totality, yes.  He's still

19   running; that would be accurate; but the totality is he

20   had to turn to his left, and was looking back at officers

21   while holding a firearm.

22   BY MR. GALIPO:

23   Q.   And when you say:  "He's bladed a little bit to

24   the left," wouldn't you essentially be aiming at his

25   back as you're firing and he's running away?

1          MS. KORNBLAU:  Objection.  Argumentative.

2          But go ahead.

3          THE WITNESS:  No, sir.  As I stated in here, we

4   don't aim at body parts, specifically.  That's not our

5   training.  I'm aiming at center mass, sir.

6   BY MR. GALIPO:

7     Q.   Right.  But if I'm facing you, the center mass

8   would be my chest-abdomen area, for example; correct?

9     A.   It could be.  Yes, sir.

10    Q.   And if I'm -- had my back towards you, for

11  example, the center mass could be my back area?

12    A.   So the way you're describing it, sir, is a

13  stationary static target.  And, again, in a perfect

14  environment, maybe.  But that's not what we had here,

15  sir. We had a live person, running, looking over his

16  shoulder, obviously doing everything that he could to

17  get away.  So he was not a perfect static target.

18          And as previously stated -- I'm sorry, ma'am --

19  he had just turned to his left and faced my partners and

20  I with the gun.  So his center mass is center mass on

21  the body, sir.  That's the best way I can describe it.

22    Q.   But you can't say whether you were shooting at

23  the front of his body or the back of his body?

24          MS. KORNBLAU:  Objection.  Misstates testimony.

25          Go ahead.

Andrew Reynoso

```
 1          THE WITNESS:  As I previously stated, sir, he
 2   had turned towards my partners and I.  And then I heard a
 3   gunshot which I perceived was from him.  At that time, I
 4   decided to pull the trigger.  He was facing towards my
 5   direction and my partners's direction.
 6   BY MR. GALIPO:
 7      Q.   Okay.  So you're saying he was facing towards
 8    you and your partners when you pulled the trigger?
 9      A.   The very first round, yes, sir.
10      Q.   Did you -- and I know you were assessing for
11   each shot.  Did you fire any shots as he was going to
12   the ground?
13      A.   Every time that I discharged my firearm, sir, I
14   was not paying immediate attention to where his body
15   was, upright, leaning, left, right.  I was focused on
16   the imminent threat, which was the firearm in his right
17   hand, and I was focusing on center mass where I was
18   aiming to stop the threat.
19      Q.   So are you saying you may have fired some shots
20    as he was going to the ground; you're not sure?
21          MS. KORNBLAU:  Objection.  Misstates testimony.
22          MR. GARCIA:  Join.
23          THE WITNESS:  So my intent in this, sir, was to
24   stop the threat.  And as I previously stated, as long as
25   he had that firearm in his right hand, he was an imminent
```

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 64

1    threat.  So it was visible to me, so every time I

2    discharged my firearm he was an imminent threat.  And I

3    was focused on the firearm in his right hand and center

4    mass.

5           I was not focused on, specifically, if he was

6    upright, facing left, facing right, leaning forward.

7    BY MR. GALIPO:

8        Q.   I get that.  And I think what you're telling me

9     is you don't know if he was going to the ground during

10    your shots.  Am I understanding you correctly or not?

11           MS. KORNBLAU:  Objection.  Misstates testimony.

12           THE WITNESS:  Sir, unfortunately, I'm just

13    going to have to keep saying the same answer.  Every time

14    I -- I would discharged my firearm, it was after

15    assessing the threat of the gun in the right hand, and

16    then aiming center mass on his person.

17    BY MR. GALIPO:

18        Q.   Okay.  So you're saying you could see the gun

19     in his right hand, in between each shot, when you were

20     assessing?

21        A.   Yes, sir.  It was a rapid series of events that

22     took place, but I visibly could see the firearm in his

23     hand.

24        Q.   Did you fire any shots after he went to the

25     ground?

1    A.   Sir, when I stopped firing my firearm, it was

2   when he no longer posed an imminent threat, and I no

3   longer saw the firearm.  That's when I stopped firing.

4    Q.   Do you think he was an imminent threat of death

5   or serious bodily injury after he went to the ground?

6    A.   Mr. Gonzalez posed an imminent threat of

7   serious bodily injury or death as long as he possessed

8   that firearm.  It doesn't matter what position he was

9   in.  The second the firearm was no longer in his hand,

10   or visible to my partners or I, that's when he no

11   longer, in my opinion, became an imminent threat.

12    Q.   Well, when you approached him after the

13   shooting, he was chest down, wasn't he?

14    A.   He was located on his chest.  Yes, sir.

15    Q.   His head would have been further from you, his

16   feet closer?

17    A.   Correct, sir.

18    Q.   And wasn't the gun near his foot or feet?

19    A.   The gun was located near his leg area.  Yes,

20   sir.

21    Q.   Do you know when he dropped the gun during the

22   shooting sequence?

23    A.   I do not, sir.

24    Q.   Did you ever give any commands to Mr. Gonzalez

25   during the foot pursuit?

Andrew Reynoso

1    A.   During the foot pursuit itself, I did not give

2    verbal commands.  But based on detective Sobaszek and

3    Officer Irick, who were within closer proximity to

4    Mr. Gonzalez, as well as hearing their audible commands

5    already being given, I didn't want to confuse the

6    situation by shouting commands behind them.

7    Q.   And we're going to try to play a portion of

8    your body-worn camera, more towards the end of the foot

9    pursuit.  I may try to play it once, and then I might

10   slow it town or try to ask you some questions.

11        MR. GALIPO:  So, Alejandro, is it possible that

12   we could get a portion of Sergeant Reynoso's body-worn

13   camera up on share screen, and then we'll mark this

14   portion as Exhibit 1.

15        (Exhibit Number 1 was marked.)

16        MR. GALIPO:  And then I ask, of course, that

17   you send it to Kimberly and defense counsel, so they have

18   it.

19        Okay.  Let's stop for a moment.  I'm getting my

20   glasses because my eyes are getting worse and worse.

21   BY MR. GALIPO:

22   Q.   Can you see that, first of all, on your screen,

23   Sergeant?

24   A.   Yes, sir.

25   Q.   Okay.  It looks like the time that I could

1    see -- it looks like the date is 1/24/2024, and the

2    time, I think, is 20:04:08.

3              Is that what it appears to be for you?

4        A.    That's what it shows on the screen, sir.  I

5    don't know if that's a hundred percent accurate.

6        Q.    Okay.  But just looking at this still, can you

7    tell that this looks like it's most likely your

8    body-worn camera, because we see a couple of the other

9    officers ahead of you?

10       A.    I can't tell with a hundred percent certainty,

11   but it appears it could be, yes, sir.

12             MR. GALIPO:  Okay.  And I think -- is that

13   28:02 on the bottom?  I think so.

14             Okay.  Let's play it from here.  We'll play it

15   through, and then I'll tell you when to stop it, and

16   then we might go back.

17             (Video being played.)

18             MR. GALIPO:  We can stop.  Okay.

19   BY MR. GALIPO:

20       Q.    Were you able to see that and hear that on your

21   screen?

22       A.    Yes, sir.

23       Q.    And we stopped it at 20:04:53, which I think is

24   maybe 28:47.

25             These two officers that we see here, do you

1    recognize who is who?

2        A.   Yes, sir.

3        Q.   Can you please tell me who's on the left and

4    who's on the right as we look at this?

5        A.   So Detective Sobaszek is on the far right, and

6    closer to the center is Officer Sean Irick.

7             MR. GALIPO:   Okay.   Now, let's play it again.

8    And I'm going ask Alejandro to stop it a few times and

9    just ask you a few clarifying questions.   And I'll note

10   for the record where we stop it.

11           (Video being placed.)

12           MR. GALIPO:   Okay.   Let's stop.   We stopped it

13   at about 20:04:19.

14   BY MR. GALIPO:

15       Q.   Was that, like, the first right turn that you

16   referenced earlier?

17       A.   Yes, sir.

18       Q.   And I think you already told me, before the

19   first right turn, you had not seen the firearm in

20   Mr. Gonzalez's hand during the foot pursuit; is that

21   fair?

22       A.   Yes, sir.   I did not observe a firearm in his

23   hand.

24       Q.   Okay.   And then you go through this part we're

25   looking at.   And then there's going to be another right

Andrew Reynoso

```
 1    turn; is that correct?
 2         A.    Correct, sir.
 3              MR. GALIPO:  Okay.  Let's continue, please,
 4    Alejandro.
 5              (Video being played.)
 6              MR. GALIPO:  And stop it again.  And we stopped
 7    it at 20:04:27.
 8    BY MR. GALIPO:
 9         Q.    Was that the second right turn that we just
10    saw, Sergeant?
11         A.    Yes, sir.
12         Q.    Okay.  And then this -- is it now going west,
13    if you know?  Well, you're not sure.
14         A.    I don't recall, sir, if it's east -- east or
15    west.  But we started off opposite direction, and then
16    we made a right-hand turn.  And now we're going the
17    opposite direction again.
18         Q.    Okay.  So it starts out wide, but as we keep
19    going, that's when we get to the narrow part; is that
20    correct?
21         A.    Yes, sir.
22              MR. GALIPO:  Okay.  Let's continue.
23              (Video being played.)
24              MR. GALIPO:  And stop it, if we can.  So we
25    stopped it at 20:04:41.
```

```
 1   BY MR. GALIPO:

 2        Q.   Now, we can see this is the narrow area we were

 3   talking about earlier; is that correct?

 4        A.   Yes, sir.

 5        Q.   And I think you had described that the truck or

 6   trucks to your right.  We can see what appears to be a

 7   truck to the right here?

 8        A.   Correct, sir.

 9             MR. GALIPO:  And we stopped it at 20:04:41.

10             Okay.  Please continue.

11             (Video being played.)

12             MR. GALIPO:  Stop right there.

13             Okay.  We stopped it at 20:04:47.

14   BY MR. GALIPO:

15        Q.   And we can see your hands are up now in a

16   shooting position.  Would you agree?

17        A.   Yes, sir.

18        Q.   By looking at this, could you tell if

19   Mr. Gonzalez is upright, going to the ground, or on the

20   ground?

21        A.   From -- no, sir.  From this pause, I can't tell

22   what he's doing.

23             MR. GALIPO:  Okay.  Could we back it up

24   slightly, Alejandro, and see if we can go in a slower

25   mode?  Just back it up a little bit, if we can.
```

1          Okay.  That's good.  20:04:30.  Let's go ahead

2     and play it, and I'll let you know when I'd like you to

3     stop.

4               (Video being played.)

5               MR. GALIPO:  Stop.

6     BY MR. GALIPO:

7          Q.   Okay.  This is where you start firing.  And

8     again, we stopped at 20:04:47.  Do you see that?

9          A.   I see the pause with my hands up.  Yes, sir.

10         Q.   Okay.

11              MR. GALIPO:  Are we able, Alejandro, to go

12    frame by frame at this point?

13              (Video is being played frame by frame.)

14              MR. GALIPO:  Let's stop.

15    BY MR. GALIPO:

16         Q.   Can you at least see that Mr. Gonzalez is on

17    the ground at this point?

18         A.   On this particular still frame, sir, to be

19    honest, it's kind of blurry.  I can't tell specifically

20    if that's him on the ground or going to the ground.

21              MR. GALIPO:  Okay.  Let's go to the next frame,

22    if we can.

23              (Next frame.)

24              MR. GALIPO:  And the next.

25              (Next frame.)

```
 1  BY MR. GALIPO:

 2       Q.   Are you able to tell now?

 3            MR. GALIPO:  Stop it.

 4            THE WITNESS:  In this particular frame where

 5   you have it paused, sir, again, which isn't the context

 6   of the actual events, which was real speed, real life,

 7   it appears maybe he's going down, but he's not down all

 8   the way on the ground on that.

 9            MR. GALIPO:  Okay.  Continue, Alejandro.

10            (Video being played.)

11  BY MR. GALIPO:

12       Q.   Are you able to tell your shots when you see

13   something, as you're watching this?

14            MS. KORNBLAU:  Objection.  Vague.

15            THE WITNESS:  No, sir, I'm not.  I do have a

16  weapon's light that has an attached pressure mat, but

17  that has do with my grip, not a pulling of the trigger;

18  so I'm not able to tell on these frame by frames if I'm

19  firing or not.

20            MR. GALIPO:  Okay.  Let's go further a little

21  bit more, Alejandro.

22            (Video being played.)

23            MR. GALIPO:  We can stop, at 20:04:49.

24            And if we can just -- one last time, we could

25  go back to regular speed on this.  We'll play the last
```

1  portion of the -- of the shooting.

2          Yeah, that's fine.  You can play it from there,

3  20:04:38.

4          (Video being played.)

5          MR. GALIPO:  Let's stop right there.

6  BY MR. GALIPO:

7      Q.   Whose voice was that that said, "Shots fired.

8   Three shooters"?

9      A.   That was my voice, sir.

10     Q.   And what three shooters were you referring to?

11     A.   The officers involved.

12     Q.   And yourself?

13     A.   Yes, sir.  All officers.  I'm an officer.  Yes,

14  sir.  All officers involved.

15          MR. GALIPO:  Okay.  We stopped it at 20:05:05.

16          Please continue.

17          (Video being played.)

18          MR. GALIPO:  We can stop it.

19          Thank you.  You can take that down, Alejandro.

20  BY MR. GALIPO:

21     Q.   Were you able to observe any wounds or gunshots

22  to Mr. Gonzalez after the shooting?

23     A.    I did observe blood, sir, on his left side of

24  his body, up towards his armpit and arm area, but I

25  didn't specifically see a gunshot wound itself.

```
 1              MR. GALIPO:  Okay.  Last, I'm going to show you
 2    Exhibit 2.
 3              (Exhibit Number 2 was marked.)
 4              MR. GALIPO:  And we'll mark it for
 5    identification.  I think this is, if I have it right,
 6    Sobaszek's body-worn camera.
 7              And see if we can play that, Alejandro, again,
 8    closer to the foot pursuit, immediately before the
 9    shooting.
10              And we're starting at 20:04:09 on this
11    body-worn camera.
12              (Video being played.)
13              MR. GALIPO:  Okay.  Let's stop.
14    BY MR. GALIPO:
15        Q.   Again, the voice we hear, "Shots fired.  Shots
16    fired.  Three shooters."  That would be yourself?
17        A.   Correct, sir.
18        Q.   And obviously, you were aware at that time that
19    the other officers had also fired; correct?
20        A.   At -- at the termination of the shooting, yes,
21    sir, I was -- I was immediately aware that they had
22    fired.
23              MR. GALIPO:  Okay.  And we stopped it at
24    20:05:02.
25              Is it possible to replay that portion in slow
```

 1   motion?  And I'll tell you when -- when to stop.  First,

 2   we might just play it through.  Yeah.

 3           This is Exhibit 2, starting at 20:04:15, in

 4   slow motion, half speed, I think.

 5           (Video being played.)

 6           MR. GALIPO:  Stop.  Okay.

 7           We stopped it at 20:04:42.

 8   BY MR. GALIPO:

 9       Q.   You see your hands look like they're kind of --

10    oh, strike that.  This would be Sobaszek's hands;

11    correct?

12       A.   Correct, sir.

13       Q.   Sorry.

14           MR. GALIPO:  Go forward a little bit.

15           (Video being played.)

16           MR. GALIPO:  Stop.

17           Okay.  I stopped it at 20:04:46.

18   BY MR. GALIPO:

19       Q.   Can we see -- can you at least see Mr. Gonzalez

20    in this view?

21       A.    In this still photograph, I can see

22    Mr. Gonzalez, yes.

23       Q.   Would you agree we're generally looking at the

24    back side of his body?

25       A.    Mr. Gonzalez is in active motion, fleeing from

1    officers, so I don't -- obviously, because this is

2    paused, it's not giving an accurate depiction of what

3    angles are a hundred percent seen; but, in general, you

4    see some of his back, yes.

5        Q.   Okay.  And do you know -- can you tell from

6    looking at this still, paused at 20:04:46, whether the

7    shots had started yet or not?

8        A.   I can't tell.  This isn't a live video, sir, or

9    what had happened in real events.  So this is just a

10   frozen video, so I don't know if the shots began or not

11   right now.

12       Q.   Okay.

13           MR. GALIPO:  Are we able to go -- okay.  Let's

14   continue to play it in slow motion.

15           (Video being played.)

16           MR. GALIPO:  We stopped it at 20:04:51.

17   BY MR. GALIPO:

18       Q.   Did you notice, in watching this, that there

19   were shots fired both as he was going to the ground and

20   on the ground?

21       A.   I didn't specifically see that he was on ground

22   there, but I did observe rounds being fired as he was

23   progressing towards the floor.

24           MR. GALIPO:  Let's just show it to the sergeant

25   one more time, that last portion.

 1              I don't know if it's possible to go a few

 2      seconds back or not.  That's good.  Go ahead and play.

 3              We stopped it at 20:04:42.

 4              (Video being played.)

 5              MR. GALIPO:  And stop it.  20:04:51.

 6      BY MR. GALIPO:

 7          Q.  That time, were you able to see that multiple

 8      shots were fired after he went to the ground?

 9              MS. KORNBLAU:  Objection.  Calls for

10      speculation.

