UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

GEORGE GONZALEZ,

Plaintiff,

v. Case No. 5:25-cv-00331-KK-DTB

STATE OF CALIFORNIA; CITY OF HEMET; PATRICK SOBASZEK; ANDREW REYNOSO; SEAN IRICK; and DOES 1-10, inclusive,

Defendants.
______________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF PATRICK SOBASZEK

WEDNESDAY, JULY 23, 2025

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 18114



APPEARANCES (Remote)

FOR THE PLAINTIFFS:

LAW OFFICES OF DALE K. GALIPO
BY: DALE K. GALIPO, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
dalekgalipo@yahoo.com
msincich@galipolaw.com

FOR THE DEFENDANTS CITY OF HEMET, PATRICK SOBASZEK, and ANDREW REYNOSO:

MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
BY: ANDREA KORNBLAU, ESQ.
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017
213.624.6900
andrea.kornblau@manningkass.com

FOR THE DEFENDANTS STATE OF CALIFORNIA, ACTING BY AND THROUGH THE CALIFORNIA HIGHWAY PATROL, AND OFFICER SEAN IRICK:

ATTORNEY GENERAL OF CALIFORNIA
BY: ASHLEY REYES, ESQ.
Deputy Attorney General
State Bar No. 312120
2550 Mariposa Mall, Room 5090
Fresno, CA 93721-2271
559.705.2312
ashley.reyes@doj.ca.gov

MARIO E. GARCIA, ESQ.
Deputy Attorney General

ALSO PRESENT: Dennis Saelee, Videographer

--oOo--



INDEX OF EXAMINATION

WITNESS: PATRICK SOBASZEK

EXAMINATION BY PAGE
MR. GALIPO..............................5
MS. KORNBLAU...........................80

EXHIBITS FOR REFERENCE


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 - | Portion of body-worn camera | 51 |
| 2 - | Still shot from body-worn camera | 51 |
| 3 - | Still shot from body-worn camera | 54 |
| 4 - | Still shot from body-worn camera | 56 |
| 5 - | Still shot from body-worn camera | 57 |
| 6 - | Still shot from body-worn camera | 59 |
| 7 - | Still shot from body-worn camera | 60 |
| 8 - | Still shot from body-worn camera | 61 |
| 9 - | Still shot from body-worn camera | 61 |
| 10- | Still shot from body-worn camera | 63 |
| 11- | Still shot from body-worn camera | 63 |
| 12- | Still shot from body-worn camera | 64 |
| 13- | Still shot from body-worn camera | 65 |
| 14- | Still shot from body-worn camera | 65 |
| 15- | Still shot from body-worn camera | 66 |
| 16- | Still shot from body-worn camera | 64 |
| 17- | Still shot enhancement/ body-worn camera | 88 |


--oOo--



--oOo--

BE IT REMEMBERED, that set on Wednesday, the 23rd day of July, 2025, commencing at the hour of 10:04 a.m., thereof, PATRICK SOBASZEK appeared remotely in Hemet, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

THE VIDEOGRAPHER: Good morning. We are now on the record. The time is 10:03 a.m. Today's date is July 23rd, 2025. This is the recorded video deposition of Patrick Sobaszek in the matter of George Gonzalez versus State of California, et al.

This deposition is being held via web conference. My name is Dennis Saelee. I'm the videographer with Focus Litigation Solutions. The court reporter is Kimberly D'Urso.

Counsel, please introduce yourselves and state whom you represent, after which the court reporter will swear in the witness.

MR. GALIPO: Dale Galipo, on behalf of the

plaintiff.

MS. KORNBLAU: Andrea Kornblau, on behalf of Defendants, City of Hemet and Corporal Patrick Sobaszek.

MR. GARCIA: Mario E. Garcia and Ashley Reyes, on behalf of the State of California, acting by and through the California Highway Patrol and California Highway Patrol Officer Sean Irick.

(Whereupon the oath was administered to the deponent by the Certified Shorthand Reporter.)

THE WITNESS: I do.

EXAMINATION

BY MR. GALIPO:

Q. Good morning. Can you please state your name?

A. Good morning. My name is Patrick Sobaszek.

Q. I was hoping I wasn't butchering your name too bad yesterday, so forgive me. I was trying my best.

A. No, you're actually pretty close. Not too far off.

Q. Okay. I'll take it.

Have you had your deposition taken before?

A. Yes.

Q. On how many prior occasions?

A. Two.

Q. And were either one of those related to an officer-involved shooting case?



A. Yes.

Q. And were both of them related to that or just one?

A. Just one.

Q. Was that in the Solis case?

A. Yes.

Q. And the other deposition you took, what was that related to?

A. That was related to a use of force and arrest incident.

Q. Were you named as a defendant in that case?

A. Yes.

Q. And what was the alleged use of force? What type of force?

A. It was a general -- just excessive force and, like, an unlawful arrest, I guess you could say.

Q. Was the force just, like, a takedown, or a Taser, or what was involved in the force?

A. On my end specifically, it was a takedown.

Q. Other officers were involved in other types of force?

A. Yes.

Q. Is that case still pending, or has that resolved?

A. It has resolved.



Q. And you've testified in court before; is that correct?

A. Yes, sir.

Q. Do you have an estimate as to how many times you've done that?

A. I just want to clarify: Like, criminal and civil, or just the civil side?

Q. No. Both, combined.

A. Probably at least a hundred times.

Q. What is your current assignment?

A. I am a corporal assigned to the investigations bureau.

Q. And what do you generally do in that assignment?

A. I supervise investigators under me during the course of their investigative duties, as well as carry a caseload of my own.

Q. What type of crimes does your unit generally investigate?

A. We're a general investigations bureau, so we'll do everything from homicides, crime against persons to property crimes, robberies. Basically, anything that will get the attention of detectives above patrol level, we'll handle it.

Q. How long have you had that assignment?



A. Since April of 2024.

Q. What was your assignment immediately before that?

A. I was a detective assigned to the Region 3 Gang Task Force.

Q. And how long were you in that assignment with the task force?

A. That was from September of 2019 to April of 2024.

Q. During that time frame, were you at least present to some extent, in the Solis case when that shooting took place?

A. Yes.

Q. And then you were involved, obviously, in the shooting of Mr. Gonzalez?

A. Yes. I was there during that incident, as well.

Q. And you were also present during the shooting of Mr. Helman?

A. Yes.

Q. Were you present for any other officer-involved shootings during your time on the task force?

A. I was present at other officer-involved shooting scenes, but I wasn't directly related to it.

Q. And when you say not "directly related," what

do you mean by that?

A. Like, when the call would come out on the radio and we would respond, you know, mostly it was like the emergency help. So, like, there was an incident in Beaumont when the --

(Reporter clarification.)

THE WITNESS: Yeah. There was an incident in Beaumont, and then, like, the incident in Elsinore where the deputy got killed. So we responded to various officer-involved shooting incidents, but they weren't directly there or related to the actual, you know, investigation or what caused it.

BY MR. GALIPO:

Q. Okay. Thank you for that. I understand now.

And do you know, with respect to the Solis case, the Gonzalez case, and the Helman case, of those three, which one chronologically occurred first?

A. Solis was first.

Q. Okay. And which one was second of those three, if you know?

A. It would be Mr. Helman.

Q. And then the Gonzalez matter would be after Helman?

A. Correct, sir.

Q. Just to get into a little bit of your



background, can you tell me a little bit about your educational background after high school?

A. Yes, sir. I -- well, I got an associate's degree with a concentration of business administration, and then, obviously, the academy trainings. I went to two academies, one for San Diego Sheriff's, which is a correctional and court services position. And then the sworn academy after that.

After getting -- completing the sworn academy, I finished my bachelor's degree with an emphasis in business administration.

Q. When did you go to the first academy in San Diego?

A. It would have been September of 2013.

Q. And when did you go to the second academy?

A. The San Bernardino Sheriff's Academy, that was July of 2015.

Q. What type of work did you generally do before going to the academies?

A. I had one part-time job out of high school, which was at the Storm Stadium in Lake Elsinore, where I did, like, parking. I was, like, a parking assistant or -- I don't remember what the title was. But basically, we controlled the flow of parking at the stadium. I did that for a couple months before I got hired by San Diego



Sheriff's.

Q. And what did you do exactly for the San Diego Sheriff's Department?

A. I was what they called the "Detentions and Court Services Deputy Sheriff." So I worked -- I was assigned to a custodial setting, so I worked in a county jail.

Q. And what time frame did you do that?

A. That would have been September 2013 to July of 2015.

Q. When, approximately, did you start with Hemet?

A. July -- my first date of the academy and my official hire date was July 6th of 2015.

Q. So they had hired you prior to starting the academy?

A. Yes, sir.

Q. And where did you go to the academy?

A. San Bernardino County Sheriff's Department.

Q. And how long, approximately, was that academy?

A. About 27 weeks.

Q. During the academy, you had to study POST Learning Domains?

A. Correct.

Q. And had some instruction with respect to a lot topics, but including tactics and use of force?



A. Yes, sir.

Q. And with Hemet, did you have a period of field training?

A. I did.

Q. How long was that, approximately?

A. Four months.

Q. And after you completed field training, were you initially assigned to patrol?

A. Yes.

Q. And how long were you assigned to patrol before your assignment changed with Hemet?

A. So I started patrol December of 2015, and then my next assignment was the Gang Task Force, which was September of 2019. So a little under four years.

Q. At some point you had some collateral assignments, such as a field training officer?

A. Yes, sir. I was a field training officer, and I was also -- and I am also a member of our SWAT team.

Q. During what time period were you a field training officer?

A. It was after I got on the Gang Team, so I don't remember the exact date. I want to say it was sometime in 2021.

Q. And are you still a field training officer, or did that end at some point?

Page 13

A. I am still a field training officer. Yes, sir.
Q. And how about with the SWAT team? Are you still a member of the SWAT team?
A. Yes.
Q. And when did you first become a member of the SWAT team?
A. I want --
Q. Approximately. Approximately.
A. It was probably the end -- it was towards the end of 2021.
Q. How old are you, currently?
A. 31.
Q. How tall are you?
A. 5'7, on a good day.
Q. On a good day? Okay. I got that.
How much do you currently weigh on a good day?
A. 165 pounds.
Q. And I don't know whether good is more or less. I guess that's subject to debate.
Did you do anything, generally, in the time frame of the shooting, in other words, the year or two before, to keep in shape?
A. Yes, sir.
Q. What did you do, generally, to keep in good physical condition?

Page 14

A. I'd workout approximately five to six days out of the week. My workouts consisted of, usually, between an hour and an hour and a half of strength training, like weights training, and followed by, usually, about a mile and a half to two mile run after that.
Q. And you would do that five or six times a week?
A. Yes, sir.
Q. Would you characterize yourself as being in generally good physical condition at the time of the shooting incident?
A. Yes.
Q. Had you seen in the course of your work, prior to the incident with Mr. Gonzalez, other than Mr. Helman, had you seen suspects with firearms in their hand before?
A. Yes.
Q. And do you have an estimate on how many occasions you had observed that in your work as a police officer?
A. I just want to clarify "in their hand," like, you're talking about actually holding the firearm; correct?
Q. For purposes of this question, yes.
A. Okay. If we're including Mr. Helman and Mr. Gonzalez, probably, like, five. Five or six.

Page 15

Q. Okay. So when you say -- it really doesn't matter. We can do the math.
So aside from Mr. Helman and Mr. Gonzalez, are you saying maybe three or four other times?
A. Yes, sir.
Q. And had you been in foot pursuits before the incident with Mr. Gonzalez?
A. Yes.
Q. Do you have an estimate or any range as to how many foot pursuits you've been in?
A. At least 20.
Q. In some of those foot pursuits, did it end up being that the person you were chasing was armed?
A. Yes.
Q. Had you had occasions where people ran from you with firearms and then tossed or tried to toss the firearm during the foot pursuit?
A. Yes.
Q. Did you have training that sometimes people will run from police officers if they have illegal items on them, such as contraband or firearms?
MS. KORNBLAU: Objection. Vague.
THE WITNESS: I mean, I don't know if it's necessarily we had training on it. But, yeah, I mean, people would run from me and try to discard contraband, yes.

Page 16

BY MR. GALIPO:
Q. And were you trained or based on your experience, people would sometimes run and try to discard firearms, if they could?
A. Yes.
Q. Were you trained that you can shoot someone merely for running away from you, that fact alone?
MS. KORNBLAU: Objection. Vague.
THE WITNESS: I mean, there's certain scenarios where you could. It would just kind of depend at the situation.
So, I mean, it's kind of hard to answer that question without any, you know, factual background or...
BY MR. GALIPO:
Q. Okay. That's fair. I'll get more specific. I understand what you're getting to.
How about seeing a gun in someone's hand? Were you trained you can shoot someone for that fact alone, merely seeing a gun in their hand?
MS. KORNBLAU: Objection. Vague.
THE WITNESS: Again, kind of like my last -- it kind of lacks the detail of, you know, why we're there and what's going on. So, I mean, it's hard to give a yes or no just based off that question.

BY MR. GALIPO:

Q. Okay. I'm just wondering, were you trained that if someone's running from you, you could automatically shoot them?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: If you're just giving me the scenario that someone is running, then, no.

BY MR. GALIPO:

Q. How about were you trained you can shoot someone automatically if you see a gun in their hand?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: Again, without certain facts, it's hard to answer. But if you're just giving me the scenario of I see someone running with a gun with no other basis, then, no. We weren't trained we could just shoot them.

BY MR. GALIPO:

Q. So let's talk a little bit -- I think you mentioned that the incident with Mr. Helman happened before the incident with Mr. Gonzalez; is that correct?

A. Yes.

Q. And in the Solis case, it's my recollection that you did not specifically see Mr. Solis at the time the shots were fired; is that accurate?

A. Correct.



Q. And with respect to Mr. Helman, was that the first officer-involved shooting you had actually been involved in?

A. Yes.

Q. And I'm not going to go into all the details, but was Mr. Helman running away from you at some point?

MS. KORNBLAU: Objection. Attorney-client and litigation privilege.

This question is being asked for an improper purpose. You're attempting to ambush my client for information that is -- he is not currently prepared to answer. He's here today to talk about the Gonzalez case, not Helman. I'm going to instruct him not to answer questions related to the Helman case.

You're attorney of record in the Helman case, and you've already noticed this deposition. It's going to take place in August. You can ask him specific questions about the Helman case at that time.

MR. GALIPO: And the basis for your objection in instructing him not to answer is what privilege, specifically?

MS. KORNBLAU: As I stated, attorney-client and litigation privilege. The Helman case, as you know, is in active litigation with your office.

MR. GALIPO: Yes. I'm very aware of that. But



since that case happened before this and that might relate to some of our claims we have in this case, I do think it's fair for me to ask at least some questions on it.

I don't think -- I'm not asking about any privileged communications between him and his attorney. And when you say "the litigation privilege," I'm not exactly sure what you're referring to in this context. I'm assuming since this officer was involved in that shooting, he has a general recollection of that event.

MS. KORNBLAU: Mr. Galipo, as you just stated, you said that you believe that since the Helman incident occurred before Gonzalez, that you have a right to ask him questions about Helman. However, your office has both of those cases.

If that is how you felt, then perhaps the deposition for the Helman case should have been noticed prior to this deposition in the Gonzalez matter.

But I'm going to stand on my objections, and I'm going to instruct him not to answer any questions today about the Helman case. He can answer questions in August. If you feel the need to bring him back for some reason, then we can address that with the court at that time.

MR. GALIPO: Okay. Are you going to follow



your attorney's advice and not answer any questions, no matter what they are today, on the Helman case?

THE WITNESS: Yes.

MR. GALIPO: Okay. So I don't really agree with you, but I understand your objection. And I guess I don't really want to waste time about -- fighting about it or asking him a hundred questions regarding Helman. I was only going to ask a few, quite frankly, but -- and have you instruct not to answer each question.

So what I'll do is I'll reserve my right to re-depose him in this case on the Helman matter, as I think it relates to some of our claims, including Monell, and other claims in this case, at a later time. And we can meet and confer on that if I think it's necessary after the completion of the Helman depo.

MS. KORNBLAU: Okay. But, Mr. Galipo, I would, then, ask that you go ahead and ask all of those questions, just so that if you do bring him back, then a judge can rule and then allow you to re-ask the questions that you would have asked today.

Otherwise, I don't know what you would have asked.

MR. GALIPO: Well, you've already told me you're going to instruct him not to answer any question on Helman.

MS. KORNBLAU: Yes.

MR. GALIPO: So I just don't think it's a good use of our time for me to ask 30 or 40, 50 questions, where you're telling me you're going to instruct him not to answer any one of them.

MS. KORNBLAU: Well, you previously just said you only had a few questions, and now you're saying 30, 40, or 50 questions. But I do think that we need to have a record of any of the questions that you had planned to ask him today.

MR. GALIPO: Okay.

MS. KORNBLAU: Or we can move on.

MR. GALIPO: Well, that's okay. I got the impression from what you were saying that no matter what I ask him, you're going to instruct him not to answer. Maybe I misunderstood you.

MS. KORNBLAU: You did not. But I do think we need to have a record of the questions that you had planned to ask him.

MR. GALIPO: Okay. Well, I'll try a few and we'll see how it goes.

BY MR. GALIPO:

Q. Was -- in the Helman case, which pre-dated the Gonzalez case, was Mr. Helman running away from you at some point?



MS. KORNBLAU: Objection. Attorney-client and litigation privilege.

I'm going to instruct this witness not to answer.

MR. GALIPO: Are you going to follow your attorney's instruction?

THE WITNESS: Yes.

MR. GALIPO: This gets a bit tedious, as you'll see.

BY MR. GALIPO:

Q. Did you shoot Mr. Helman as he was running away from you?

MS. KORNBLAU: Objection. Attorney-client and litigation privilege.

I'm going to instruct this witness not to answer.

BY MR. GALIPO:

Q. Did Mr. Helman ever point a gun at you?

MS. KORNBLAU: Same objection.

MR. GALIPO: Are you going to follow your attorney's advice?

THE WITNESS: Yes.

BY MR. GALIPO:

Q. Were you aiming at Mr. Helman's back when you fired?



MS. KORNBLAU: Objection. Attorney-client litigation privilege.

Instruct not to answer.

MR. GALIPO: Are you going to follow your attorney's advice.

THE WITNESS: Yes.

BY MR. GALIPO:

Q. How many shots did you fire at Mr. Helman?

MS. KORNBLAU: Objection. Attorney-client and litigation privilege.

Instruct not to answer.

MR. GALIPO: Are you going to follow your attorney's advice?

THE WITNESS: Yes.

BY MR. GALIPO:

Q. Did you give Mr. Helman any verbal warning you were going to shoot him?

MS. KORNBLAU: Objection. Attorney-client and litigation privilege.

Instruct not to answer.

MR. GALIPO: Are you going to follow your attorney's advice?

THE WITNESS: Yes.

BY MR. GALIPO:

Q. Did you ever see any objects in Mr. Helman's



hand or hands before you fired?

MS. KORNBLAU: Objection. Attorney-client and litigation privilege.

Instruct not to answer.

MR. GALIPO: I think I'm satisfied for today for this purpose, and understanding we're going to be taking his deposition. I was told -- I think we had set the date of August 21st, and I was told there might be an issue with that date. The 28th may be a problem for my office. So maybe before we're done today, since we have the corporal here, we can confirm a date that works for everybody.

MS. KORNBLAU: Sure.

MR. GALIPO: Okay.

BY MR. GALIPO:

Q. So let's go to the Gonzalez case. And you were at least listening in on the deposition that took place yesterday?

A. Yes.

Q. And that would have been the deposition of CHP Officer Sean Irick?

A. Yes.

Q. With respect to Mr. Gonzalez, had you ever seen Mr. Gonzalez before the day that you shot him?

MS. KORNBLAU: Objection. Misstates and

mischaracterizes the evidence in this case, and vague.

BY MR. GALIPO:

Q. You may answer. I'm assuming you did shoot Mr. Gonzalez; is that correct?

A. I mean, I shot at him, but I don't think there was any official results of who actually shot Mr. Gonzalez.

Q. Well, do you know if that testing was ever done?

A. I do not. That was all the force investigation's detail, and I never got any results from them for any testing that they may or may not have done.

Q. So is it fair to say you don't know whether the testing was done or not?

A. Correct.

Q. And is it also fair to say if testing was done, you don't know what the results are?

A. Correct.

Q. Do you have an understanding as to how many times Mr. Gonzales was struck?

A. I do not.

Q. Do you know if he was struck at all?

A. I do.

Q. What is your understanding in that regard?

A. All I know is that he was transported to the



hospital with gunshot wounds after the incident.

Q. Did you observe any areas of gunshot wounds on him?

A. I did see one, yes.

(Reporter clarification.)