11              MR. GARCIA:  Join.

12              THE WITNESS:  So there's a lot going on.

13      Obviously, could it be gunshots as he's on the ground?

14      Yes, sir.  But it also could be a number of other things.

15              But I also want to point out that you can't see

16      a firearm yet right there.  So, again, firearms mean an

17      imminent threat.

18      BY MR. GALIPO:

19          Q.  Right.  I mean, you would agree, as we're

20      watching this shooting sequence from Sobaszek's video,

21      during the shots, we don't see a firearm in the

22      body-worn camera.  Is that fair?

23              MS. KORNBLAU:  Objection.  Calls for

24      speculation.

25              MR. GARCIA:  Join.

 1            THE WITNESS:  That's not what I said, sir.  I'm

 2    saying in this particular freeze frame where you have it

 3    paused right here, I'm not able to determine if there's a

 4    firearm.  It didn't appear that there is, in my

 5    perception, on this still footage.  That's all I'm

 6    saying, sir.

 7            MR. GALIPO:  So let's just go back a little bit

 8    then, if we can, Alejandro.

 9            Okay.  That's fine.  20:04:49.  You went back

10    further.

11            That's fine, too.  20:04:36.  Go ahead and

12    play.

13            (Video being played.)

14            MR. GALIPO:  Okay.  That's good.  We stopped it

15    at 20:04:58.

16    BY MR. GALIPO:

17       Q.   You can hear the shots; would you agree?

18            MS. KORNBLAU:  Objection.  Calls for

19    speculation.

20            THE WITNESS:  There's definitely loud sounds

21    that could be consistent with a firearm.  It could be

22    other things, sir.

23            But I do want to note that if you play that

24    video again, you can actually see, after officers have

25    stopped shooting, that that firearm is thrown out after

Andrew Reynoso

1   officers have stopped shooting.

2           So if you can show that video, again, you can

3   see that.  So, again, the firearm on his person in his

4   immediate hand.  That's the imminent threat, sir.  This

5   is not my view.  This is Detective Sobaszek's.  I had a

6   different perspective, a different view, but I'm just

7   saying that he still posed an imminent threat.

8   BY MR. GALIPO:

9       Q.   You said that there could be other -- they

10   could be gunshots or some other sound.  What other sound

11   did you have in mind?

12          MS. KORNBLAU:  Objection.  Calls for

13   speculation.

14          Go ahead.

15          THE WITNESS:  It's a commercial building, sir.

16   There's all kinds of things going on.  I've been around

17   plenty of commercial buildings.

18          (Reporter clarification.)

19          THE WITNESS:  I've been around plenty of

20   commercial environments, and there have been things,

21   noises from whether forklifts or backfire of cars, things

22   that sound like gunfire.

23          So, yes, there were shots fired here, but I

24   can't tell you specifically at the end of this video that

25   every one of those was a gunshot.  I don't know.

Andrew Reynoso

```
1              MR. GALIPO:  Okay.  We can take it down.
2         Thank you, Alejandro.
3    BY MR. GALIPO:
4         Q.   And lastly -- and we spoke about this to some
5    extent already.  We talked about the standard and the
6    training that applies to the use of deadly force.
7    Remember us talking about the imminent threat of death,
8    or serious bodily injury, and the opportunity, ability,
9    and intent to immediately cause death or serious bodily
10   injury as a standard?  Do you recall that?
11        A.   I recall it, sir.
12        Q.   Okay.  And your training, with respect to the
13   use of the deadly force, is also that you should
14   consider your backdrop; is that fair?
15        A.   Absolutely, sir.
16        Q.   And that you are responsible to justify every
17   shot?  Is that also accurate?
18        A.   Yes, sir.
19        Q.   And that you should assess, if you can, both
20   before and during the shooting sequence?
21        A.   You should be constantly assessing, yes, sir.
22        Q.   And part of the reason for the importance of
23   the assessment is to determine whether additional shots
24   are necessary?
25        A.   The assessment is for the totality of the
```

Andrew Amoroso

```
 1    circumstances, yes:  Is the threat still present, and
 2    has your backdrop changed?  And there's other variables
 3    that may come into play.
 4         Q.   And part of the training is to give a verbal
 5    warning that you're going to use deadly force when
 6    feasible; correct?
 7         A.   Correct, sir.  "When feasible" being the key
 8    terminology.
 9         Q.   How was it determined that you fired six shots,
10    if you know?
11         A.   I had done a tactical check of my magazines,
12    sir, so I was able to determine that I fired six rounds.
13         Q.   You did the check yourself?
14         A.   I did the check, sir.  In addition, there was a
15    charting.  I apologize.  That's the terminology.  After
16    any officer-involved or deputy-involved shooting,
17    there's a charting that takes place.
18         Q.   Okay.  Can you explain to me how you did the
19    check?
20         A.   I don't recall specifically when, sir, the
21    time, but it was post the officer-involved shooting.
22    And prior to being charted, I checked my magazines, and
23    my -- as far as the round count.
24         Q.   And how many rounds were left?
25         A.   Well, from 17, plus one, that would be 18
```

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 82

1    rounds in there, sir.  So if I fired six, I had 13

2    rounds left.

3        Q.   Actually, that would be 12 rounds.

4        A.   12 rounds.  I'm sorry.

5        Q.   Correct.

6        A.   Oh, man.  I feel embarrassed.  Yes.

7        Q.   Okay.  And do you know, was that documented

8    somewhere, like a photograph of the rounds that were

9    left; or is that just something you observed yourself?

10       A.   It's documented in my summary of events, but

11   there should -- I don't recall specifically -- or I

12   don't know specifically if there is photographs.  I know

13   that I was photographed.  I just don't know any further

14   where those photographs went.

15            MR. GALIPO:  Okay.  All right.  I think that's

16   all the questions I have.  I just don't know whether

17   counsel has any questions today, so I'll turn it over to

18   them.

19            MS. KORNBLAU:  Yes.  Andrea Kornblau.  I have

20   just a few follow-up questions for the witness.

21                      EXAMINATION

22   BY MS. KORNBLAU:

23       Q.   Sergeant, earlier, Counsel showed you your

24   body-worn camera video footage, which was marked here as

25   Exhibit 1.  Do you recall watching that video footage?

1          A.    Yes, ma'am.

2          Q.    And earlier, you testified that you saw

3     Mr. Gonzalez turn around with the firearm in his hand,

4     and then you heard a loud noise, a pop, which you

5     believed was a gunshot going off; is that correct?

6                MR. GALIPO:  Objection.  Leading.

7                THE WITNESS:  Yes; a gunshot, specifically from

8     Mr. Gonzalez.

9     BY MS. KORNBLAU:

10         Q.    And after that point, you reported that shots

11    had been fired.  Do you recall reporting that?

12         A.    Yes.

13         Q.    How many shooters did you report had discharged

14    firearms?

15         A.    I had stated three shooters.  But specifically,

16    the reason why I stated three shooters on the radio was

17    for how many officers/deputies were involved, not in

18    regards to the suspect.  Whenever -- in my training and

19    experience, when we say "shots fired," it's how many

20    involved shooters of law enforcement.  That's

21    specifically why I said that number.

22               MS. KORNBLAU:  Okay.  Thank you for clarifying

23    that.  That's all I have.

24               MR. GARCIA:  I don't have any questions on my

25    end.

Andrew Reynoso

1             MR. GALIPO:  Okay, Mario.  Then I think we're

2  all done.

3             THE CERTIFIED STENOGRAPHER:  Ms. Kornblau, are

4  you ordering a copy?

5             MS. KORNBLAU:  Yes, please.

6             THE CERTIFIED STENOGRAPHER:  Okay.

7             And, Mr. Garcia, are you ordering a copy?

8             MR. GARCIA:  Yes.  I'd like a certified copy,

9  and also a synch -- A video as well, please.

10            THE VIDEOGRAPHER:  Going off the record at

11  12:20 p.m.

12           (12:20 p.m., deposition concluded.)

13                 --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF CALIFORNIA)
                        ) ss:
 2   COUNTY OF BUTTE    )

 3
             I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5           That the witness named in the foregoing

 6   deposition was present remotely and duly sworn to testify

 7   to the truth in the within-entitled action on the day and

 8   date and at the time and place therein specified;

 9           That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12           That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15           Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19           That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21           IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 29th day of August, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```