BY MR. GALIPO:

Q. And where did you see the one gunshot wound?

A. It was on his left leg.

Q. And did you see the actual wound or bleeding associated with the wound or both?

A. I just saw blood coming down from his leg.

Q. What type of firearm did you fire from when shooting at Mr. Gonzalez?

A. It was a Gen 5 Glock 17, 9 millimeter semi-automatic handgun.

Q. How many rounds did you fire?

A. Ten.

Q. How do you know it was ten rounds?

A. Because after the incident, the Riverside Sheriff's Department does what they call "charting," and they count the number of rounds in the handgun. So my handgun is always loaded with 18 rounds, and there were eight rounds left in it after the incident.

Q. So just doing the math, that told you you fired ten rounds?



A. Yes, sir.

Q. And the weapon you had was a semi-automatic weapon?

A. Correct.

Q. And did you have to press the trigger for each shot?

A. Yes.

Q. Were you intentionally pressing the trigger?

A. Yes.

Q. And so in this case, you would have intentionally pressed the trigger ten times; is that correct?

A. Correct.

Q. Where were you aiming on Mr. Gonzalez's body when you started firing?

A. Center mass.

Q. What was center mass, from your perspective? His front, his back, or something else?

A. It was the center of his body.

Q. What was the center of his body, from your perspective?

A. The center of his body. I mean, I don't know how to describe center of a body.

Q. Well, was he facing you, or did he have his back to you when you fired?



A. At the time I was reacting to the threat, he was turned around, sideways.

Q. When you say "reacting to the threat," are you saying at the time you fired or something else?

A. Well, would you like me to break it down in steps, because I feel like we're kind of, like, jumping around here.

Q. Well, right now I asked you where you were aiming when you fired, and you said "center mass."

A. Correct.

Q. Then you defined that as the center of the body. And I guess you could shoot someone at the center of their body if they're facing you, they have their back to you, or they have their side to you; is that fair?

MS. KORNBLAU: Objection. Vague.

MR. GALIPO: You may answer.

THE WITNESS: Yes.

BY MR. GALIPO:

Q. And so, although I appreciate your response of "center mass" and "center of the body," I was just trying to find out how he was oriented to you when you were firing. And you said something about him being sideways when you were reacting to the threat, and I was following up to see when you said "reacting to the

Page 29

threat," meant at the time you were firing or before you were firing? So can you clarify that, please?

A. Yes. So as Mr. Gonzalez is running, at this point, since we skipped a bunch of stuff, he's running with a firearm in his hand. Mr. Gonzalez turns to his left, exposing -- I could see the front of his body as he's turning towards me and my partners with a firearm, and that is when I begin to shoot at his center mass.

Q. Were you shooting at his back?

A. I was shooting at his center mass at the time that I saw the threat and reacted to it.

Q. Was his back exposed to you when you were firing?

A. I mean, yeah, I guess you could say half of it. He was sideways.

Q. What half of his back was exposed to you when you were firing?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: I don't really understand how to describe half of his back.

BY MR. GALIPO:

Q. I don't know if it was the right side of his back or the left side of his back. I'm not sure when you say "half" what you're referring to.

A. Well, he's turning to the left, so it would

Page 30

have been the left side of his back.

Q. Okay. When you were firing your ten shots, could you see the gun?

A. Yes.

Q. Could you see the gun for all ten shots?

A. Yes.

Q. Could you see his face when you were firing the ten shots?

A. No. I wasn't focused on his face.

Q. Did you hear any shots before you fired your first shot?

A. No.

Q. Did you fire any shots as he was going to the ground?

A. I don't recall if I was firing as he's falling to the ground.

Q. Did you fire any shots after he made contact with the ground?

A. I don't know.

Q. Have you watched the body-worn camera footage?

A. I have.

Q. Which body-worn camera footage have you watched?

A. I watched mine, as well as Sergeant Reynoso's.

Q. How many times have you watched yours?

Page 31

A. Three times.

Q. When was the first time you watched it?

A. The first time would have been before my FID interview.

Q. When was the second time?

A. What? Three days ago, maybe. Two or three --

Q. And when was the --

(Simultaneous speakers.)

BY MR. GALIPO:

Q. I'm sorry?

A. I said probably two to three days ago.

Q. And when was the third time you watched it?

A. That would have been this morning.

Q. Have you ever watched it slowed down?

A. Yes.

Q. On how many occasions?

A. Just one.

Q. Have you ever watched it frame by frame?

A. No.

Q. Do you have an estimate as to how many meetings you have attended regarding this case?

A. "Meetings," as in with my attorney or, like --

Q. Any meetings. Total meetings regarding this case.

A. Well, if we're counting the FID interview,

Page 32

what, three.

Q. How much time passed from you first seeing a firearm in Mr. Gonzalez's hand and you firing your first shot?

A. I don't know. Approximately, probably less than five seconds.

Q. When you say "less than five seconds," can you do any better on your estimate? In other words, do you know if it was one to three seconds or any other range?

MS. KORNBLAU: Objection. Asked and answered.

MR. GALIPO: You may answer.

THE WITNESS: The best guess I gave you is within five seconds.

BY MR. GALIPO:

Q. Is that an estimate based on your recollection in watching the video?

A. Correct.

Q. Did you say anything to Mr. Gonzalez in between seeing the firearm and shooting?

A. I know there was commands given to him. I know Officer Irick told him to "Drop it" right before the shooting. I want to say I said something to the effect of "Get down" before the -- before the shooting.

Q. Okay. Just so we're clear, I'm talking about this time frame in between you seeing the firearm and

Page 33

you firing. Do you have that time frame in mind?

MS. KORNBLAU: Objection. Asked and answered.

MR. GALIPO: You may answer. Do you have that time frame in mind?

THE WITNESS: Yes.

BY MR. GALIPO:

Q. Okay. So are you saying you said "Get down" during that time frame, or are you saying you said "Get down" quoted earlier? That's what I'm trying to clarify.

MS. KORNBLAU: Objection. Asked and answered.

THE WITNESS: Yeah. Like I said, I know Officer Irick was telling him to "Drop it." I don't remember if my "Get down" was during that time frame or right before. So for sure, I can tell you that I said "Get down" during that time -- specific five second time frame.

BY MR. GALIPO:

Q. Did you ever say "Drop it?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: Do we -- is -- during which time? Do we --

BY MR. GALIPO:

Q. At any time. At any time.

A. Yes, I did. I don't remember exactly at what

Page 34

point, though.

Q. At some point during the pursuit, you believe you said, "Drop it."

A. Yes.

Q. Did you ever see during the foot pursuit, Mr. Gonzalez looking over his right shoulder?

A. No. I don't recall him looking over his right shoulder, only his left.

Q. How many times, approximately, did you see Mr. Gonzalez look over his left shoulder during the foot pursuit?

A. It was several times.

Q. And when you say "several," can you give me a general estimate of how many you're thinking of?

A. It was -- I mean, it was definitely -- I mean, he definitely looked over his shoulder many times. I probably couldn't count it on my two hands. It was constant throughout the whole foot pursuit, he was looking back over his shoulder.

Q. So you think at least ten times or so?

A. Yeah. We can approximate about ten times or so.

Q. And each time he looked over his shoulder during the foot pursuit, it was the left shoulder?

A. Correct.

Page 35

Q. Did you have -- strike that.

You initially, on the day of the shooting, saw Mr. Gonzalez outside of a vehicle; is that correct?

A. Correct.

Q. And based on your training, did you think it would have been appropriate to shoot him when he was outside of that vehicle?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: Yeah, I mean, it depends. What factors are we talking about? Is there anything else? Are we just talking about this situation in general?

BY MR. GALIPO:

Q. In this situation, based on what you observed Mr. Gonzalez doing, did you think it was appropriate to shoot him when you saw him initially outside the vehicle?

A. I mean, that wasn't the case here, so, no.

Q. Did you ever see him outside the car, or not?

A. Yes.

Q. For how long did you see him outside the car?

A. On the initial approach, I mean, it was probably, I don't know, five seconds, maybe, if that.

Q. Did he do anything at that time that, in your mind, would have justified shooting him in that approximate five seconds before he got in the car?

Page 36

A. No.

Q. And then, how long was he in the car for before it started moving?

A. Approximately, eight or nine minutes.

Q. Based on what you observed him doing inside the car, did you think it was appropriate to shoot him?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: Based on the totality of the circumstances at the time, yeah. I think that he -- he could have been shot, based on his actions, his noncompliance, his reach around the car, his history of guns. He's a violent person. He's supposed to have a gun.

All the information with the way he's acting, yes, I would say he -- it would have been justifiable to shoot him at that point, yes.

BY MR. GALIPO:

Q. Okay. So from your perspective, you thought it would have been appropriate to shoot him when he was in the car based on what you observed?

A. Yes.

MS. KORNBLAU: Objection. Misstates testimony. Vague.

But go ahead.

THE WITNESS: Yes, I did.

BY MR. GALIPO:
Q. Did you give him any warning that you were considering shooting him when he was in the car?
MS. KORNBLAU: Objection. Misstates testimony. Go ahead.
THE WITNESS: Yes. He was told that he was going to get shot, several times by several officers on scene.
BY MR. GALIPO:
Q. Was that including when he was in the car?
A. Correct.
Q. Do you know if any of that is recorded on any of the body-worn camera footage?
A. Yes. I believe you can hear it in mine, and you can hear it in Sergeant Reynoso's camera.
Q. When did you first turn on your body-worn camera?
A. So my body-worn camera was activated, like, right when we approached. When the overhead lights came on, the camera was activated. But there is pre-report buffer on our cameras, so it records 30 seconds prior to it actually being activated with no audio.
Q. At some point, the car left the location and there was a vehicle pursuit; is that correct?
A. Yes, sir.



Q. And you were the primary car in the vehicle pursuit?
A. I was.
Q. And you were driving?
A. Correct.
Q. And then at some point, the car that you were pursuing that Mr. Gonzales was driving crashed or became disabled?
A. Yes.
Q. Was that near some railroad tracks?
A. Correct.
Q. Did you observe Mr. Gonzales get out of the car?
A. Yes.
Q. Where were you when he got out of the car?
A. I was in the driver's seat of my vehicle.
Q. Did you think, based on what you observed, it was appropriate to shoot him when he initially got out of the car?
MS. KORNBLAU: Objection. Vague. Incomplete hypothetical.
THE WITNESS: Again, you know, without any more information -- can you rephrase the question or --
BY MR. GALIPO:
Q. Sure. You have training with respect to when



you can and cannot use deadly force; is that correct?
A. Correct.
Q. And you heard me go over some of it with the officer yesterday?
A. Correct.
Q. And part of it is someone having the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury. That's part of your training; correct?
A. Correct.
Q. I'm just wondering, based on your training and what you observed Mr. Gonzales do when he first got out of the car, did you, in your mind, think it was appropriate to shoot him at that point?
A. As he's getting out of the car, no.
Q. And could you see his hands at all as he was getting out of the car?
A. Yes.
Q. After he got out of the car, did he start running away from you?
A. He did.
Q. And we heard that there were some right turns you had to make during the foot pursuit?
A. Correct.
Q. I think you described them in your statement as



"blind corners," or words to that effect?
A. Yes.
Q. During the initial part of the foot pursuit, before the first turn, how far were you, approximately, from Mr. Gonzalez?
A. You're saying as he's taking that first right turn down the long straightaway, the first right --
Q. Yeah, or even before you got there. So from the -- from the car to that first right turn -- first of all, how far was that, approximately, from the car to where the first right turn was made?
A. I mean, it was a pretty good stretch. Approximately, a hundred yards, at least.
Q. Okay. About a football field?
A. Correct.
Q. And during that period, were you gaining on him, to some extent?
A. I couldn't really tell during that stretch of it. A little later on, yeah, we were. But at that point, it was kind of hard to tell.
Q. During that initial stretch, that approximate hundred yards before that first right turn, based on what you observed and your training, did you think it was appropriate to shoot Mr. Gonzalez at that time?
MS. KORNBLAU: Objection. Vague.

THE WITNESS: Well, I mean, there's a lot of factors that go into that. Obviously, the totality of circumstances in this case. I guess, what we haven't really clarified here is his actions during the foot pursuit.

Would you like me to elaborate on that more so I can answer the question?

BY MR. GALIPO:

Q. Well, before -- right now, I'm taking into everything you observed up to that first right turn, and we'll go through it after our break.

I understand you thought he had a gun. I understand that it appeared that he was holding his waistband as he was running, swinging his left arm, and the right arm more holding the waistband. Is that your recollection?

A. Yes. Yeah. Yeah.

Q. And I'm not saying that's everything. But everything that you observed -- and I'll give you a chance to describe that after the break -- I'm just wondering, did you think, based on what you observed in that first hundred yards, it was appropriate to shoot him, based on your training?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: If we're answering that off face value in that first hundred yards, no.



BY MR. GALIPO:

Q. And then after the right turn, you went some distance before another right turn?

A. Correct.

Q. And how long was that distance between the two rights turns, approximately?

A. I couldn't say on that one. I know it was shorter than the first right turn. But I couldn't really give you a good estimation on how much shorter.

Q. But somewhat less than a hundred yards?

A. Yeah. It would be -- it was less than the first one for sure, yes.

Q. And then during that second part, between the two right turns, based on everything you observed and based on your training, did you think it would have been appropriate to shoot him at that time?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: No.

BY MR. GALIPO:

Q. And then at some point, did you get to this -- this narrow pathway that I spoke to the officer about yesterday?

A. Are we talking about, like, between -- there's, like, a truck ramp or something?



Q. You were there and I wasn't, so maybe you can help me out. I know you had to make the first right turn and then the second right turn, and then after the second right turn, which way did the pursuit go until you got to that narrow place? And maybe it's what you're referring to.

A. I mean, I don't know what "the narrow place" is that you're referring to. If I think of a place that's narrow, it would be that truck ramp. But I want to make sure we're talking about the same thing.

Q. Okay. We probably are. I just got that narrow pathway because that's the way the officer described it yesterday. So I was thinking maybe you're familiar with what he was trying to describe. But you're thinking the truck ramp was the narrow portion?

A. Correct.

Q. Okay. How long was this truck ramp, approximately?

A. I would estimate, about a hundred feet.

Q. Before Mr. Gonzalez got to that narrow truck ramp, I'll call it -- are you comfortable with that?

A. Yes.

Q. Before he got to the truck ramp, based on what you observed and your training, did you think it was appropriate to shoot him?



A. Well, at this point, things had kind of changed. As we made that last turn coming up to that truck ramp, there was workers out there. There was two workers near one of the trucks, in the kind -- kind of by the narrow truck ramp that we're running towards, as well as workers in a building straight ahead that he was running to.

So, I mean, at this point, yeah, I think you could articulate, you know, he's running with his actions of holding his waistband, unnatural swing. No one runs with one arm in front of them. He's obviously holding something in his waistband, which I presumed to be a gun. That, at that point, yes, I think you are justified to shoot him.

Q. Okay. So in your mind, before he got to the truck ramp, you thought, based on your training and your observations, it was appropriate to shoot him. Am I understanding you correctly?

A. Yes. I think it would be justifiable to shoot him at that point, yes.

Q. Had you visibly seen a firearm up to that point?

A. Based on the totality of the circumstances, again, you know, with all the information I mentioned earlier, and his actions in the vehicle, even leading up

to the ending of the foot pursuit, yes. I think he had, you know, justifiable actions to shoot him at that point, yes.

Q. Okay. I understand your testimony. I guess what I'm wondering, I know you believed he had a gun for all the reasons you've stated. I'm just wondering if you had seen the firearm yet.

A. As he's running towards that truck ramp, the short and narrow truck ramp --

Q. At any time before he got to the truck ramp, did you actually see a firearm?

A. I had not seen the firearm come out of his waistband at that point, no.

Q. Okay. And then during the time he was running across or through the truck ramp, based on your training, did you think it was appropriate to shoot him?

A. Yes.

Q. And did you see a firearm at any time while he was running through this truck ramp?

A. I had not seen the firearm go in his pants yet, no.

Q. And then at some point, did you see him get past this truck ramp?

A. I did.

Q. And were you in this truck ramp when you fired, or was it after you got past the truck ramp?



A. It was after I got past the truck ramp.

Q. And do you have an estimate as to how far past the truck ramp you got before you fired your first shot?

A. I don't know how far past it it was.

Q. Do you have any estimate at all?

A. I can give you a within.

Q. Okay.

A. I would say within 30 yards.

Q. And how about timing? Do you have any timing estimate as to how much time passed from exiting the truck ramp to you firing your first shot?

A. Approximately, no more than 10, 15 seconds, maybe, at the most.

Q. And what would you estimate -- excuse me -- what would you estimate the distance between you and Mr. Gonzalez, when you fired the first shot?

A. I would say approximately 25 yards.

Q. Did you have any information before that day that Mr. Gonzalez ever seriously injured or killed anyone?

A. Yes.

Q. Who did you have information --

A. Let me reframe that. I wouldn't say -- I mean, I don't know if you would classify it as "seriously." That's kind of vague. But I know he had domestic violence charges, which indicates he was, you know, violent. I don't know to what extent that violence was, but it was a felony. So there was at least visible injury on our victim.



Q. Okay. So what I'm asking is a little bit more of a specific question. Did you have any evidence that he had seriously injured anyone where you actually saw the injuries? Saw photos? Had specific information?

MS. KORNBLAU: Objection. Asked and answered.

THE WITNESS: No. Not directly, no.

BY MR. GALIPO:

Q. And do you know what, specifically, the extent of the injury was, if any, in that domestic case, or did you know at the time?

A. No. Just -- like I said, just based off it being a felony, obviously there was some kind of visible injury. But to what extent, I don't -- I don't know. I can't speak about what extent it was.

Q. Right. I mean, my understanding, and correct me if I'm wrong, for there to be a felony domestic violence, there could be any visible injury, even a bruise?

A. Correct.

Q. And did you know at the time whether that he had actually been convicted of that as opposed to charged?



A. No. I don't think there was -- there wasn't a conviction, no.

Q. Okay. Anything else that you had informationally that he had ever injured anyone before in his life?

A. No.

MR. GALIPO: Okay. Is this a good time for everyone to take a ten-minute break?

MS. KORNBLAU: Yes.

MR. GALIPO: Okay. We'll let Dennis take us off.

THE VIDEOGRAPHER: We are off the record. The time is 11:06 a.m.

(Break taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:20 a.m.

BY MR. GALIPO:

Q. Okay. So just going back for a moment, earlier on, before the vehicle pursuit, when Mr. Gonzalez was in the car for the eight or nine minutes, do you know the time frame I'm referring to?

A. Yes.

Q. Did you see a gun at any time during that time

frame, in the car or on Mr. Gonzalez?

A. Mr. Gonzalez had something in his hand on initial approach once he got into the vehicle. I couldn't determine if it was a firearm a hundred percent or not, that he was kind of stuffing into his jacket or waistband area.

Q. Okay. So that would have been before he got in the car?

A. No, sir. It would have been like right after he got into the vehicle, like on the initial approach.

Q. Okay. Did it appear to you during the approximate eight or nine minutes that Mr. Gonzalez was in the vehicle, that he was trying to shoot anyone?

A. No.

Q. During the initial part of the foot pursuit, before you got to that first right turn, did it appear to you that Mr. Gonzalez was trying to shoot anyone?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: No.

BY MR. GALIPO:

Q. In between the two right turns, did it appear to you that Mr. Gonzalez was trying to shoot anyone?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: No.

BY MR. GALIPO:



Q. When he ran through this narrow portion that you described earlier, did it appear that he was trying to shoot anyone at that time?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: At that point, as I was chasing Mr. Gonzalez through that narrow pathway by the truck ramp, as I closed the distance on him, he did say -- told me to "stop" and "back up," which, based on the totality of circumstances here, he -- he meant that: You know, hey, like, you better stop or I'm going to shoot you.

He's holding his waistband still, and I can see him actively now moving that right arm as if he's trying to get something out. So I...

(Simultaneous speakers.)

BY MR. GALIPO:

Q. I understand -- I'm sorry. Go ahead.

A. I'm sorry. So I would say, yeah, I mean, it appears that he's preparing to get that gun out and possibly use it.

Q. I just -- I understand all that, and thank you for that. I was just wondering whether it looked to you that he was actually shooting the gun or trying to shoot the gun during that time frame?

MS. KORNBLAU: Objection. Vague. Asked and answered.



THE WITNESS: I mean, you know, based off what I just said, I mean, if he's -- you could argue he's trying to shoot someone if he's taking a gun out. So, I mean, he's not actively firing a gun, no; but there's -- he's trying to produce what appears to be that gun, telling me to "stop," "back up." Even saying something to the effect of, "I've got something," "something" meaning a gun.