ERRATA SHEET

PAGE/LINE                CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

```
 1                  DECLARATION OF DEPONENT

 2

 3         I,  _____, say I have read the

 4   foregoing deposition and declare under penalty of perjury

 5   under the laws of the State of California and all federal

 6   laws that my answers as indicated are true and correct.

 7

 8         Dated this _____ day of _____, 2025, at

 9   _____, California.

10

11                         _____

12                         ANDREW REYNOSO

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## WORD INDEX

**< 1 >**
**1**  3:*9*  67:*14, 15*
83:*25*
**1/24/2024**  68:*1*
**10:04**  4:*4, 10*
**10:16**  12:*11*
**10:18**  12:*23*
**11:08**  49:*3*
**11:24**  49:*6*
**1-10**  1:*9*
**11372**  1:*23*  86:*24*
**12**  83:*3, 4*
**12:20**  85:*11, 12*
**13**  83:*1*
**14**  1:*18*
**14th**  4:*3, 10*
**15th**  2:*9*
**16**  57:*20, 21*
**17**  7:*9*  57:*20, 22*
82:*25*
**18**  82:*25*
**18115**  1:*24*

**< 2 >**
**2**  3:*9*  25:*14*  75:*2, 3*
76:*3*
**20**  6:*12*  8:*3, 10*
23:*19*  24:*7, 13, 18*
60:*25*  61:*24*
**20:04:08**  68:*2*
**20:04:09**  75:*10*
**20:04:15**  76:*3*
**20:04:19**  69:*13*
**20:04:27**  70:*7*
**20:04:30**  72:*1*
**20:04:36**  79:*11*
**20:04:38**  74:*3*
**20:04:41**  70:*25*  71:*9*
**20:04:42**  76:*7*  78:*3*
**20:04:46**  76:*17*  77:*6*
**20:04:47**  71:*13*  72:*8*
**20:04:49**  73:*23*  79:*9*
**20:04:51**  77:*16*  78:*5*
**20:04:53**  68:*23*
**20:04:58**  79:*15*
**20:05:02**  75:*24*
**20:05:05**  74:*15*

**2014**  35:*7*
**2016**  35:*3*  38:*24*
**2017**  35:*3*  36:*6*
37:*14*
**2018**  37:*13*  38:*23, 24*
39:*6, 10, 18*
**2022**  39:*4, 5*
**2023**  39:*5*
**2024**  6:*23*
**2025**  1:*18*  4:*3, 10*
86:*22*  88:*8*
**21**  62:*1*
**213.624.6900**  2:*10*
**21800**  2:*4*
**24th**  6:*21*  22:*14*
50:*12*
**25**  8:*3, 10*  34:*11*
**2550**  2:*15*
**27**  47:*19*
**28:02**  68:*13*
**28:47**  68:*24*
**29th**  86:*22*

**< 3 >**
**3**  8:*16*  25:*14*
**310**  2:*4*
**312120**  2:*15*
**35**  61:*2, 15*

**< 4 >**
**40**  61:*21, 23*
**40525**  22:*16*  54:*18*
**40-millimeter**  56:*6*
**45-degree**  13:*23*

**< 5 >**
**5:25-cv-00331-KK-
DTB**  1:*7*  4:*13*
**5090**  2:*15*
**559.705.2312**  2:*16*

**< 6 >**
**60**  8:*8*

**< 7 >**
**7**  19:*12*
**75**  8:*8*

**< 8 >**

**801**  2:*9*
**818.347.3333**  2:*5*
**835(a**  33:*8*

**< 9 >**
**90017**  2:*9*
**90-degree**  42:*11*
43:*5, 17, 20*  44:*1, 2*
45:*2*
**90-degrees**  42:*7*
**91367**  2:*4*
**93721-2271**  2:*16*
**9-millimeter**  7:*10*

**< A >**
**a.m**  4:*4, 10*  12:*11, 23*
49:*3, 6*
**ability**  33:*3, 10*
44:*11*  48:*17*  81:*8*
**able**  10:*15*  14:*8*
15:*18*  24:*19*  68:*20*
72:*11*  73:*2, 12, 18*
74:*21*  77:*13*  78:*7*
79:*3*  82:*12*
**absolutely**  28:*3*
32:*12, 20*  46:*19*
47:*18*  57:*7, 19*  81:*15*
**accurate**  60:*23*
62:*19*  68:*5*  77:*2*
81:*17*
**Acosta**  38:*2*  49:*23*
**ACTING**  2:*12*  26:*6*
**action**  86:*7, 20*
**actions**  26:*20*  56:*12,
14*  57:*5*
**active**  76:*25*
**actual**  23:*20*  60:*11*
73:*6*
**addition**  49:*24*  82:*14*
**additional**  81:*23*
**address**  24:*3*  54:*18*
**administered**  5:*2*
**afoot**  55:*3*
**aforementioned**  32:*21*
**agitated**  54:*24*
**agree**  33:*15, 18*
71:*16*  76:*23*  78:*19*
79:*17*
**agreed**  41:*8*

**ahead**  12:*21*  14:*6, 24*
19:*19*  33:*21*  41:*19*
46:*14*  48:*5*  59:*1*
62:*11*  63:*2, 25*  68:*9*
72:*1*  78:*2*  79:*11*
80:*14*
**aim**  63:*4*
**aiming**  18:*24*  61:*16*
62:*5, 24*  63:*5*  64:*18*
65:*16*
**al**  4:*13*
**Alejandro**  2:*19*
67:*11*  69:*8*  70:*4*
71:*24*  72:*11*  73:*9, 21*
74:*19*  75:*7*  79:*8*
81:*2*
**Alfaro**  61:*3, 7, 13*
**allow**  53:*18*  55:*11, 14*
**allowing**  54:*24*
**ANDREA**  2:*8*  4:*22*
83:*19*
**andrea.kornblau@ma
nningkass.com**  2:*10*
**ANDREW**  1:*9, 17*
2:*7*  3:*2*  4:*4, 11*  5:*9*
88:*12*
**A-N-D-R-E-W**  5:*9*
**Angeles**  2:*9*
**angle**  13:*23*  30:*10*
**angles**  77:*3*
**answer**  12:*14*  14:*1*
16:*9*  17:*21*  18:*12*
21:*5*  46:*2, 15*  51:*6*
52:*2*  56:*25*  62:*6*
65:*13*
**answered**  18:*9*  27:*15*
30:*13, 16*  48:*4*  51:*4*
**answering**  59:*3*
**answers**  88:*6*
**Anybody**  20:*13*
21:*20*  51:*18, 20*
53:*19*
**apologize**  9:*2*  15:*9*
22:*21*  36:*19*  39:*5*
40:*16*  43:*8*  48:*6*
50:*21*  52:*3*  59:*22*
60:*8*  82:*15*
**apparent**  33:*3, 11*
44:*11*

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 1

**appear** 24:*12* 79:*4*
**APPEARANCES** 2:*1*
**appeared** 4:*4* 54:*24*
**appears** 59:*11* 68:*3*,
*11* 71:*6* 73:*7*
**application** 33:*4*
**applies** 81:*6*
**approached** 24:*1*
66:*12*
**appropriate** 27:*24*
32:*5, 17* 44:*3* 45:*24*
46:*4, 7* 47:*8, 24*
**approximate** 24:*7*
25:*16*
**Approximately** 5:*16*
8:*3, 8, 16* 13:*23*
19:*12* 23:*15* 25:*4*
34:*10, 11* 35:*1, 3, 4*
36:*6* 37:*13* 38:*22, 25*
43:*12* 47:*20*
**area** 22:*5, 10* 30:*22*
45:*3, 6, 10, 13, 18, 19,
25* 52:*21* 53:*2* 60:*5,
7* 63:*8, 11* 66:*19*
71:*2* 74:*24*
**Argumentative** 63:*1*
**arm** 74:*24*
**armed** 17:*7* 27:*11,
17* 30:*20* 32:*9* 47:*13*
53:*14* 54:*23* 58:*8*
**armpit** 74:*24*
**arrests** 51:*10*
**arrival** 23:*23*
**arriving** 23:*18*
**articulate** 42:*8*
**articulated** 44:*21*
**Asked** 18:*9* 27:*15*
30:*16* 48:*4* 51:*4*
**asking** 13:*4* 16:*5, 24*
17:*3, 15* 18:*6* 55:*15*
56:*15, 24* 58:*18* 59:*9*
61:*16*
**assess** 10:*15* 81:*19*
**assessed** 14:*14*
**assessing** 17:*13, 17*
64:*10* 65:*15, 20*
81:*21*
**assessment** 81:*23, 25*
**assigned** 35:*8, 9*

**assignment** 5:*17, 19*
**assisting** 29:*22*
**attached** 73:*16*
**attention** 18:*20* 64:*14*
**ATTORNEY** 2:*12,
14* 38:*9*
**audible** 17:*22* 67:*4*
**AUGUST** 1:*18* 4:*3,
10* 86:*22*
**author** 5:*25*
**available** 28:*5* 55:*21*
58:*14, 17*
**Avenue** 22:*16* 54:*18*
**aware** 41:*13, 14, 20*
51:*7* 75:*18, 21*
**Ayes** 48:*24*

**< B >**
**back** 8:*24* 9:*8, 23*
11:*9* 12:*22* 15:*13*
22:*10* 28:*16, 19*
29:*16* 31:*2* 40:*11*
41:*25* 42:*23* 46:*6, 10,
18* 47:*1* 49:*5* 54:*1*
62:*20, 25* 63:*10, 11,
23* 68:*16* 71:*23, 25*
73:*25* 76:*24* 77:*4*
78:*2* 79:*7, 9*
**backdrop** 21:*24*
22:*1, 3* 28:*9* 81:*14*
82:*2*
**backfire** 80:*21*
**background** 25:*25*
**backseat** 29:*4*
**backyard** 41:*4, 5, 22*
**bail** 32:*2*
**Bar** 2:*15*
**barrels** 55:*13*
**barricaded** 52:*11*
**based** 13:*8* 18:*23*
25:*17* 26:*5, 7* 28:*4*
30:*10* 32:*9, 18, 20, 24*
33:*2, 6, 15* 34:*2* 44:*2,
4* 45:*23* 46:*1, 11*
47:*9, 23* 48:*10* 53:*9*
56:*12, 14, 25* 57:*5*
58:*7, 8* 67:*2*
**beating** 17:*6*
**Beaumont** 43:*8*

**began** 15:*14* 58:*6, 13*
77:*10*
**beginning** 37:*13*
58:*10*
**behalf** 4:*22, 24*
**behavior** 26:*23*
**believe** 27:*11* 33:*24*
36:*18* 38:*19, 22* 47:*7*
**believed** 9:*3* 26:*25*
28:*3, 13, 22* 29:*2, 5*
30:*19* 32:*20* 42:*24*
43:*21* 53:*14* 54:*12*
55:*1* 58:*12* 84:*5*
**believing** 32:*8* 58:*8*
**bell** 49:*15*
**best** 10:*3* 17:*20*
56:*25* 61:*9* 63:*21*
**better** 61:*12*
**bit** 8:*6* 13:*3* 59:*25*
62:*4, 23* 71:*25* 73:*21*
76:*14* 79:*7*
**black** 22:*22, 23, 25*
23:*4* 26:*9, 15, 17*
**bladed** 62:*4, 14, 23*
**blood** 74:*23*
**blurry** 72:*19*
**bodily** 32:*25* 33:*9,
12* 44:*8* 48:*16* 53:*20*
54:*8* 66:*5, 7* 81:*8, 9*
**body** 9:*22* 10:*23*
13:*19* 14:*20* 18:*21*
63:*4, 21, 23* 64:*14*
74:*24* 76:*24*
**body-worn** 3:*9* 20:*8,
10, 16* 26:*21* 29:*25*
30:*2, 5, 12* 67:*8, 12*
68:*8* 75:*6, 11* 78:*22*
83:*24*
**bottom** 57:*19* 60:*24*
61:*23* 68:*13*
**Boulevard** 2:*4*
**break** 48:*22* 49:*4*
**building** 47:*18* 53:*16,
19* 54:*7* 55:*14* 56:*22*
80:*15*
**buildings** 80:*17*
**build-up** 54:*14*
**Burbank** 2:*4*
**Bureau** 61:*11*

**business** 47:*15* 60:*10*
**BUTTE** 86:*2*

**< C >**
**CA** 2:*16*
**CALIFORNIA** 1:*2, 8*
2:*4, 9, 10, 12* 4:*5, 7,
13, 25* 86:*1* 88:*5, 9*
**call** 54:*17*
**Calls** 19:*15* 78:*9, 23*
79:*18* 80:*12*
**camera** 20:*8, 10, 16*
26:*21* 29:*25* 30:*2, 5,
12* 67:*8, 13* 68:*8*
75:*6, 11* 78:*22* 83:*24*
**camera...........................
..........75** 3:*11*
**camera...........................
67** 3:*9*
**canine** 35:*9, 20*
36:*13* 37:*22* 49:*24*
56:*3, 4, 16*
**capacity** 34:*4*
**car** 23:*16* 29:*13, 21*
30:*7* 31:*11* 32:*6, 19*
42:*23* 47:*13*
**cars** 80:*21*
**Case** 1:*7* 4:*13* 7:*1*
8:*12* 38:*4, 7, 15, 17*
40:*24* 41:*1, 12, 25*
49:*18, 21, 23, 25* 50:*4,
6* 55:*17* 61:*12* 86:*16*
**cause** 33:*11* 53:*20*
54:*7* 81:*9*
**center** 18:*24* 23:*7*
61:*21* 62:*2, 5* 63:*5, 7,
11, 20* 64:*17* 65:*3, 16*
69:*6*
**CENTRAL** 1:*2*
**certain** 6:*10*
**certainty** 68:*10*
**Certified** 4:*6* 5:*3*
59:*24* 60:*3* 85:*3, 6, 8*
86:*19*
**certify** 86:*2*
**CHANGE** 87:*2*
**changed** 82:*2*
**charted** 82:*22*
**charting** 82:*15, 17*
**chasing** 19:*14, 22*

**check** 82:*11, 13, 14, 19*

**checked** 82:22

**chest** 66:*13, 14*

**chest-abdomen** 63:*8*

**children** 28:*6, 10* 47:*12* 54:*2, 25*

**chose** 28:*4*

**CHP** 5:*1*

**circumstances** 13:*8* 25:*20* 26:*6* 28:*5* 32:*10* 45:*1* 47:*10, 25* 53:*10* 57:*1* 58:*8* 59:*7* 82:*1*

**CITY** 1:*8* 2:*5* 5:*12, 14* 6:*15* 43:*7*

**clarification** 33:*25* 41:*10* 61:*20* 80:*18*

**clarify** 26:*16*

**clarifying** 69:*9* 84:*22*

**clear** 12:*25* 24:*5* 28:*17* 31:*13*

**close** 23:*5, 7*

**closer** 19:*4, 7* 21:*14* 66:*16* 67:*3* 69:*6* 75:*8*

**Code** 33:*8*

**combined** 4:*25*

**come** 6:*11* 31:*15* 55:*16* 82:*3*

**comes** 40:*21*

**comfortable** 21:*4, 5* 52:*4* 59:*3*

**commands** 21:*9, 10, 15, 16* 53:*11* 66:*24* 67:*2, 4, 6*

**commencing** 4:*3*

**commercial** 52:*22* 80:*15, 17, 20*

**communication** 52:*9*

**community** 53:*16*

**comparing** 60:*8*

**compartment** 29:*4*

**compass** 9:*20*

**complete** 12:*14*

**completion** 86:*17*

**Compound** 16:*7* 17:*18* 18:*10*

**computer-aided** 86:*11*

**concerned** 28:*9*

**concluded** 85:*12*

**conference** 4:*15*

**confuse** 67:*5*

**consider** 81:*14*

**considered** 9:*13*

**consistent** 6:*6* 79:*21*

**constantly** 81:*21*

**constitutes** 86:*12*

**context** 25:*19* 34:*1, 4* 62:*13* 73:*5*

**continue** 57:*13* 70:*3, 22* 71:*10* 73:*9* 74:*16* 77:*14*

**continued** 9:*5* 15:*15* 17:*24* 29:*16*

**continuing** 9:*5, 7*

**convicted** 51:*13*

**convictions** 51:*10*

**copy** 57:*17* 85:*4, 7, 8*

**corners** 42:*1*

**Correct** 7:*15, 21* 9:*18* 10:*22* 13:*12* 14:*18* 16:*6* 17:*1, 13* 19:*5* 28:*23* 30:*23* 31:*1* 34:*13* 37:*3* 38:*25* 40:*7* 44:*7* 48:*18* 50:*1* 53:*4* 60:*15, 17* 63:*8* 66:*17* 70:*1, 2, 20* 71:*3, 8* 75:*17, 19* 76:*11, 12* 82:*6, 7* 83:*5* 84:*5* 86:*13* 88:*6*

**corrected** 26:*17*

**correction** 26:*10*

**correctly** 48:*2* 65:*10*

**corresponding** 52:*11*

**Counsel** 4:*18* 67:*17* 83:*17, 23*

**count** 39:*9* 82:*23*

**COUNTY** 86:*2*

**couple** 68:*8*

**course** 67:*16*

**COURT** 1:*1* 4:*16, 19*

**cover** 28:*5* 29:*16*

**crashed** 31:*16*

**crime** 54:*13*

**criminal** 51:*10*

**crossing** 55:*25*

**CSR** 1:*23* 4:*20* 86:*24*

**current** 5:*11, 17*

**Currently** 5:*12, 18*

**< D >**

**DALE** 2:*3* 4:*21*

**dalekgalipo@yahoo.com** 2:*5*

**danger** 32:*8, 12, 20* 47:*12*

**dangerous** 55:*22*

**dark** 26:*10, 17, 24* 28:*21, 25* 30:*6, 9*

**date** 4:*10* 6:*20* 68:*1* 86:*8*

**Dated** 88:*8*

**day** 4:*3* 7:*3* 22:*12, 14* 34:*6* 50:*10, 19* 51:*11, 16, 17, 18, 20* 61:*8* 86:*7, 22* 88:*8*

**daylight** 60:*9*

**dead** 17:*6*

**dead-end** 47:*17*

**deadly** 33:*1, 4, 18* 44:*17, 23* 47:*3* 55:*18, 25* 56:*19* 57:*3* 81:*6, 13* 82:*5*

**deals** 6:*12*

**death** 32:*25* 33:*9, 11* 44:*8* 48:*16* 66:*4, 7* 81:*7, 9*

**decided** 64:*4*

**deciding** 57:*14*

**decision** 58:*16*

**DECLARATION** 88:*1*

**declare** 88:*4*

**de-escalation** 56:*5*

**defend** 44:*24*

**DEFENDANT** 2:*10* 38:*7* 49:*21, 25* 50:*6*

**Defendants** 1:*9* 2:*5* 4:*23*

**defense** 33:*5* 67:*17*

**definitely** 27:*3* 79:*20*

**definitions** 44:*14*

**degree** 61:*6*

**Department** 5:*13, 22,*

**24, 25** 6:*5, 15* 32:*1*

**depiction** 77:*2*

**deploy** 35:*20* 36:*13* 37:*22*

**deployed** 39:*10* 49:*24*

**deponent** 5:*3* 88:*1*

**DEPOSITION** 1:*17* 4:*7, 11, 14* 8:*13* 38:*14* 49:*17* 50:*4* 85:*12* 86:*6, 13, 16* 88:*4*

**Deputy** 2:*14* 23:*25* 54:*16, 19*

**deputy-involved** 82:*16*

**describe** 9:*11* 45:*6, 8* 60:*5* 63:*21*

**described** 32:*1* 45:*7* 58:*10* 71:*5*

**describing** 63:*12*

**DESCRIPTION** 3:*8*

**details** 51:*7*

**Detective** 3:*9* 19:*9* 51:*12* 61:*11* 67:*2* 69:*5* 80:*5*

**determine** 36:*21* 79:*3* 81:*23* 82:*12*

**determined** 57:*4* 82:*9*

**different** 6:*2* 8:*22* 42:*6* 45:*7* 80:*6*

**differently** 45:*7*

**Dillon** 23:*25*

**direction** 9:*19, 20* 10:*3* 64:*5* 70:*15, 17*

**directions** 8:*22*

**directly** 11:*23*

**disabled** 31:*6, 8, 17*

**disagree** 59:*14*

**discharge** 7:*8* 46:*25*

**discharged** 7:*6* 11:*11* 14:*11* 15:*17* 17:*10* 18:*13, 15* 35:*12* 40:*8* 64:*13* 65:*2, 14* 84:*13*

**discharging** 8:*2* 15:*14, 20* 20:*1, 3* 22:*4*

**discussed** 44:*10*

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 3