BY MR. GALIPO:

Q. Okay. But is it correct to say during that time frame you had not seen the gun yet?

MS. KORNBLAU: Objection. Asked and answered. Vague.

THE WITNESS: Yeah. I had not seen it come out of his waistband at this point, no.

MR. GALIPO: Okay. So I have -- we're going to try -- I'm going to mark as Exhibit 1, a portion of your body-worn camera, which we'll look at together in a minute. But I want to -- I have a still from that, that I'd like to mark as Exhibit 2, and we're going to try to screen share. Sometimes this works better than others. So we'll see if it works.

(Exhibit Number 1 was marked.)

(Exhibit Number 2 was marked.)

MR. GALIPO: And let's see, Alejandro, if we



can put up or screen share Exhibit 2, please. Can we make it a little larger, possibly?

Thank you.

BY MR. GALIPO:

Q. Can you see this on your screen?

A. Yes.

Q. First of all, does it look to be like a still taken from your body-worn camera?

A. Yes.

MS. KORNBLAU: Objection. It hasn't been authenticated, and we haven't played the entire video at this point, so I'll object to the use of still photos.

MR. GALIPO: You can object to it. Your objection is noted. But I think he said "Yes."

BY MR. GALIPO:

Q. Does that look to be the area, generally speaking, where the shooting occurred?

A. Yes.

Q. And can you see, at least in this image -- and I think the time at the top is 20:04 and 46 seconds. Can you see Mr. Gonzalez?

A. Yes.

Q. And do you know where Officer Irick was in relation to you, just prior to you firing your shots?

MR. GARCIA: Objection. Calls for speculation.

BY MR. GALIPO:
Q. If you know.
A. Yes.
Q. And where was he in relation to you?
A. He was on my left side.
Q. In this image we're looking at, can you at least see a portion of Mr. Gonzalez's back?
MS. KORNBLAU: Objection. Vague.
THE WITNESS: In this image, yes, I can.
BY MR. GALIPO:
Q. Are you able to see his right hand or a firearm in this image?
A. No, it's too blurry to -- to tell.
Q. Okay. Does he appear to be looking over his left shoulder in this image?
A. No.
Q. Can you -- does he appear to be turned to his left towards you in this image?
A. No.
Q. Can you tell, simply by looking at this image, whether the shots had started yet or not?
A. No.
Q. And from looking at this image, can you in any way -- I think you said earlier about 25 yards from you, at the time you fired. Is that still an estimate that



you're comfortable with?
A. Yes.
Q. Okay. Let's look at Exhibit 3, please.
(Exhibit Number 3 was marked.)
MR. GALIPO: This is a -- is that three -- there's three, I think.
Can you make that a little bit larger, please?
BY MR. GALIPO:
Q. And just prior to you firing your first shot, was Mr. Gonzalez still running away from you?
A. Prior to me firing my first shot, he was turning with a gun in his hand up above his chest, turning towards me.
Q. Okay. Was he running, or did he stop and was stationary?
A. I mean, he had slowed down to turn, so he wasn't -- he wasn't stationary, no; but he had definitely slowed down.
Q. Okay. Was he turned towards you at the time you actually fired your first shot?
A. Well, I mean, this is where it's important to where we're skipping a lot of pertinent details. If you go back a second before this, when I start firing, you clearly see Mr. Gonzalez turning with a gun in his hand towards me and my partner. I'm reacting to that threat.



So, you know, it's like, you know, by the time I perceive what I'm seeing and react to it, is going to be a second or two delay, right, typically. So what Mr. Gonzalez did in that second or two, is not what I'm reacting to. I was reacting to him turning, with the firearm towards me and my partner.
Q. And let me ask you about this turning. You're saying he was turning to his left?
A. Correct.
Q. Did you ever see him turning to his right?
A. No.
Q. And you said you reviewed your transcript of your initial interview?
A. Yes.
Q. Would you at least agree -- and I can go over it with you or put it up on the screen -- that you never said in your initial statement or interview that he was turning to his left, right before you fired or when you fired?
MS. KORNBLAU: Objection. Vague.
THE WITNESS: I don't remember if I said "turning to his left" or "looking to his left." I don't remember exactly what I said.
BY MR. GALIPO:
Q. Well, isn't it accurate that you did indicate



that he looked over his left shoulder at some point, but you never said he was turning to his left? Isn't that fair?
MS. KORNBLAU: Objection. Vague.
THE WITNESS: Yeah. Sir, I mean, I don't have the transcript in front of me. If that's what it says, then, I mean, yeah, that's what I said.
BY MR. GALIPO:
Q. Can you tell from looking at Exhibit 3, whether the shots have started yet or not?
A. Yeah. I would say here, yes, just based off the -- looks like, you know, the gunpowder, I guess you could say, coming out of my barrel, and the flash -- the muzzle flash, it would appear to be that's on the screen.
Q. Okay. All right.
MR. GALIPO: Let's go to Exhibit 4, please.
(Exhibit Number 4 was marked.)
MR. GALIPO: We can enlarge it slightly.
BY MR. GALIPO:
Q. And can you tell from looking at this image whether there's gunshots going on at this time?
A. I cannot, no.
Q. Does Mr. Gonzalez appear to be slightly bent or hunched over in this, if you can tell?

Page 57

MS. KORNBLAU: Objection. Calls for speculation.

THE WITNESS: I can't tell if he's hunched over or not.

BY MR. GALIPO:

Q. Did you have the impression that some of your shots were striking him?

A. No, I did not, at this point.

MR. GALIPO: Okay. Can we go to the next exhibit, please, Exhibit 5.

(Exhibit Number 5 was marked.)

BY MR. GALIPO:

Q. At some point, did you see Mr. Gonzalez start to go to the ground?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: At some point, he did end up on the ground, yes. But I don't know at what point -- at what point that was.

BY MR. GALIPO:

Q. I'm just wondering whether you saw his body going to the ground at some point?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: No. During -- during the shooting, I perceived, you know, obviously, the imminent threat with him and the gun, and I didn't stop firing

Page 58

until I didn't see that gun anymore. So I don't -- I don't recall at what point during that he was going to the ground or he fell to the ground. I don't -- I don't -- I don't know.

BY MR. GALIPO:

Q. Okay. In this exhibit, Exhibit 5, we see at the top, it may be gloves. Do you know if those are your hands or gloves we see?

A. I'm sorry. Yeah, which -- which one are we looking at? The top --

Q. Yeah. Right at the top of the frame, do you see what appears to be some gloves? Not to the left, but to the top.

A. I don't see gloves. I believe that was -- those are my hands, and that's, like, the magazine of my pistol --

(Simultaneous speakers.)

THE WITNESS: -- in my left hand.

BY MR. GALIPO:

Q. Okay. Thank you.

Were you wearing gloves -- were you wearing gloves at that time?

A. No, sir. I was not.

Q. Okay. And can you see him looking over his left shoulder in this image, Exhibit 5?

Page 59

A. It's -- it's kind of blurred out. So, I mean, it's hard to tell.

Q. Okay. Does he appear to be turned to his left in this image?

A. No. I mean, slightly centered towards the left, yeah. But he's not completely turned to the left.

Q. Can you see a gun in either one of his hands in this image?

A. It's too blurry to tell.

Q. Okay. And then to the left, if you look at the far left of the image, we see what appears to be another gun and hands. Would that be your partner, if you know?

MR. GARCIA: Objection. Calls for speculation.

THE WITNESS: Yes, that was Officer Irick.

MR. GALIPO: Okay. And for the record, the timing on this is 20:04:47.

And let's go to Exhibit 6, please.

(Exhibit Number 6 was marked.)

MR. GALIPO: Can we enlarge it slightly, or is that the enlarged? There we go.

BY MR. GALIPO:

Q. Can you tell if any firing is happening at this time, from looking at this image?

A. Yes. It appears the gun to my -- to my left side there is being discharged.

Page 60

Q. Okay. And is Mr. Gonzalez's back, based on this image, generally to you at this time?

A. Yes.

Q. Would you at least agree he's not turned towards you in this image?

MR. GARCIA: Objection. It calls for speculation.

THE WITNESS: Yeah. In this image, he's generally not turning towards us, no.

BY MR. GALIPO:

Q. Okay. And can you see a gun at least in this image on Mr. Gonzalez?

A. It's also too blurry to tell.

MR. GALIPO: Okay. Let's look at Exhibit 7, please.

(Exhibit Number 7 was marked.)

BY MR. GALIPO:

Q. Can you tell by looking at this image whether any shots are being fired?

A. No, I cannot.

Q. Do you have any estimate as to how much time passed from your first shot to your tenth shot?

A. I would estimate three seconds, maybe, four. Three or four seconds.

Q. Okay.

MR. GALIPO: Can we go to Exhibit 8, please.

(Exhibit Number 8 was marked.)

BY MR. GALIPO:

Q. Can you tell in this image whether you're firing or not?

A. I cannot.

Q. Do you see -- I don't know if that appears to be some smoke towards the top or not. Can you tell?

A. No. I can't tell what it is. It might be smoke, and maybe it's just a blur or the glim of the light.

Q. Okay. Would you agree that Mr. Gonzalez is not turned towards you in this image?

A. I mean, again, he's -- he's favoring kind of left. But, yeah, he's not completely turned towards us, no.

Q. And would you agree his back, at least, is presented to you in this image?

A. Yes.

MR. GALIPO: Could we go to the next exhibit. I think we're up to 9.

(Exhibit Number 9 was marked.)

MR. GALIPO: And I'll note the time on this is 20:04:48.

BY MR. GALIPO:



Q. Does it appear in this image that Mr. Gonzalez is in the process of going to the ground?

MS. KORNBLAU: Objection. Vague. Calls for speculation.

MR. GARCIA: Join.

THE WITNESS: Yeah. Either crouching down or falling to the ground, either one of those two. He's definitely lowered his body position.

BY MR. GALIPO:

Q. And can you tell from looking at this image whether you're firing at this point?

A. I cannot tell, no.

Q. From the -- your first shot to your tenth shot, were you generally firing in rapid succession?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: Yes.

BY MR. GALIPO:

Q. Were you assessing in between shots?

A. Yes. I was -- each shot I was taking, I was focused on that firearm.

Q. So you would have been assessing for each one of your ten shots, prior to firing?

A. Correct. As I'm making visual down my sites, I'm focusing on center mass and that firearm, and the imminent threat of Mr. Gonzalez possessing that firearm.



Q. Would you agree, at least, in this image, Exhibit 9, you do not see Mr. Gonzalez turn towards you?

MS. KORNBLAU: Objection. Leading. Vague.

MR. GARCIA: Join.

THE WITNESS: Yeah. I mean, I -- yeah, he's kind favoring left, but he's not turned towards me, no.

BY MR. GALIPO:

Q. Do you see a firearm in this image on Mr. Gonzalez?

A. I can't tell either. It's too blurry.

MR. GALIPO: Can we go to Exhibit 10, please.

(Exhibit Number 10 was marked.)

BY MR. GALIPO:

Q. When Mr. Gonzalez went to the ground, did he generally go forward to the ground, if you recall?

A. Yes, and he ended up on his stomach.

Q. Can you tell from looking at Exhibit 10 whether you're firing at this time?

A. I cannot.

MR. GALIPO: Going to Exhibit 11.

(Exhibit Number 11 was marked.)

BY MR. GALIPO:

Q. Can you tell from looking at this image whether you're firing at this time?

A. No, sir.



Q. Does Mr. Gonzalez in this image appear to be either near the ground or on the ground?

MS. KORNBLAU: Objection. Compound. Vague. Calls for speculation.

THE WITNESS: Yeah. It appears his -- like he's kneeling almost.

MR. GALIPO: Okay. Let's look at -- I'm losing track. Was that --

THE CERTIFIED STENOGRAPHER: That was 11.

MR. GALIPO: Let's look at Exhibit 12.

(Exhibit Number 12 was marked.)

BY MR. GALIPO:

Q. Is that generally how you recall Mr. Gonzalez's body position when he went to the ground?

MS. KORNBLAU: Objection. Vague.

THE WITNESS: No. I mean, I don't really recall, like, the in between of him, like, kneeling or -- I recall him once he was on the ground, that he was kind of flat out on his belly. But I don't recall him kind of hunched over like that, no.

BY MR. GALIPO:

Q. Okay. Do you recall when you approached him after the shooting, the firearm being close to his feet?

A. Yes.

Q. And did you kick it away at that point?

A. Yes, sir.
Q. Are you aware that he dropped the firearm at some point during the shots?
MS. KORNBLAU: Objection. Vague.
THE WITNESS: I wasn't aware he dropped it at his feet until after the shots were done being fired.
BY MR. GALIPO:
Q. And I think you indicated that just before the shots, you heard your partner yell, "Drop it."
A. Yes, sir.
Q. Can you tell from looking at Exhibit 12, whether you were firing any shots at this point?
MS. KORNBLAU: Objection. Asked and answered.
THE WITNESS: I cannot.
MR. GALIPO: Going to Exhibit 13.
(Exhibit Number 13 was marked.)
BY MR. GALIPO:
Q. Can you tell from looking at this image whether you're still firing shots at this point?
A. I cannot.
Q. Same question for Exhibit 14.
(Exhibit Number 14 was marked.)
THE WITNESS: I cannot, no.
MR. GALIPO: And two more exhibits, 15 -- and I'll note the time is 20:04:49.



(Exhibit Number 15 was marked.)
BY MR. GALIPO:
Q. Do you know if you're still firing at this point?
MS. KORNBLAU: Objection. Vague.
THE WITNESS: Just based on this image, I cannot tell, no.
MR. GALIPO. Okay. And lastly, Exhibit 16.
(Exhibit Number 16 was marked.)
BY MR. GALIPO:
Q. Can you tell if you're still firing at this point?
MS. KORNBLAU: Objection. Vague.
THE WITNESS: I cannot.
MR. GALIPO: Okay. Thank you for that, Alejandro.
I'll have Alejandro send those exhibits, 2 through 16, to all counsel and the court reporter, as soon as the depo is completed; or he can do it now, too, if he can.
BY MR. GALIPO:
Q. Did you hear any shots after your last shot?
A. I don't remember.
Q. So I want to follow up on a few things you said.



I think you said at some point you heard him say, was it, "Hey, stop," or what were the words again?
A. I don't remember the exact words. It was something to the effect of, like, "Stop, get back."
Q. And did he say that before or after he got through that narrow space?
A. It was during the narrow space.
Q. When he was in -- running through the narrow space?
A. Yes, sir.
Q. Now, I realize he was about 25 yards away from you when you fired, but in the -- and I think you said earlier there was less than five seconds between seeing the firearm and firing. Is that -- do you recall giving me that general estimate?
A. Yes.
Q. In the few seconds before you saw the firearm, did you hear Mr. Gonzalez say anything?
A. Yes. So at the point -- so I kind of want to take it through here. So as we're in the narrow space, he says something to the effect of," Stop, get back." At that point is when I realized he was, like, reaching or manipulating his right hand, right, as what I perceived he was trying to take the firearm out. So I slowed way down to give him some space.



Because within -- at this point, I'm probably 10 to 15 yards behind him, and I'm catching up to him. At that point when I slowed down, as he's kind of exiting that space, I heard him saying something to the effect of, "I got something," or "I have something," or something to that effect.
Q. Where were you when you heard that, in relation to this narrow space? Were you still in it, or had you already passed it?
A. I don't -- I don't know if it was, like, towards the end of it or if we were already out of it. But it was somewhere towards that back exit out of that space. It was somewhere in that general area.
Q. And when --
(Simultaneous speakers.)
BY MR. GALIPO:
Q. Okay.
A. I just don't know if it was past a ramp or not.
Q. Okay. And when did you hear that in relation to your first shot? Was it, like, that five seconds before or some other time period?
A. Yeah. So that would have been, like, right before the firearm was drawn by Mr. Gonzalez.
Q. Were you thinking at some point he's -- strike that.

At some point, did it appear to you that Mr. Gonzalez was getting tired at the end of the foot pursuit?

MS. KORNBLAU: Objection. Calls for speculation.

BY MR. GALIPO:

Q. Based on your observations.

A. Yeah. I mean, either he was getting tired or I was getting faster. But at that point, we were catching up to him for sure, so...

Q. Okay. I would be surprised if Mr. Gonzalez was running one or two miles, five days a week, but I guess we'll find out.

After you saw the firearm in Mr. Gonzalez's hand, was Mr. Gonzalez still running forward?

A. Yes.

Q. Did you see any civilians in the background or backdrop when you were firing your shots?

A. At the time I started firing, no. But there was that window, like, leading into the building that was straight ahead, that when we came around that corner, that one straightaway, I could see people working in there. But the time that I started firing shots, I didn't see anyone through that window, no.

Q. Okay. So the people that you saw would have



been before you fired the shots. Is that fair?

A. Correct.

Q. And am I understanding you correctly, the people that you saw appeared to be in the building and you saw them through the window?

A. Yeah. Well, there was two -- there was a couple workers outside in that truck bay, and then the people inside the building.

Q. The people outside, you had already passed them at the time of the shooting?

A. Yes.

Q. You didn't see Mr. Gonzalez try to attack them, did you?

A. No.

Q. When you saw the firearm in Mr. Gonzalez's hand, were those people still visible at that time through the window?

A. No.

Q. Now, when you kicked the firearm, did the magazine separate, if you recall?

A. Yes, it did.

Q. Can you explain what you observed in that regard?

A. So when I went up to kick it, I don't know if I, like, kind of fumbled it and missed, but I kind of,



like, almost stepped on top of it and, like, swiped it, if that makes sense. And when I did that, I noticed the magazine come out of the firearm, as it was like, sliding on the ground.

Q. And I think you've already told me this, but with Mr. Gonzalez prone or chest down after the shooting, his head would have been further from you than his feet, the manner he fell. Is that correct?

A. Correct.

Q. And the gun that you saw was some distance close by, but some distance from his feet?

A. Yeah. It was off on the right side, like on his -- off his right foot, probably, you know, within -- I don't know -- a foot or two.

Q. Okay. Now, did anyone handcuff Mr. Gonzalez after the shooting?

A. Yes.

Q. And do you know who handcuffed him? Was it Officer Reynoso?

A. I think it was a couple people. I think it was Officer Reynoso and possibly Officer Godward. I'm not too sure on Godward, but I know Sergeant Reynoso was involved in the handcuffing, and there was another person assisting him.

Q. How -- did you hear Mr. Gonzalez say anything



after the shooting?

A. Yes. I recall him saying, "Kill me." He was saying, "Kill me." And I know he was screaming, like, "Ow," or something like that. "Ow," or something to that effect.

Q. Did he appear to be in pain to you from the gunshots? Was that your impression?

MS. KORNBLAU: Objection. Calls for speculation.

THE WITNESS: Yeah, based off of the "Ow," I would say so.

BY MR. GALIPO:

Q. Did you have any physical injuries from this incident?

A. Besides some sore legs, no.

Q. Have you gone back to that area to do any walkthrough since the shooting?

A. No, sir. I have not.

Q. Did you -- were you aware that there were other officers in the pursuit, other than just you and Officer Irick?

A. Yes.

Q. And how were you aware of that?

A. Well, behind me was our partners, our task force partners. It was Sergeant Reynoso and

Deputy Irick. They were in a car together. I saw them behind us during the pursuit.

And then I also saw our K9 unit behind them. And I think it was even aired on the radio that they were involved in the pursuit, as well.

Q. You indicated in your statement -- and I think you told me this today -- at some point, you recall or believe you said, "Drop it." Do you recall that?

A. Yes.

Q. Are you just saying you're not sure when you said that, whether it was before or after you saw the firearm?

A. Correct.

Q. But you do believe you heard Irick say, "Drop it" shortly before the shooting?

A. Yes.

Q. Sorry for the pause. I'm just looking at your statement and most of this we already covered.

A. Oh, no problem.

Q. Do you recall in your statement saying, "I was just aiming towards his, like, back area"?

A. Yes.

MS. KORNBLAU: Objection. Vague.

BY MR. GALIPO:

Q. Did you see him drop the firearm at some point?



A. I didn't see him drop it. When I stopped firing, I noticed he didn't have it anymore, and then I saw that it was on the ground next to him.

Q. How did you notice he didn't have it anymore when you stopped firing?

A. I don't understand.

Q. I'm just trying to clarify. Did you -- you said "I didn't" -- I forget your words exactly, but -- "I didn't see that he had it anymore" -- and then you saw it on the ground?

A. Uh-huh.

Q. Is that the same thing or are those two different things? In other words, you didn't see it on him, and then you saw on it ground?

MS. KORNBLAU: Objection. Compound. Vague.

BY MR. GALIPO:

Q. You can explain.

A. Yeah. So when I -- when I stopped firing, I didn't see him possessing the gun anymore is why I stopped firing. And then once I was able to assess, I saw that it was on the ground by his feet. I hope that makes sense.