discussion 61:*19*
disinterested 86:*20*
disrespect 18:*11*
distance 7:*25* 19:*10*
30:*10* 42:*16* 43:*16*
56:*18*
distance-wise 42:*10*
DISTRICT 1:*1, 2*
documented 83:*7, 10*
dog 39:*11*
doing 16:*11* 63:*16*
71:*22*
Domain 6:*12*
domestic 50:*23*
door 23:7 41:*2*
doorway 40:*3*
draw 57:*15* 58:6, *13*
drawing 57:*11, 14*
58:*3, 21* 59:*10, 11*
drawn 53:*25*
drew 54:*3*
driven 23:*24*
driver's 23:8 25:*10*
driveway 22:*16, 24,
25* 23:6 24:*2*
driving 24:*2*
drop 22:*10* 29:*12, 14*
dropped 66:*21*
Drye 41:*7*
duly 86:*6*
D'URSO 1:*23* 4:*5,
17* 86:2, *24*
DV 60:*21*

< E >
earlier 69:*16* 71:*3*
83:*23* 84:*2*
east 9:*25* 10:4 70:*14*
eastbound 24:*2*
easy 12:*18* 46:*25*
effect 27:*13* 29:*13, 23*
either 9:*16* 24:*9*
42:*25* 43:*3, 22* 56:*16*
elaborate 59:*17*
eleven 5:*16*
ELLROD 2:*8*
else's 20:*13* 30:*3*
embarrassed 83:*6*
employed 5:*12, 14*

endangering 47:*14*
53:*15*
ended 41:*3*
enforcement 24:*22*
55:9 84:*20*
engine 23:*1*
enhanced 20:*22*
enter 55:*14*
entire 22:*14*
entirety 19:*24* 21:*17*
28:*1* 31:*14*
environment 63:*14*
environments 80:*20*
ERRATA 87:*1*
erratic 26:6, *23*
47:*13*
ESQ 2:*3, 8, 14*
essentially 62:*24*
estimate 7:*25* 19:*10*
21:*1* 23:*17* 25:2, *12*
37:*18* 42:5, 9 43:*18*
45:*12* 51:*21* 52:*5*
estimates 8:*12*
et 4:*13*
evading 47:*13*
event 59:7 61:*15*
events 60:*19* 65:*21*
73:6 77:9 83:*10*
Ex 3:9 50:22 54:*25*
exact 20:*5*
exactly 14:*3, 19* 15:2,
*10* 16:*11* 18:*20*
EXAMINATION 3:*1,
3* 5:6 83:*21*
example 6:*12* 10:*24*
50:*14* 52:1 56:*23*
63:*8, 11*
EXHIBIT 3:8 67:*14,
15* 75:2, 3 76:*3*
83:*25*
EXHIBITS 3:*7*
exit 46:*3*
exited 46:*3*
exiting 32:*3*
experience 46:*16*
84:*19*
explain 82:*18*
extent 49:*10* 81:*5*
exterior 60:*10*

eyes 67:*20*

< F >
face 11:*24*
faced 23:*1* 63:*19*
facilitate 5:*20*
facing 17:8 24:*6*
25:8 47:4 62:*16*
63:7 64:4, 7 65:*6*
fact 33:*16*
factors 48:*11*
factory 43:*8*
facts 47:5 59:*4, 5*
fair 33:*1* 42:2 59:*13*
69:*21* 78:22 81:*14*
false 54:*13* 55:*2*
familiar 6:8, *10, 13,
14* 57:*10*
family 26:8 32:*10*
41:*16* 54:*17*
far 25:*12* 37:*9*
53:*11* 56:*17* 62:*3*
69:5 82:*23*
fast 17:*25* 59:*23*
faster 9:*14*
feasible 82:6, *7*
February 35:*7*
federal 86:*16* 88:*5*
federally 38:*19*
feel 55:*24* 59:*2*
61:*12* 83:*6*
feet 8:8, *14, 16* 66:*16,
18*
fellow 27:*4, 14* 30:*14*
felon 51:*11*
field 42:*14*
fifth 10:*20* 40:6, *8*
Figueroa 2:*9*
figure 9:*24*
filed 38:*4* 49:*20*
find 13:*20*
fine 74:*2* 79:9, *11*
fire 7:5 35:*11* 36:*7*
37:*15* 40:*14* 64:*11*
65:*24*
firearm 7:6, *8, 9* 8:*2,
23* 10:*15, 18, 23* 11:*7,
9, 19, 21* 12:*1, 2, 6*
13:9 14:*8, 11, 17*
15:*10, 14, 17, 18, 20*

17:7, *10, 22* 18:*13, 16,
22* 19:*24, 25* 20:*1, 3*
21:2 22:4 26:9, *13*
28:*3, 14* 29:2, *17*
32:9 33:*16* 34:*3*
40:9 42:*17, 20, 24*
43:*1, 22, 24* 45:*20, 22*
46:*3, 5, 9, 25* 47:*6, 19*
48:*1, 13* 53:*14, 17, 22*
54:*4, 23* 56:*14* 57:*3,
6, 15* 58:*4, 7, 12, 13,
19, 21, 22* 59:*5, 11, 12,
19* 62:*21* 64:*13, 16,
25* 65:*2, 3, 14, 22*
66:*1, 3, 8, 9* 69:*19, 22*
78:*16, 21* 79:*4, 21, 25*
80:*3* 84:*3*
firearms 39:*22*
60:*12* 78:*16* 84:*14*
fired 9:*3* 10:9, *12*
11:*14, 17, 18* 12:*19*
13:*2, 4, 5, 12, 16* 19:*1,
11* 21:*8, 11* 24:*21*
27:*20* 34:*17* 36:*11*
37:*10* 39:*7, 12* 40:*2,
13* 64:*19* 74:7 75:*15,
16, 19, 22* 77:*19, 22*
78:8 80:*23* 82:9, *12*
83:*1* 84:*11, 19*
firing 8:*1* 10:*14*
11:*19* 13:*7, 14, 18*
14:*16* 17:*4, 16* 18:*8*
62:9, *25* 66:*1, 3* 72:*7*
73:*19*
First 5:9 8:*23, 25*
9:4 10:9, *19* 11:6, *11,
14, 18, 19, 23* 12:*1*
13:*2, 5, 6, 7, 12, 16, 18*
17:*10* 18:*13, 16*
22:*13, 15, 23* 23:*4, 16*
24:*15* 34:*25* 42:*11,
18, 23* 43:*4, 10, 16, 25*
45:*20, 22* 57:*21* 64:*9*
67:*22* 69:*15, 19* 76:*1*
five 14:*2* 21:*3, 8, 11,
18, 21, 22*
fled 32:*4, 22*
flee 15:*15* 17:*24*
32:*3*
fleed 24:*25*

fleeing 9:21 15:22 24:16 76:25
flight 32:18
Floor 2:9 77:23
Florida 50:2
foc 11:13
Focus 4:16 25:23
focused 18:21, 24 21:18 29:5 64:15 65:3, 5
focusing 64:17
followed 8:11
following 4:7
follow-up 83:20
foot 19:25 21:17 32:2, 3, 4 41:24 42:1, 3, 8, 9 43:7, 21 44:5 45:20 51:22 56:10 66:18, 25 67:1, 8 69:20 75:8
footage 20:8, 10, 12, 16 26:21 79:5 83:24, 25
football 8:5 42:14
force 6:13, 14, 16, 17 33:1, 4, 18 44:17, 23 55:10, 19, 25 56:6, 11, 13, 14, 20 57:3 81:6, 13 82:5
foregoing 86:5, 12, 15 88:4
forklifts 80:21
form 20:23
former 56:3
forward 9:9, 10 15:24 16:12, 21, 22 65:6 76:14
four 14:2 20:17 34:20 38:25
fourth 10:20, 24 38:21 39:17
frame 20:5, 20 23:22 24:22 25:5 58:18 72:12, 13, 18, 21, 23, 25 73:4, 18 79:2
frames 73:18
freeze 79:2
Fresno 2:16

front 23:7 28:16, 19 29:4 41:2 42:19 54:25 60:14 63:23
frozen 77:10
full 86:12
fully 29:3, 4
fur 24:5
further 66:15 73:20 79:10 83:13 86:15
furtive 26:7

< G >
gait 9:11
GALIPO 2:3 4:21 5:5, 7 12:13, 21, 24 14:13 15:5 16:4, 8, 23 18:5, 17 19:18, 21 27:19 30:21 34:5 35:19 41:11, 23 46:22 48:14, 20, 25 49:7 51:5 57:25 59:8 60:4 62:22 63:6 64:6 65:7, 17 67:11, 16, 21 68:12, 18, 19 69:7, 12, 14 70:3, 6, 8, 22, 24 71:1, 9, 12, 14, 23 72:5, 6, 11, 14, 15, 21, 24 73:1, 3, 9, 11, 20, 23 74:5, 6, 15, 18, 20 75:1, 4, 13, 14, 23 76:6, 8, 14, 16, 18 77:13, 16, 17, 24 78:5, 6, 18 79:7, 14, 16 80:8 81:1, 3 83:15 84:6 85:1
GALIPO.......................
.......5 3:4
GARCIA 2:14 4:24 17:19 19:17 33:22 48:24 64:22 78:11, 25 84:24 85:7, 8
GENERAL 2:12, 14 23:17 33:13 77:3
Generally 10:2, 6 22:17 44:16, 22 60:22 76:23
GEORGE 1:5 4:12 7:1

getting 8:5 23:16, 20 32:6 56:22 57:15 59:3 67:19, 20
Girard 24:1
give 21:1, 9, 10, 12, 20 23:17 25:2, 19 66:24 67:1 82:4
given 8:12 29:19 53:13 67:5
giving 21:15 52:4 77:2
glasses 67:20
GLOCK 7:9 11:7
go 11:15 12:21 14:6, 24 19:19 33:21 38:17 41:19 45:3 46:14 48:5 53:18 59:1 62:11 63:2, 25 68:16 69:24 71:24 72:1, 11, 21 73:20, 25 76:14 77:13 78:1, 2 79:7, 11 80:14
goes 54:11
going 11:15 12:10 13:2 18:12 21:12, 21 29:20, 24 41:24 46:15 47:11 48:20 49:2 52:13, 16, 17 53:7, 25 55:5 57:12, 14, 21 58:22 59:4, 6 64:11, 20 65:9, 13 67:7 69:8, 25 70:12, 16, 19 71:19 72:20 73:7 75:1 77:19 78:12 80:16 82:5 84:5 85:10
GONZALEZ 1:5 4:12 7:1, 3, 23 8:1, 3, 18, 21, 23 9:3, 5 10:16 17:23 19:3, 5, 14, 23 21:9, 14 22:7, 11, 14 23:3, 12 24:8, 24 25:17 26:6 27:10, 20, 22 28:12 29:19 30:6, 18 31:20, 23 32:6 34:7 41:25 42:17 43:13, 25 45:16, 24 46:4 50:9, 11, 13 52:7, 9 54:22 55:23 66:6, 24 67:4

71:19 72:16 74:22 76:19, 22, 25 84:3, 8
Gonzalez's 43:22, 24 56:12 69:20
Good 4:9 48:21 72:1 78:2 79:14
grammatical 60:20
gray 23:24
great 53:20 54:8
grip 73:17
ground 21:16 64:12, 20 65:9, 25 66:5 71:19, 20 72:17, 20 73:8 77:19, 20, 21 78:8, 13
guess 9:13 16:24 17:12 20:6, 25 27:12 45:15 52:3 55:15 56:15 58:18
guessing 11:2 13:21 15:2 20:4 21:6 27:1 29:10 37:20 39:9 42:15 43:15 45:15 51:23
gun 10:10, 13 13:6, 11, 15, 17 18:14, 24 19:22 25:18 26:3, 11, 15, 25 27:4, 6, 13 28:22 30:9, 15 31:10 34:7, 12 46:18 62:16 63:20 65:15, 18 66:18, 19, 21
gunfire 36:22 80:22
guns 19:13
gunshot 9:3 11:11, 23 13:14 15:13 17:9, 23 18:15 62:17 64:3 74:25 80:25 84:5, 7
gunshots 74:21 78:13 80:10

< H >
half 5:16 76:4
hand 8:24 10:17, 19, 25 11:1, 4, 5, 7, 21 12:3 13:6, 9, 11, 16, 17, 19, 24 14:4, 8, 17, 21 15:4, 11, 18 17:7, 22 18:14, 22 24:11 26:10, 18, 25 27:10

30:*15*  33:*16*  34:8, *12*
36:*1, 3*  37:5  39:*11,
14, 19, 23*  42:*18, 20*
46:9  47:6  59:*19*
64:*17, 25*  65:*3, 15, 19,
23*  66:9  69:*20, 23*
80:*4*  84:*3*  86:22
**handgun**  11:8
**handler**  35:9  56:*4*
**hands**  24:9  27:8
28:25  42:25  43:*1, 22,
24*  71:*15*  72:9  76:9,
*10*
**happened**  11:*14*
13:*1*  34:25  59:*12*
77:9
**happening**  12:*3, 5*
59:*18, 21*
**harm**  24:*17*  52:8, *17*
53:*20*  54:*1, 8*  55:*11*
**head**  66:*15*
**hear**  17:22  19:*1*
21:20  24:*17, 19*
27:*18*  30:*4, 19*  52:7,
*15, 18*  68:20  75:*15*
79:*17*
**heard**  11:*10*  12:7
13:*13, 14*  15:*13*
18:*15*  29:*18*  40:*13,
19*  61:5  64:2  84:*4*
**hearing**  11:*23*  17:9
19:2  62:*17*  67:*4*
**held**  4:*14*
**help**  5:20
**helping**  5:*23*
**HEMET**  1:8  2:5
4:5  5:*12, 15*  6:*15*
**hereunder**  86:*21*
**Hey**  55:*12*
**high**  11:*3*
**HIGHWAY**  2:*12*  5:*1*
**Hills**  2:*4*
**hit**  50:20, 21
**Hofiani**  4:*19*  4:*15*
**holding**  34:*3*  62:*21*
**holster**  60:*21*
**honest**  72:*19*
**honestly**  59:2
**hoping**  55:*21*

**hopping**  26:22
**horse**  17:6
**hostage**  53:*19*  54:7,
*10*  56:23
**hour**  4:*3*  48:*21*
**house**  28:6, *11*  47:*12*
53:25  54:*1*
**hundred**  46:*19*
47:*21*  55:*1*  68:5, *10*
77:*3*
**hypothetical**  33:*20*
46:*13*  58:25
**hypothetically**  46:8
**Hyundai**  22:22, *24,
25*  23:*4*  27:22

< I >
**identification**  75:*5*
**illumination**  60:9
**immediate**  18:22
22:5  24:*11*  28:9
64:*14*  80:*4*
**immediately**  21:2
32:22  33:*11*  44:*17,
23*  60:6  75:8, *21*
81:9
**imminency**  46:*10*
**imminent**  10:*16*
14:9, *10*  15:*16, 19, 21*
18:*23*  29:6  32:2, *12,
22, 25*  33:9  44:6, *7, 8,
15, 20*  46:20  47:*21*
48:*10, 13, 15*  57:2, *7*
59:6  64:*16, 25*  65:2
66:2, *4, 6, 11*  78:*17*
80:*4, 7*  81:*7*
**importance**  81:22
**important**  47:*11*
**imprisonment**  54:*13*
55:2
**incident**  6:*19, 20*  7:6
8:*21*  9:5, *23*  28:7
34:6, *18, 23*  35:*11, 13,
18*  36:7, *11, 13*  37:*15,
22*  40:9  50:2  51:8,
*12, 17*  52:*10*  54:2, *15*
56:*3*  58:*10*
**include**  6:*16*  10:6
28:8  55:*23*  56:6, *9*

**including**  16:*21*
**inclusive**  1:*9*
**Incomplete**  33:*19*
46:*12*  58:24
**INDEX**  3:*1*
**indicated**  16:25  88:6
**individual**  39:22
40:*3*  41:*3, 5, 13*
**individuals**  21:25
22:*3, 6*
**information**  50:*10, 14,
17*  51:2, *9, 16*  54:9
**initial**  15:8  24:*13, 18*
32:*18*  52:*10*  56:9
**initially**  17:*21*  22:*11*
56:2  58:*4*
**injured**  50:*15, 18*
51:*18, 20*
**injury**  32:25  33:*10,
12*  44:9  48:*16*  51:2
53:*20*  54:8  66:5, *7*
81:*8, 10*
**inside**  24:*24*  28:6, *20*
**instance**  9:*1*  53:25
60:*21*
**intent**  33:*3, 11*  44:*11*
48:*17*  64:*23*  81:9
**intentionally**  7:*16, 19*
**intermittently**  26:*19*
**internal**  5:*21*
**interruption**  12:8
**introduce**  4:*18*
**Investigator**  61:2, *5,
7, 13*
**involved**  5:*23*  6:*1*
34:*16, 22*  35:*18*  36:*4*
41:*15, 21*  55:22
74:*11, 14*  84:*17, 20*
**IRICK**  1:*9*  2:*12*  5:*1*
19:9  67:*3*  69:6
**item**  26:*10*

< J >
**January**  6:*21*  22:*14*
50:*12*
**Job**  1:*24*  6:7
**jog**  9:*13, 16*
**jogging**  9:*19, 25*
16:*15, 20*  17:25

**Join**  17:*19*  19:*17*
33:22  64:22  78:*11,
25*
**justify**  81:*16*

< K >
**KASS**  2:8
**keep**  17:6  56:22
65:*13*  70:*18*
**Keller**  23:25
**kept**  58:20
**key**  82:7
**kidnapping**  54:*13*
55:2
**kill**  52:*13, 16*
**killed**  50:*15*
**KIMBERLY**  1:*23*
4:5, *17*  67:*17*  86:2,
*24*
**kind**  61:*16*  62:*4*
72:*19*  76:9
**kinds**  80:*16*
**knife**  37:8, *10*  49:9
**know**  6:*24*  8:5  9:*12,
19*  10:*1, 3*  11:3, *5*
13:22  14:2, *19*  19:*13,
18, 20*  21:*1*  25:24
26:2, 21  27:5  28:*10*
29:*5, 22*  30:8, *12*
35:22  36:*15, 20, 23,
25*  39:24  40:23  41:7
42:*13, 16*  51:*13, 15,
25*  56:*4*  59:*3*  64:*10*