Q. Yes. You stopped firing because you didn't see him possessing the gun anymore?

A. Yes, sir.



MR. GALIPO: Okay. I'm going to try to see if we can play Exhibit 1, but I'm just going to play a portion of the video. I think this would be the foot pursuit and leading up to the shooting.

So if, Alejandro, you can help us with that. And before you start it, I just want to put on the record what time we're starting it at.

Okay. So it looks like 20:04:27 is the time on this portion.

And why don't we play it and see how it goes -- oh, and also -- hold on. What's the time on the bottom? 28:27 is on the bottom.

(Video being played.)

MR. GALIPO: Stop for a second.

BY MR. GALIPO:

Q. You see this portion with the yellow on the right, is this the narrow area?

A. Yes. That would be, like, the truck ramp.

Q. Okay. And is that your firearm, if you can tell?

A. Yes, it is.

Q. Is there something orange on it or red?

A. Yes.

MR. GALIPO: Okay. And we stopped it at 20:04:39, which is also 28:40 at the bottom.



Okay. Please continue.

(Video being played.)

MR. GALIPO: Okay. You can stop it now.

We stopped it at 20:05:28, which is 29:29 at the bottom.

BY MR. GALIPO:

Q. Do you recognize who these two officers are?

A. Yes. That is Sergeant Reynoso in the black and -- black shirt and the jeans. And that's Officer Godward in the uniform.

Q. Okay. Did you note when watching the video, whether any shots were fired after Mr. Gonzalez went to the ground?

A. I did not, no.

MR. GALIPO: Okay. Let's just play it one more time and see if you can tell me --

Let's go back just a little bit. Not all the way back. But -- okay. Let's see where we are. We are at 20:04:22. Maybe you can go forward a little bit. Go back a little. I'm sorry.

Okay. That's good. 20:04:29.

(Video being played.)

MR. GALIPO: Stop.

We stopped it at 20:04:54.

BY MR. GALIPO:

Q. Did you notice in watching it again that there was at least some shots fired after he went to the ground?

MS. KORNBLAU: Objection. Asked and answered.

MR. GARCIA: Joined.

BY MR. GALIPO:

Q. You may answer.

A. Yeah. It looks like within that split second of him hitting the ground, I do hear some gunshots. You know, but again, like I explained earlier, the, you know, time to process something and react to it; right?

So, you know, that's within, what, a split second, if a second, if even that. So, I mean -- but, yeah, looking at the video, there is some gunshots going off as he's hitting ground, yes.

Q. And could you tell if any of those were your shots from looking at the video?

A. I couldn't tell.

Q. All right. Let's just look at it one last time, just last five or ten seconds, and just look to see if it -- you could tell if any of those were your shots.

MR. GALIPO: And we're going to -- we have it at 20:04:29. That's fine.

(Video being played.)



MR. GALIPO: Okay. You can stop it.

BY MR. GALIPO:

Q. Were you able to tell from looking at the video of your gun and the recoil and the smoke or muzzle flash, whether you fired a couple of those shots after he went to the ground?

MS. KORNBLAU: Objection. Asked and answered.

THE WITNESS: Yeah. It appeared there might have been a shot or two as he's hitting the ground.

BY MR. GALIPO:

Q. Okay. And it appeared, at least by looking at your gun, that those shots -- at least some of those shots came from you?

MS. KORNBLAU: Objection. Asked and answered.

THE WITNESS: Yes.

By MR. GALIPO:

Q. Okay. Thank you.

MR. GALIPO: You can take that down, Alejandro. Thank you.

BY MR. GALIPO:

Q. So lastly -- I think we've covered this pretty much -- your training with respect to the use of the deadly force, were you trained it was the highest level of force an officer can use?

A. Yes.



Q. And were you trained that shooting someone center mass is likely to cause death or serious bodily injury?

A. Yes.

Q. And we talked a little bit about the training where there has to be the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury. Is that your understanding?

A. Correct.

Q. Are you trained that you should consider your background or backdrop when firing?

A. Yes.

Q. And are you trained that you're responsible to justify each of your shots?

A. Yes.

Q. Are you trained that you should assess before shooting and during the shooting sequence, if you can?

A. Yes.

Q. Are you trained to give a verbal warning before using deadly force when feasible?

A. Yes.

Q. How long did you stay at the scene of the shooting before you left?

A. It was quite a while. I know we were here, like, in the general area for a little bit, and then we



walked out and went to the front where -- kind of near the termination point of the pursuit.

They were trying to coordinate, like, you know, where we're going and who was picking us up and all that stuff. So it took, I mean, I don't know, maybe an hour or so.

Q. Okay. And where did you go from the scene?

A. To the Hemet Police Station.

Q. Was Mr. Gonzalez running in the direction of the factory when you fired your shots?

A. Yes.

MR. GALIPO: Okay. I think that's all I have. I'm not sure if Counsel have follow-up today.

MS. KORNBLAU: I do, but can we take a quick ten-minute break?

MR. GALIPO: Sure. That's fine.

Go ahead, Dennis.

THE VIDEOGRAPHER: We're going off the record. The time is 12:13 p.m.

(Break taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:27 p.m.

EXAMINATION

BY MS. KORNBLAU:

Q. Good afternoon, Corporal Sobaszek.

Before the break, we were watching video footage that was from your body-worn camera. Do you recall that?

A. Yes.

Q. Did the incident that unfolded, was it more closely related to the entire video footage or was it more closely related to still shots that were shown to you during this deposition?

MR. GALIPO: Objection. Vague and ambiguous as phrased.

THE WITNESS: It would be the video footage.

BY MS. KORNBLAU:

Q. In the still shots that were shown to you, I believe it was 12 of them, do you know for certain that you were shooting at each moment of time when you were asked?

MR. GALIPO: I'm going to object as vague and overly broad as phrased.

THE WITNESS: No, I do not.

BY MS. KORNBLAU:

Q. So when you were asked and shown a still frame from your body-worn camera video footage and it was described that you could see what appeared to be a muzzle flash or smoke coming from your firearm, did that indicate that you had already fired the firearm?



A. Yes.

Q. And do you know how long it takes for you to pull the trigger and for the bullet to come out of the gun and for that muzzle flash and smoke to appear?

A. No, I don't.

Q. But it would be sometime after you pull the -- make the decision to pull the trigger, and then your brain sends a signal to your hand to pull the trigger, and then for the bullet to come out of the gun, and then for the muzzle flash to appear, and then for the smoke to appear. Would you agree with that?

A. Yeah. The round would have already left the barrel at that point.

(Reporter clarification.)

BY MS. KORNBLAU:

Q. I'm going to share my screen and show you a still shot, since we've been showing still shots all day.

MR. GALIPO: Not all day, just for ten minutes.

BY MS. KORNBLAU:

Q. So Corporal Sobaszek, can you see the still shot that's on my screen?

A. Yes.

Q. Can you describe what that is?

A. That -- so that would be me. In front of me



would be Mr. Gonzalez. At this point, it looks like his right arm is raised up by his head. That's the arm he was holding the gun in, and he's turning back towards me, to his left.

Q. And what were you doing at that point in time?

A. This is when I began to perceive the -- the imminent threat of Mr. Gonzalez holding the firearm and turning towards me. But this point would be probably right before I was aiming at his center mass and discharging my firearm.

Q. And in this still frame, can you see Mr. Gonzalez's chest?

MR. GALIPO: For the record -- just for the record, this is not a still frame. This is partially a still frame, but it appears to have some enhancement or enlargement on it and red markings that are not part of a true still frame. I just wanted to state that for the record.

And when you're asking him if he can see his chest, I don't know if you're asking about the left portion of the still frame or the right portion or something else.

BY MS. KORNBLAU:

Q. Mr. -- or Corporal Sobaszek, can you understand my question?



A. Yes. You're asking me if I can see, like, his chest area.

Q. Yes. And can you see Mr. Gonzalez's chest area?

A. Yes.

Q. Can you see Mr. Gonzalez's face, the front of his face?

A. Yes.

Q. At the time of the incident, could you see Mr. Gonzalez's chest and the front of his face when you made the decision to fire at Mr. Gonzalez?

MR. GALIPO: Objection. Leading.

THE WITNESS: Yes.

BY MS. KORNBLAU:

Q. Where on your body do you wear the body-worn camera?

A. It's on my right -- it's the right side of my chest, about, probably, like, a little under, like, my right pec, my right pectoral.

Q. So the body-worn camera is lower than your eyes; is that correct?

MR. GALIPO: Objection. Leading.

THE WITNESS: Yes.

BY MS. REYES:

Q. Does the body-worn camera video footage appear

Page 85

exactly as you perceived the incident, from your eyes?

MR. GALIPO: Objection. Vague.

THE WITNESS: No, it doesn't. The -- the body camera has a different perspective. It's not at my eye level.

BY MS. KORNBLAU:

Q. So you may have seen something, maybe a gun, even, in his hand that perhaps the body-worn camera wouldn't pick up because it's lower; is that right?

MR. GALIPO: Objection. Leading, and mischaracterizes the evidence.

THE WITNESS: That is possible, yes.

MS. KORNBLAU: Those are all the questions that I have.

MR. GALIPO: Okay. I don't know if Mario, are you still good today?

MR. GARCIA: Yeah, I have no questions.

MR. GALIPO: Saving all your good ones for later, right, Mario?

MR. GARCIA: That's correct.

MR. GALIPO: Okay. You're a smart man.

All right. I think I'm good.

And I don't know if Kimberly has any spelling questions or order questions, but I'll turn it over to her.

Page 86

MS. KORNBLAU: I'm going to mark that, though, as an exhibit, and I'll send it to you.

THE CERTIFIED STENOGRAPHER: Okay. What exhibit number are you marking that as?

MR. GALIPO: I think my last one, I think, was 16. So that should be 17, Andrea.

MS. KORNBLAU: Okay. Thank you.

(Exhibit Number 17 was marked.)

THE CERTIFIED STENOGRAPHER: Ms. Kornblau, are you ordering a copy?

MS. KORNBLAU: Yes, please.

THE CERTIFIED STENOGRAPHER: Mr. Garcia, are you ordering a copy?

MR. GARCIA: Yes, please.

THE VIDEOGRAPHER: We are going off the record. The time is 12:35 p.m.

(12:35 p.m., deposition concluded.)

--oOo--

Page 87

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 2nd day of August, 2025.

_______________________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

Page 88

ERRATA SHEET

| PAGE/LINE | CHANGE | REASON |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

DECLARATION OF DEPONENT

I, ___________________, say I have read the foregoing deposition and declare under penalty of perjury under the laws of the State of California and all federal laws that my answers as indicated are true and correct.

Dated this _____ day of _____________, 2025, at _____________________, California.

___________________________

PATRICK SOBASZEK

**WORD INDEX**


< 1 >
**1** 3:5 51:17, 23 75:2
**10** 3:5 46:13 63:11, 12, 17 68:2
**10:03** 4:14
**10:04** 4:4
**11** 3:5 63:20, 21 64:9
**11:06** 48:15
**11:20** 48:18
**1-10** 1:9
**11372** 1:23 87:24
**12** 3:5 64:10, 11 65:11 81:14
**12:13** 80:19
**12:27** 80:22
**12:35** 86:16, 17
**13** 3:5 65:15, 16
**14** 3:5 65:21, 22
**15** 3:5 46:13 65:24 66:1 68:2
**15th** 2:10
**16** 3:5 66:8, 9, 18 86:6
**165** 13:17
**17** 3:5 26:14 86:6, 8
**18** 26:22
**18114** 1:24

< 2 >
**2** 3:5 51:20, 24 52:1 66:17
**20** 15:11
**20:04** 52:20
**20:04:22** 76:19
**20:04:27** 75:8
**20:04:29** 76:21 77:24
**20:04:39** 75:25
**20:04:47** 59:16
**20:04:48** 61:24
**20:04:49** 65:25
**20:04:54** 76:24
**20:05:28** 76:4
**2013** 10:14 11:9
**2015** 10:17 11:10, 13 12:12
**2019** 8:8 12:14
**2021** 12:23 13:10
**2024** 8:1, 9
**2025** 1:18 4:3, 15 87:22 89:8
**213.624.6900** 2:11
**21800** 2:4
**21st** 24:8
**23** 1:18
**23rd** 4:3, 15
**25** 46:18 53:24 67:11
**2550** 2:16
**27** 11:20
**28:27** 75:12
**28:40** 75:25
**28th** 24:9
**29:29** 76:4
**2nd** 87:22

< 3 >
**3** 3:5 8:4 54:3, 4 56:9
**30** 21:3, 7 37:21 46:9
**31** 13:12
**310** 2:4
**312120** 2:16

< 4 >
**4** 3:5 56:17, 18
**40** 21:3, 8
**46** 52:20

< 5 >
**5** 3:5 26:14 57:10, 11 58:6, 25
**5:25-cv-00331-KK-DTB** 1:7
**50** 21:3, 8
**5090** 2:16
**559.705.2312** 2:17
**5'7** 13:14

< 6 >
**6** 3:5 59:17, 18
**6th** 11:13

< 7 >
**7** 3:5 60:14, 16

< 8 >
**8** 3:5 61:1, 2
**801** 2:10
**818.347.3333** 2:5

< 9 >
**9** 3:5 26:14 61:21, 22 63:2
**90017** 2:10
**91367** 2:4
**93721-2271** 2:17

< A >
**a.m** 4:4, 14 48:15, 18
**ability** 39:7 79:6
**able** 53:11 74:20 78:3
**academies** 10:6, 19
**academy** 10:5, 8, 9, 12, 15, 16 11:12, 15, 17, 19, 21
**accurate** 17:24 55:25
**ACTING** 2:13 5:5 36:14
**action** 87:7, 20
**actions** 36:10 41:4 44:9, 25 45:2
**activated** 37:18, 20, 22
**active** 18:24
**actively** 50:12 51:4
**actual** 9:11 26:9
**address** 19:23
**administered** 4:11 5:8
**administration** 10:4, 11
**advice** 20:1 22:21 23:5, 13, 22
**afternoon** 80:25
**ago** 31:6, 11
**agree** 20:4 55:15 60:4 61:12, 17 63:1 82:11
**ahead** 20:17 36:24 37:5 44:6 50:16 69:21 80:17
**aiming** 22:24 27:14 28:9 73:21 83:9
**aired** 73:4
**al** 4:17
**Alejandro** 51:25 66:16, 17 75:5 78:18
**alleged** 6:13
**allow** 20:19
**ambiguous** 81:9
**ambush** 18:10
**ANDREA** 2:9 5:2 86:6
**andrea.kornblau@manningkass.com** 2:11
**ANDREW** 1:9 2:8
**Angeles** 2:10
**answer** 16:13 17:13 18:12, 13, 20 19:20, 21 20:1, 9, 24 21:5, 15 22:4, 16 23:3, 11, 20 24:4 25:3 28:17 32:11 33:3 41:7 77:7
**answered** 32:10 33:2, 11 47:10 50:25 51:12 65:13 77:4 78:7, 14
**answering** 41:25
**answers** 89:6
**anymore** 58:1 74:2, 4, 9, 19, 24
**apparent** 39:7 79:7
**appear** 49:11, 16, 21 50:2 53:14, 17 56:14, 24 59:3 62:1 64:1 69:1 72:6 82:4, 10, 11 84:25
**APPEARANCES** 2:1
**appeared** 4:4 41:13 70:4 78:8, 11 81:23
**appears** 50:18 51:5 58:12 59:11, 24 61:7 64:5 83:15
**appreciate** 28:20
**approach** 35:21 49:3, 10
**approached** 37:19 64:22
**appropriate** 35:6, 14 36:6, 19 38:18 39:14 40:24 41:22 42:17 43:25 44:17 45:16

**approximate** 34:21 35:25 40:21 49:12
**approximately** 11:11, 19 12:5 13:8 14:1 32:5 34:9 36:4 40:4, 10, 13 42:7 43:18 46:13, 18
**April** 8:1, 8
**area** 49:6 52:16 68:13 72:16 73:21 75:17 79:25 84:2, 4
**areas** 26:2
**argue** 51:2
**arm** 41:14, 15 44:11 50:12 83:2
**armed** 15:13
**arrest** 6:9, 16
**articulate** 44:9
**ASHLEY** 2:15 5:4
**ashley.reyes@doj.ca.gov** 2:18
**aside** 15:3
**asked** 18:9 20:20, 22 28:8 32:10 33:2, 11 47:10 50:24 51:12 65:13 77:4 78:7, 14 81:16, 21
**asking** 19:5 20:7 47:6 83:19, 20 84:1
**assess** 74:20 79:16
**assessing** 62:18, 21
**assigned** 7:11 8:4 11:6 12:8, 10
**assignment** 7:10, 14, 25 8:2, 6 12:11, 13
**assignments** 12:16
**assistant** 10:22
**assisting** 71:24
**associated** 26:10
**associate's** 10:3
**assuming** 19:9 25:3
**attack** 70:12
**attempting** 18:10
**attended** 31:21
**attention** 7:23
**ATTORNEY** 2:13, 15, 19 18:15 19:6 31:22
**Attorney-client** 18:7, 22 22:1, 13 23:1, 9, 18 24:2
**attorney's** 20:1 22:6, 21 23:5, 13, 22
**audio** 37:22
**August** 18:17 19:22 24:8 87:22
**authenticated** 52:11
**automatically** 17:4, 10
**aware** 18:25 65:2, 5 72:19, 23

**< B >**
**bachelor's** 10:10
**back** 19:22 20:18 22:24 27:18, 25 28:14 29:9, 12, 16, 20, 23 30:1 34:19 48:17, 20 50:8 51:6 53:7 54:23 60:1 61:17 67:4, 21 68:12 72:16 73:21 76:17, 18, 20 80:21 83:3
**backdrop** 69:18 79:11
**background** 10:1, 2 16:14 69:17 79:11
**bad** 5:16
**Bar** 2:16
**barrel** 56:13 82:13
**based** 16:3, 25 32:15 35:5, 13 36:5, 8, 10, 20 38:17 39:11 40:22 41:21, 23 42:15, 16 43:23 44:16, 23 45:15 47:16 50:8 51:1 56:11 60:1 66:6 69:7 72:10
**Basically** 7:22 10:23
**basis** 17:15 18:19
**bay** 70:7
**Beaumont** 9:5, 8
**began** 83:6
**behalf** 4:25 5:2, 5
**believe** 19:12 34:2 37:14 58:14 73:8, 14 81:14
**believed** 45:5
**belly** 64:19
**bent** 56:24
**Bernardino** 10:16 11:18
**best** 5:16 32:12
**better** 32:8 50:10 51:21
**bit** 9:25 10:1 17:18 22:8 47:6 54:7 76:17, 19 79:5, 25
**black** 76:8, 9
**bleeding** 26:9
**blind** 40:1
**blood** 26:11
**blur** 61:10
**blurred** 59:1
**blurry** 53:13 59:9 60:13 63:10
**bodily** 39:8 79:2, 8
**body** 27:14, 19, 20, 22, 23 28:12, 13, 21 29:6 57:20 62:8 64:14 84:15 85:3
**body-worn** 3:5 30:20, 22 37:13, 16, 18 51:18 52:8 81:2, 22 84:15, 20, 25 85:8
**bottom** 75:11, 12, 25 76:5
**Boulevard** 2:4
**brain** 82:8
**break** 28:5 41:11, 20 48:10, 16 80:15, 20 81:1
**bring** 19:22 20:18
**broad** 81:18
**bruise** 47:23
**buffer** 37:21
**building** 44:6 69:20 70:4, 8
**bullet** 82:3, 9
**bunch** 29:4
**Burbank** 2:4
**bureau** 7:12, 20
**business** 10:4, 11
**butchering** 5:15
**BUTTE** 87:2

**< C >**
**CA** 2:17
**CALIFORNIA** 1:2, 8 2:4, 10, 11, 13 4:5, 7, 17 5:5, 6 87:1 89:5, 9
**call** 9:2 26:20 43:21
**called** 11:4
**Calls** 52:25 57:1 59:13 60:6 62:3 64:4 69:4 72:8
**camera** 30:20, 22 37:13, 15, 17, 18, 20 51:18 52:8 81:2, 22 84:16, 20, 25 85:4, 8
**camera.................51** 3:5
**camera............51** 3:5
**camera............54** 3:5
**camera............56** 3:5
**camera............57** 3:5
**camera............59** 3:5
**camera............60** 3:5
**camera............61** 3:5
**camera............63** 3:5
**camera............64** 3:5
**camera............65** 3:5
**camera............66** 3:5
**camera....88** 3:5
**cameras** 37:21
**car** 35:18, 20, 25 36:2, 6, 11, 20 37:3, 10, 23 38:1, 6, 13, 15, 19 39:13, 15, 17, 19 40:9, 10 48:22 49:1, 8 73:1
**carry** 7:16
**Case** 1:7 5:25 6:5, 11, 23 8:11 9:16 17:22 18:12, 14, 15, 18, 23 19:1, 2, 17, 21 20:2, 11, 13 21:23, 24 24:16 25:1 27:10 31:21, 24 35:17 41:3 47:14 87:16
**caseload** 7:17
**cases** 19:15
**catching** 68:2 69:9
**cause** 39:8 79:2, 7
**caused** 9:12