65:9  66:*21*  68:5
70:*13*  72:2  77:5, *10*
78:*1*  80:25  82:*10*
83:7, *12, 13, 16*
**knowledge**  7:2  24:*21,
23*  26:7  38:5  50:*13*
51:*19*
**KORNBLAU**  2:8
4:22  14:5, *22*  16:2, *7,
18*  17:*18*  18:9  19:*15*
27:*15*  30:*16*  33:*19*
35:*16*  41:*17*  46:*12*
48:*4, 8, 23*  51:*4*
58:24  62:*10*  63:*1, 24*
64:*21*  65:*11*  73:*14*
78:9, *23*  79:*18*  80:*12*

*83*:*19, 22*  *84*:*9, 22*
*85*:*3, 5*

**KORNBLAU................**
**...........83**  3:*5*

**< L >**
**laid**  54:*20*
**lasted**  51:*22*
**lastly**  81:*4*
**late**  35:*3*
**launcher**  56:*7*
**LAW**  2:*3*  24:*22*
  44:*15*  55:*8*  84:*20*
**lawful**  53:*11*
**laws**  88:*5, 6*
**lawsuit**  38:*4*  49:*20*
**layman**  50:*21*
**layman's**  26:*9*
**laymen**  54:*23*
**Leading**  84:*6*
**leaning**  64:*15*  65:*6*
**Learning**  6:*12*
**leave**  54:*25*
**leaving**  52:*13*
**left**  8:*24*  11:*9*  15:*12*
  17:*8*  18:*1*  26:*18*
  27:*10*  30:*15, 22*  43:*4,*
  *9, 13*  46:*6*  62:*4, 14,*
  *16, 20, 24*  63:*19*
  64:*15*  65:*6*  69:*3*
  74:*23*  82:*24*  83:*2, 9*
**leg**  66:*19*
**less-lethal**  56:*6*
**lethal**  6:*16, 17*  56:*11,*
  *16*
**level**  55:*10*
**license**  4:*20*
**life**  44:*19, 24*  73:*6*
**life-threatening**  44:*18*
**light**  73:*16*
**lighting**  60:*5, 10*
**lights**  60:*12*
**line**  53:*6, 21*  54:*3*
  55:*4, 6, 12, 16, 18*
  56:*1, 18*  57:*11*  58:*5,*
  *20*  59:*10*  61:*2, 15, 21,*
  *23*
**lined**  25:*10*
**lines**  53:*24*  57:*21, 22*

**listed**  24:*3*
**listen**  29:*25*
**Litigation**  4:*16*
**little**  8:*6*  13:*3*  24:*5*
  45:*4*  48:*21*  59:*24, 25*
  62:*4, 23*  71:*25*  73:*20*
  76:*14*  79:*7*
**live**  63:*15*  77:*8*
**LLP**  2:*8*
**located**  66:*14, 19*
**long**  5:*14*  25:*3*
  26:*14*  35:*5*  42:*9*
  44:*20*  45:*11*  51:*22*
  64:*24*  66:*7*
**longer**  14:*10, 11*
  15:*21*  66:*2, 3, 9, 11*
**look**  43:*9*  57:*19, 20*
  60:*13, 24*  69:*4*  76:*9*
**looked**  8:*24*  15:*13*
  20:*22*  46:*6, 10*  47:*7*
**looking**  9:*8, 23*  11:*9*
  41:*1, 6*  43:*13*  46:*23*
  47:*23*  62:*1, 20*  63:*15*
  68:*6*  69:*25*  71:*18*
  76:*23*  77:*6*
**looks**  67:*25*  68:*1, 7*
**Los**  2:*9*
**lot**  26:*7*  78:*12*
**loud**  12:*7*  15:*13*
  27:*17*  30:*18*  79:*20*
  84:*4*
**low**  11:*3*
**lowest**  55:*9*
**lying**  37:*20*  41:*8*

**< M >**
**ma'am**  48:*6, 7*  59:*22*
  60:*2*  63:*18*  84:*1*
**magazines**  82:*11, 22*
**maintenance**  45:*9, 13*
**making**  32:*11*  52:*12*
**Mall**  2:*15*
**man**  83:*6*
**manipulating**  26:*11*
**manner**  8:*20*
**MANNING**  2:*8*
**March**  35:*7*
**MARIO**  2:*14*  4:*24*
  85:*1*

**mario.garcia@doj.ca.g**
**ov**  2:*17*
**Mariposa**  2:*15*
**mark**  67:*13*  75:*4*
**marked**  67:*15*  75:*3*
  83:*24*
**Martin**  49:*14, 16*
**mass**  18:*24*  61:*21*
  62:*2, 5*  63:*5, 7, 11, 20*
  64:*17*  65:*4, 16*
**Master**  61:*2, 5, 7, 13*
**mat**  73:*16*
**match**  50:*21*
**materials**  6:*5*
**math**  8:*9*
**matter**  4:*12*  66:*8*
**mean**  17:*25*  78:*16, 19*
**meaning**  8:*15*  55:*6*
**means**  62:*14*
**meant**  8:*14*
**medium**  11:*3*
**meet**  56:*13*
**members**  26:*8*  54:*17*
**mental**  55:*13*
**mentioned**  29:*23*
  50:*20*
**mere**  56:*4*
**merely**  48:*12*
**met**  61:*7*
**Michael**  49:*16*
**mind**  40:*21*  54:*6*
  58:*18*  80:*11*
**mine**  30:*4*
**Minus**  13:*13*
**minute**  52:*1*
**minutes**  25:*4, 16*
  26:*4*  27:*21*  28:*1, 20*
  47:*20*
**missing**  34:*1*
**misspeaking**  36:*19*
**misstate**  41:*17*
**Misstates**  14:*5, 22*
  63:*24*  64:*21*  65:*11*
**mistake**  26:*16*
**misunderstand**  16:*17*
**misunderstood**  16:*13*
**mode**  71:*25*
**moment**  32:*7*  57:*20*
  58:*6*  67:*19*

**moments**  54:*4*
**Monguia**  2:*19*
**morning**  4:*9*
**motion**  8:*3, 18*  9:*6, 7*
  15:*15, 24*  16:*12, 22,*
  *25*  17:*3*  18:*4*  46:*17*
  76:*1, 4, 25*  77:*14*
**move**  29:*16*
**movement**  18:*3*
**movements**  26:*7*
**moving**  8:*19, 22*  9:*8,*
  *9, 10, 14, 22*  15:*24*
  16:*11, 14*  17:*25*  18:*1,*
  *4*  26:*23*  28:*18*
**multiple**  78:*7*
**multiplying**  8:*7*
**muzzle**  11:*23*

**< N >**
**name**  4:*15*  5:*8, 9*
  6:*24*  35:*14, 17*  36:*10,*
  *12*  37:*2, 24*  40:*23*
  41:*9*  49:*14*  50:*22*
**named**  38:*7*  49:*21,*
  *25*  50:*6*  86:*5*
**names**  61:*10*
**narrative**  62:*15*
**narrow**  45:*4, 12, 16,*
  *18, 19, 25*  52:*21*  53:*1*
  70:*19*  71:*2*
**nature**  51:*2*  52:*14*
**near**  31:*6, 9*  43:*8*
  52:*21*  66:*18, 19*
**necessarily**  33:*17*
**necessary**  44:*23*
  81:*24*
**need**  11:*22*  17:*6*
**needed**  58:*14*
**new**  12:*15, 16*
**nine**  25:*4, 16*  26:*3*
  27:*21*  28:*1, 20*
**Noise**  12:*8*  84:*4*
**noises**  80:*21*
**nonsensical**  26:*23*
**north**  9:*25*  10:*3*
  23:*1*  24:*6*
**northwest**  25:*8*
**note**  69:*9*  79:*23*
**noted**  21:*14*  47:*16*
**notice**  77:*18*

number  4:*13, 20*
*27*:2  29:*11*  31:*12*
43:*15*  44:*5*  67:*15*
75:*3*  78:*14*  84:*21*
numbers  21:*7*
numerous  27:*8, 11*
28:*8, 19*

< O >
oath  5:*2*
obey  53:*11*
object  24:*9, 10*  26:*15,*
*17, 25*  28:*21, 25*  29:*1*
30:*6, 9*
Objection  14:*5, 22*
16:*2, 7, 18*  17:*18*
18:*9*  19:*15*  27:*15*
30:*16*  33:*19*  35:*16*
41:*17*  46:*12*  48:*4*
51:*4*  58:*24*  62:*10*
63:*1, 24*  64:*21*  65:*11*
73:*14*  78:*9, 23*  79:*18*
80:*12*  84:*6*
objectively  44:*25*
observations  25:*17*
observe  22:*9*  28:*25*
31:*20*  43:*1, 23*  69:*22*
74:*21, 23*  77:*22*
observed  12:*6*  13:*8*
14:*17*  22:*5, 15*  24:*16*
26:*3, 19, 21*  27:*5*
28:*24*  30:*11, 12*
31:*19*  45:*20, 22*
46:*16*  58:*9*  83:*9*
observing  24:*15*  26:*9*
obviously  7:*22*  20:*6*
33:*24*  53:*15*  60:*20*
63:*16*  75:*18*  77:*1*
78:*13*
occasions  34:*10*
occupied  47:*15*
53:*16, 19*  54:*7*  57:*13*
occurred  9:*4*  45:*17*
54:*14*
occurring  54:*14*
offhand  50:*8*
office  41:*16*
OFFICER  2:*12*  5:*1*
8:*12*  19:*9*  35:*5*

52:*17*  67:*3*  69:*6*
74:*13*
officer-involved
34:*15, 21, 23*  40:*12,*
*18*  82:*16, 21*
officers  6:*2*  9:*21*
10:*2, 6, 7*  11:*9, 10*
15:*15, 22, 25*  16:*15,*
*21*  19:*4, 7, 11*  22:*7*
26:*13*  27:*4, 14*  28:*14*
29:*2, 19, 22*  30:*6, 14*
34:*17*  40:*20*  46:*17*
47:*14*  52:*8*  53:*15*
55:*9*  62:*16, 20*  68:*9,*
*25*  74:*11, 13, 14*
75:*19*  77:*1*  79:*24*
80:*1*
officers/deputies
84:*17*
OFFICES  2:*3*
Oh  36:*19*  37:*4*
76:*10*  83:*6*
Okay  8:*11*  10:*5*
11:*13*  12:*17*  13:*10,*
*15, 19*  14:*1*  16:*10, 13*
18:*18*  32:*16*  33:*23*
34:*22*  41:*24*  42:*22*
45:*2, 11, 16, 19*  46:*8*
48:*8, 20, 25*  49:*8*
50:*3, 14*  51:*1, 21, 25*
52:*4, 5, 15*  57:*24*
58:*15*  59:*9*  60:*16, 24*
62:*1*  64:*7*  65:*18*
67:*19, 25*  68:*6, 12, 14,*
*18*  69:*7, 12, 24*  70:*3,*
*12, 18, 22*  71:*10, 13,*
*23*  72:*1, 7, 10, 21*
73:*9, 20*  74:*15*  75:*1,*
*13, 23*  76:*6, 17*  77:*5,*
*12, 13*  79:*9, 14*  81:*1,*
*12*  82:*18*  83:*7, 15*
84:*22*  85:*1, 6*
once  27:*1, 3*  28:*22*
29:*7, 8, 10*  30:*20*
47:*6*  67:*9*
onset  54:*14*  56:*2, 9*
58:*11*
oOo  1:*3*  2:*19*  3:*11*
4:*1*  85:*13*
opinion  66:*11*

opportunity  33:*3, 10*
44:*11*  48:*17*  56:*13*
59:*17*  81:*8*
opposed  51:*10*
opposite  70:*15, 17*
option  55:*21*  56:*11*
57:*3, 4*  58:*13, 17*
options  55:*24*  56:*6*
order  33:*8*  44:*19*
50:*20, 24*
ordering  85:*4, 7*
original  86:*16*
outside  22:*12, 15*
24:*8*

< P >
p.m  85:*11, 12*
pace  9:*15*  17:*25*
18:*3*
PAGE  3:*3, 8*  8:*7*
57:*19, 20*  60:*24*
61:*24*  62:*1*
PAGE/LINE  87:*2*
Paralegal  2:*19*
paraphrasing  61:*17*
parked  22:*24, 25*
23:*6*  52:*22*
part  6:*4, 7*  13:*13*
25:*8*  52:*10*  62:*6*
69:*24*  70:*19*  81:*22*
82:*4*
partially  45:*21*  52:*23*
particular  32:*7*
43:*23*  72:*18*  73:*4*
79:*2*
partners  8:*25*  10:*16*
12:*7*  13:*25*  15:*11*
17:*9, 21*  18:*14*  21:*14*
27:*18*  30:*19*  57:*7*
63:*19*  64:*2, 8*  66:*10*
partners's  64:*5*
parts  63:*4*
party  50:*25*
passed  20:*2*  23:*15*
45:*17*
passenger  23:*23*
31:*25*
passenger's  23:*8, 10*
25:*9*

passes  55:*13*
PATRICK  1:*8*  2:*5*
PATROL  2:*12*  5:*1*
35:*8, 9*  40:*22*
Pause  12:*9, 12*  57:*23*
71:*21*  72:*9*
paused  73:*5*  77:*2, 6*
79:*3*
paying  18:*20*  64:*14*
peacefully  47:*20*
53:*12, 13*
Penal  33:*8*
penalty  88:*4*
people  45:*7*  46:*16*
53:*17*  56:*8*  57:*8*
perceive  14:*9*  17:*23*
32:*8, 12, 21*  44:*6*
perceived  17:*8*  19:*2*
26:*11, 12*  28:*2*  29:*1*
30:*9*  32:*2*  42:*20*
45:*9*  46:*20*  47:*17*
64:*3*
perceiving  29:*16*
percent  46:*19*  47:*21*
55:*1*  68:*5, 10*  77:*3*
perception  47:*12*
79:*5*
perfect  63:*13, 17*
period  24:*25*  26:*14*
perjury  88:*4*
person  6:*24*  7:*3, 22*
15:*3*  33:*10*  35:*14*
36:*10, 16, 21*  37:*10,*
*24*  38:*10*  39:*18, 24*
40:*1, 23*  41:*16*  47:*18*
49:*9*  63:*15*  65:*16*
80:*3*  86:*20*
person's  39:*11*  49:*14*
perspective  80:*6*
pertains  86:*15*
phone  54:*17*
photograph  76:*21*
83:*8*
photographed  83:*13*
photographs  83:*12,*
*14*
physical  55:*12*
physically  50:*18*
51:*20*  55:*14*

**place** 15:2, *3, 10*
60:*19* 65:22 82:*17*
86:*8, 14*
**placed** 69:*11*
**placement** 18:*21*
**Plaintiff** 1:*6* 4:*21*
**PLAINTIFFS** 2:2
**play** 48:*12* 67:7, *9*
68:*14* 69:*7* 72:2
73:25 74:2 75:7
76:2 77:*14* 78:2
79:*12, 23* 82:3
**played** 68:*17* 70:5,
*23* 71:*11* 72:4, *13*
73:*10, 22* 74:4, *17*
75:*12* 76:5, *15* 77:15
78:4 79:13
**please** 4:*18* 5:8
60:25 69:*3* 70:*3*
71:*10* 74:*16* 85:5, *9*
**plenty** 60:*9* 80:*17, 19*
**plus** 82:25
**point** 15:*14* 16:25
23:*12* 24:*19* 25:*18*
26:*3* 30:22 31:5, *15,
18* 32:*13, 14* 37:21
44:*4* 45:*3* 46:*21*
47:25 48:*10* 52:20
53:7 72:*12, 17* 78:*15*
84:*10*
**pointed** 11:*24*
**pointing** 26:*12* 28:2,
*13* 29:*1* 30:6
**Police** 5:*13* 6:*15*
23:*24* 25:*9* 27:*21*
32:*1* 35:5
**policies** 5:*24, 25*
6:*10, 14*
**pop** 15:*13* 17:22
84:*4*
**populated** 50:*24*
**Portion** 3:*9* 57:*9*
67:7, *12, 14* 74:*1*
75:25 77:25
**pose** 59:*5*
**posed** 10:*15* 15:*16,
19* 48:9, *12* 66:2, *6*
80:7
**position** 6:*4* 66:8
71:*16*

**positioned** 23:*21*
25:6
**possessed** 10:*17*
58:*12* 66:7
**possessing** 47:*19*
**possible** 55:*10* 67:*11*
75:25 78:*1*
**possibly** 26:*15* 43:*14*
**POST** 5:*21* 6:6, *8,
11* 33:*7* 82:*21*
**potential** 55:2 56:*23*
**potentially** 29:*20*
53:*19* 54:*12*
**power** 55:8
**praying** 55:*21*
**precise** 42:22
**preface** 33:*23*
**presence** 56:*4*
**PRESENT** 2:*19*
10:7 22:*19* 40:*13, 19*
53:*17* 54:*18, 22* 56:9
57:*8* 59:5 82:*1* 86:6
**presentation** 54:*5*
**presented** 11:7
15:*10* 46:2, *5* 48:*13*
53:*10* 57:6
**preserve** 44:*19*
**press** 7:*14*
**pressed** 7:*19*
**pressing** 7:*16*
**pressure** 73:*16*
**pretty** 57:*10*
**previous** 46:*1*
**previously** 25:7 29:9
31:25 32:*19* 42:*19*
44:*10* 49:*11* 57:*1*
58:9 62:*14* 63:*18*
64:*1, 24*
**prior** 9:2, *4* 13:*14*
14:*16* 20:*1* 22:4, *20*
34:*6, 15, 18, 20* 40:9
43:*4, 20* 62:*16* 82:22
**probably** 33:7
**procedures** 6:*11*
**proceedings** 86:*14, 17*
**progressing** 77:*23*
**promoted** 39:2, *4*
**property** 24:*4* 25:8
28:8
**protected** 50:*24*

**proximity** 23:*5*
32:*19* 67:*3*
**public** 47:*14*
**pull** 19:*25* 64:*4*
**pulled** 21:*1, 2* 64:8
**pulling** 20:2 47:*1*
73:*17*
**pursuing** 43:*10*
**pursuit** 19:25 21:*17*
30:25 31:*3, 6, 10, 11,
12, 14, 19* 32:*11*
40:*10* 41:*24* 42:*1, 3,
8, 10* 43:7, *21* 44:5
45:20 51:22 56:*10*
66:25 67:*1, 9* 69:20
75:8
**putting** 47:2

**< Q >**
**question** 12:*15, 16, 25*
18:7 22:2 40:*17*
**questions** 25:*23* 26:*1*
67:*10* 69:9 83:*16, 17,
20* 84:*24*

**< R >**
**radio** 84:*16*
**railroad** 31:6, *9, 16*
**RAMIREZ** 2:8
**ramp** 52:*24*
**ran** 22:*20, 21* 50:*24*
**rapid** 12:*3* 65:*21*
**rapidly** 59:*21*
**rapidly-evolving** 12:5
59:*15*
**read** 25:24 57:*24*
88:*3*
**ready** 8:5 57:*15*
**real** 73:6 77:9
**reason** 8:*11* 27:*17*
59:9 81:22 84:*16*
87:2
**reasonable** 44:*25*
**recall** 6:20 19:2
21:22 22:*17* 24:*10*
35:2, *17* 36:2, *8, 10,
12* 37:2, *16, 24* 38:*1,
3, 9, 14* 39:7 41:9
42:6 43:*4, 6, 10, 13*
45:*21* 46:2 49:9, *17,*