**Center** 27:16, 17, 19, 20, 22, 23 28:9, 11, 12, 21 29:8, 10 62:24 79:2 83:9
**centered** 59:5
**CENTRAL** 1:2
**certain** 16:10 17:12 81:14
**Certified** 4:6, 9 5:9 64:9 86:3, 9, 12 87:19
**certify** 87:2
**chance** 41:20
**CHANGE** 88:2
**changed** 12:11 44:2
**characterize** 14:8
**charged** 48:2
**charges** 47:2
**charting** 26:20
**chasing** 15:13 50:5
**chest** 54:12 71:6 83:12, 20 84:2, 3, 10, 18
**CHP** 24:20
**chronologically** 9:17
**circumstances** 36:9 41:3 44:23 50:9
**CITY** 1:8 2:6 5:3
**civil** 7:7
**civilians** 69:17
**claims** 19:2 20:12, 13
**clarification** 9:6 26:5 82:14
**clarified** 41:4
**clarify** 7:6 14:20 29:2 33:10 74:7
**classify** 46:25
**clear** 32:24
**clearly** 54:24
**client** 18:10
**close** 5:17 64:23 71:11
**closed** 50:7
**closely** 81:6, 7
**collateral** 12:15
**combined** 7:8
**come** 9:2 45:12 51:14 71:3 82:3, 9
**comfortable** 43:21 54:1
**coming** 26:11 44:2 56:13 81:24
**commands** 32:20
**commencing** 4:3
**communications** 19:6
**completed** 12:7 66:19
**completely** 59:6 61:15
**completing** 10:9
**completion** 20:15 87:17
**Compound** 64:3 74:15
**computer-aided** 87:11
**concentration** 10:4
**concluded** 86:17
**condition** 13:25 14:9
**confer** 20:14
**conference** 4:19
**confirm** 24:11
**consider** 79:10
**considering** 37:3
**consisted** 14:2
**constant** 34:18
**constitutes** 87:12
**contact** 30:17
**context** 19:8
**continue** 76:1
**contraband** 15:21, 25
**controlled** 10:24
**convicted** 48:1
**conviction** 48:4
**coordinate** 80:3
**copy** 86:10, 13
**corner** 69:22
**corners** 40:1
**Corporal** 5:3 7:11 24:11 80:25 82:21 83:24
**correct** 7:2 9:24 11:23 14:22 17:20, 25 25:4, 15, 18 27:4, 12, 13 28:10 32:17 34:25 35:3, 4 37:11, 24 38:5, 11 39:1, 2, 5, 9, 10, 24 40:15 42:5 43:16 47:20, 24 51:10 55:9 62:23 70:2 71:8, 9 73:13 79:9 84:21 85:20 87:13 89:6
**correctional** 10:7
**correctly** 44:18 70:3
**Counsel** 4:22 66:18 80:13
**count** 26:21 34:17
**counting** 31:25
**county** 11:6, 18 87:2
**couple** 10:25 70:7 71:20 78:5
**course** 7:16 14:12
**COURT** 1:1 4:20, 23 7:1 10:7 11:5 19:23 66:18
**covered** 73:18 78:21
**crashed** 38:7
**crime** 7:21
**crimes** 7:18, 22
**criminal** 7:6
**crouching** 62:6
**CSR** 1:23 87:24
**current** 7:10
**currently** 13:11, 16 18:11
**custodial** 11:6

**< D >**
**DALE** 2:3 4:25
**dalekgalipo@yahoo.com** 2:5
**date** 4:14 11:12, 13 12:22 24:8, 9, 11 87:8
**Dated** 89:8
**day** 4:3 13:14, 15, 16 24:24 35:2 46:19 82:18, 19 87:7, 22 89:8
**days** 14:1 31:6, 11 69:12
**deadly** 39:1 78:23 79:20
**death** 39:8 79:2, 7
**debate** 13:19
**December** 12:12
**decision** 82:7 84:11
**DECLARATION** 89:1
**declare** 89:4
**defendant** 6:11
**Defendants** 1:9 2:6, 11 5:3
**defined** 28:11
**definitely** 34:15, 16 54:18 62:8
**degree** 10:4, 10
**delay** 55:3
**Dennis** 2:19 4:19 48:12 80:17
**Department** 11:3, 18 26:20
**depend** 16:11
**depends** 35:9
**depo** 20:15 66:19
**deponent** 4:11 5:9 89:1
**DEPOSITION** 1:17 4:7, 15, 18 5:20 6:7 18:16 19:17, 18 24:7, 17, 20 81:8 86:17 87:6, 13, 16 89:4
**Deputy** 2:15, 19 9:9 11:5 73:1
**describe** 27:23 29:20 41:20 43:14 82:24
**described** 39:25 43:12 50:2 81:23
**DESCRIPTION** 3:5
**detail** 16:23 25:11
**details** 18:5 54:22
**detective** 8:4
**detectives** 7:23
**Detentions** 11:4
**determine** 49:4
**Diego** 10:6, 13, 25 11:2
**different** 74:13 85:4
**direction** 80:9
**directly** 8:24, 25 9:11 47:11
**disabled** 38:8
**discard** 15:25 16:5
**discharged** 59:25
**discharging** 83:10
**disinterested** 87:20
**distance** 42:4, 6 46:16 50:7 71:10, 11
**DISTRICT** 1:1, 2

**doing** 26:24 35:14 36:5 83:5
**Domains** 11:22
**domestic** 47:1, 14, 21
**drawn** 68:23
**driver's** 38:16
**driving** 38:4, 7
**Drop** 32:21 33:13, 19 34:3 65:9 73:8, 14, 25 74:1
**dropped** 65:2, 5
**duly** 87:6
**D'URSO** 1:23 4:5, 21 87:2, 24
**duties** 7:16

< E >
**earlier** 33:9 44:25 48:20 50:2 53:24 67:13 77:10
**educational** 10:2
**effect** 32:22 40:1 51:7 67:4, 21 68:5, 6 72:5
**eight** 26:23 36:4 48:22 49:12
**either** 5:24 59:7 62:6, 7 63:10 64:2 69:8
**elaborate** 41:6
**ELLROD** 2:9
**Elsinore** 9:8 10:21
**emergency** 9:4
**emphasis** 10:10
**ended** 63:16
**enhancement** 3:5 83:15
**enlarge** 56:19 59:19
**enlarged** 59:20
**enlargement** 83:16
**entire** 52:11 81:6
**ERRATA** 88:1
**ESQ** 2:3, 9, 15, 19
**estimate** 7:4 14:17 15:9 31:20 32:8, 15 34:14 43:19 46:3, 6, 11, 15, 16 53:25 60:21, 23 67:15
**estimation** 42:10
**et** 4:17
**event** 19:10
**everybody** 24:12
**evidence** 25:1 47:7 85:11
**exact** 12:22 67:3
**exactly** 11:2 19:8 33:25 55:23 74:8 85:1
**EXAMINATION** 3:1, 3 5:11 80:23
**excessive** 6:15
**excuse** 46:15
**EXHIBIT** 3:5 51:17, 20, 23, 24 52:1 54:3, 4 56:9, 17, 18 57:10, 11 58:6, 25 59:17, 18 60:14, 16 61:1, 2, 20, 22 63:2, 11, 12, 17, 20, 21 64:10, 11 65:11, 15, 16, 21, 22 66:1, 8, 9 75:2 86:2, 4, 8
**EXHIBITS** 3:5 65:24 66:17
**exit** 68:12
**exiting** 46:11 68:4
**experience** 16:4
**explain** 70:22 74:17
**explained** 77:10
**exposed** 29:12, 16
**exposing** 29:6
**extent** 8:11 40:17 47:3, 13, 18, 19
**eye** 85:4
**eyes** 84:21 85:1

< F >
**face** 30:7, 9 41:25 84:6, 7, 10
**facing** 27:24 28:13
**fact** 16:8, 19
**factors** 35:10 41:2
**factory** 80:10
**facts** 17:12
**factual** 16:14
**fair** 16:16 19:3 25:13, 16 28:15 56:3 70:1
**falling** 30:15 62:7
**familiar** 43:13
**far** 5:17 40:4, 10 46:3, 5 59:11
**faster** 69:9
**favoring** 61:14 63:6
**feasible** 79:20
**federal** 87:16 89:5
**feel** 19:22 28:6
**feet** 43:19 64:23 65:6 71:8, 11 74:21
**fell** 58:3 71:8
**felony** 47:4, 17, 21
**felt** 19:16
**FID** 31:3, 25
**field** 12:2, 7, 16, 17, 19, 24 13:1 40:14
**fighting** 20:6
**Figueroa** 2:10
**find** 28:22 69:13
**fine** 77:24 80:16
**finished** 10:10
**fire** 23:8 26:12, 16 30:13, 17 84:11
**firearm** 14:21 15:17 26:12 29:5, 7 32:3, 19, 25 44:21 45:7, 11, 12, 18, 20 49:4 53:11 55:6 62:20, 24, 25 63:8 64:23 65:2 67:14, 17, 24 68:23 69:14 70:15, 19 71:3 73:12, 25 75:19 81:24, 25 83:7, 10
**firearms** 14:14 15:16, 21 16:5
**fired** 17:24 22:25 24:1 26:24 27:25 28:4, 9 30:10 45:25 46:4, 17 53:25 54:20 55:18, 19 60:19 65:6 67:12 70:1 76:12 77:2 78:5 80:10 81:25
**firing** 27:15 28:23 29:1, 2, 13, 17 30:2, 7, 15 32:3 33:1 46:12 51:4 52:24 54:9, 11, 23 57:25 59:22 61:5 62:11, 14, 22 63:18, 24 65:12, 19 66:3, 11 67:14 69:18, 19, 23 74:2, 5, 18, 20, 23 79:11
**first** 9:17, 18 10:12 11:12 13:5 18:2 30:11 31:2, 3 32:2, 3 37:16 39:12 40:4, 6, 7, 9, 11, 22 41:10, 22 42:1, 9, 13 43:2 46:4, 12, 17 49:16 52:7 54:9, 11, 20 60:22 62:13 68:20
**five** 14:1, 6, 25 32:6, 7, 13 33:16 35:22, 25 67:13 68:20 69:12 77:20
**flash** 56:13, 14 78:5 81:24 82:4, 10
**flat** 64:19
**Floor** 2:10
**flow** 10:24
**Focus** 4:20
**focused** 30:9 62:20
**focusing** 62:24
**follow** 19:25 22:5, 20 23:4, 12, 21 66:24
**followed** 14:4
**following** 4:7 28:25
**follow-up** 80:13
**foot** 15:6, 10, 12, 17 34:5, 10, 18, 24 39:23 40:3 41:4 45:1 49:15 69:2 71:13, 14 75:3
**footage** 30:20, 22 37:13 81:2, 6, 11, 22 84:25
**football** 40:14
**force** 6:9, 13, 14, 15, 17, 18, 21 8:5, 7, 22 11:25 12:13 25:10 39:1 72:25 78:23, 24 79:20
**foregoing** 87:5, 12, 15 89:4
**forget** 74:8
**forgive** 5:16
**forward** 63:15 69:15 76:19
**Four** 12:6, 14 15:4 60:23, 24

**frame** 8:10 11:8 13:21 31:18 32:25 33:1, 4, 8, 14, 17 48:23 49:1 50:23 51:11 58:11 81:21 83:11, 14, 15, 17, 21
**frankly** 20:8
**Fresno** 2:17
**front** 27:18 29:6 44:11 56:6 80:1 82:25 84:6, 10
**full** 87:12
**fumbled** 70:25
**further** 71:7 87:15

< G >
**gaining** 40:16
**GALIPO** 2:3 4:25 5:12 9:13 16:2, 15 17:1, 8, 17 18:19, 25 19:11, 25 20:4, 16, 23 21:2, 11, 13, 20, 22 22:5, 8, 10, 17, 20, 23 23:4, 7, 12, 15, 21, 24 24:5, 14, 15 25:2 26:6 28:17, 19 29:21 31:9 32:11, 14 33:3, 6, 18, 23 35:12 36:17 37:1, 9 38:24 41:8 42:2, 20 47:12 48:9, 12, 19 49:20, 25 50:15 51:9, 16, 25 52:4, 13, 15 53:1, 10 54:5, 8 55:24 56:8, 17, 19, 20 57:5, 9, 12, 19 58:5, 19 59:15, 19, 21 60:10, 14, 17 61:1, 3, 20, 23, 25 62:9, 17 63:7, 11, 13, 20, 22 64:7, 10, 12, 21 65:7, 15, 17, 24 66:2, 8, 10, 15, 21 68:16 69:6 72:12 73:24 74:16 75:1, 14, 15, 24 76:3, 6, 15, 23, 25 77:6, 23 78:1, 2, 10, 16, 18, 20 80:12, 16 81:9, 17 82:19 83:13 84:12, 22 85:2, 10, 15, 18, 21 86:5
**GALIPO............................5** 3:4
**Gang** 8:4 12:13, 21
**GARCIA** 2:19 5:4 52:25 59:13 60:6 62:5 63:4 77:5 85:17, 20 86:12, 14
**Gen** 26:14
**GENERAL** 2:13, 15, 19 6:15 7:20 19:10 34:14 35:11 67:15 68:13 79:25
**generally** 7:13, 18 10:18 13:20, 24 14:9 52:16 60:2, 9 62:14 63:15 64:13
**GEORGE** 1:5 4:16
**getting** 10:9 16:17 39:15, 17 69:2, 8, 9
**give** 16:24 23:16 34:13 37:2 41:19 42:10 46:7 67:25 79:19
**given** 32:20
**giving** 17:6, 13 67:14
**glim** 61:10
**Glock** 26:14
**gloves** 58:7, 8, 12, 14, 21, 22
**go** 10:12, 15 11:17 18:5 20:17 24:16 36:24 37:5 39:3 41:2, 11 43:4 45:20 50:16 54:23 55:15 56:17 57:9, 14 59:17, 20 61:1, 20 63:11, 15 76:17, 19 80:7, 17
**Godward** 71:21, 22 76:10
**goes** 21:21 75:10
**going** 10:19 16:24 18:5, 13, 16 19:19, 20, 25 20:8, 24 21:4, 15 22:3, 5, 15, 20 23:4, 12, 17, 21 24:6 30:13 37:7 48:20 50:10 51:16, 17, 20 55:2 56:22 57:21 58:2 62:2 63:20 65:15 75:1, 2 77:14, 23 80:4, 18 81:17 82:16 86:1, 15
**Gonzales** 25:20 38:7, 12 39:12
**GONZALEZ** 1:5 4:16 8:15 9:16, 22 14:13, 25 15:3, 7 17:20 18:12 19:13, 18 21:24 24:16, 23, 24 25:4, 7 26:13 29:3, 5 32:18 34:6, 10 35:3, 14 40:5, 24 43:20 46:17, 20 48:21 49:1, 2, 12, 17, 22 50:6 52:21 54:10, 24 55:4 56:24 57:13 60:12 61:12 62:1, 25 63:2, 9, 14 64:1 67:18 68:23 69:2, 11, 15 70:12 71:6, 15, 25 76:12 80:9 83:1, 7 84:11
**Gonzalez's** 27:14 32:3 53:7 60:1 64:13 69:14 70:15 83:12 84:3, 6, 10
**Good** 4:13 5:13, 14 13:14, 15, 16, 18, 24 14:9 21:2 40:12 42:10 48:9 76:21 80:25 85:16, 18, 22
**ground** 30:14, 16, 18 57:14, 17, 21 58:3 62:2, 7 63:14, 15 64:2, 14, 18 71:4 74:3, 10, 14, 21 76:13 77:3, 9, 15 78:6, 9
**guess** 6:16 13:19 20:5 28:12 29:14 32:12 41:3 45:4 56:12 69:12
**gun** 16:18, 20 17:10, 14 22:18 30:3, 5 36:13 41:12 44:12 45:5 48:25 50:18, 22, 23 51:3, 4, 5, 8, 11 54:12, 24 57:25 58:1 59:7, 12, 24 60:11 71:10 74:19, 24 78:4, 12 82:4, 9 83:3 85:7
**gunpowder** 56:12
**guns** 36:12
**gunshot** 26:1, 2, 7
**gunshots** 56:22 72:7 77:9, 14

< H >
**half** 14:3, 5 29:14, 16, 20, 24
**hand** 14:15, 20 16:18, 20 17:10 24:1 29:5 32:3 49:2 53:11 54:12, 24 58:18 67:23 69:15 70:16 82:8 85:8 87:22
**handcuff** 71:15
**handcuffed** 71:18
**handcuffing** 71:23
**handgun** 26:15, 21, 22
**handle** 7:24
**hands** 24:1 34:17 39:16 58:8, 15 59:7, 12
**happened** 17:19 19:1
**happening** 59:22
**hard** 16:13, 24 17:13 40:20 59:2
**head** 71:7 83:2
**hear** 30:10 37:14, 15 66:22 67:18 68:19 71:25 77:9
**heard** 39:3, 22 65:9 67:1 68:4, 7 73:14
**held** 4:18
**Helman** 8:19 9:16, 21, 23 14:14, 24 15:3 17:19 18:1, 6, 13, 14, 15, 18, 23 19:12, 14, 17, 21 20:2, 7, 11, 15, 25 21:23, 24 22:11, 18 23:8, 16
**Helman's** 22:24 23:25
**help** 9:4 43:2 75:5
**HEMET** 1:8 2:6 4:5 5:3 11:11 12:2, 11 80:8

**hereunder** 87:21
**hey** 50:10 67:2
**high** 10:2, 20
**highest** 78:23
**HIGHWAY** 2:13 5:6, 7
**Hills** 2:4
**hire** 11:13
**hired** 10:25 11:14
**history** 36:11
**hitting** 77:9, 15 78:9
**hold** 75:11
**holding** 14:21 41:13, 15 44:10, 11 50:11 83:3, 7
**homicides** 7:21
**hope** 74:21
**hoping** 5:15
**hospital** 26:1
**hour** 4:3 14:3 80:5
**hunched** 56:25 57:3 64:20
**hundred** 7:9 20:7 40:13, 22 41:22 42:1, 11 43:19 49:4
**hypothetical** 38:21

**< I >**
**illegal** 15:20
**image** 52:19 53:6, 9, 12, 15, 18, 20, 23 56:21 58:25 59:4, 8, 11, 23 60:2, 5, 8, 12, 18 61:4, 13, 18 62:1, 10 63:1, 8, 23 64:1 65:18 66:6
**immediately** 8:2 39:7 79:7
**imminent** 57:24 62:25 83:7
**important** 54:21
**impression** 21:14 57:6 72:7
**improper** 18:9
**incident** 6:10 8:16 9:4, 7, 8 14:10, 13 15:7 17:19, 20 19:12 26:1, 19, 23 72:14 81:5 84:9 85:1
**incidents** 9:10
**including** 11:25 14:24 20:12 37:10
**inclusive** 1:9
**Incomplete** 38:20
**INDEX** 3:1
**indicate** 55:25 81:25
**indicated** 65:8 73:6 89:6
**indicates** 47:2
**information** 18:11 36:14 38:23 44:24 46:19, 23 47:9
**informationally** 48:6
**initial** 35:21 40:3, 21 49:3, 10, 15 55:13, 17
**initially** 12:8 35:2, 15 38:18
**injured** 46:20 47:8 48:6
**injuries** 47:9 72:13
**injury** 39:8 47:5, 14, 18, 22 79:3, 8
**inside** 36:5 70:8
**instruct** 18:13 19:20 20:9, 24 21:4, 15 22:3, 15 23:3, 11, 20 24:4
**instructing** 18:20
**instruction** 11:24 22:6
**intent** 39:7 79:7
**intentionally** 27:8, 11
**interview** 31:4, 25 55:13, 17
**introduce** 4:22
**introduced** 4:10
**investigate** 7:19
**investigation** 9:12
**investigations** 7:11, 20
**investigation's** 25:11
**investigative** 7:16
**investigators** 7:15
**involved** 6:18, 20 8:14 18:3 19:9 71:23 73:5
**IRICK** 1:9 2:13 5:7 24:21 32:21 33:13 52:23 59:14 72:21 73:1, 14
**issue** 24:9
**items** 15:20