*19* 50:*13, 22* 53:2
54:*3* 57:9, *16* 61:*11*
70:*14* 81:*10, 11*
82:20 83:*11, 25*
84:*11*
**recalling** 50:8
**received** 14:*10* 15:*21*
54:*17*
**recognize** 69:*1*
**recollection** 7:*4* 37:9
62:8
**record** 4:*10* 5:8
12:*10, 20, 22, 25* 49:2,
*5* 69:*10* 85:*10*
**recorded** 4:*11*
**REFERENCE** 3:*7*
8:*10* 55:4 57:*17, 18*
59:*4*
**referenced** 41:*12, 22*
69:*16*
**referencing** 56:*19*
**referring** 30:*3* 74:*10*
**refresh** 62:*8*
**refusal** 53:*11*
**regards** 60:8 84:*18*
**regular** 73:25
**reiterating** 14:*25*
**relation** 23:*3* 50:*20*
**relative** 10:*23*
**relayed** 54:*19, 21*
**relevant** 25:*21* 28:7
**remember** 35:*14*
49:*20, 24* 50:*3* 52:23
61:*13, 14* 81:7
**REMEMBERED** 4:2
**REMOTE** 1:*17* 2:*1*
4:*11*
**remotely** 4:*4* 86:6
**repeat** 17:6
**repeated** 21:*15* 27:8
**replay** 75:25
**report** 84:*13*
**Reported** 1:22 4:8
84:*10* 86:9
**Reporter** 4:6, *17, 19*
5:*3* 33:25 41:*10*
80:*18* 86:*19*
**REPORTER'S** 1:*16*
**reporting** 84:*11*

represent  4:19
represented  41:13, 16
representing  38:10
requested  56:3  86:18
required  44:13
residence  23:23  40:4
  42:20
resolved  38:18
respect  50:9  81:12
responsible  81:16
restrained  50:25
restraining  50:19, 23
review  86:17
reviewing  6:9
Revised  33:8
REYNOSO  1:9, 17
  2:7  3:2  4:4, 11  5:10
  88:12
R-E-Y-N-O-S-O  5:10
Reynoso's  3:9  67:12
right  8:24  9:24
  10:17, 19, 25  11:1, 4,
  5, 7  13:4, 17, 19, 24
  14:4, 8, 17  15:4, 11,
  18  17:11  18:2, 22
  21:18  25:22  26:2
  29:7  33:6  43:3
  48:15  53:3  63:7
  64:15, 16, 25  65:3, 6,
  15, 19  69:4, 5, 15, 19,
  25  70:9  71:6, 7, 12
  74:5  75:5  77:11
  78:16, 19  79:3  83:15
right-hand  70:16
ring  49:14
Riverside  23:24  32:1
Room  2:15
round  10:14  11:12,
  15  13:7  35:12, 22
  39:9  64:9  82:23
rounds  36:20  39:7
  77:22  82:12, 24  83:1,
  2, 3, 4, 8
RPR  1:23  4:5  86:24
run  9:13, 16
running  9:11, 20, 25
  10:5  16:15, 20  18:1
  32:16  40:1  43:25
  46:17  47:8, 15, 17
  48:1  52:20  53:1, 5

58:20  62:3, 4, 9, 19,
  25  63:15

< S >

safe  56:5
sand  53:6, 21, 24
  55:4, 6, 16, 18  56:1,
  18  57:12  58:5, 20
  59:11
saw  12:2  22:11, 23
  23:4  24:7  26:24
  28:21  29:7  47:6
  53:22  58:22  59:12
  66:3  70:10  84:2
saying  10:18  11:25
  12:2  13:10  14:3, 14,
  16, 20  15:6, 9  24:20
  28:13, 21, 24  34:3
  47:5, 9, 22  48:9  55:5,
  7, 17, 20, 23  59:10
  62:2  64:7, 19  65:13,
  18  79:2, 6  80:7
says  61:21
scene  23:18
screen  67:13, 22
  68:4, 21
SEAN  1:9  2:12  5:1
  69:6
season's  8:5
seat  28:16  31:25
second  10:12, 19
  31:2  36:4  43:11, 17,
  20  44:1  45:2  47:1
  48:13  57:2, 6  66:9
  70:9
seconds  12:6  20:5
  21:3, 6, 8, 11, 19, 21,
  23  23:19  24:7, 14, 18
  78:2
Section  33:8  58:1
see  10:9, 12, 15, 18
  11:19, 23, 25  13:6, 10
  14:8  15:18  21:25
  22:6  23:12  24:8
  26:14  30:5, 8  31:10,
  15  39:11  42:17, 24
  43:21  58:1  61:2, 15,
  23  62:6  65:18, 22
  67:22  68:1, 8, 20, 25
  71:2, 6, 15, 24  72:8, 9,

16  73:12  74:25  75:7
  76:9, 19, 21  77:4, 21
  78:7, 15, 21  79:24
  80:3
seeing  22:13  23:16,
  18  24:10  33:16
  47:18  48:1
seen  7:2  11:21  34:7
  46:9  58:19  69:19
  77:3
semi-automatic  7:9,
  12  11:8
send  67:17
sense  62:5
sequence  66:22
  78:20  81:20
Sergeant  3:9  5:18
  39:2, 4  67:12, 23
  70:10  77:24  83:23
series  65:21
serious  32:25  33:9,
  12  44:8  48:16  66:5,
  7  81:8, 9
seriously  50:15  51:18
set  4:2  47:5
share  67:13
SHEET  87:1
Sheriff's  23:25  32:1
shoot  21:12, 21
  24:13  27:25  29:20
  32:5, 17  40:11  44:3
  45:24  46:4, 16  47:8,
  24  58:22
shooter  36:23
shooters  74:8, 10
  75:16  84:13, 15, 16,
  20
shooting  7:17, 22
  17:16  21:25  22:3, 8,
  9  36:4  37:4, 12
  38:21  39:6, 7, 10, 17
  40:5, 6, 8, 20  45:17
  49:8, 24  60:6, 11
  63:22  66:13, 22
  71:16  74:1, 22  75:9,
  20  78:20  79:25  80:1
  81:20  82:16, 21
shootings  34:15, 21,
  23  38:25  40:12, 18
  41:15

Shorthand  4:6  5:3
  86:10
shot  6:25  7:14  8:23
  9:4  10:9, 12, 19, 20,
  21, 24  11:6, 18, 20
  12:1  13:2, 5, 6, 12, 16,
  18  14:10, 14, 16
  17:13  19:2  21:2
  27:23  29:24  32:14
  35:15  37:24  38:10
  40:10, 24  41:3, 5, 14
  46:20  50:11  64:11
  65:19  81:17
shots  7:5  14:2  15:7,
  23  16:6  17:17  18:19
  19:1  24:21  27:20
  35:11  36:7, 11, 15
  37:15  40:13, 19
  51:22  64:11, 19
  65:10, 24  73:12  74:7
  75:15  77:7, 10, 19
  78:8, 21  79:17  80:23
  81:23  82:9  84:10, 19
shoulder  43:3, 4, 9,
  13  46:18  47:2  63:16
shouting  67:6
show  75:1  77:24
  80:2
showed  15:11  83:23
shows  68:4
side  9:22  23:8, 9, 10
  24:3, 6  25:9, 10
  28:19  56:10  74:23
  76:24
Similar  21:16
simple  18:6  46:17
simply  17:15
Simultaneous  48:3
simultaneously  46:6
  59:18
single  10:14
sir  5:25  6:18, 21
  7:11, 13, 15, 18, 21, 24
  8:9, 10, 17  10:25
  11:2, 16, 21, 24  12:2,
  4, 17  13:13, 17, 21, 24
  14:15  15:1, 8  16:10,
  19  17:2, 6, 14, 20
  18:11  19:6, 20  20:4,
  9, 12, 14, 17, 19, 21, 24

21:5, *10*, *13*, *23*  22:*10*
23:*11*, *14*  24:*23*  25:*1*,
*7*, *15*, *19*  26:*16*  27:*7*,
*17*  28:*2*, *17*, *24*  29:*9*,
*11*, *14*  30:*4*, *17*, *24*
31:*1*, *4*, *8*, *12*, *18*, *19*,
*22*  32:*7*, *18*  33:*24*
34:*9*, *14*, *18*, *24*  35:*2*,
*7*, *10*, *13*, *21*, *24*  36:*3*,
*6*, *8*, *12*, *14*, *17*, *19*
37:*1*, *3*, *6*, *11*, *14*, *16*,
*20*  38:*1*, *3*, *6*, *8*, *16*, *20*
39:*1*, *5*, *8*, *9*, *13*, *20*, *25*
40:*17*, *21*, *25*  41:*6*, *8*,
*21*, *22*  42:*4*, *8*, *12*, *15*,
*21*  43:*7*, *15*, *19*, *23*
44:*5*, *11*  45:*5*, *15*, *18*,
*22*  46:*1*, *15*, *25*  47:*9*
48:*9*, *19*  49:*13*, *16*, *19*,
*22*  50:*2*, *5*, *8*, *12*, *16*
51:*15*, *23*, *24*  52:*6*, *12*,
*19*, *25*  53:*4*  54:*11*
55:*7*, *20*, *23*  56:*2*, *21*,
*24*, *25*  57:*1*, *18*, *24*
58:*2*, *6*  59:*2*, *14*
60:*15*, *23*  61:*1*, *4*, *9*,
*18*, *25*  62:*2*, *7*, *12*
63:*3*, *5*, *9*, *12*, *15*, *21*
64:*1*, *9*, *13*, *23*  65:*12*,
*21*  66:*1*, *14*, *17*, *20*, *23*
67:*24*  68:*4*, *11*, *22*
69:*2*, *17*, *22*  70:*2*, *11*,
*14*, *21*  71:*4*, *8*, *17*, *21*
72:*9*, *18*  73:*5*, *15*
74:*9*, *13*, *14*, *23*  75:*17*,
*21*  76:*12*  77:*8*  78:*14*
79:*1*, *6*, *22*  80:*4*, *15*
81:*11*, *15*, *18*, *21*  82:*7*,
*12*, *14*, *20*  83:*1*
**situation**  12:*5*  59:*16*
*67*:6
**six**  7:*7*, *20*  14:*2*
15:*7*, *17*, *23*  16:*5*
18:*19*  82:*9*, *12*  83:*1*
**sixth**  10:*21*
**slightly**  71:*24*
**slow**  18:*3*  59:*25*
*67*:*10*  75:*25*  76:*4*
*77*:*14*

**slowed**  20:*18*
**slower**  71:*24*
**snippet**  62:*13*
**SOBASZEK**  1:*8*  2:*5*
19:*9*  51:*12*  54:*16*, *19*
67:*2*  69:*5*
**Sobaszek's**  3:*9*  75:*6*
76:*10*  78:*20*  80:*5*
**sole**  36:*23*
**Solutions**  4:*16*
**somebody**  47:*4*
**someone's**  33:*16*
**sorry**  12:*21*  48:*6*
63:*18*  76:*13*  83:*4*
**sound**  80:*10*, *22*
**sounds**  57:*10*  79:*20*
**south**  10:*1*, *4*  23:*2*
24:*1*  25:*8*
**southbound**  24:*6*
**speak**  53:*6*
**speakerphone**  54:*20*
**speakers**  48:*3*
**speaking**  60:*22*
**specific**  21:*7*  26:*1*
27:*2*  29:*11*  34:*2*
50:*10*, *14*, *17*  51:*2*, *7*,
*9*
**specifically**  13:*22*
21:*13*, *22*  22:*20*
24:*10*  26:*18*  27:*7*, *9*,
*13*  28:*11*, *15*  29:*3*, *14*,
*23*  30:*8*, *10*, *12*, *17*
35:*2*  36:*2*, *8*, *12*, *20*
37:*16*  43:*6*  45:*21*
46:*2*  49:*19*  50:*18*
51:*13*, *15*, *19*  52:*18*
53:*13*  54:*3*  61:*11*
63:*4*  65:*5*  72:*19*
74:*25*  77:*21*  80:*24*
82:*20*  83:*11*, *12*  84:*7*,
*15*, *21*
**specified**  86:*8*
**speculation**  19:*16*
78:*10*, *24*  79:*19*
80:*13*
**speed**  73:*6*, *25*  76:*4*
**split**  12:*6*  47:*1*
**spoke**  81:*4*
**squeezing**  47:*2*

**ss**  86:*1*
**St**  2:*9*
**standard**  81:*5*, *10*
**standards**  5:*20*, *21*
6:*5*  33:*7*
**start**  8:*6*  57:*15*
59:*11*  72:*7*
**started**  32:*16*  70:*15*
*77*:7
**starting**  53:*5*  57:*21*
75:*10*  76:*3*
**starts**  70:*18*
**STATE**  1:*8*  2:*10*, *15*
4:*6*, *12*, *18*, *20*, *25*  5:*8*
86:*1*  88:*5*
**stated**  16:*19*  25:*7*
27:*9*, *10*  29:*9*  30:*18*
32:*20*  42:*19*  57:*2*
62:*15*  63:*3*, *18*  64:*1*,
*24*  84:*15*, *16*
**statement**  25:*24*
30:*1*  34:*2*  42:*2*  46:*1*
57:*10*  59:*10*, *19*
60:*14*, *18*  62:*13*
**statements**  32:*10*, *21*
52:*12*
**STATES**  1:*1*
**static**  18:*2*  63:*13*, *17*
**stating**  48:*12*
**stationary**  26:*22*
63:*13*
**STENOGRAPHER**
59:*24*  60:*3*  85:*3*, *6*
**STENOGRAPHIC**
1:*16*  86:*19*
**Stenographically**
1:*22*  4:*7*
**stop**  18:*24*  21:*15*
31:*16*  47:*21*  55:*19*
64:*18*, *24*  67:*19*
68:*15*, *18*  69:*8*, *10*, *12*
70:*6*, *24*  71:*12*  72:*3*,
*5*, *14*  73:*3*, *23*  74:*5*,
*18*  75:*13*  76:*1*, *6*, *16*
78:*5*
**stopped**  15:*20*  24:*3*
31:*19*  66:*1*, *3*  68:*23*
69:*12*  70:*6*, *25*  71:*9*,
*13*  72:*8*  74:*15*  75:*23*

76:*7*, *17*  77:*16*  78:*3*
79:*14*, *25*  80:*1*
**stopping**  18:*2*
**strapped**  26:*8*  54:*23*
**stretch**  45:*12*, *16*
**strike**  35:*24*  76:*10*
**struck**  35:*22*  36:*15*,
*20*, *22*  39:*24*
**subject**  35:*18*, *20*
**subjects**  22:*5*
**subscribed**  86:*21*
**succession**  12:*4*
**Suite**  2:*4*
**summary**  53:*8*, *23*
54:*11*, *21*  59:*17*, *20*
60:*18*  83:*10*
**super**  47:*10*
**supervisor**  40:*22*
**sure**  6:*4*  8:*6*  12:*18*
16:*16*  37:*14*  40:*18*
48:*23*  64:*20*  70:*13*
**surrender**  47:*20*
53:*12*, *13*
**survive**  36:*25*
**suspect**  7:*1*  25:*10*
27:*22*  31:*8*  32:*3*
34:*7*  35:*18*, *23*, *24*, *25*
36:*2*, *22*, *25*  37:*5*
41:*2*, *6*  61:*20*  84:*18*
**swear**  4:*20*
**sworn**  86:*6*
**synch**  85:*9*

**< T >**
**tactical**  60:*12*  82:*11*
**take**  38:*14*  53:*19*
54:*7*  57:*20*  74:*19*
81:*1*
**taken**  49:*4*  54:*9*
**takes**  82:*17*
**talk**  6:*19*  40:*5*
**talked**  41:*2*  48:*16*
52:*21*  81:*5*
**talking**  49:*9*  59:*23*
71:*3*  81:*7*
**target**  63:*13*, *17*
**Taser**  56:*8*, *10*, *17*
**tell**  13:*22*  28:*15*
29:*10*, *12*  30:*14*  61:*9*
68:*7*, *10*, *15*  69:*3*

71:*18, 21*  72:*19*  73:*2, 12, 18*  76:*1*  77:*5, 8*  80:*24*
**telling**  17:*12*  65:*8*
**ten**  21:*3*  25:*4, 16*  26:*4*  27:*21*  28:*1, 20*
**ten-minute**  48:*22*
**tense**  12:*4*  59:*15*
**termination**  31:*18*  75:*20*
**terminology**  27:*16*  82:*8, 15*
**terms**  26:*9*  50:*21*  54:*23*
**testified**  84:*2*
**testify**  16:*10*  38:*19*  86:*6*
**testimony**  13:*12*  14:*5, 7, 12, 23*  41:*18*  63:*24*  64:*21*  65:*11*  86:*9*
**Thank**  5:*5*  48:*25*  59:*25*  74:*19*  81:*2*  84:*22*
**Thanks**  60:*3*
**thereof**  4:*4*
**thing**  15:*9*  16:*22*
**things**  11:*14*  13:*1*  52:*14, 18*  60:*20*  78:*14*  79:*22*  80:*16, 20, 21*
**think**  6:*12*  20:*15*  25:*20*  26:*24*  27:*24*  30:*13*  32:*5, 17*  33:*6*  44:*2*  45:*23*  48:*20*  53:*5*  60:*13*  65:*8*  66:*4*  68:*2, 12, 13, 23*  69:*18*  71:*5*  75:*5*  76:*4*  83:*15*  85:*1*
**thinking**  53:*21*  55:*17*  56:*19*  57:*14*  58:*4, 21*
**third**  10:*20*  37:*4, 12*
**thought**  16:*13, 14*  26:*15*  27:*5*  30:*15*  47:*24*  55:*13*
**threat**  10:*16*  14:*9, 11*  15:*16, 19, 21*  17:*8*  18:*23, 25*  29:*6*  32:*13, 22, 25*  33:*9*  44:*6, 7, 8,*

*15*  46:*20*  47:*21*  48:*10, 13, 16*  57:*2, 7*  59:*6*  64:*16, 18, 24*  65:*1, 2, 15*  66:*2, 4, 6, 11*  78:*17*  80:*4, 7*  81:*7*  82:*1*