**< J >**
**jacket** 49:5
**jail** 11:7
**jeans** 76:9
**Job** 1:24 10:20
**Join** 62:5 63:4
**Joined** 77:5
**judge** 20:19
**JULY** 1:18 4:3, 14 10:17 11:9, 12, 13
**jumping** 28:6
**justifiable** 36:15 44:19 45:2
**justified** 35:24 44:13
**justify** 79:14

**< K >**
**K9** 73:3
**KASS** 2:9
**keep** 13:22, 24
**kick** 64:25 70:24
**kicked** 70:19
**Kill** 72:2, 3
**killed** 9:9 46:20
**KIMBERLY** 1:23 4:5, 21 85:23 87:2, 24
**kind** 16:11, 13, 22, 23 28:6 40:20 44:1, 4 47:1, 17 49:5 59:1 61:14 63:6 64:18, 19 67:19 68:3 70:25 80:1
**kneeling** 64:6, 17
**know** 9:3, 11, 15, 20 13:18 15:23 16:14, 23 18:23 20:21 25:8, 13, 17, 22, 25 26:18 27:22 29:22 30:19 32:5, 9, 20 33:12 35:22 37:12 38:22 42:8 43:2, 7 44:9, 24 45:2, 5 46:5, 25 47:1, 2, 3, 13, 15, 18, 25 48:22 50:9 51:1 52:23 53:2 55:1 56:12 57:17, 24 58:4, 7 59:12 61:7 66:3 68:10, 18 70:24 71:13, 14, 18, 22 72:3 77:10, 11, 12 79:24 80:3, 5 81:14 82:2 83:20 85:15, 23
**KORNBLAU** 2:9 5:2 15:22 16:9, 21 17:5, 11 18:7, 22 19:11 20:16 21:1, 6, 12, 17 22:1, 13, 19 23:1, 9, 18 24:2, 13, 25 28:16 29:18 32:10 33:2, 11, 20 35:8 36:7, 22 37:4 38:20 40:25 41:24 42:18 47:10 48:11 49:18, 23 50:4, 24 51:12 52:10 53:8 55:20 56:4 57:1, 15, 22 62:3, 15 63:3 64:3, 15 65:4, 13 66:5, 13 69:4 72:8 73:23 74:15 77:4 78:7, 14 80:14, 24 81:12, 20 82:15, 20 83:23 84:14 85:6, 13 86:1, 7, 9, 11
**KORNBLAU...........................80** 3:5

**< L >**
**lacks** 16:23
**Lake** 10:21
**larger** 52:2 54:7
**lastly** 66:8 78:21
**LAW** 2:3
**laws** 89:5, 6
**leading** 44:25 63:3 69:20 75:4 84:12, 22 85:10
**Learning** 11:22
**left** 26:8, 23 29:6, 23, 25 30:1 34:8, 10, 24 37:23 41:14 53:5, 15, 18 55:8, 18, 22 56:1, 2 58:12, 18, 25 59:3, 6, 10, 11, 24 61:15 63:6 79:23 82:12

83:4, 20
**leg** 26:8, 11
**legs** 72:15
**level** 7:23 78:23 85:5
**life** 48:7
**light** 61:11
**lights** 37:19
**listening** 24:17
**Litigation** 4:20 18:8, 23, 24 19:7 22:2, 14 23:2, 10, 19 24:3
**little** 9:25 10:1 12:14 17:18 40:19 47:6 52:2 54:7 76:17, 19, 20 79:5, 25 84:18
**LLP** 2:9
**loaded** 26:22
**location** 37:23
**long** 7:25 8:6 11:19 12:5, 10 35:20 36:2 40:7 42:6 43:17 79:22 82:2
**look** 34:10 51:18 52:7, 16 54:3 59:10 60:14 64:7, 10 77:19, 20
**looked** 34:16, 23 50:21 56:1
**looking** 34:6, 7, 19 53:6, 14, 20, 23 55:22 56:9, 21 58:10, 24 59:23 60:18 62:10 63:17, 23 65:11, 18 73:17 77:14, 17 78:3, 11
**looks** 56:12 75:8 77:8 83:1
**Los** 2:10
**losing** 64:7
**lot** 11:24 41:1 54:22
**lower** 84:20 85:9
**lowered** 62:8

< M >
**magazine** 58:15 70:20 71:3
**making** 62:23
**Mall** 2:16
**man** 85:21
**manipulating** 67:23
**manner** 71:8
**MANNING** 2:9
**MARIO** 2:19 5:4 85:15, 19
**Mariposa** 2:16
**mark** 51:17, 20 86:1
**marked** 51:23, 24 54:4 56:18 57:11 59:18 60:16 61:2, 22 63:12, 21 64:11 65:16, 22 66:1, 9 86:8
**marking** 86:4
**markings** 83:16
**mass** 27:16, 17 28:9, 21 29:8, 10 62:24 79:2 83:9
**math** 15:2 26:24
**matter** 4:16 9:22 15:2 19:18 20:2, 11 21:14
**mean** 9:1 15:23, 24 16:10, 13, 24 25:5 27:22 29:14 34:15 35:9, 17, 21 40:12 41:1 43:7 44:8 46:24 47:20 50:17 51:1, 2, 4 54:16, 21 56:5, 7 59:1, 5 61:14 63:5 64:16 69:8 77:13 80:5
**meaning** 51:8
**meant** 29:1 50:9
**meet** 20:14
**meetings** 31:20, 22, 23
**member** 12:18 13:3, 5
**mentioned** 17:19 44:24
**merely** 16:8, 20
**mile** 14:5
**miles** 69:12
**millimeter** 26:14
**mind** 33:1, 4 35:24 39:13 44:15
**mine** 30:24 37:14
**minute** 51:19
**minutes** 36:4 48:22 49:12 82:19
**mischaracterizes** 25:1 85:11
**missed** 70:25
**Misstates** 24:25 36:22 37:4
**misunderstood** 21:16
**moment** 48:20 81:15
**Monell** 20:12
**months** 10:25 12:6
**morning** 4:13 5:13, 14 31:13
**move** 21:12
**moving** 36:3 50:12
**msincich@galipolaw.com** 2:6
**muzzle** 56:14 78:4 81:24 82:4, 10

< N >
**name** 4:19 5:13, 14, 15
**named** 6:11 87:5
**narrow** 42:22 43:5, 7, 9, 11, 15, 20 44:5 45:9 50:1, 6 67:6, 7, 8, 20 68:8 75:17
**near** 38:10 44:4 64:2 80:1
**necessarily** 15:24
**necessary** 20:14
**need** 19:22 21:8, 18
**never** 25:11 55:16 56:2
**nine** 36:4 48:22 49:12
**noncompliance** 36:11
**note** 61:23 65:25 76:11
**noted** 52:14
**notice** 74:4 77:1
**noticed** 18:16 19:17 71:2 74:2
**number** 26:21 51:23, 24 54:4 56:18 57:11 59:18 60:16 61:2, 22 63:12, 21 64:11 65:16, 22 66:1, 9
86:4, 8

< O >
**oath** 4:11 5:8
**object** 52:12, 13 81:17
**Objection** 15:22 16:9, 21 17:5, 11 18:7, 19 20:5 22:1, 13, 19 23:1, 9, 18 24:2, 25 28:16 29:18 32:10 33:2, 11, 20 35:8 36:7, 22 37:4 38:20 40:25 41:24 42:18 47:10 49:18, 23 50:4, 24 51:12 52:10, 14, 25 53:8 55:20 56:4 57:1, 15, 22 59:13 60:6 62:3, 15 63:3 64:3, 15 65:4, 13 66:5, 13 69:4 72:8 73:23 74:15 77:4 78:7, 14 81:9 84:12, 22 85:2, 10
**objections** 19:19
**objects** 23:25
**observations** 44:17 69:7
**observe** 26:2 38:12
**observed** 14:18 35:13 36:5, 20 38:17 39:12 40:23 41:10, 19, 21 42:15 43:24 70:22
**obviously** 8:14 10:5 41:2 44:11 47:17 57:24
**occasions** 5:22 14:18 15:15 31:16
**occurred** 9:17 19:13 52:17
**office** 18:24 19:14 24:10
**OFFICER** 2:13 5:7 12:16, 17, 20, 24 13:1 14:19 19:9 24:21 32:21 33:13 39:4 42:22 43:12 52:23

59:14 71:19, 21 72:21 76:9 78:24
**officer-involved** 5:25 8:21, 23 9:10 18:2
**officers** 6:20 15:20 37:7 72:20 76:7
**OFFICES** 2:3
**official** 11:13 25:6
**Oh** 73:19 75:11
**Okay** 5:19 9:14, 19 13:15 14:24 15:1 16:16 17:2 19:25 20:4, 16 21:11, 13, 20 24:14 30:2 32:24 33:7 36:18 40:14 43:11, 17 44:15 45:4, 14 46:8 47:6 48:5, 9, 12, 20 49:7, 11 51:10, 16 53:14 54:3, 14, 19 56:16 57:9 58:6, 20, 24 59:3, 10, 15 60:1, 11, 14, 25 61:12 64:7, 22 66:8, 15 68:17, 19 69:11, 25 71:15 75:1, 8, 19, 24 76:1, 3, 11, 15, 18, 21 78:1, 11, 17 80:7, 12 85:15, 21 86:3, 7
**old** 13:11
**once** 49:3 64:18 74:20
**ones** 85:18
**oOo** 1:3 2:19 3:5 4:1 86:18
**opportunity** 39:7 79:6
**opposed** 48:1
**orange** 75:22
**order** 85:24
**ordering** 86:10, 13
**oriented** 28:22
**original** 87:16
**outside** 35:3, 7, 15, 18, 20 70:7, 9
**overhead** 37:19
**overly** 81:18
**Ow** 72:4, 10

**< P >**
**p.m** 80:19, 22 86:16, 17
**PAGE** 3:3, 5
**PAGE/LINE** 88:2
**pain** 72:6
**pants** 45:20
**parking** 10:22, 24
**part** 39:6, 8 40:3 42:14 49:15 83:16
**partially** 83:14
**partner** 54:25 55:6 59:12 65:9
**partners** 29:7 72:24, 25
**part-time** 10:20
**passed** 32:2 46:11 60:22 68:9 70:9
**pathway** 42:22 43:12 50:6
**PATRICK** 1:8, 17 2:6 3:2 4:4, 16 5:3, 14 89:12
**PATROL** 2:13 5:6, 7 7:23 12:8, 10, 12
**pause** 73:17
**pec** 84:19
**pectoral** 84:19
**penalty** 89:4
**pending** 6:23
**people** 15:15, 19, 25 16:4 69:22, 25 70:4, 8, 9, 16 71:20
**perceive** 55:2 83:6
**perceived** 57:24 67:24 85:1
**percent** 49:4
**period** 12:2, 19 40:16 68:21
**perjury** 89:4
**person** 15:13 36:12 71:24 87:20
**persons** 7:21
**perspective** 27:17, 21 36:18 85:4
**pertains** 87:15
**pertinent** 54:22
**photos** 47:9 52:12
**phrased** 81:10, 18
**physical** 13:25 14:9 72:13
**pick** 85:9
**picking** 80:4
**pistol** 58:16
**place** 8:12 18:17 24:17 43:5, 7, 8 87:8, 14
**Plaintiff** 1:6 5:1
**PLAINTIFFS** 2:2
**planned** 21:9, 19
**play** 75:2, 10 76:15
**played** 52:11 75:13 76:2, 22 77:25
**please** 4:22 5:13 29:2 52:1 54:3, 7 56:17 57:10 59:17 60:15 61:1 63:11 76:1 86:11, 14
**point** 12:15, 25 18:6 21:25 22:18 29:4 34:1, 2 36:16 37:23 38:6 39:14 40:20 42:21 44:1, 8, 13, 20, 22 45:3, 13, 22 50:5 51:15 52:12 56:1 57:8, 13, 16, 17, 18, 21 58:2 62:11 64:25 65:3, 12, 19 66:4, 12 67:1, 19, 22 68:1, 3, 24 69:1, 9 73:7, 25 80:2 82:13 83:1, 5, 8
**police** 14:18 15:20 80:8
**Portion** 3:5 43:15 50:1 51:17 53:7 75:3, 9, 16 83:21
**position** 10:7 62:8 64:14
**possessing** 62:25 74:19, 24
**possible** 85:12
**possibly** 50:19 52:2 71:21
**POST** 11:21
**pounds** 13:17
**pre-dated** 21:23
**prepared** 18:11
**preparing** 50:18
**pre-report** 37:20
**PRESENT** 2:19 8:11, 18, 21, 23 39:6 79:6 87:6
**presented** 61:18
**press** 27:5
**pressed** 27:11
**pressing** 27:8
**presumed** 44:12
**pretty** 5:17 40:12 78:21
**previously** 21:6
**primary** 38:1
**prior** 5:22 11:14 14:12 19:18 37:21 52:24 54:9, 11 62:22
**privilege** 18:8, 20, 23 19:7 22:2, 14 23:2, 10, 19 24:3
**privileged** 19:6
**Probably** 7:9 13:9 14:25 31:11 32:5 34:17 35:22 43:11 68:1 71:13 83:8 84:18
**problem** 24:9 73:19
**proceedings** 87:14, 17
**process** 62:2 77:11
**produce** 51:5
**prone** 71:6
**property** 7:22
**pull** 82:3, 6, 7, 8
**purpose** 18:10 24:6
**purposes** 14:23
**pursuing** 38:7
**pursuit** 15:17 34:2, 5, 11, 18, 24 37:24 38:2 39:23 40:3 41:5 43:4 45:1 48:21 49:15 69:3 72:20 73:2, 5 75:4 80:2
**pursuits** 15:6, 10, 12
**put** 52:1 55:16 75:6

**< Q >**
**question** 14:23 16:14, 25 18:9 20:9, 24 38:23 41:7 47:7 65:21 83:25

**questions** 18:14, 18 19:3, 14, 20, 21 20:1, 7, 18, 19 21:3, 7, 8, 9, 18 85:13, 17, 24
**quick** 80:14
**quite** 20:8 79:24
**quoted** 33:9

< R >
**radio** 9:2 73:4
**railroad** 38:10
**raised** 83:2
**RAMIREZ** 2:9
**ramp** 42:25 43:9, 15, 17, 21, 23 44:3, 5, 16 45:8, 9, 10, 15, 19, 23, 25 46:1, 2, 4, 12 50:7 68:18 75:18
**ran** 15:15 50:1
**range** 15:9 32:9
**rapid** 62:14
**reach** 36:11
**reaching** 67:22
**react** 55:2 77:11
**reacted** 29:11
**reacting** 28:1, 3, 24, 25 54:25 55:5
**read** 89:3
**realize** 67:11
**realized** 67:22
**really** 15:1 20:4, 6 29:19 40:18 41:4 42:10 64:16
**re-ask** 20:19
**reason** 19:23 88:2
**reasons** 45:6
**recall** 30:15 34:7 58:2 63:15 64:13, 17, 18, 19, 22 67:14 70:20 72:2 73:7, 8, 20 81:3
**recognize** 76:7
**recoil** 78:4
**recollection** 17:22 19:10 32:15 41:16
**record** 4:10, 14 18:15 21:9, 18 48:14, 17 59:15 75:6 80:18, 21 83:13, 14, 18 86:15
**recorded** 4:15 37:12
**records** 37:21
**red** 75:22 83:16
**re-depose** 20:11
**REFERENCE** 3:5
**referring** 19:8 29:24 43:6, 8 48:23
**reframe** 46:24
**regard** 25:24 70:23
**regarding** 20:7 31:21, 23
**Region** 8:4
**relate** 19:2
**related** 5:24 6:2, 8, 9 8:24, 25 9:11 18:14 81:6, 7
**relates** 20:12
**relation** 52:24 53:4 68:7, 19
**remember** 10:23 12:22 33:14, 25 55:21, 23 66:23 67:3
**REMEMBERED** 4:2
**REMOTE** 1:17 2:1
**remotely** 4:4 87:6
**rephrase** 38:23
**Reported** 1:22 4:8 87:9
**Reporter** 4:6, 9, 21, 23 5:9 9:6 26:5 66:18 82:14 87:19
**REPORTER'S** 1:16
**represent** 4:23
**requested** 87:18
**reserve** 20:10
**resolved** 6:24, 25
**respect** 9:15 11:24 18:1 24:23 38:25 78:22
**respond** 9:3
**responded** 9:9
**response** 28:20
**responsible** 79:13
**results** 25:6, 11, 17
**review** 87:17
**reviewed** 55:12
**REYES** 2:15 5:4 84:24
**REYNOSO** 1:9 2:8 71:19, 21, 22 72:25 76:8
**Reynoso's** 30:24 37:15
**right** 19:13 20:10 28:8 29:22 32:21 33:15 34:6, 7 37:19 39:22 40:6, 7, 9, 11, 22 41:9, 10, 15 42:3, 4, 9, 15 43:2, 3, 4 47:20 49:9, 16, 21 50:12 53:11 55:3, 10, 18 56:16 58:11 67:23 68:22 71:12, 13 75:17 77:11, 19 83:2, 9, 21 84:17, 19 85:9, 19, 22
**rights** 42:7
**Riverside** 26:19
**robberies** 7:22
**Room** 2:16
**round** 82:12
**rounds** 26:16, 18, 21, 22, 23, 25
**RPR** 1:23 4:6 87:24
**rule** 20:19
**run** 14:5 15:20, 25 16:4
**running** 16:8 17:3, 7, 14 18:6 21:24 22:11 29:3, 4 39:20 41:14 44:5, 7, 9 45:8, 14, 19 54:10, 14 67:8 69:12, 15 80:9
**runs** 44:10

< S >
**Saelee** 2:19 4:19
**San** 10:6, 12, 16, 25 11:2, 18
**satisfied** 24:5
**Saving** 85:18
**saw** 26:11 29:11 35:2, 15 47:8, 9 57:20 67:17 69:14, 25 70:4, 5, 15 71:10 73:1, 3, 11 74:3, 10, 14, 21
**saying** 15:4 21:7, 14 28:4 33:7, 8 40:6 41:18 51:6 55:8 68:4 72:2, 3 73:10, 20
**says** 56:6 67:21
**scenario** 17:7, 14
**scenarios** 16:10
**scene** 37:8 79:22 80:7
**scenes** 8:24
**school** 10:2, 20
**screaming** 72:3
**screen** 51:21 52:1, 5 55:16 56:15 82:16, 22
**SEAN** 1:9 2:13 5:7 24:21
**seat** 38:16
**second** 9:19 10:15 31:5 33:16 42:14 43:3, 4 54:23 55:3, 4 75:14 77:8, 13
**seconds** 32:6, 7, 9, 13 35:22, 25 37:21 46:13 52:20 60:23, 24 67:13, 17 68:20 77:20
**see** 17:10, 14, 23 21:21 22:9 23:25 26:4, 7, 9 28:25 29:6 30:3, 5, 7 34:5, 9 35:18, 20 39:16 45:11, 18, 22 48:25 50:11 51:22, 25 52:5, 19, 21 53:7, 11 54:24 55:10 57:13 58:1, 6, 8, 12, 14, 24 59:7, 11 60:11 61:7 63:2, 8 69:17, 22, 24 70:12 73:25 74:1, 9, 13, 19, 23 75:1, 10, 16 76:16, 18 77:21 81:23 82:21 83:11, 19 84:1, 3, 6, 9
**seeing** 16:18, 20 32:2, 19, 25 55:2 67:13