**threaten**  24:*17*  52:*8, 16*
**three**  8:*7*  14:*2*  21:*3*  22:*19*  44:*5, 13*  74:*8, 10*  75:*16*  84:*15, 16*
**thrown**  79:*25*
**THURSDAY**  1:*18*  4:*2*
**tilting**  46:*18*  47:*1*
**time**  6:*9*  8:*2, 13, 22*  10:*14, 24*  11:*6, 11, 18*  12:*1, 19*  13:*4, 5, 7, 11, 16, 17*  15:*16*  16:*3*  17:*10*  18:*16*  20:*2, 5*  21:*24*  22:*2, 4, 7, 13*  23:*15, 21*  24:*11, 13, 15, 22, 25*  25:*2, 5*  26:*13*  27:*23, 25*  32:*13, 15*  35:*6, 8*  36:*3*  40:*17*  41:*20*  42:*18, 23*  43:*2, 23*  46:*5, 21*  47:*14, 16*  48:*10, 21*  51:*21*  54:*16*  58:*6*  60:*6, 11*  61:*10*  62:*10*  64:*3, 13*  65:*1, 13*  67:*25*  68:*2*  73:*24*  75:*18*  77:*25*  78:*7*  82:*21*  86:*8*
**times**  6:*3*  7:*7, 20*  9:*8, 9*  15:*17*  18:*1*  20:*15, 17*  26:*12, 24*  27:*9, 11*  28:*19*  43:*12*  69:*8*
**time-wise**  42:*10*
**tint**  28:*17*
**today**  49:*12*  83:*17*
**Today's**  4:*10*
**told**  11:*3*  30:*18*  49:*8*  51:*11*  69:*18*
**tool**  56:*5*
**top**  57:*20*  62:*1*
**topics**  6:*2*
**total**  15:*17*  20:*17*  25:*4*  34:*20*  40:*15*

**totality**  13:*8*  25:*20*  26:*5*  28:*4*  32:*9*  45:*1*  47:*9, 25*  53:*9*  57:*1*  58:*7*  59:*7*  62:*18, 19*  81:*25*
**totally**  17:*11*  28:*16*
**town**  67:*10*
**tracks**  31:*7, 9, 16*
**trained**  34:*4*  44:*16, 22*  55:*10*
**training**  5:*18, 20, 21*  6:*1, 5*  32:*24*  33:*2, 6, 15*  44:*2, 13*  45:*23*  46:*11*  47:*23*  63:*5*  81:*6, 12*  82:*4*  84:*18*
**transcribed**  86:*10*
**TRANSCRIPT**  1:*16*  53:*9, 24*  54:*12*  57:*18*  59:*20*  86:*13, 16, 18*
**transcription**  60:*16*  86:*11*
**transcripts**  54:*21*
**transitioning**  11:*10*
**transpired**  48:*11*
**TRESTER**  2:*8*
**trial**  8:*14*  38:*17*
**trigger**  7:*14, 16, 20*  47:*2, 3*  64:*4, 8*  73:*17*
**truck**  71:*5, 7*
**trucks**  71:*6*
**true**  10:*3*  86:*12*  88:*6*
**trunk**  23:*2*
**truth**  86:*7*
**try**  67:*7, 9, 10*
**trying**  9:*24*  11:*13, 17*  13:*20*  24:*12*  26:*1*  61:*19*
**turn**  42:*11, 18, 24*  43:*3, 5, 10, 11, 17, 20*  44:*1, 2*  45:*3*  62:*20*  69:*15, 19*  70:*1, 9, 16*  83:*17*  84:*3*
**turned**  8:*24*  11:*8, 22*  12:*6*  13:*24*  15:*6, 12*  17:*5, 7, 21*  18:*13, 18*  46:*9*  47:*7*  58:*20*  62:*15*  63:*19*  64:*2*
**turning**  13:*9, 11*  15:*8*  16:*25*  17:*3, 15*

18:*7*  46:*23*  47:*22*
**turns**  42:*1, 3, 6*
**twice**  43:*14*
**two**  10:*7*  14:*2*  18:*19*  19:*4*  22:*7*  31:*13*  39:*22*  42:*7*  43:*15*  50:*7*  57:*21, 22*  68:*25*
**type**  7:*8*  22:*17*

< U >
**unable**  56:*16*
**unaware**  61:*6*
**uncertain**  12:*4*  59:*15*
**understand**  11:*13*  13:*1, 21*  16:*5*  18:*6*  25:*25*  33:*24*  55:*15*  56:*24*  60:*17*
**understanding**  8:*15*  33:*13*  38:*18*  44:*12*  48:*2*  65:*10*
**unfortunately**  56:*11*  57:*4*  65:*12*
**UNITED**  1:*1*
**unobstructed**  28:*18*
**upright**  64:*15*  65:*6*  71:*19*
**use**  6:*13, 14*  33:*1, 17*  44:*17, 23*  55:*9, 18*  56:*16*  81:*6, 13*  82:*5*
**utilize**  55:*20*  56:*13*

< V >
**Vague**  14:*22*  16:*2, 7, 18*  17:*18*  18:*10*  35:*16*  62:*10*  73:*14*
**vantage**  24:*19*  44:*4*
**variables**  82:*2*
**vehicle**  22:*12, 15, 18, 20, 21*  23:*5, 11, 13, 20, 24*  24:*6, 8, 16, 24, 25*  25:*3, 9, 11, 13, 14*  27:*21*  28:*12, 17, 18, 20*  30:*22*  31:*2, 5, 8, 14, 15, 18, 21, 24*  32:*1, 4, 11, 19, 23*  39:*14, 15, 16*  40:*10*  45:*9, 13*  52:*12, 23*  53:*2*
**vehicles**  22:*19*  52:*22*

verbal  21:*12*, *20*
29:*18*  52:9  67:2
82:*4*
verbally  24:*17*  52:7,
*16*
verbatim  30:*1*
versus  4:*12*
viable  57:*3*, *5*
VIDEO  1:*17*  68:*17*
69:*11*  70:5, *23*  71:*11*
72:*4*, *13*  73:*10*, *22*
74:*4*, *17*  75:*12*  76:5,
*15*  77:8, *10*, *15*  78:*4*,
*20*  79:*13*, *24*  80:2, *24*
83:*24*, *25*  85:9
Videographer  2:*19*
4:*9*, *16*  12:*10*, *20*, *22*
49:*2*, *5*  85:*10*
view  28:*18*  31:*13*
76:20  80:5, *6*
violence  50:*23*
visible  11:2, *4*  15:*1*,
*3*  53:*18*  65:*1*  66:*10*
visibly  65:*22*
voice  30:*19*  74:7, *9*
75:*15*

< W >
wait  11:*22*
walk  9:*14*
walking  9:*10*, *12*, *17*
16:*15*, *20*  17:*24*, *25*
18:*3*
want  9:*13*  12:*14*
20:*6*  25:*22*  33:*23*
52:*3*  55:9  67:5
78:*15*  79:*23*
wanting  26:*2*
warehouse  57:*12*
warning  21:*12*, *20*
29:*18*  82:5
watched  20:*8*, *11*, *15*,
*18*, *20*
watching  73:*13*
77:*18*  78:*20*  83:*25*
way  9:7  17:*20*
18:*12*  26:*11*  36:*21*,
*23*  38:*18*  44:*1*  56:*25*
63:*12*, *21*  73:8

weapon  7:*12*  35:*25*
36:*3*  37:5, *7*  39:*11*,
*13*, *14*, *18*, *21*  47:*3*
weapon's  73:*16*
web  4:*14*
well  5:*1*, *21*  25:*22*
49:*18*  56:*11*  57:8
60:*10*  61:*10*  62:*12*
66:*12*  67:*4*  70:*13*
82:*25*  85:9
well-lit  60:7, *8*
went  30:*25*  41:2
65:*24*  66:5  78:8
79:9  83:*14*
We're  4:9  6:*19*  8:6
12:*20*, *22*  40:5  49:5
67:7  69:*24*  70:*16*
75:*10*  76:*23*  78:*19*
85:*1*
west  9:*25*  10:*4*  24:*3*
70:*12*, *15*
western  23:6  24:2
we've  48:*20*
WHEREOF  86:*21*
Whittier  22:*16*  54:*18*
wide  70:*18*
wife  41:*3*
wild  32:*11*
windows  28:8
windshield  30:*11*
within-entitled  86:7
WITNESS  3:2  4:*20*
5:*4*  14:7, *25*  16:*19*
17:*20*  18:*11*  19:*20*
27:*16*  30:*17*  33:*23*
34:*1*  35:*17*  41:*20*
46:*15*  48:6, *9*  57:*24*
59:2, *22*  60:2  62:*12*
63:*3*  64:*1*, *23*  65:*12*
73:*4*, *15*  78:*12*  79:*1*,
*20*  80:*15*, *19*  83:*20*
84:7  86:5, *9*, *21*
women  28:*6*, *10*
47:*11*  54:*1*
wondering  20:*25*
27:*12*  29:7  51:*1*
Woodland  2:*4*
word  60:*19*, *23*
word-by-word  60:*16*

words  27:*13*  29:*12*
51:*17*  53:*12*  54:*22*
work  5:*11*
worse  67:*20*
wound  74:*25*
wounds  74:*21*
write  5:*23*
writing  5:*23*
wrong  52:2

< Y >
yard  8:*16*  23:7
54:*25*
yards  8:*4*, *10*, *13*, *15*
19:*12*  25:*14*
Yeah  40:*8*  74:2  76:2
year  6:*22*  35:*1*  39:*3*
years  5:*16*
yell  27:*4*
Yep  49:2
Yvette  50:22  54:*25*

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 13

**WORD LIST**

**< 1 >**
**1** (4)
**1/24/2024** (1)
**10:04** (2)
**10:16** (1)
**10:18** (1)
**11:08** (1)
**11:24** (1)
**1-10** (1)
**11372** (2)
**12** (2)
**12:20** (2)
**13** (1)
**14** (1)
**14th** (2)
**15th** (1)
**16** (2)
**17** (4)
**18** (1)
**18115** (1)

**< 2 >**
**2** (5)
**20** (9)
**20:04:08** (1)
**20:04:09** (1)
**20:04:15** (1)
**20:04:19** (1)
**20:04:27** (1)
**20:04:30** (1)
**20:04:36** (1)
**20:04:38** (1)
**20:04:41** (2)
**20:04:42** (2)
**20:04:46** (2)
**20:04:47** (2)
**20:04:49** (2)
**20:04:51** (2)
**20:04:53** (1)
**20:04:58** (1)
**20:05:02** (1)
**20:05:05** (1)
**2014** (1)
**2016** (2)
**2017** (3)
**2018** (6)
**2022** (2)

**2023** (1)
**2024** (1)
**2025** (5)
**21** (1)
**213.624.6900** (1)
**21800** (1)
**24th** (3)
**25** (3)
**2550** (1)
**27** (1)
**28:02** (1)
**28:47** (1)
**29th** (1)

**< 3 >**
**3** (2)
**310** (1)
**312120** (1)
**35** (2)

**< 4 >**
**40** (2)
**40525** (2)
**40-millimeter** (1)
**45-degree** (1)

**< 5 >**
**5:25-cv-00331-KK-DTB** (2)
**5090** (1)
**559.705.2312** (1)

**< 6 >**
**60** (1)

**< 7 >**
**7** (1)
**75** (1)

**< 8 >**
**801** (1)
**818.347.3333** (1)
**835(a** (1)

**< 9 >**
**90017** (1)
**90-degree** (8)
**90-degrees** (1)
**91367** (1)

**93721-2271** (1)
**9-millimeter** (1)

**< A >**
**a.m** (6)
**ability** (5)
**able** (14)
**absolutely** (8)
**accurate** (5)
**Acosta** (1)
**ACTING** (2)
**action** (2)
**actions** (4)
**active** (1)
**actual** (3)
**addition** (2)
**additional** (1)
**address** (2)
**administered** (1)
**afoot** (1)
**aforementioned** (1)
**agitated** (1)
**agree** (6)
**agreed** (1)
**ahead** (17)
**aim** (1)
**aiming** (7)
**al** (1)
**Alejandro** (12)
**Alfaro** (3)
**allow** (3)
**allowing** (1)
**ANDREA** (3)
**andrea.kornblau@ma
nningkass.com** (1)
**ANDREW** (8)
**A-N-D-R-E-W** (1)
**Angeles** (1)
**angle** (2)
**angles** (1)
**answer** (13)
**answered** (6)
**answering** (1)
**answers** (1)
**Anybody** (5)
**apologize** (13)
**apparent** (3)
**appear** (2)
**APPEARANCES** (1)

**appeared** (2)
**appears** (5)
**application** (1)
**applies** (1)
**approached** (2)
**appropriate** (9)
**approximate** (2)
**Approximately** (19)
**area** (19)
**Argumentative** (1)
**arm** (1)
**armed** (9)
**armpit** (1)
**arrests** (1)
**arrival** (1)
**arriving** (1)
**articulate** (1)
**articulated** (1)
**Asked** (5)
**asking** (12)
**assess** (2)
**assessed** (1)
**assessing** (6)
**assessment** (2)
**assigned** (2)
**assignment** (2)
**assisting** (1)
**attached** (1)
**attention** (2)
**ATTORNEY** (3)
**audible** (2)
**AUGUST** (4)
**author** (1)
**available** (4)
**Avenue** (2)
**aware** (6)
**Ayes** (1)

**< B >**
**back** (34)
**backdrop** (6)
**backfire** (1)
**background** (1)
**backseat** (1)
**backyard** (3)
**bail** (1)
**Bar** (1)
**barrels** (1)
**barricaded** (1)

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 1

based *(31)*
beating *(1)*
Beaumont *(1)*
began *(4)*
beginning *(2)*
behalf *(2)*
behavior *(1)*
believe *(6)*
believed *(16)*
believing *(2)*
bell *(1)*
best *(5)*
better *(1)*
bit *(10)*
black *(7)*
bladed *(3)*
blood *(1)*
blurry *(1)*
bodily *(11)*
body *(12)*
body-worn *(17)*
bottom *(4)*
Boulevard *(1)*
break *(2)*
building *(7)*
buildings *(1)*
build-up *(1)*
Burbank *(1)*
Bureau *(1)*
business *(2)*
BUTTE *(1)*

< C >
CA *(1)*
CALIFORNIA *(15)*
call *(1)*
Calls *(5)*
camera *(15)*
camera...........................
..........75 *(1)*
camera...........................
67 *(1)*
canine *(8)*
capacity *(1)*
car *(9)*
cars *(1)*
Case *(21)*
cause *(4)*
center *(14)*

CENTRAL *(1)*
certain *(1)*
certainty *(1)*
Certified *(8)*
certify *(1)*
CHANGE *(1)*
changed *(1)*
charted *(1)*
charting *(2)*
chasing *(2)*
check *(4)*
checked *(1)*
chest *(2)*
chest-abdomen *(1)*
children *(5)*
chose *(1)*
CHP *(1)*
circumstances *(13)*
CITY *(6)*
clarification *(4)*
clarify *(1)*
clarifying *(2)*
clear *(4)*
close *(2)*
closer *(7)*
Code *(1)*
combined *(1)*
come *(4)*
comes *(1)*
comfortable *(4)*
commands *(9)*
commencing *(1)*
commercial *(4)*
communication *(1)*
community *(1)*
comparing *(1)*
compartment *(1)*
compass *(1)*
complete *(1)*
completion *(1)*
Compound *(3)*
computer-aided *(1)*
concerned *(1)*
concluded *(1)*
conference *(1)*
confuse *(1)*
consider *(1)*
considered *(1)*
consistent *(2)*

constantly *(1)*
constitutes *(1)*
context *(5)*
continue *(7)*
continued *(4)*
continuing *(2)*
convicted *(1)*
convictions *(1)*
copy *(4)*
corners *(1)*
Correct *(40)*
corrected *(1)*
correction *(1)*
correctly *(1)*
corresponding *(1)*
Counsel *(4)*
count *(2)*
COUNTY *(1)*
couple *(1)*
course *(1)*
COURT *(3)*
cover *(2)*
crashed *(1)*
crime *(1)*
criminal *(1)*
crossing *(1)*
CSR *(3)*
current *(1)*
Currently *(2)*

< D >
DALE *(3)*
dalekgalipo@yahoo.co
m *(1)*
danger *(4)*
dangerous *(1)*
dark *(9)*
date *(4)*
Dated *(1)*
day *(16)*
daylight *(1)*
dead *(1)*
dead-end *(1)*
deadly *(13)*
deals *(1)*
death *(9)*
decided *(1)*
deciding *(1)*
decision *(1)*

DECLARATION *(1)*
declare *(1)*
de-escalation *(1)*
defend *(1)*
DEFENDANT *(5)*
Defendants *(3)*
defense *(2)*
definitely *(2)*
definitions *(1)*
degree *(1)*
Department *(7)*
depiction *(1)*
deploy *(3)*
deployed *(2)*
deponent *(2)*
DEPOSITION *(13)*
Deputy *(4)*
deputy-involved *(1)*
describe *(5)*
described *(4)*
describing *(1)*
DESCRIPTION *(1)*
details *(1)*
Detective *(7)*
determine *(4)*
determined *(2)*
different *(6)*
differently *(1)*
Dillon *(1)*
direction *(7)*
directions *(1)*
directly *(1)*
disabled *(3)*
disagree *(1)*
discharge *(2)*
discharged *(13)*
discharging *(6)*
discussed *(1)*
discussion *(1)*
disinterested *(1)*
disrespect *(1)*
distance *(6)*
distance-wise *(1)*
DISTRICT *(2)*
documented *(2)*
dog *(1)*
doing *(3)*
Domain *(1)*
domestic *(1)*

door  *(2)*
doorway  *(1)*
draw  *(3)*
drawing  *(6)*
drawn  *(1)*
drew  *(1)*
driven  *(1)*
driver's  *(2)*
driveway  *(5)*
driving  *(1)*
drop  *(3)*
dropped  *(1)*
Drye  *(1)*
duly  *(1)*
D'URSO  *(5)*
DV  *(1)*

< E >
earlier  *(4)*
east  *(4)*
eastbound  *(1)*
easy  *(2)*
effect  *(3)*
either  *(6)*
elaborate  *(1)*
eleven  *(1)*
ELLROD  *(1)*
else's  *(2)*
embarrassed  *(1)*
employed  *(2)*
endangering  *(2)*
ended  *(1)*
enforcement  *(3)*
engine  *(1)*
enhanced  *(1)*
enter  *(1)*
entire  *(1)*
entirety  *(4)*
environment  *(1)*
environments  *(1)*
ERRATA  *(1)*
erratic  *(3)*
ESQ  *(3)*
essentially  *(1)*
estimate  *(13)*
estimates  *(1)*
et  *(1)*
evading  *(1)*
event  *(2)*

events  *(5)*
Ex  *(4)*
exact  *(1)*
exactly  *(6)*
EXAMINATION  *(4)*
example  *(7)*
EXHIBIT  *(7)*
EXHIBITS  *(1)*
exit  *(1)*
exited  *(1)*
exiting  *(1)*
experience  *(2)*
explain  *(1)*
extent  *(1)*
exterior  *(1)*
eyes  *(1)*

< F >
face  *(1)*
faced  *(2)*
facilitate  *(1)*
facing  *(10)*
fact  *(1)*
factors  *(1)*
factory  *(1)*
facts  *(3)*
fair  *(6)*
false  *(2)*
familiar  *(5)*
family  *(4)*
far  *(7)*