**seen** 14:12, 14 24:23 44:21 45:7, 12, 20 51:11, 14 85:7
**semi-automatic** 26:15 27:2
**send** 66:17 86:2
**sends** 82:8
**sense** 71:2 74:22
**separate** 70:20
**September** 8:8 10:14 11:9 12:14
**sequence** 79:17
**Sergeant** 30:24 37:15 71:22 72:25 76:8
**serious** 39:8 79:2, 8
**seriously** 46:20, 25 47:8
**services** 10:7 11:5
**set** 4:2 24:7
**setting** 11:6
**shape** 13:22
**share** 51:21 52:1 82:16
**SHEET** 88:1
**Sheriff** 11:5
**Sheriff's** 10:6, 16 11:1, 3, 18 26:20
**shirt** 76:9
**shoot** 16:7, 19 17:4, 9, 16 22:11 23:17 25:3 28:12 29:8 35:6, 15 36:6, 16, 19 38:18 39:14 40:24 41:22 42:17 43:25 44:14, 17, 19 45:2, 16 49:13, 17, 22 50:3, 10, 22 51:3
**shooting** 5:25 8:12, 15, 18, 24 9:10 13:21 14:10 18:2 19:10 26:13 29:9, 10 32:19, 22, 23 35:2, 24 37:3 50:22 52:17 57:24 64:23 70:10 71:7, 16 72:1, 17 73:15 75:4 79:1, 17, 23 81:15
**shootings** 8:22
**short** 45:9
**shorter** 42:9, 10
**Shorthand** 4:6, 9 5:9 87:10
**shortly** 73:15
**shot** 3:5 24:24 25:5, 6 27:6 30:11 32:4 36:10 37:7 46:4, 12, 17 54:9, 11, 20 60:22 62:13, 19 66:22 68:20 78:9 82:17, 22
**shots** 17:24 23:8 30:2, 5, 8, 10, 13, 17 52:24 53:21 56:10 57:7 60:19 62:18, 22 65:3, 6, 9, 12, 19 66:22 69:18, 24 70:1 76:12 77:2, 17, 22 78:5, 12, 13 79:14 80:10 81:7, 13 82:17
**shoulder** 34:6, 8, 10, 16, 19, 23, 24 53:15 56:1 58:25
**show** 82:16
**showing** 82:17
**shown** 81:7, 13, 21
**side** 7:7 28:14 29:22, 23 30:1 53:5 59:25 71:12 84:17
**sideways** 28:2, 24 29:15
**signal** 82:8
**simply** 53:20
**Simultaneous** 31:8 50:14 58:17 68:15
**sir** 7:3 9:24 10:3 11:16 12:1, 17 13:1, 23 14:7 15:5 27:1 37:25 49:9 56:5 58:23 63:25 65:1, 10 67:10 72:18 74:25
**sites** 62:23
**situation** 16:12 35:11, 13
**six** 14:1, 6, 25
**skipped** 29:4
**skipping** 54:22
**sliding** 71:4
**slightly** 56:19, 24 59:5, 19
**slowed** 31:14 54:16, 18 67:25 68:3
**smart** 85:21
**smoke** 61:8, 10 78:4 81:24 82:4, 10
**SOBASZEK** 1:8, 17 2:6 3:2 4:4, 16 5:3, 14 80:25 82:21 83:24 89:12
**Solis** 6:5 8:11 9:15, 18 17:22, 23
**Solutions** 4:20
**someone's** 16:18 17:3
**somewhat** 42:11
**soon** 66:19
**sore** 72:15
**sorry** 31:10 50:16, 17 58:9 73:17 76:20
**space** 67:6, 7, 9, 20, 25 68:4, 8, 13
**speak** 47:19
**speakers** 31:8 50:14 58:17 68:15
**speaking** 52:17
**specific** 16:16 18:17 33:16 47:7, 9
**specifically** 6:19 17:23 18:21 47:13
**specified** 87:8
**speculation** 52:25 57:2 59:13 60:7 62:4 64:4 69:5 72:9
**spelling** 85:23
**split** 77:8, 12
**spoke** 42:22
**ss** 87:1
**St** 2:10
**Stadium** 10:21, 24
**stand** 19:19
**start** 11:11 39:19 54:23 57:13 75:6
**started** 12:12 27:15 36:3 53:21 56:10 69:19, 23
**starting** 11:14 75:7
**STATE** 1:8 2:11, 16 4:6, 17, 22 5:5, 13 83:17 87:1 89:5
**stated** 18:22 19:11 45:6
**statement** 39:25 55:17 73:6, 18, 20
**STATES** 1:1
**Station** 80:8
**stationary** 54:15, 17
**stay** 79:22
**STENOGRAPHER** 64:9 86:3, 9, 12
**STENOGRAPHIC** 1:16 87:19
**Stenographically** 1:22 4:7
**stepped** 71:1
**steps** 28:6
**stomach** 63:16
**stop** 50:8, 10 51:6 54:14 57:25 67:2, 4, 21 75:14 76:3, 23 78:1
**stopped** 74:1, 5, 18, 20, 23 75:24 76:4, 24
**Storm** 10:21
**straight** 44:6 69:21
**straightaway** 40:7 69:22
**strength** 14:3
**stretch** 40:12, 18, 21
**strike** 35:1 68:24
**striking** 57:7
**struck** 25:20, 22
**study** 11:21
**stuff** 29:4 80:5
**stuffing** 49:5
**subject** 13:19
**subscribed** 87:21
**succession** 62:14
**Suite** 2:4
**supervise** 7:15
**supposed** 36:12
**sure** 19:8 24:13 29:23 33:15 38:25 42:13 43:10 69:10 71:22 73:10 80:13, 16
**surprised** 69:11
**suspects** 14:14
**SWAT** 12:18 13:2, 3, 6
**swear** 4:24

**swing** 44:*10*
**swinging** 41:*14*
**swiped** 71:*1*
**sworn** 10:*8, 9* 87:*6*

< T >
**tactics** 11:*25*
**take** 5:*19* 18:*17* 48:*10, 12* 67:*20, 24* 78:*18* 80:*14*
**takedown** 6:*17, 19*
**taken** 5:*20* 48:*16* 52:*8* 80:*20*
**takes** 82:*2*
**talk** 17:*18* 18:*12*
**talked** 79:*5*
**talking** 14:*21* 32:*24* 35:*10, 11* 42:*24* 43:*10*
**tall** 13:*13*
**Taser** 6:*18*
**Task** 8:*5, 7, 22* 12:*13* 72:*24*
**team** 12:*18, 21* 13:*2, 3, 6*
**tedious** 22:*8*
**tell** 10:*1* 33:*15* 40:*18, 20* 53:*13, 20* 56:*9, 21, 25* 57:*3* 59:*2, 9, 22* 60:*13, 18* 61:*4, 8, 9* 62:*10, 12* 63:*10, 17, 23* 65:*11, 18* 66:*7, 11* 75:*20* 76:*16* 77:*16, 18, 21* 78:*3*
**telling** 21:*4* 33:*13* 51:*6*
**Ten** 26:*17, 18, 25* 27:*11* 30:*2, 5, 8* 34:*20, 21* 62:*22* 77:*20* 82:*19*
**ten-minute** 48:*10* 80:*15*
**tenth** 60:*22* 62:*13*
**termination** 80:*2*
**testified** 7:*1*
**testify** 87:*6*
**testimony** 36:*22* 37:*4* 45:*4* 87:*9*
**testing** 25:*8, 12, 14, 16*
**Thank** 9:*14* 50:*20* 52:*3* 58:*20* 66:*15* 78:*17, 19* 86:*7*
**thereof** 4:*4*
**thing** 43:*10* 74:*12*
**things** 44:*1* 66:*24* 74:*13*
**think** 17:*18* 19:*3, 5* 20:*12, 14* 21:*2, 8, 17* 24:*5, 7* 25:*5* 34:*20* 35:*5, 14* 36:*6, 9* 38:*17* 39:*13, 25* 40:*23* 41:*21* 42:*16* 43:*8, 24* 44:*8, 13, 19* 45:*1, 16* 48:*3* 52:*14, 20* 53:*24* 54:*6* 61:*21* 65:*8* 67:*1, 12* 71:*5, 20* 73:*4, 6* 75:*3* 78:*21* 80:*12* 85:*22* 86:*5*
**thinking** 34:*14* 43:*13, 14* 68:*24*
**third** 31:*12*
**thought** 36:*18* 41:*12* 44:*16*
**threat** 28:*1, 3, 24* 29:*1, 11* 54:*25* 57:*25* 62:*25* 83:*7*
**three** 9:*17, 19* 15:*4* 31:*1, 6, 11* 32:*1, 9* 54:*5, 6* 60:*23, 24*
**time** 4:*14* 8:*10, 22* 11:*8* 12:*19* 13:*20* 14:*9* 17:*23* 18:*18* 19:*24* 20:*6, 13* 21:*3* 28:*1, 4* 29:*1, 10* 31:*2, 3, 5, 12* 32:*2, 25* 33:*1, 4, 8, 14, 16, 21, 24* 34:*23* 35:*23* 36:*9* 40:*24* 42:*17* 45:*10, 14, 18* 46:*11* 47:*15, 25* 48:*9, 15, 18, 23, 25* 50:*3, 23* 51:*11* 52:*20* 53:*25* 54:*19* 55:*1* 56:*22* 58:*22* 59:*23* 60:*2, 21* 61:*23* 63:*18, 24* 65:*25* 68:*21* 69:*19, 23* 70:*10, 16* 75:*7, 8, 11* 76:*16* 77:*11, 20* 80:*19, 22* 81:*15* 83:*5* 84:*9* 86:*16* 87:*8*
**times** 7:*4, 9* 14:*6* 15:*4* 25:*20* 27:*11* 30:*25* 31:*1* 34:*9, 12, 16, 20, 21* 37:*7*
**timing** 46:*10* 59:*16*
**tired** 69:*2, 8*
**title** 10:*23*
**today** 18:*12* 19:*21* 20:*2, 20* 21:*10* 24:*5, 10* 73:*7* 80:*13* 85:*16*
**Today's** 4:*14*
**told** 20:*23* 24:*7, 8* 26:*24* 32:*21* 37:*6* 50:*7* 71:*5* 73:*7*
**top** 52:*20* 58:*7, 10, 11, 13* 61:*8* 71:*1*
**topics** 11:*25*
**toss** 15:*16*
**tossed** 15:*16*
**Total** 31:*23*
**totality** 36:*8* 41:*2* 44:*23* 50:*8*
**track** 64:*8*
**tracks** 38:*10*
**trained** 16:*3, 7, 19* 17:*2, 9, 15* 78:*23* 79:*1, 10, 13, 16, 19*
**training** 12:*3, 7, 16, 17, 20, 24* 13:*1* 14:*3, 4* 15:*19, 24* 35:*5* 38:*25* 39:*9, 11* 40:*23* 41:*23* 42:*16* 43:*24* 44:*16* 45:*16* 78:*22* 79:*5*
**trainings** 10:*5*
**transcribed** 87:*10*
**TRANSCRIPT** 1:*16* 55:*12* 56:*6* 87:*13, 16, 18*
**transcription** 87:*11*
**transported** 25:*25*
**TRESTER** 2:*9*
**tried** 15:*16*
**trigger** 27:*5, 8, 11* 82:*3, 7, 8*
**truck** 42:*25* 43:*9, 15, 17, 20, 23* 44:*3, 5, 16* 45:*8, 9, 10, 15, 19, 23, 25* 46:*1, 2, 4, 12* 50:*6* 70:*7* 75:*18*
**trucks** 44:*4*
**true** 83:*17* 87:*12* 89:*6*
**truth** 87:*7*
**try** 15:*25* 16:*4* 21:*20* 51:*17, 20* 70:*12* 75:*1*
**trying** 5:*16* 28:*22* 33:*9* 43:*14* 49:*13, 17, 22* 50:*2, 12, 22* 51:*3, 5* 67:*24* 74:*7* 80:*3*
**turn** 37:*16* 40:*4, 7, 9, 11, 22* 41:*10* 42:*3, 4, 9* 43:*3, 4* 44:*2* 49:*16* 54:*16* 63:*2* 85:*24*
**turned** 28:*2* 53:*17* 54:*19* 59:*3, 6* 60:*4* 61:*13, 15* 63:*6*
**turning** 29:*7, 25* 54:*12, 13, 24* 55:*5, 7, 8, 10, 18, 22* 56:*2* 60:*9* 83:*3, 8*
**turns** 29:*5* 39:*22* 42:*7, 15* 49:*21*
**Two** 5:*23* 10:*6* 13:*21* 14:*5* 31:*6, 11* 34:*17* 42:*6, 15* 44:*3* 49:*21* 55:*3, 4* 62:*7* 65:*24* 69:*12* 70:*6* 71:*14* 74:*12* 76:*7* 78:*9*
**type** 6:*14* 7:*18* 10:*18* 26:*12*
**types** 6:*20*
**typically** 55:*3*

< U >
**Uh-huh** 74:*11*
**understand** 9:*14* 16:*17* 20:*5* 29:*19* 41:*12, 13* 45:*4* 50:*16, 20* 74:*6* 83:*24*
**understanding** 24:*6* 25:*19, 24* 44:*18* 47:*20* 70:*3* 79:*8*
**unfolded** 81:*5*
**uniform** 76:*10*

**unit** 7:18 73:3
**UNITED** 1:1
**unlawful** 6:16
**unnatural** 44:10
**use** 6:9, 13 11:25 21:3 39:1 50:19 52:12 78:22, 24
**usually** 14:2, 4

< V >
**Vague** 15:22 16:9, 21 17:5, 11 25:1 28:16 29:18 33:20 35:8 36:7, 23 38:20 40:25 41:24 42:18 47:1 49:18, 23 50:4, 24 51:13 53:8 55:20 56:4 57:15, 22 62:3, 15 63:3 64:3, 15 65:4 66:5, 13 73:23 74:15 81:9, 17 85:2
**value** 42:1
**various** 9:9
**vehicle** 35:3, 7, 16 37:24 38:1, 16 44:25 48:21 49:3, 10, 13
**verbal** 23:16 79:19
**versus** 4:16
**victim** 47:5
**VIDEO** 1:17 4:15 32:16 52:11 75:3, 13 76:2, 11, 22 77:14, 17, 25 78:3 81:1, 6, 11, 22 84:25
**Videographer** 2:19 4:13, 20 48:14, 17 80:18, 21 86:15
**violence** 47:2, 3, 22
**violent** 36:12 47:3
**visible** 47:4, 17, 22 70:16
**visibly** 44:21
**visual** 62:23

< W >
**waistband** 41:14, 15 44:10, 12 45:13 49:6 50:11 51:15
**walked** 80:1
**walkthrough** 72:17
**want** 7:6 12:22 13:7 14:20 20:6 32:22 43:9 51:19 66:24 67:19 75:6
**wanted** 83:17
**warning** 23:16 37:2 79:19
**waste** 20:6
**watched** 30:20, 23, 24, 25 31:2, 12, 14, 18
**watching** 32:16 76:11 77:1 81:1
**way** 36:14 43:4, 12 53:24 67:25 76:18
**weapon** 27:2, 3
**wear** 84:15
**wearing** 58:21
**web** 4:18
**WEDNESDAY** 1:18 4:2
**week** 14:2, 6 69:12
**weeks** 11:20
**weigh** 13:16
**weights** 14:4
**well** 7:16 8:17 10:3 20:23 21:6, 13, 20 25:8 27:24 28:5, 8 29:25 30:24 31:25 41:1, 9 44:1, 6 54:21 55:25 70:6 72:24 73:5
**went** 10:5 42:3 63:14 64:14 70:24 76:12 77:2 78:6 80:1
**We're** 7:20 14:24 16:23 24:6, 10 28:6 31:25 32:24 41:25 43:10 44:5 51:16, 20 53:6 54:22 61:21 67:20 75:7 77:23 80:4, 18
**we've** 78:21 82:17
**WHEREOF** 87:21
**window** 69:20, 24 70:5, 17
**within-entitled** 87:7
**WITNESS** 3:2 4:24 5:10 9:7 15:23 16:10, 22 17:6, 12 20:3 22:3, 7, 15, 22 23:6, 14, 23 28:18 29:19 32:12 33:5, 12, 21 35:9 36:8, 25 37:6 38:22 41:1, 25 42:19 47:11 49:19, 24 50:5 51:1, 14 53:9 55:21 56:5 57:3, 16, 23 58:18 59:14 60:8 62:6, 16 63:5 64:5, 16 65:5, 14, 23 66:6, 14 72:10 78:8, 15 81:11, 19 84:13, 23 85:3, 12 87:5, 9, 21
**wondering** 17:2 39:11 41:21 45:5, 6 50:21 57:20
**Woodland** 2:4
**words** 13:21 32:8 40:1 67:2, 3 74:8, 13
**work** 10:18 14:12, 18
**worked** 11:5, 6
**workers** 44:3, 4, 6 70:7
**working** 69:23
**workout** 14:1
**workouts** 14:2
**works** 24:11 51:21, 22
**wound** 26:7, 9, 10
**wounds** 26:1, 2
**wrong** 47:21

< Y >
**yards** 40:13, 22 41:22 42:1, 11 46:9, 18 53:24 67:11 68:2
**Yeah** 9:7 15:24 29:14 33:12 34:21 35:9 36:9 40:8, 19 41:17 42:12 44:8 50:17 51:14 56:5, 7, 11 58:9, 11 59:6 60:8 61:15 62:6 63:5 64:5 68:22 69:8 70:6 71:12 72:10 74:18 77:8, 14 78:8 82:12 85:17
**year** 13:21
**years** 12:14
**yell** 65:9
**yellow** 75:16
**yesterday** 5:16 24:18 39:4 42:23 43:13

**WORD LIST**


< 1 >
1 (4)
10 (6)
10:03 (1)
10:04 (1)
11 (4)
11:06 (1)
11:20 (1)
1-10 (1)
11372 (2)
12 (5)
12:13 (1)
12:27 (1)
12:35 (2)
13 (3)
14 (3)
15 (5)
15th (1)
16 (5)
165 (1)
17 (4)
18 (1)
18114 (1)

< 2 >
2 (5)
20 (1)
20:04 (1)
20:04:22 (1)
20:04:27 (1)
20:04:29 (2)
20:04:39 (1)
20:04:47 (1)
20:04:48 (1)
20:04:49 (1)
20:04:54 (1)
20:05:28 (1)
2013 (2)
2015 (4)
2019 (2)
2021 (2)
2024 (2)
2025 (5)
213.624.6900 (1)
21800 (1)
21st (1)
23 (1)
23rd (2)
25 (3)
2550 (1)
27 (1)
28:27 (1)
28:40 (1)
28th (1)
29:29 (1)
2nd (1)

< 3 >
3 (5)
30 (4)
31 (1)
310 (1)
312120 (1)

< 4 >
4 (3)
40 (2)
46 (1)

< 5 >
5 (6)
5:25-cv-00331-KK-DTB (1)
50 (2)
5090 (1)
559.705.2312 (1)
5'7 (1)

< 6 >
6 (3)
6th (1)

< 7 >
7 (3)

< 8 >
8 (3)
801 (1)
818.347.3333 (1)

< 9 >
9 (5)
90017 (1)
91367 (1)
93721-2271 (1)

< A >
a.m (4)
ability (2)
able (3)
academies (2)
academy (11)
accurate (2)
ACTING (3)
action (2)
actions (5)
activated (3)
active (1)
actively (2)
actual (2)
address (1)
administered (2)
administration (2)
advice (5)
afternoon (1)
ago (2)
agree (7)
ahead (7)
aiming (5)
aired (1)
al (1)
Alejandro (5)
alleged (1)
allow (1)
ambiguous (1)
ambush (1)
ANDREA (3)
andrea.kornblau@manningkass.com (1)
ANDREW (2)
Angeles (1)
answer (24)
answered (10)
answering (1)
answers (1)
anymore (6)
apparent (2)
appear (17)
APPEARANCES (1)
appeared (6)
appears (8)
appreciate (1)
approach (3)
approached (2)
appropriate (12)
approximate (4)
approximately (16)
April (2)
area (9)
areas (1)
argue (1)
arm (6)
armed (1)
arrest (2)
articulate (1)
ASHLEY (2)
ashley.reyes@doj.ca.gov (1)
aside (1)
asked (16)
asking (6)
assess (2)
assessing (2)
assigned (5)
assignment (7)
assignments (1)
assistant (1)
assisting (1)
associated (1)
associate's (1)
assuming (2)
attack (1)
attempting (1)
attended (1)
attention (1)
ATTORNEY (6)
Attorney-client (8)
attorney's (6)
audio (1)
August (4)
authenticated (1)
automatically (2)
aware (5)

< B >
bachelor's (1)
back (32)
backdrop (2)
background (5)
bad (1)
Bar (1)
barrel (2)
based (28)
Basically (2)

basis (2)
bay (1)
Beaumont (2)
began (1)
behalf (3)
believe (7)
believed (1)
belly (1)
bent (1)
Bernardino (2)
best (2)
better (3)
bit (10)
black (2)
bleeding (1)
blind (1)
blood (1)
blur (1)
blurred (1)
blurry (4)
bodily (3)
body (14)
body-worn (30)
bottom (4)
Boulevard (1)
brain (1)
break (8)
bring (2)
broad (1)
bruise (1)
buffer (1)
building (4)
bullet (2)
bunch (1)
Burbank (1)
bureau (2)
business (2)
butchering (1)
BUTTE (1)