fast  *(2)*
faster  *(1)*
feasible  *(2)*
February  *(1)*
federal  *(2)*
federally  *(1)*
feel  *(4)*
feet  *(5)*
fellow  *(3)*
felon  *(1)*
field  *(1)*
fifth  *(1)*
Figueroa  *(1)*
figure  *(1)*
filed  *(2)*
find  *(1)*
fine  *(3)*
fire  *(7)*

firearm  *(103)*
firearms  *(4)*
fired  *(41)*
firing  *(17)*
First  *(46)*
five  *(8)*
fled  *(2)*
flee  *(3)*
fleed  *(1)*
fleeing  *(4)*
flight  *(1)*
Floor  *(2)*
Florida  *(1)*
foc  *(1)*
Focus  *(2)*
focused  *(7)*
focusing  *(1)*
followed  *(1)*
following  *(1)*
follow-up  *(1)*
foot  *(22)*
footage  *(8)*
football  *(2)*
force  *(21)*
foregoing  *(4)*
forklifts  *(1)*
form  *(1)*
former  *(1)*
forward  *(8)*
four  *(4)*
fourth  *(4)*
frame  *(18)*
frames  *(1)*
freeze  *(1)*
Fresno  *(1)*
front  *(9)*
frozen  *(1)*
full  *(1)*
fully  *(2)*
fur  *(1)*
further  *(5)*
furtive  *(1)*

< G >
gait  *(1)*
GALIPO  *(101)*
GALIPO.......................
.......5  *(1)*
GARCIA  *(13)*

GENERAL  *(5)*
Generally  *(7)*
GEORGE  *(3)*
getting  *(9)*
Girard  *(1)*
give  *(11)*
given  *(4)*
giving  *(3)*
glasses  *(1)*
GLOCK  *(2)*
go  *(31)*
goes  *(1)*
going  *(45)*
GONZALEZ  *(65)*
Gonzalez's  *(4)*
Good  *(5)*
grammatical  *(1)*
gray  *(2)*
great  *(2)*
grip  *(1)*
ground  *(17)*
guess  *(11)*
guessing  *(13)*
gun  *(31)*
gunfire  *(2)*
guns  *(1)*
gunshot  *(14)*
gunshots  *(3)*

< H >
half  *(2)*
hand  *(64)*
handgun  *(1)*
handler  *(2)*
hands  *(11)*
happened  *(5)*
happening  *(4)*
harm  *(7)*
head  *(1)*
hear  *(14)*
heard  *(12)*
hearing  *(5)*
held  *(1)*
help  *(1)*
helping  *(1)*
HEMET  *(6)*
hereunder  *(1)*
Hey  *(1)*
high  *(1)*

**HIGHWAY** (2)
**Hills** (1)
**hit** (2)
**Hofiani** (2)
**holding** (2)
**holster** (1)
**honest** (1)
**honestly** (1)
**hoping** (1)
**hopping** (1)
**horse** (1)
**hostage** (4)
**hour** (2)
**house** (5)
**hundred** (6)
**hypothetical** (3)
**hypothetically** (1)
**Hyundai** (5)

**< I >**
**identification** (1)
**illumination** (1)
**immediate** (6)
**immediately** (9)
**imminency** (1)
**imminent** (38)
**importance** (1)
**important** (1)
**imprisonment** (2)
**incident** (28)
**include** (6)
**including** (1)
**inclusive** (1)
**Incomplete** (3)
**INDEX** (1)
**indicated** (2)
**individual** (5)
**individuals** (3)
**information** (7)
**initial** (6)
**initially** (4)
**injured** (4)
**injury** (12)
**inside** (3)
**instance** (3)
**intent** (6)
**intentionally** (2)
**intermittently** (1)
**internal** (1)

**interruption** (1)
**introduce** (1)
**Investigator** (4)
**involved** (13)
**IRICK** (6)
**item** (1)

**< J >**
**January** (3)
**Job** (2)
**jog** (2)
**jogging** (5)
**Join** (6)
**justify** (1)

**< K >**
**KASS** (1)
**keep** (5)
**Keller** (1)
**kept** (1)
**key** (1)
**kidnapping** (2)
**kill** (2)
**killed** (1)
**KIMBERLY** (6)
**kind** (4)
**kinds** (1)
**knife** (3)
**know** (55)
**knowledge** (7)
**KORNBLAU** (39)
**KORNBLAU................**
**............83** (1)

**< L >**
**laid** (1)
**lasted** (1)
**lastly** (1)
**late** (1)
**launcher** (1)
**LAW** (5)
**lawful** (1)
**laws** (2)
**lawsuit** (2)
**layman** (1)
**layman's** (1)
**laymen** (1)
**Leading** (1)
**leaning** (2)

**Learning** (1)
**leave** (1)
**leaving** (1)
**left** (27)
**leg** (1)
**less-lethal** (1)
**lethal** (4)
**level** (1)
**license** (1)
**life** (3)
**life-threatening** (1)
**light** (1)
**lighting** (2)
**lights** (1)
**line** (18)
**lined** (1)
**lines** (3)
**listed** (1)
**listen** (1)
**Litigation** (1)
**little** (13)
**live** (2)
**LLP** (1)
**located** (2)
**long** (10)
**longer** (7)
**look** (7)
**looked** (7)
**looking** (16)
**looks** (3)
**Los** (1)
**lot** (2)
**loud** (6)
**low** (1)
**lowest** (1)
**lying** (2)

**< M >**
**ma'am** (6)
**magazines** (2)
**maintenance** (2)
**making** (2)
**Mall** (1)
**man** (1)
**manipulating** (1)
**manner** (1)
**MANNING** (1)
**March** (1)
**MARIO** (3)

**mario.garcia@doj.ca.g**
**ov** (1)
**Mariposa** (1)
**mark** (2)
**marked** (3)
**Martin** (2)
**mass** (12)
**Master** (4)
**mat** (1)
**match** (1)
**materials** (1)
**math** (1)
**matter** (2)
**mean** (3)
**meaning** (2)
**means** (1)
**meant** (1)
**medium** (1)
**meet** (1)
**members** (2)
**mental** (1)
**mentioned** (2)
**mere** (1)
**merely** (1)
**met** (1)
**Michael** (1)
**mind** (4)
**mine** (1)
**Minus** (1)
**minute** (1)
**minutes** (7)
**missing** (1)
**misspeaking** (1)
**misstate** (1)
**Misstates** (5)
**mistake** (1)
**misunderstand** (1)
**misunderstood** (1)
**mode** (1)
**moment** (4)
**moments** (2)
**Monguia** (1)
**morning** (1)
**motion** (17)
**move** (1)
**movement** (1)
**movements** (1)
**moving** (15)
**multiple** (1)

multiplying  (1)
muzzle  (1)

< N >
name  (15)
named  (5)
names  (1)
narrative  (1)
narrow  (10)
nature  (2)
near  (6)
necessarily  (1)
necessary  (2)
need  (2)
needed  (1)
new  (2)
nine  (6)
Noise  (2)
noises  (1)
nonsensical  (1)
north  (5)
northwest  (1)
note  (2)
noted  (2)
notice  (1)
number  (11)
numbers  (1)
numerous  (4)

< O >
oath  (1)
obey  (1)
object  (10)
Objection  (28)
objectively  (1)
observations  (1)
observe  (9)
observed  (19)
observing  (2)
obviously  (9)
occasions  (1)
occupied  (5)
occurred  (3)
occurring  (1)
offhand  (1)
office  (1)
OFFICER  (9)
officer-involved  (7)
officers  (43)

officers/deputies  (1)
OFFICES  (1)
Oh  (4)
Okay  (82)
once  (9)
onset  (4)
oOo  (5)
opinion  (1)
opportunity  (7)
opposed  (1)
opposite  (2)
option  (6)
options  (2)
order  (4)
ordering  (2)
original  (1)
outside  (3)

< P >
p.m  (2)
pace  (3)
PAGE  (8)
PAGE/LINE  (1)
Paralegal  (1)
paraphrasing  (1)
parked  (4)
part  (10)
partially  (2)
particular  (5)
partners  (16)
partners's  (1)
parts  (1)
party  (1)
passed  (3)
passenger  (2)
passenger's  (3)
passes  (1)
PATRICK  (2)
PATROL  (5)
Pause  (5)
paused  (4)
paying  (2)
peacefully  (3)
Penal  (1)
penalty  (1)
people  (5)
perceive  (6)
perceived  (13)
perceiving  (1)

percent  (6)
perception  (2)
perfect  (2)
period  (2)
perjury  (1)
person  (23)
person's  (2)
perspective  (1)
pertains  (1)
phone  (1)
photograph  (2)
photographed  (1)
photographs  (2)
physical  (1)
physically  (3)
place  (8)
placed  (1)
placement  (1)
Plaintiff  (2)
PLAINTIFFS  (1)
play  (16)
played  (16)
please  (9)
plenty  (3)
plus  (1)
point  (24)
pointed  (1)
pointing  (5)
Police  (7)
policies  (4)
pop  (3)
populated  (1)
Portion  (9)
pose  (1)
posed  (8)
position  (3)
positioned  (2)
possessed  (3)
possessing  (1)
possible  (4)
possibly  (1)
POST  (6)
potential  (2)
potentially  (3)
power  (1)
praying  (1)
precise  (1)
preface  (1)
presence  (1)

PRESENT  (13)
presentation  (1)
presented  (7)
preserve  (1)
press  (1)
pressed  (1)
pressing  (1)
pressure  (1)
pretty  (1)
previous  (1)
previously  (13)
prior  (16)
probably  (1)
procedures  (1)
proceedings  (2)
progressing  (1)
promoted  (2)
property  (3)
protected  (1)
proximity  (3)
public  (1)
pull  (2)
pulled  (3)
pulling  (3)
pursuing  (1)
pursuit  (28)
putting  (1)

< Q >
question  (6)
questions  (8)

< R >
radio  (1)
railroad  (3)
RAMIREZ  (1)
ramp  (1)
ran  (3)
rapid  (2)
rapidly  (1)
rapidly-evolving  (2)
read  (3)
ready  (2)
real  (3)
reason  (6)
reasonable  (1)
recall  (44)
recalling  (1)
received  (3)

recognize  *(1)*
recollection  *(3)*
record  *(10)*
recorded  *(1)*
**REFERENCE**  *(6)*
referenced  *(3)*
referencing  *(1)*
referring  *(2)*
refresh  *(1)*
refusal  *(2)*
regards  *(2)*
regular  *(1)*
reiterating  *(1)*
relation  *(2)*
relative  *(1)*
relayed  *(2)*
relevant  *(2)*
remember  *(8)*
**REMEMBERED**  *(1)*
**REMOTE**  *(3)*
remotely  *(2)*
repeat  *(1)*
repeated  *(2)*
replay  *(1)*
report  *(1)*
**Reported**  *(4)*
**Reporter**  *(8)*
**REPORTER'S**  *(1)*
reporting  *(1)*
represent  *(1)*
represented  *(2)*
representing  *(1)*
requested  *(2)*
required  *(1)*
residence  *(3)*
resolved  *(1)*
respect  *(2)*
responsible  *(1)*
restrained  *(1)*
restraining  *(2)*
review  *(1)*
reviewing  *(1)*
**Revised**  *(1)*
**REYNOSO**  *(8)*
**R-E-Y-N-O-S-O**  *(1)*
**Reynoso's**  *(2)*
right  *(55)*
right-hand  *(1)*
ring  *(1)*

**Riverside**  *(2)*
**Room**  *(1)*
round  *(9)*
rounds  *(10)*
**RPR**  *(3)*
run  *(2)*
running  *(25)*

**< S >**
safe  *(1)*
sand  *(13)*
saw  *(15)*
saying  *(33)*
says  *(1)*
scene  *(1)*
screen  *(4)*
**SEAN**  *(4)*
season's  *(1)*
seat  *(3)*
second  *(15)*
seconds  *(16)*
**Section**  *(2)*
see  *(57)*
seeing  *(7)*
seen  *(7)*
semi-automatic  *(3)*
send  *(1)*
sense  *(1)*
sequence  *(3)*
**Sergeant**  *(9)*
series  *(1)*
serious  *(9)*
seriously  *(2)*
set  *(2)*
share  *(1)*
**SHEET**  *(1)*
**Sheriff's**  *(2)*
shoot  *(15)*
shooter  *(1)*
shooters  *(7)*
shooting  *(38)*
shootings  *(7)*
**Shorthand**  *(3)*
shot  *(47)*
shots  *(37)*
shoulder  *(7)*
shouting  *(1)*
show  *(3)*
showed  *(2)*

shows  *(1)*
**side**  *(14)*
**Similar**  *(1)*
simple  *(2)*
simply  *(1)*
**Simultaneous**  *(1)*
simultaneously  *(2)*
single  *(1)*
sir  *(246)*
situation  *(3)*
six  *(11)*
sixth  *(1)*
slightly  *(1)*
slow  *(6)*
slowed  *(1)*
slower  *(1)*
snippet  *(1)*
**SOBASZEK**  *(8)*
**Sobaszek's**  *(5)*
sole  *(1)*
**Solutions**  *(1)*
somebody  *(1)*
someone's  *(1)*
sorry  *(5)*
sound  *(3)*
sounds  *(2)*
south  *(5)*
southbound  *(1)*
speak  *(1)*
speakerphone  *(1)*
speakers  *(1)*
speaking  *(1)*
specific  *(11)*
specifically  *(48)*
specified  *(1)*
speculation  *(5)*
speed  *(3)*
split  *(2)*
spoke  *(1)*
squeezing  *(1)*
ss  *(1)*
**St**  *(1)*
standard  *(2)*
standards  *(4)*
start  *(4)*
started  *(3)*
starting  *(4)*
starts  *(1)*
**STATE**  *(11)*

stated  *(16)*
statement  *(11)*
statements  *(3)*
**STATES**  *(1)*
static  *(3)*
stating  *(1)*
stationary  *(2)*
**STENOGRAPHER**  *(4)*
**STENOGRAPHIC**  *(2)*
**Stenographically**  *(2)*
stop  *(28)*
stopped  *(21)*
stopping  *(1)*
strapped  *(2)*
stretch  *(3)*
strike  *(2)*
struck  *(5)*
subject  *(2)*
subjects  *(1)*
subscribed  *(1)*
succession  *(1)*
**Suite**  *(1)*
summary  *(8)*
super  *(1)*
supervisor  *(1)*
sure  *(9)*
surrender  *(3)*
survive  *(1)*
suspect  *(18)*
swear  *(1)*
sworn  *(1)*
synch  *(1)*

**< T >**
tactical  *(2)*
take  *(6)*
taken  *(2)*
takes  *(1)*
talk  *(2)*
talked  *(4)*
talking  *(4)*
target  *(2)*
**Taser**  *(3)*
tell  *(20)*
telling  *(2)*
ten  *(7)*
ten-minute  *(1)*

tense  (2)
termination  (2)
terminology  (3)
terms  (3)
testified  (1)
testify  (3)
testimony  (10)
Thank  (7)
Thanks  (1)
thereof  (1)
thing  (2)
things  (10)
think  (26)
thinking  (6)
third  (3)
thought  (7)
threat  (42)
threaten  (3)
three  (11)
thrown  (1)
THURSDAY  (2)
tilting  (2)
time  (77)
times  (16)
time-wise  (1)
tint  (1)
today  (2)
Today's  (1)
told  (5)
tool  (1)
top  (2)
topics  (1)
total  (5)
totality  (15)
totally  (2)
town  (1)
tracks  (3)
trained  (4)
training  (19)
transcribed  (1)
TRANSCRIPT  (9)
transcription  (2)
transcripts  (1)
transitioning  (1)
transpired  (1)
TRESTER  (1)
trial  (2)
trigger  (8)
truck  (2)

trucks  (1)
true  (3)
trunk  (1)
truth  (1)
try  (3)
trying  (7)
turn  (21)
turned  (19)
turning  (9)
turns  (3)
twice  (1)
two  (13)
type  (2)

< U >
unable  (1)
unaware  (1)
uncertain  (2)
understand  (10)
understanding  (6)
unfortunately  (3)
UNITED  (1)
unobstructed  (1)
upright  (3)
use  (12)
utilize  (2)

< V >
Vague  (10)
vantage  (2)
variables  (1)
vehicle  (50)
vehicles  (2)
verbal  (6)
verbally  (3)
verbatim  (1)
versus  (1)
viable  (2)
VIDEO  (27)
Videographer  (9)
view  (5)
violence  (1)
visible  (7)
visibly  (1)
voice  (4)

< W >
wait  (1)
walk  (1)

walking  (8)
want  (10)
wanting  (1)
warehouse  (1)
warning  (4)
watched  (5)
watching  (4)
way  (12)
weapon  (11)
weapon's  (1)
web  (1)
well  (14)
well-lit  (2)
went  (7)
We're  (14)
west  (5)
western  (2)
we've  (1)
WHEREOF  (1)
Whittier  (2)
wide  (1)
wife  (1)
wild  (1)
windows  (1)
windshield  (1)
within-entitled  (1)
WITNESS  (39)
women  (4)
wondering  (4)
Woodland  (1)
word  (4)
word-by-word  (1)
words  (5)
work  (1)
worse  (2)
wound  (1)
wounds  (1)
write  (1)
writing  (1)
wrong  (1)

< Y >
yard  (3)
yards  (6)
Yeah  (3)
year  (3)
years  (1)
yell  (1)
Yep  (1)

Yvette  (2)