< C >
CA (1)
CALIFORNIA (16)
call (3)
called (1)
Calls (8)
camera (16)
camera................51 (1)
camera...........51 (1)
camera...........54 (1)
camera...........56 (1)
camera...........57 (1)
camera...........59 (1)
camera...........60 (1)
camera...........61 (2)
camera...........63 (2)
camera...........64 (2)
camera...........65 (2)
camera...........66 (1)
camera....88 (1)
cameras (1)
car (25)
carry (1)
Case (33)
caseload (1)
cases (1)
catching (2)
cause (3)
caused (1)
Center (16)
centered (1)
CENTRAL (1)
certain (3)
Certified (8)
certify (1)
chance (1)
CHANGE (1)
changed (2)
characterize (1)
charged (1)
charges (1)
charting (1)
chasing (2)
chest (8)
CHP (1)
chronologically (1)
circumstances (4)
CITY (3)
civil (2)
civilians (1)
claims (3)
clarification (3)
clarified (1)
clarify (5)
classify (1)
clear (1)
clearly (1)
client (1)
close (3)
closed (1)
closely (2)
collateral (1)
combined (1)
come (6)
comfortable (2)
coming (4)
commands (1)
commencing (1)
communications (1)
completed (2)
completely (2)
completing (1)
completion (2)
Compound (2)
computer-aided (1)
concentration (1)
concluded (1)
condition (2)
confer (1)
conference (1)
confirm (1)
consider (1)
considering (1)
consisted (1)
constant (1)
constitutes (1)
contact (1)
context (1)
continue (1)
contraband (2)
controlled (1)
convicted (1)
conviction (1)
coordinate (1)
copy (2)
corner (1)
corners (1)
Corporal (6)
correct (44)
correctional (1)
correctly (2)
Counsel (3)
count (2)
counting (1)
county (3)
couple (4)
course (2)
COURT (8)
covered (2)
crashed (1)
crime (1)
crimes (2)
criminal (1)
crouching (1)
CSR (2)
current (1)
currently (3)
custodial (1)

< D >
DALE (3)
dalekgalipo@yahoo.com (1)
date (8)
Dated (1)
day (12)
days (4)
deadly (3)
death (3)
debate (1)
December (1)
decision (2)
DECLARATION (1)
declare (1)
defendant (1)
Defendants (4)
defined (1)
definitely (4)
degree (2)
delay (1)
Dennis (4)
Department (3)
depend (1)
depends (1)
depo (2)
deponent (3)
DEPOSITION (18)
Deputy (5)
describe (5)
described (4)
DESCRIPTION (1)
detail (2)
details (2)
detective (1)
detectives (1)

**Detentions** (1)
**determine** (1)
**Diego** (4)
**different** (2)
**direction** (1)
**directly** (4)
**disabled** (1)
**discard** (2)
**discharged** (1)
**discharging** (1)
**disinterested** (1)
**distance** (6)
**DISTRICT** (2)
**doing** (4)
**Domains** (1)
**domestic** (3)
**drawn** (1)
**driver's** (1)
**driving** (2)
**Drop** (9)
**dropped** (2)
**duly** (1)
**D'URSO** (5)
**duties** (1)

< E >
**earlier** (7)
**educational** (1)
**effect** (8)
**eight** (4)
**either** (7)
**elaborate** (1)
**ELLROD** (1)
**Elsinore** (2)
**emergency** (1)
**emphasis** (1)
**ended** (1)
**enhancement** (2)
**enlarge** (2)
**enlarged** (1)
**enlargement** (1)
**entire** (2)
**ERRATA** (1)
**ESQ** (4)
**estimate** (17)
**estimation** (1)
**et** (1)
**event** (1)
**everybody** (1)
**evidence** (3)
**exact** (2)
**exactly** (6)
**EXAMINATION** (4)
**excessive** (1)
**excuse** (1)
**EXHIBIT** (45)
**EXHIBITS** (3)
**exit** (1)
**exiting** (2)
**experience** (1)
**explain** (2)
**explained** (1)
**exposed** (2)
**exposing** (1)
**extent** (6)
**eye** (1)
**eyes** (2)

< F >
**face** (6)
**facing** (2)
**fact** (2)
**factors** (2)
**factory** (1)
**facts** (1)
**factual** (1)
**fair** (7)
**falling** (2)
**familiar** (1)
**far** (6)
**faster** (1)
**favoring** (2)
**feasible** (1)
**federal** (2)
**feel** (2)
**feet** (6)
**fell** (2)
**felony** (3)
**felt** (1)
**FID** (2)
**field** (8)
**fighting** (1)
**Figueroa** (1)
**find** (2)
**fine** (2)
**finished** (1)
**fire** (6)
**firearm** (38)
**firearms** (4)
**fired** (24)
**firing** (39)
**first** (37)
**five** (14)
**flash** (6)
**flat** (1)
**Floor** (1)
**flow** (1)
**Focus** (1)
**focused** (2)
**focusing** (1)
**follow** (7)
**followed** (1)
**following** (2)
**follow-up** (1)
**foot** (17)
**footage** (8)
**football** (1)
**force** (18)
**foregoing** (4)
**forget** (1)
**forgive** (1)
**forward** (3)
**Four** (5)
**frame** (22)
**frankly** (1)
**Fresno** (1)
**front** (8)
**full** (1)
**fumbled** (1)
**further** (2)

< G >
**gaining** (1)
**GALIPO** (153)
**GALIPO.......................**
**.......5** (1)
**Gang** (3)
**GARCIA** (13)
**Gen** (1)
**GENERAL** (11)
**generally** (12)
**GEORGE** (2)
**getting** (7)
**give** (9)
**given** (1)
**giving** (3)
**glim** (1)
**Glock** (1)
**gloves** (6)
**go** (30)
**Godward** (3)
**goes** (2)
**going** (45)
**Gonzales** (4)
**GONZALEZ** (67)
**Gonzalez's** (11)
**Good** (18)
**ground** (27)
**guess** (10)
**gun** (37)
**gunpowder** (1)
**guns** (1)
**gunshot** (3)
**gunshots** (4)

< H >
**half** (6)
**hand** (19)
**handcuff** (1)
**handcuffed** (1)
**handcuffing** (1)
**handgun** (3)
**handle** (1)
**hands** (7)
**happened** (2)
**happening** (1)
**hard** (5)
**head** (2)
**hear** (8)
**heard** (7)
**held** (1)
**Helman** (30)
**Helman's** (2)
**help** (3)
**HEMET** (8)
**hereunder** (1)
**hey** (2)
**high** (2)
**highest** (1)
**HIGHWAY** (3)
**Hills** (1)
**hire** (1)
**hired** (2)
**history** (1)
**hitting** (3)
**hold** (1)

**holding** (*8*)
**homicides** (*1*)
**hope** (*1*)
**hoping** (*1*)
**hospital** (*1*)
**hour** (*4*)
**hunched** (*3*)
**hundred** (*9*)
**hypothetical** (*1*)

< I >
**illegal** (*1*)
**image** (*30*)
**immediately** (*3*)
**imminent** (*3*)
**important** (*1*)
**impression** (*3*)
**improper** (*1*)
**incident** (*18*)
**incidents** (*1*)
**including** (*4*)
**inclusive** (*1*)
**Incomplete** (*1*)
**INDEX** (*1*)
**indicate** (*2*)
**indicated** (*3*)
**indicates** (*1*)
**information** (*7*)
**informationally** (*1*)
**initial** (*8*)
**initially** (*4*)
**injured** (*3*)
**injuries** (*2*)
**injury** (*7*)
**inside** (*2*)
**instruct** (*12*)
**instructing** (*1*)
**instruction** (*2*)
**intent** (*2*)
**intentionally** (*2*)
**interview** (*4*)
**introduce** (*1*)
**introduced** (*1*)
**investigate** (*1*)
**investigation** (*1*)
**investigations** (*2*)
**investigation's** (*1*)
**investigative** (*1*)
**investigators** (*1*)
**involved** (*7*)
**IRICK** (*11*)
**issue** (*1*)
**items** (*1*)

< J >
**jacket** (*1*)
**jail** (*1*)
**jeans** (*1*)
**Job** (*2*)
**Join** (*2*)
**Joined** (*1*)
**judge** (*1*)
**JULY** (*7*)
**jumping** (*1*)
**justifiable** (*3*)
**justified** (*2*)
**justify** (*1*)

< K >
**K9** (*1*)
**KASS** (*1*)
**keep** (*2*)
**kick** (*2*)
**kicked** (*1*)
**Kill** (*2*)
**killed** (*2*)
**KIMBERLY** (*6*)
**kind** (*22*)
**kneeling** (*2*)
**know** (*77*)
**KORNBLAU** (*83*)
**KORNBLAU...........................80** (*1*)

< L >
**lacks** (*1*)
**Lake** (*1*)
**larger** (*2*)
**lastly** (*2*)
**LAW** (*1*)
**laws** (*2*)
**leading** (*7*)
**Learning** (*1*)
**left** (*35*)
**leg** (*2*)
**legs** (*1*)
**level** (*3*)
**life** (*1*)
**light** (*1*)
**lights** (*1*)
**listening** (*1*)
**Litigation** (*11*)
**little** (*14*)
**LLP** (*1*)
**loaded** (*1*)
**location** (*1*)
**long** (*12*)
**look** (*11*)
**looked** (*4*)
**looking** (*24*)
**looks** (*4*)
**Los** (*1*)
**losing** (*1*)
**lot** (*3*)
**lower** (*2*)
**lowered** (*1*)

< M >
**magazine** (*3*)
**making** (*1*)
**Mall** (*1*)
**man** (*1*)
**manipulating** (*1*)
**manner** (*1*)
**MANNING** (*1*)
**MARIO** (*4*)
**Mariposa** (*1*)
**mark** (*3*)
**marked** (*17*)
**marking** (*1*)
**markings** (*1*)
**mass** (*9*)
**math** (*2*)
**matter** (*7*)
**mean** (*36*)
**meaning** (*1*)
**meant** (*2*)
**meet** (*1*)
**meetings** (*4*)
**member** (*3*)
**mentioned** (*2*)
**merely** (*2*)
**mile** (*2*)
**miles** (*1*)
**millimeter** (*1*)
**mind** (*5*)
**mine** (*2*)
**minute** (*1*)
**minutes** (*4*)
**mischaracterizes** (*2*)
**missed** (*1*)
**Misstates** (*3*)
**misunderstood** (*1*)
**moment** (*2*)
**Monell** (*1*)
**months** (*2*)
**morning** (*4*)
**move** (*1*)
**moving** (*2*)
**msincich@galipolaw.com** (*1*)
**muzzle** (*5*)

< N >
**name** (*4*)
**named** (*2*)
**narrow** (*17*)
**near** (*4*)
**necessarily** (*1*)
**necessary** (*1*)
**need** (*3*)
**never** (*3*)
**nine** (*3*)
**noncompliance** (*1*)
**note** (*3*)
**noted** (*1*)
**notice** (*2*)
**noticed** (*4*)
**number** (*19*)

< O >
**oath** (*2*)
**object** (*3*)
**Objection** (*68*)
**objections** (*1*)
**objects** (*1*)
**observations** (*2*)
**observe** (*2*)
**observed** (*13*)
**obviously** (*6*)
**occasions** (*4*)
**occurred** (*3*)
**office** (*3*)
**OFFICER** (*23*)
**officer-involved** (*5*)
**officers** (*5*)

OFFICES (1)
official (2)
Oh (2)
Okay (80)
old (1)
once (3)
ones (1)
oOo (5)
opportunity (2)
opposed (1)
orange (1)
order (1)
ordering (2)
oriented (1)
original (1)
outside (7)
overhead (1)
overly (1)
Ow (3)

< P >
p.m (4)
PAGE (2)
PAGE/LINE (1)
pain (1)
pants (1)
parking (3)
part (6)
partially (1)
partner (4)
partners (3)
part-time (1)
passed (5)
pathway (3)
PATRICK (9)
PATROL (7)
pause (1)
pec (1)
pectoral (1)
penalty (1)
pending (1)
people (11)
perceive (2)
perceived (3)
percent (1)
period (4)
perjury (1)
person (4)
persons (1)
perspective (4)
pertains (1)
pertinent (1)
photos (2)
phrased (2)
physical (3)
pick (1)
picking (1)
pistol (1)
place (8)
Plaintiff (2)
PLAINTIFFS (1)
planned (2)
play (4)
played (5)
please (15)
point (55)
police (3)
Portion (10)
position (3)
possessing (3)
possible (1)
possibly (3)
POST (1)
pounds (1)
pre-dated (1)
prepared (1)
preparing (1)
pre-report (1)
PRESENT (8)
presented (1)
press (1)
pressed (1)
pressing (1)
presumed (1)
pretty (3)
previously (1)
primary (1)
prior (9)
privilege (10)
privileged (1)
Probably (12)
problem (2)
proceedings (2)
process (2)
produce (1)
prone (1)
property (1)
pull (4)
purpose (2)
purposes (1)
pursuing (1)
pursuit (21)
pursuits (3)
put (3)

< Q >
question (11)
questions (19)
quick (1)
quite (2)
quoted (1)

< R >
radio (2)
railroad (1)
raised (1)
RAMIREZ (1)
ramp (23)
ran (2)
range (2)
rapid (1)
reach (1)
reaching (1)
react (2)
reacted (1)
reacting (7)
read (1)
realize (1)
realized (1)
really (8)
re-ask (1)
reason (2)
reasons (1)
recall (16)
recognize (1)
recoil (1)
recollection (4)
record (15)
recorded (2)
records (1)
red (2)
re-depose (1)
REFERENCE (1)
referring (5)
reframe (1)
regard (2)
regarding (3)
Region (1)
relate (1)
related (10)
relates (1)
relation (4)
remember (8)
REMEMBERED (1)
REMOTE (2)
remotely (2)
rephrase (1)
Reported (3)
Reporter (10)
REPORTER'S (1)
represent (1)
requested (1)
reserve (1)
resolved (2)
respect (6)
respond (1)
responded (1)
response (1)
responsible (1)
results (3)
review (1)
reviewed (1)
REYES (3)
REYNOSO (7)
Reynoso's (2)
right (54)
rights (1)
Riverside (1)
robberies (1)
Room (1)
round (1)
rounds (6)
RPR (3)
rule (1)
run (4)
running (23)
runs (1)

< S >
Saelee (2)
San (6)
satisfied (1)
Saving (1)
saw (21)
saying (15)
says (2)

**scenario** *(2)*
**scenarios** *(1)*
**scene** *(3)*
**scenes** *(1)*
**school** *(2)*
**screaming** *(1)*
**screen** *(7)*
**SEAN** *(4)*
**seat** *(1)*
**second** *(14)*
**seconds** *(15)*
**see** *(70)*
**seeing** *(7)*
**seen** *(10)*
**semi-automatic** *(2)*
**send** *(2)*
**sends** *(1)*
**sense** *(2)*
**separate** *(1)*
**September** *(4)*
**sequence** *(1)*
**Sergeant** *(5)*
**serious** *(3)*
**seriously** *(3)*
**services** *(2)*
**set** *(2)*
**setting** *(1)*
**shape** *(1)*
**share** *(3)*
**SHEET** *(1)*
**Sheriff** *(1)*
**Sheriff's** *(6)*
**shirt** *(1)*
**shoot** *(33)*
**shooting** *(35)*
**shootings** *(1)*
**short** *(1)*
**shorter** *(2)*
**Shorthand** *(4)*
**shortly** *(1)*
**shot** *(40)*
**shots** *(36)*
**shoulder** *(10)*
**show** *(1)*
**showing** *(1)*
**shown** *(3)*
**side** *(9)*
**sideways** *(3)*
**signal** *(1)*
**simply** *(1)*
**Simultaneous** *(4)*
**sir** *(21)*
**sites** *(1)*
**situation** *(3)*
**six** *(3)*
**skipped** *(1)*
**skipping** *(1)*
**sliding** *(1)*
**slightly** *(4)*
**slowed** *(5)*
**smart** *(1)*
**smoke** *(6)*
**SOBASZEK** *(12)*
**Solis** *(6)*
**Solutions** *(1)*
**someone's** *(2)*
**somewhat** *(1)*
**soon** *(1)*
**sore** *(1)*
**sorry** *(6)*
**space** *(8)*
**speak** *(1)*
**speakers** *(4)*
**speaking** *(1)*
**specific** *(5)*
**specifically** *(4)*
**specified** *(1)*
**speculation** *(8)*
**spelling** *(1)*
**split** *(2)*
**spoke** *(1)*
**ss** *(1)*
**St** *(1)*
**Stadium** *(2)*
**stand** *(1)*
**start** *(5)*
**started** *(7)*
**starting** *(2)*
**STATE** *(11)*
**stated** *(3)*
**statement** *(5)*
**STATES** *(1)*
**Station** *(1)*
**stationary** *(2)*
**stay** *(1)*
**STENOGRAPHER** *(4)*
**STENOGRAPHIC** *(2)*
**Stenographically** *(2)*
**stepped** *(1)*
**steps** *(1)*
**stomach** *(1)*
**stop** *(12)*
**stopped** *(8)*
**Storm** *(1)*
**straight** *(2)*
**straightaway** *(2)*
**strength** *(1)*
**stretch** *(3)*
**strike** *(2)*
**striking** *(1)*
**struck** *(2)*
**study** *(1)*
**stuff** *(2)*
**stuffing** *(1)*
**subject** *(1)*
**subscribed** *(1)*
**succession** *(1)*
**Suite** *(1)*
**supervise** *(1)*
**supposed** *(1)*
**sure** *(12)*
**surprised** *(1)*
**suspects** *(1)*
**SWAT** *(4)*
**swear** *(1)*
**swing** *(1)*
**swinging** *(1)*
**swiped** *(1)*
**sworn** *(3)*

**< T >**
**tactics** *(1)*
**take** *(8)*
**takedown** *(2)*
**taken** *(4)*
**takes** *(1)*
**talk** *(2)*
**talked** *(1)*
**talking** *(6)*
**tall** *(1)*
**Taser** *(1)*
**Task** *(5)*
**team** *(5)*
**tedious** *(1)*
**tell** *(33)*
**telling** *(3)*
**Ten** *(12)*
**ten-minute** *(2)*
**tenth** *(2)*
**termination** *(1)*
**testified** *(1)*
**testify** *(1)*
**testimony** *(4)*
**testing** *(4)*
**Thank** *(8)*
**thereof** *(1)*
**thing** *(2)*
**things** *(3)*
**think** *(49)*
**thinking** *(4)*
**third** *(1)*
**thought** *(3)*
**threat** *(9)*
**three** *(13)*
**time** *(83)*
**times** *(14)*
**timing** *(3)*
**tired** *(2)*
**title** *(1)*
**today** *(10)*
**Today's** *(1)*
**told** *(9)*
**top** *(7)*
**topics** *(1)*
**toss** *(1)*
**tossed** *(1)*
**Total** *(1)*
**totality** *(4)*
**track** *(1)*
**tracks** *(1)*
**trained** *(12)*
**training** *(23)*
**trainings** *(1)*
**transcribed** *(1)*
**TRANSCRIPT** *(6)*
**transcription** *(1)*
**transported** *(1)*
**TRESTER** *(1)*
**tried** *(1)*
**trigger** *(6)*
**truck** *(23)*
**trucks** *(1)*
**true** *(3)*
**truth** *(1)*

**try** (*7*)
**trying** (*15*)
**turn** (*18*)
**turned** (*9*)
**turning** (*15*)
**turns** (*5*)
**Two** (*21*)
**type** (*4*)
**types** (*1*)
**typically** (*1*)

< U >
**Uh-huh** (*1*)
**understand** (*11*)
**understanding** (*7*)
**unfolded** (*1*)
**uniform** (*1*)
**unit** (*2*)
**UNITED** (*1*)
**unlawful** (*1*)
**unnatural** (*1*)
**use** (*9*)
**usually** (*2*)

< V >
**Vague** (*40*)
**value** (*1*)
**various** (*1*)
**vehicle** (*11*)
**verbal** (*2*)
**versus** (*1*)
**victim** (*1*)
**VIDEO** (*18*)
**Videographer** (*8*)
**violence** (*3*)
**violent** (*2*)
**visible** (*4*)
**visibly** (*1*)
**visual** (*1*)

< W >
**waistband** (*8*)
**walked** (*1*)
**walkthrough** (*1*)
**want** (*11*)
**wanted** (*1*)
**warning** (*3*)
**waste** (*1*)
**watched** (*8*)
**watching** (*4*)
**way** (*6*)
**weapon** (*2*)
**wear** (*1*)
**wearing** (*2*)
**web** (*1*)
**WEDNESDAY** (*2*)
**week** (*3*)
**weeks** (*1*)
**weigh** (*1*)
**weights** (*1*)
**well** (*23*)
**went** (*9*)
**We're** (*21*)
**we've** (*2*)
**WHEREOF** (*1*)
**window** (*4*)
**within-entitled** (*1*)
**WITNESS** (*68*)
**wondering** (*7*)
**Woodland** (*1*)
**words** (*7*)
**work** (*3*)
**worked** (*2*)
**workers** (*4*)
**working** (*1*)
**workout** (*1*)
**workouts** (*1*)
**works** (*3*)
**wound** (*3*)
**wounds** (*2*)
**wrong** (*1*)

< Y >
**yards** (*10*)
**Yeah** (*38*)
**year** (*1*)
**years** (*1*)
**yell** (*1*)
**yellow** (*1*)
**yesterday** (*5*)