"EXHIBIT A"

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                      --oOo--

 4

 5   GEORGE GONZALEZ,

 6           Plaintiff,

 7   v.                     Case No.  5:25-cv-00331-KK-DTB

 8   STATE OF CALIFORNIA; CITY OF
     HEMET; PATRICK SOBASZEK;
 9   ANDREW REYNOSO; SEAN IRICK;
     and DOES 1-10, inclusive,
10
             Defendants.
11   _____/

12

13

14

15

16          STENOGRAPHIC REPORTER'S TRANSCRIPT OF

17      REMOTE VIDEO DEPOSITION OF ANDREW REYNOSO

18              THURSDAY, AUGUST 14, 2025

19

20

21

22   Reported Stenographically by:

23   KIMBERLY D'URSO, CSR 11372, RPR

24   Job No.  18115

25
```

```
 1   Highway Patrol, as well as CHP Officer Sean Irick.
 2              (Whereby the oath was administered to the
 3              deponent by the Certified Shorthand Reporter.)
 4              THE WITNESS:  I do.
 5              MR. GALIPO:  Thank you.
 6                        EXAMINATION
 7   BY MR. GALIPO:
 8        Q.    Can you please state your name for the record?
 9        A.    First name is Andrew, A-N-D-R-E-W.  Last is
10   Reynoso, R-E-Y-N-O-S-O.
11        Q.    Who do you current work for?
12        A.    Currently employed with the City of Hemet
13   Police Department.
14        Q.    How long have you been employed with the City
15   of Hemet?
16        A.    Approximately, eleven and a half years.
17        Q.    What is your current assignment?
18        A.    Currently, I am the training sergeant.
19        Q.    What do you do in that assignment?
20        A.    I help facilitate training standards according
21   to POST, as well as internal training standards
22   according to the department.
23        Q.    Are you involved in writing or helping to write
24   any department policies?
25        A.    I do not author department policies.  No, sir.
```

Andrew Choso

1    Q.   Are you, yourself, involved in training the

2    officers on different topics?

3    A.   At times, yes.

4    Q.   So is part of your position to make sure the

5    department has training standards or materials that are

6    consistent with POST?

7    A.   Part of my job, yes.

8    Q.   And do you become familiar with POST by

9    reviewing it from time to time?

10   A.   I become familiar with certain policies and

11   procedures, yes, that come down from POST.

12   Q.   For example, I think Learning Domain 20 deals

13   with use of force.  Are you familiar with that?

14   A.   I'm familiar with use of force policies in

15   accordance with the City of Hemet Police Department.

16   Q.   And that would include less lethal force and

17   lethal force?

18   A.   Yes, sir.

19   Q.   In the incident we're here to talk about, do

20   you recall the date of the incident?

21   A.   January 24th, sir.

22   Q.   Of what year?

23   A.   2024.

24   Q.   Do you know the name of the person that you

25   shot at?

Andrew Cardoso

1    A.    The suspect in this case was George Gonzalez.

2    Q.    To your knowledge, had you ever seen

3    Mr. Gonzalez in person before that day?

4    A.    Not to my recollection.

5    Q.    How many shots did you fire?

6    A.    During this incident, I discharged my firearm

7    six times.

8    Q.    What type of firearm did you discharge?

9    A.    A GLOCK 17, semi-automatic firearm.

10    Q.    Is that a 9-millimeter?

11    A.    Yes, sir.

12    Q.    It's a semi-automatic weapon?

13    A.    Yes, sir.

14    Q.    You have to press the trigger for each shot?

15    A.    Correct, sir.

16    Q.    Were you intentionally pressing the trigger

17    while you were shooting?

18    A.    Yes, sir.

19    Q.    So you would have intentionally pressed the

20    trigger six times?

21    A.    Correct, sir.

22    Q.    And the person you were shooting at, obviously

23    that would be Mr. Gonzalez?

24    A.    Yes, sir.

25    Q.    What would you estimate your distance to be

1    from Mr. Gonzalez when you were firing?

2        A.    At the time of discharging my firearm,

3    Mr. Gonzalez was in motion, but approximately 20 to 25

4    yards.

5        Q.    And I know football season's getting ready to

6    start in a little bit, but just to make sure we're on

7    the same page -- and I'm multiplying by three -- that

8    would be 60 to 75 feet, approximately?

9        A.    I'd have to do the math, sir.  Just -- that's

10   what my reference is, 20, 25 yards, sir.

11       Q.    Okay.  The only reason I followed up is I had a

12   case recently where the officer was given the estimates

13   in his deposition in yards, and then by the time we got

14   trial he said he meant feet.

15            But you're meaning yards, understanding that

16   there's 3 feet in a yard, approximately?

17       A.    Yes, sir.

18       Q.    And you say that Mr. Gonzalez was in motion.

19   Was he moving towards you, away from you, or in some

20   other manner?

21       A.    So in the -- in this incident, Mr. Gonzalez was

22   moving in several different directions.  But at the time

23   of my first shot, Mr. Gonzalez had a firearm in his

24   right hand, had looked to his left, and then turned back

25   towards my partners and I; and that was the first

1    instance.

2         And I apologize.  Just prior to that, there was

3    a gunshot fired that I believed Mr. Gonzalez had fired.

4    That all occurred prior to my first shot.  And then as

5    the incident continued, Mr. Gonzalez was continuing in

6    motion.

7         Q.   Continuing which way in motion?

8         A.   He was moving around, so at times looking back

9    still, and at times still moving forward.

10         Q.   And when he was moving forward, was he walking

11    or running?  How would you describe his gait?

12         A.   He was not walking.  I don't know if that would

13    be considered a jog or a run.  I don't want to guess on

14    that.  But he was just moving at a faster than a walk

15    pace.

16         Q.   You would say it was either a jog or a run, but

17    not walking?

18         A.   Correct.

19         Q.   And do you know which direction he was jogging

20    or running in, compass direction?

21         A.   He still was fleeing away from officers.  But

22    again, his body was still moving around side to side,

23    and he was looking back throughout this incident.

24         Q.   Right.  I'm trying to figure out when he was

25    jogging or running, whether it was east, west, north, or

1    south, if you know?

2         A.   Generally, away from officers.  That would be

3    the best.  I don't know the true direction of north,

4    west, east, or south.

5         Q.   Okay.  And when you say he was running

6    generally away from the officers, would that include you

7    and the two other officers who were present?

8         A.   Yes.

9         Q.   When you fired your first shot, could you see

10   the gun?

11        A.   Yes.

12        Q.   When you fired your second shot, could you see

13   the gun?

14        A.   At the time of firing every single round, I was

15   able to assess and see a firearm, which posed an

16   imminent threat to my partners and I, that Mr. Gonzalez

17   possessed in his right hand.

18        Q.   So you're saying you could see the firearm in

19   his right hand for your first shot, your second shot,

20   your third shot, your fourth shot, your fifth shot, and

21   your sixth shot?

22        A.   Correct.

23        Q.   Where was the firearm, relative to his body, at

24   the time of your fourth shot, for example?

25        A.   It was in his right hand, sir.

Andre Veloroso

1   I understand there's things that happened before you

2   fired your first shot, and I'm going to ask you about

3   those in a little bit.

4           Right now I'm asking, at the time you fired

5   your first shot -- not before, but at the time you fired

6   your first shot, could you see the gun in his hand?

7       A.   At the time of firing the first round, again,

8   based on the totality of the circumstances, I observed

9   him with that firearm in his hand, turning, yes.

10      Q.   Okay.  So you're saying that you could see the

11  gun in his hand, and he was turning, at the time you

12  fired the first shot?  Do I have your testimony correct?

13      A.   Minus the part, sir, where I say I heard -- I

14  heard a gunshot prior to me firing.

15      Q.   Okay.  And so which -- where was the gun in his

16  hand at the time you fired the first shot?

17      A.   The gun was in his right hand, sir, at the time

18  of me firing my first shot.

19      Q.   Okay.  Where on his body was his right hand?

20  That's what I'm trying to find out.

21      A.   I understand, sir.  Again, I would be guessing

22  if I were to tell you specifically, you know,

23  "Approximately, 45-degree angle here or there."  So it

24  was in his right hand, sir, as he had turned towards my

25  partners and I.

1    Q.    Okay.  And would that be your same answer for

2    shots two, three, four, five, and six?  You don't know

3    exactly where it was, just that you're saying it was in

4    his right hand?

5              MS. KORNBLAU:  Objection.  Misstates testimony.

6              Go ahead.

7              THE WITNESS:  My testimony was that he had the

8    firearm in his right hand that I was able to see and

9    perceive as an imminent threat after -- or before every

10   shot.  And then when I no longer received an imminent

11   threat, I no longer discharged my firearm.  That's my

12   testimony.

13   BY MR. GALIPO:

14   Q.    So you're saying you assessed for each shot?

15   A.    Yes, sir.

16   Q.    And you're saying, prior to firing each shot,

17   you observed the firearm in his right hand?

18   A.    Correct.

19   Q.    You just don't know exactly where it was on his

20   body; is that what you're saying, other than in his

21   hand?

22             MS. KORNBLAU:  Objection.  Vague.  Misstates

23   testimony.

24             Go ahead.

25             THE WITNESS:  Again, reiterating what I said

1   before, sir, it was visible to me.  And I would be

2   guessing if I were to say, "Exactly this place, this

3   place on his person."  It just was visible to me in his

4   right hand.

5   BY MR. GALIPO:

6        Q.   And are you saying he was turned towards you

7   during your six shots?

8        A.   Again, sir, after the initial turning -- so

9   again, I apologize if I'm saying the same thing, but

10  this is exactly what took place.  He presented a firearm

11  in his right hand, showed it to my partners and I, and

12  he turned on his left.  And has he turned to his left,

13  he also looked back, and I heard a loud pop, a gunshot.

14          At that point, I began discharging my firearm.

15  He still continued in motion to flee from officers, but

16  he still posed an imminent threat.  Every time I

17  discharged my firearm, which was a total of six times, I

18  was able to see the firearm in his hand, right hand.

19  And he posed an imminent threat.

20          I stopped discharging my firearm when I no

21  longer received an imminent threat.

22       Q.   Was he fleeing from the officers during your

23  six shots?

24       A.   He was in motion, moving forward.

25       Q.   Would that be away from the officers?

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 15

1        A.    Yes.

2                MS. KORNBLAU:  Objection.  Vague -- vague as to

3    time.

4    BY MR. GALIPO:

5        Q.    You understand I'm asking you during your six

6     shots; correct?

7                MS. KORNBLAU:  Objection.  Vague.  Compound.

8    BY MR. GALIPO:

9        Q.    You may answer.

10       A.    Okay.  So he -- I -- I -- sir, I can't testify

11    that -- what exactly he was doing.  He was moving in a

12    forward motion.

13       Q.    Okay.  I thought -- maybe I misunderstood you.

14    I thought you said before that he was moving away from

15    the officers, not walking.  It was jogging or running.

16    You weren't sure which one.

17                Did I misunderstand that?

18                MS. KORNBLAU:  Objection.  Vague.

19                THE WITNESS:  No, sir.  I had stated that he

20    was not walking, jogging, or running away -- yes, away

21    from officers, including me.  Again, that's a forward

22    motion, so it's the same thing, just forward motion.

23    BY MR. GALIPO:

24       Q.    And I guess what I was asking -- because you

25     indicated he made a turning motion at some point; is

1  or running.  And, at times, he's still moving left and

2  right.  He's not static.  He's not stopping.  He's not

3  walking at a slow pace, so there's movement.  He's in

4  motion, moving.

5  BY MR. GALIPO:

6       Q.  I understand.  I'm asking a very simple

7   question.  Was he turning towards you when you were

8   firing?  When you were firing?

9          MS. KORNBLAU:  Objection.  Asked and answered.

10  Vague.  Compound.

11          THE WITNESS:  Again, sir, no disrespect, I'm

12  going to answer the same way.  Just that when he -- when

13  I first discharged my firearm, he was -- had turned

14  towards my partners and I, with the gun in his hand, and

15  then I heard a gunshot.  That was when I discharged my

16  firearm the first time.

17  BY MR. GALIPO:

18       Q.  Okay.  And was he also turned towards you for

19   shots two through six?

20       A.  I was not paying attention to exactly where his

21   body placement was at that.  I was focused on the

22   firearm in his right hand, which was the immediate and

23   imminent threat.  And based off of that imminent threat,

24   I was focused on the gun and aiming center mass, to stop

25   the threat.

1      Q.    How many shots did you hear before you fired?

2      A.    I recall hearing one shot that I perceived was

3   from Mr. Gonzalez.

4      Q.    Two of the other officers were closer to

5   Mr. Gonzalez than you were; is that correct?

6      A.    Yes, sir.

7      Q.    And which officers were closer to him than you

8   were?

9      A.    You had Detective Sobaszek and Officer Irick.

10      Q.    And what would you estimate the distance they

11   were from you, these other officers, when you fired?

12      A.    I'd say approximately 7 yards.

13      Q.    Do you know if they had their guns out as they

14   were chasing Mr. Gonzalez?

15          MS. KORNBLAU:  Objection.  Calls for

16   speculation.

17          MR. GARCIA:  Join.

18          MR. GALIPO:  That's why I said "if you know."

19          But go ahead.

20          THE WITNESS:  I do not know, sir.

21   BY MR. GALIPO:

22      Q.    Did you have your gun out as you were chasing

23   Mr. Gonzalez?

24      A.    I did not have my firearm out in the entirety

25   of the foot pursuit.  At the end, I did pull my firearm

1   can't give an estimate -- do you know if you pulled out

2   your firearm immediately before you shot, or pulled it

3   out three seconds, five seconds, five to ten seconds

4   before?  Whatever you're comfortable with.

5       A.   My comfortable answer, sir, would just be it

6   was within seconds; but I would be guessing if I gave

7   you specific numbers.

8       Q.   In the five seconds before you fired, did you

9   give any commands to Mr. Gonzalez?

10      A.   I did not give any commands.  No, sir.

11      Q.   In the five seconds before you fired, did you

12  give a verbal warning that you were going to shoot?

13      A.   I did not specifically, sir.  But it should be

14  noted that my partners, who were closer to Mr. Gonzalez,

15  were giving repeated commands to "Stop."  "Get on the

16  ground."  Similar commands like that, through the

17  entirety of the foot pursuit.

18      Q.   Right now I'm just focused on last five

19  seconds.

20           Did you hear anybody give a verbal warning in

21  the last five seconds that they were going to shoot?

22      A.   I cannot specifically recall within that five

23  seconds.  No, sir.

24      Q.   Your backdrop -- at the time when you were

25  shooting, were there any individuals that you could see

1  in your backdrop?

2      A.   So per your question, at the time of my

3  shooting, there was no individuals in my backdrop at the

4  time of me discharging my firearm; but prior to, there

5  were subjects observed in the immediate area.

6      Q.   Did you see any individuals, other than

7  Mr. Gonzalez and the two other officers, at the time of

8  your shooting?

9      A.   During the shooting itself, I did not observe

10  anyone in the back drop area.   No, sir.

11      Q.   When you initially saw Mr. Gonzalez, was he in

12  a vehicle or outside of the vehicle that day?

13      A.   So at -- the first time I was seeing

14  Mr. Gonzalez, throughout the entire day of January 24th,

15  he was first observed outside of the vehicle, in the

16  driveway of 40525 Whittier Avenue.

17      Q.   And you do generally recall what type of

18  vehicle that was?

19      A.   There were three vehicles present during that;

20  but specifically, the vehicle he ran into, prior to

21  our -- or I apologize.   The vehicle he ran into was a

22  black Hyundai.

23      Q.   And when you first saw him, was that black

24  Hyundai parked in the driveway or somewhere else?

25      A.   The black Hyundai was parked in the driveway.

1          A.    Not the entirety of the nine to ten minutes,

2    sir.  But when I perceived that he was pointing a --

3    what I believed to be a firearm, absolutely.

4              But I chose not to, based on the totality of

5    the circumstances, which was, there was cover available;

6    there was also women and children inside of the house

7    that were relevant to this incident; and there were

8    numerous windows on the property, to include in his

9    immediate backdrop, which made me concerned, because I

10   don't know where the children or women are at in the

11   house, specifically.

12        Q.    Where was Mr. Gonzalez in the vehicle when you

13   are saying he was pointing what you believed to be a

14   firearm at the officers?

15        A.    He was -- I couldn't tell you specifically if

16   he was totally in the back seat or the front seat.  But

17   there was no tint on the vehicle, sir, so I had a clear

18   and unobstructed view into the vehicle as he was moving

19   front to back, side to side, numerous times throughout

20   the nine to ten minutes being inside this vehicle.

21        Q.    So you're saying you saw this dark object that

22   you believed to be a gun more than once; is that

23   correct?

24        A.    What I'm saying is, sir -- is that I observed

25   the dark object in his hands, yes.  And did I observe

```
 1    described Riverside Sheriff's Department police vehicle,

 2    as I perceived a foot bail was imminent, which the

 3    suspect did flee on foot.  So I was already exiting the

 4    vehicle as he fled on foot.

 5         Q.   Did you think it was appropriate to shoot

 6    Mr. Gonzalez as he was getting out of the car?

 7         A.   At that particular moment, sir, although I did

 8    perceive he was a danger, again, believing that he was

 9    armed with a firearm, and based on the totality of the

10    circumstances with the family, and statements he was

11    making, the vehicle pursuit, which was wild, was he a

12    danger?  Absolutely.  But I did not perceive an imminent

13    threat at that point in time.

14              So, no, I would not have shot him at that point

15    in time.

16         Q.   Okay.  And when he started running away, did

17    you think it was appropriate to shoot him?

18         A.   Again, sir, so based on his initial flight from

19    the vehicle and proximity to that car, as I previously

20    stated, I believed he was absolutely a danger, based on

21    aforementioned statements.  But I did not perceive an

22    imminent threat when he immediately fled from the

23    vehicle.

24         Q.   And based on your training, there has to being

25    an imminent threat of death or serious bodily injury to
```

 1    use deadly force; is that fair?

 2        A.    So based on my training, there has to be the

 3    apparent ability, the opportunity, and the intent for

 4    deadly force application; so, yes.    And that can be in

 5    defense of others or myself.

 6        Q.    Right.    So based on the training -- and I think

 7    this is probably in the POST standards and also the

 8    Revised Penal Code Section 835(a) -- in order for there

 9    to be an imminent threat of death or serious bodily

10    injury, the person has to have the ability, opportunity,

11    and apparent intent to immediately cause death or

12    serious bodily injury.

13            Is that your general understanding?

14        A.    Yes.

15        Q.    And you would agree, based on your training,

16    seeing a firearm in someone's hand, that fact alone,

17    with nothing else, is not necessarily enough to use

18    deadly force?    Would you agree?

19            MS. KORNBLAU:    Objection.    Incomplete

20    hypothetical.

21            But go ahead.

22            MR. GARCIA:    Join.

23            THE WITNESS:    Okay.    So I just want to preface,

24    sir, that I believe -- obviously, I understand --

25            (Reporter clarification.)

1          THE WITNESS:  -- there is some missing context

2   with this.  But based on that specific statement you're

3   saying on just holding a firearm alone, with no other

4   context, no, we are not trained in that capacity.

5   BY MR. GALIPO:

6          Q.   Prior to the day of the incident with

7   Mr. Gonzalez, had you ever seen a suspect with a gun in

8   their hand before?

9          A.   Yes, sir.

10         Q.   On how many occasions, approximately?

11         A.   Approximately, 25.

12         Q.   And that would be a gun in the hand; is that

13  correct?

14         A.   Sir -- yes, sir.

15         Q.   How many prior officer-involved shootings had

16  you been involved in when you actually were one of the

17  officers who fired?

18         A.   Prior to this incident, sir?

19         Q.   Yes.

20         A.   It's been a total of four prior

21  officer-involved shootings.

22         Q.   Okay.  Have you been involved in any

23  officer-involved shootings since this incident?

24         A.   No, sir.

25         Q.   So the first one would have happened in what

```
 1    year, approximately?
 2         A.   I don't recall specifically, sir.
 3    Approximately, 2017.  It could be late 2016 -- or
 4    approximately.
 5         Q.   How long had you been a police officer at that
 6    time?
 7         A.   Since February, March of 2014, sir.
 8         Q.   Were you assigned to Patrol at that time?
 9         A.   I was assigned to Patrol as a canine handler;
10    yes, sir.
11         Q.   How many shots did you fire in that incident?
12         A.   There was one round that I discharged during
13    that incident, sir.
14         Q.   Do you remember the name of the person that you
15    shot?
16              MS. KORNBLAU:  Objection.  Vague.
17              THE WITNESS:  I don't recall the name of the
18    subject or suspect involved in that incident.
19    BY MR. GALIPO:
20         Q.   Did you deploy your canine at that subject?
21         A.   No, sir.
22         Q.   And do you know if your round struck the
23    suspect or not?
24         A.   I did not strike the suspect in that one, sir.
25         Q.   And did that suspect have a weapon in their
```

1    hand?

2        A.    I don't specifically recall if the suspect had

3    a weapon in their hand at that time, sir.

4        Q.    How about the second shooting you were involved

5    in, when was that?

6        A.    Approximately, 2017, sir.

7        Q.    How many shots did you fire in that incident?

8        A.    I don't recall specifically, sir, but more than

9    one.

10        Q.    Do you recall the name of the person that you

11    fired shots at in that incident?

12        A.    I don't recall the name specifically, sir.

13        Q.    Did you deploy your canine in that incident?

14        A.    No, sir.

15        Q.    Do you know whether your shots struck the

16    person or not?

17        A.    Yes, sir.

18        Q.    And do you believe they did?

19        A.    Oh, I apologize, sir.  I would be misspeaking.

20    I don't know specifically if my rounds struck that

21    person.  There was no way to determine that.  The

22    suspect in that was struck by gunfire, but I wasn't a

23    sole shooter in that, so there's no way to know if it

24    was me or not.

25        Q.    Did that suspect survive, if you know?

| | |
|---|---|
| 1 | A.    Yes, sir. |
| 2 | Q.    You just don't recall the name? |
| 3 | A.    Correct, sir. |
| 4 | Q.    When was your third shooting -- oh, did that |
| 5 | suspect have a weapon in their hand? |
| 6 | A.    Yes, sir. |
| 7 | Q.    What was the weapon? |
| 8 | A.    A knife. |
| 9 | Q.    Do you have a recollection of how far you were |
| 10 | from this person with the knife when you fired? |
| 11 | A.    I -- I do not, sir. |
| 12 | Q.    When was your third shooting? |
| 13 | A.    Approximately, beginning of 2018.  Maybe the |
| 14 | end of 2017, sir.  I'm not sure. |
| 15 | Q.    How many shots did you fire in that incident? |
| 16 | A.    I don't recall specifically, sir, but it was |
| 17 | more than one. |
| 18 | Q.    Do you have any estimate other than "more than |
| 19 | one"? |
| 20 | A.    I would be lying, sir -- or guessing at that |
| 21 | point. |
| 22 | Q.    Did you deploy your canine in that incident? |
| 23 | A.    Yes, I did. |
| 24 | Q.    Do you recall the name of the person you shot |
| 25 | at? |

1        A.    I -- I don't recall, sir.

2        Q.    Was that a Mr. Acosta?

3        A.    I -- I don't recall, sir.

4        Q.    Was a lawsuit filed in that case, to your

5   knowledge?

6        A.    Yes, sir.

7        Q.    Were you named as a defendant in that case?

8        A.    Yes, sir.

9        Q.    Do you recall if I was the attorney

10  representing the person who was shot?

11       A.    I do.

12       Q.    And was I?

13       A.    Yes.

14       Q.    And if you recall, did I take your deposition

15  in that case?

16       A.    Yes, sir.

17       Q.    And that case did not go to trial.  Is that

18  your understanding?  It was resolved in some way?

19       A.    I believe so.  I didn't testify federally, no,

20  sir.

21       Q.    And then when was your fourth shooting?

22       A.    I believe the end of -- approximately, the end

23  of 2018.

24       Q.    So between 2016 and the end of 2018, you would

25  have had four shootings; is that approximately correct?

1        A.    Yes, sir.

2        Q.    When were you promoted to sergeant?  In what

3    year?

4        A.    I was promoted to sergeant in 2022 -- or

5    actually, I apologize, 2022 or 2023, sir.

6        Q.    And then in your shooting in 2018, do you

7    recall how many rounds you fired in that shooting?

8        A.    I don't, sir.  But again, more than one.  But I

9    would be guessing if I gave you a round count, sir.

10        Q.    And in the 2018 shooting, when you deployed

11    your dog, did you see a weapon in that person's hand

12    when you fired?

13        A.    So the weapon used against me in that, sir, was

14    a vehicle.  So there was a weapon in his hand, yes, the

15    vehicle.

16        Q.    The vehicle.

17              And then this fourth shooting you had towards

18    the end of 2018, did that person have a weapon in their

19    hand?

20        A.    Yes, sir.

21        Q.    What was that weapon?

22        A.    That individual had two firearms, one in each

23    hand.

24        Q.    And do you know if you struck that person?

25        A.    I do not, sir.

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 39

1      Q.    Was that person running away from you when you

2  fired?

3      A.    That individual was in a doorway of a

4  residence.

5      Q.    So the shooting we're here to talk about would

6  actually be your fifth shooting?  Do I have that

7  correct?

8      A.    Yeah.  The fifth shooting of where I discharged

9  my firearm, yes.  There was an incident prior to this

10  where I was shot at, in a vehicle pursuit, but I did not

11  shoot back.

12      Q.    And how many officer-involved shootings had you

13  been present for where you heard shots fired but didn't

14  fire yourself?

15      A.    It would be a total of -- actually, I

16  apologize.

17            Can you ask that question one more time, sir?

18      Q.    Sure.  How many officer-involved shootings had

19  you been present for when you heard the shots but you

20  didn't -- you weren't one of the shooting officers?

21      A.    There's only one that comes to mind, sir, when

22  I was a supervisor on Patrol.

23      Q.    Do you know the name of the person that was

24  shot in that case?

25      A.    I do not, sir.

1        Q.    Was that a case where you were looking for a

2    suspect, and you went to the front door and talked to

3    the wife, and then the individual ended up being shot in

4    the backyard?

5        A.    There was an individual shot in the backyard

6    while looking for a suspect; yes, sir.

7        Q.    Was that a Mr. Drye, if you know?

8        A.    Again, sir, I would be lying if I agreed with

9    that.  I don't recall the name.

10            (Reporter clarification.)

11   BY MR. GALIPO:

12       Q.    Other than the one case that you referenced

13   that you were aware that I represented the individual

14   shot by you, were you aware of any of the other

15   shootings that you had, or were involved in, where my

16   office represented the person or the family?

17            MS. KORNBLAU:  Objection.  May misstate

18   testimony.

19            But go ahead.

20            THE WITNESS:  The only time I was made aware of

21   you being involved, sir, the other one would be the one

22   you just referenced for the backyard, sir.

23   BY MR. GALIPO:

24       Q.    Okay.  During the foot pursuit -- I'm going

25   back to the case with Mr. Gonzalez now -- there were

1    A.   I did not observe a firearm in his hands at

2    that time.

3    Q.   Did he turn either over his right shoulder or

4    left shoulder, that you recall, prior to that first

5    90-degree turn?

6    A.   I don't specifically recall where it was during

7    the foot pursuit, sir, at the -- in the city of

8    Beaumont, no -- or I apologize -- near that factory.

9    But he did look over his left shoulder while we were

10   pursuing him; I just don't recall if it was first turn

11   or second turn.

12   Q.   And how many times, approximately, do you

13   recall Mr. Gonzalez looking over his left shoulder?

14   A.   At least twice, possibly more, but I would be

15   guessing if I gave you a number more than two, sir.

16   Q.   And then the distance between the first

17   90-degree turn and the second 90-degree turn, do you

18   have any estimate as to that?

19   A.   I do not, sir.

20   Q.   Prior to that second 90-degree turn, after or

21   during the foot pursuit, did you see what you believed

22   to be a firearm in either one of Mr. Gonzalez's hands?

23   A.   At that particular time, sir, I did not observe

24   a firearm in Mr. Gonzalez's hands.

25   Q.   As Mr. Gonzalez was running up to the first

1    90-degree turn, or all the way up to the second

2    90-degree turn, did you think, based on your training,

3    it would have been appropriate to shoot him?

4        A.    So based on my vantage point, and also being

5    number three in the foot pursuit, sir, I did not

6    perceive an imminent threat from where I was.

7        Q.    And am I correct that the imminent threat has

8    to be an imminent threat of death or serious bodily

9    injury to yourself or others?

10       A.    Again, as what we previously discussed, yes,

11   sir:  apparent opportunity, ability, and intent, sir.

12       Q.    And is it your understanding from your

13   training, all three of those are required?

14       A.    Those are -- those are the definitions of an

15   imminent threat, according to the law.

16       Q.    And are you generally trained that you should

17   only use deadly force when it's immediately

18   life-threatening?

19       A.    So in order to preserve the life of others and

20   yourself, as long as it's imminent is -- can be

21   articulated, then, yes.

22       Q.    And are you generally trained that you should

23   only use deadly force when it's necessary to immediately

24   defend life?

25       A.    When it's objectively reasonable under the

```
 1        A.   So based on my previous statement, sir, or

 2   answer, I don't specifically recall if he presented the

 3   firearm as he had just exited or was just about to exit.

 4   It was appropriate to shoot at Mr. Gonzalez when he

 5   presented the firearm, and all at the same time,

 6   simultaneously, looked to his left and looked back.

 7   That's when it was appropriate.

 8        Q.   Okay.  And if -- hypothetically, if you had

 9   seen a firearm in his hand, but he had not turned or

10   looked back, would you then still have the imminency,

11   based on your training?

12            MS. KORNBLAU:  Objection.  Incomplete

13   hypothetical.

14            But go ahead.

15            THE WITNESS:  Sir, I'm going to answer that

16   with, I have experience and observed people shoot while

17   running away from officers, by simple motion of just

18   tilting the gun back or over their shoulder.  So

19   absolutely he could -- it could be a hundred percent

20   perceived as an imminent threat, and he could be shot at

21   that point in time.

22   BY MR. GALIPO:

23        Q.   Even without turning towards you or looking at

24   you?

25        A.   It is just as easy to discharge a firearm, sir,
```

1    by tilting it back a split second, and pulling that

2    trigger, or putting it over your shoulder and squeezing

3    the trigger.  That's just as deadly as a weapon as it is

4    facing somebody.

5        Q.   So are you saying that under this set of facts,

6    once you saw the firearm in his hand, even if he hadn't

7    turned or looked at you, you believe it would be

8    appropriate to shoot him as he was running away?

9        A.   I'm saying, sir, based on the totality of the

10   circumstances, we can't just -- again, that is super

11   important into everything that's going on.  The women

12   and children in danger at the house.  The perception

13   he's armed during the car -- the erratic, evading and

14   endangering officers in public for that time.  And now,

15   running through an occupied business.

16        And at this time it should be noted, I

17   perceived where he's running, towards a dead-end, into a

18   building where I am seeing a person.  So, absolutely,

19   him possessing that firearm, and having more than 27

20   minutes, approximately, to surrender peacefully and

21   stop, he, a hundred percent, is an imminent threat.

22        Q.   So you're saying that even without him turning

23   towards you or looking at you, based on your training,

24   you thought it was appropriate to shoot him at that

25   point, under the totality of the circumstances, for

```
 1                Said.
 2                THE VIDEOGRAPHER:  Yep.  Going off the record
 3   at 11:08 a.m.
 4                (Break taken.)
 5                THE VIDEOGRAPHER:  We're back on record at
 6   11:24 a.m.
 7   BY MR. GALIPO:
 8        Q.    Okay.  So the one shooting you told me about
 9   with the person with the knife, do you recall us talking
10   about that to some extent --
11        A.    Previously just -- yes.
12        Q.    -- today?
13        A.    Yes, sir.
14        Q.    Was that person's name Martin?  Does that ring
15   a bell?
16        A.    Michael Martin.  Yes, sir.
17        Q.    Do you recall that I took your deposition in
18   that case, as well?
19        A.    I didn't specifically recall that, sir.
20        Q.    Do you remember that there was a lawsuit filed
21   in that case, where you were named as a defendant?
22        A.    Yes, sir.
23        Q.    And the case with Mr. Acosta where you, in
24   addition to shooting, deployed your canine, you remember
25   you were named as a defendant in that case; is that
```

1    correct?

2        A.    If that's the Florida incident, then, yes, sir.

3        Q.    Okay.  And you do remember me taking your

4    deposition in that case?

5        A.    Yes, sir.  I do.

6        Q.    Were you named a defendant in any other case,

7    other than those two and this one

8        A.    Not that I'm recalling offhand, sir.

9        Q.    Now, with respect to Mr. Gonzalez, did you have

10    any specific information before that day, that

11    Mr. Gonzalez had ever shot anyone?

12        A.    Before January 24th, sir, I did not have any

13    knowledge of Mr. Gonzalez, that I recall.

14        Q.    Okay.  Any specific information, for example,

15    that he had ever seriously injured or killed someone?

16        A.    No, sir.

17        Q.    Did you have any specific information that he

18    had ever specifically physically injured anyone?

19        A.    There -- the day of, there was a restraining

20    order that was mentioned, and a hit in relation -- I

21    apologize -- "hit" being layman terms for a match to his

22    name and the ex, Yvette.  I don't recall her name.

23            So there was a domestic violence restraining

24    order that populated when she was ran as a protected

25    party, and he was restrained.

1        Q.   Okay.  I'm just wondering if you had any

2    specific information about the nature of any injury, if

3    any?

4             MS. KORNBLAU:  Objection.  Asked and answered.

5    BY MR. GALIPO:

6        Q.   You may answer.

7        A.   I'm not aware of any specific details of the

8    incident.

9        Q.   Did you have any specific information of any

10   criminal convictions as opposed to arrests?

11       A.   I was told that he was a felon out -- the day

12   of the incident, by Detective Sobaszek.

13       Q.   Do you know specifically what he was convicted

14   of?

15       A.   I do not know that, specifically.  No, sir.

16       Q.   Did you have any information, on the day of the

17   incident, that he -- on that day, in other words, that

18   he had seriously injured anybody on that day?

19       A.   I had no knowledge that he specifically had

20   physically injured anybody that day.

21       Q.   Okay.  Do you have any time estimate as to how

22   long the foot pursuit lasted, before the shots?

23       A.   I don't, sir.  I don't.  I would be guessing,

24   sir.

25       Q.   Okay.  Do you know if it was more or less than

```
 1    a minute, for example?
 2         A.   I -- I could be wrong if I answer that, and I
 3    don't want to guess.  I apologize.
 4         Q.   That's okay.  If you're not comfortable giving
 5    an estimate, that's okay.
 6         A.   Yes, sir.
 7         Q.   Did you ever hear Mr. Gonzalez verbally
 8    threaten to harm any of the officers?
 9         A.   Mr. Gonzalez -- the only verbal communication I
10    had with him was during the initial part of the incident
11    where he and I were corresponding, as he was barricaded
12    in the vehicle, sir.  He was making statements that,
13    "You're going to have to kill me," no, he's not leaving.
14    Things of that nature.
15         Q.   Okay.  But you didn't hear him say that he was
16    going kill someone or verbally threaten that he was
17    going to harm an officer, did you?
18         A.   No, I did not specifically hear those things.
19    No, sir.
20         Q.   At some point while he is running away -- we
21    talked about this narrow area -- was that near some
22    parked commercial vehicles?
23         A.   I remember one vehicle that was partially up on
24    that -- it almost was like a ramp.  But that's about it,
25    sir.
```

1    where he was at.  So I, a hundred percent, believed that

2    there was a false imprisonment or potential kidnapping

3    afoot.

4         Q.   And when you reference this "line in the sand,"

5    are you saying that you're not going to let him get past

6    this line in the sand?  Is that what you're meaning?

7         A.   What I'm saying, sir, is that we have to do

8    everything within our -- our power.  And, again, as law

9    enforcement officers, we always want to use the lowest

10   level of force possible.  That's how we are trained and

11   that's how we should be, to not allow him to harm

12   others.  So it was not a physical line of like, "Hey, if

13   you passes both barrels; it was just a mental thought

14   that we cannot allow him to physically enter a building.

15        Q.   I understand that.  I guess what I'm asking,

16   when you come up with this line in the sand, are you

17   saying, in this case, you're thinking if he gets past

18   that line in the sand, or to it, you would use deadly

19   force to stop him?

20        A.   So I'm saying, sir, that we would utilize every

21   option available, and we are hoping, and I am praying,

22   that it is the least dangerous for everyone involved, to

23   include Mr. Gonzalez.  That's what I'm saying, sir.

24        Q.   And what other options did you feel that you

25   had, other than deadly force, from him crossing that

1    line in the sand?

2        A.    So initially, sir, upon the onset of this

3    incident, we had -- I requested canine.  As a former

4    canine handler, I know that just the mere presence alone

5    can be a safe de-escalation tool.  We also had

6    less-lethal force options to include a 40-millimeter

7    launcher.

8                There were some people with a Taser that were

9    present during the initial onset.  And then, to include

10   during the foot pursuit, I had a Taser on my side, as

11   well, as a less lethal force option.  But unfortunately,

12   based on Mr. Gonzalez's actions, there was not an

13   opportunity to utilize that, and we had to meet force

14   with force, based on his actions with the firearm.

15       Q.    I guess what I'm asking, if he -- if you were

16   unable to use less lethal, either because the canine

17   wasn't there, or the Taser, it was too far of a

18   distance, and he got past this line in the sand you're

19   referencing, were you then thinking about using deadly

20   force --

21       A.    So, sir, I --

22       Q.    -- to keep him from getting in the building,

23   for example, and taking a potential hostage?

24       A.    Yes, sir.  I understand what you're asking,

25   sir.  And the best way I can answer is, just based on

1    Q.    Do you see that section?

2    A.    Yes, sir.

3    Q.    And so is that when you were drawing your

4    firearm out, initially, when you were thinking about

5    this line in the sand?

6    A.    So at that moment in time, sir, I began to draw

7    my firearm, again, based on the totality of the

8    circumstances, and believing he's armed, based on

9    everything I had observed and had already previously

10   described at the beginning of this incident, at the

11   onset.

12         I believed he still possessed that firearm.  So

13   I began to draw my firearm as an option that was

14   available, if needed.  Again --

15   Q.    Okay.

16   A.    It wasn't the only decision.  It just was an

17   option that was available.

18   Q.    So I guess what I'm asking, your mind frame,

19   let's say you hadn't seen a firearm and he hadn't

20   turned, just kept running past your line in the sand.

21   You're drawing out your firearm.  Are you thinking that

22   you were going to shoot him, whether you saw a firearm

23   or not?

24         MS. KORNBLAU:  Objection.  Incomplete

25   hypothetical.

1              But go ahead.

2              THE WITNESS:   Sir, honestly, I don't feel

3    comfortable answering -- I know what you're getting at.

4    All I'm going to do is just reference the facts.  The

5    facts are he did present a firearm.  He did pose an

6    imminent threat.  And all of that is going on with the

7    totality of the circumstances of the event, so...

8    BY MR. GALIPO:

9        Q.   Okay.  But the reason I'm asking, in your

10    statement you're saying:  "I'm drawing a line in the

11    sand, and I start drawing my firearm."  And it appears

12    that that happened before you saw him with the firearm.

13    Is that fair?

14        A.   I -- I would disagree with that, sir.  All of

15    this is -- again, a tense, uncertain, rapidly-evolving

16    situation.  And although I may have said that in the

17    summary up here, I do have an opportunity to elaborate.

18    All of this is happening simultaneously.  The very next

19    statement is that:  "He has a firearm in his hand,"

20    according to my summary transcript.  So all of this is

21    happening rapidly.

22              THE WITNESS:  I apologize, ma'am, if I'm

23    talking too fast.

24              THE CERTIFIED STENOGRAPHER:  You are a little

25    bit.  Thank you.  Just slow down a little bit.  Thank

1    THE WITNESS:  As I previously stated, sir, he

2 had turned towards my partners and I.  And then I heard a

3 gunshot which I perceived was from him.  At that time, I

4 decided to pull the trigger.  He was facing towards my

5 direction and my partners's direction.

6 BY MR. GALIPO:

7   Q.   Okay.  So you're saying he was facing towards

8 you and your partners when you pulled the trigger?

9   A.   The very first round, yes, sir.

10   Q.   Did you -- and I know you were assessing for

11 each shot.  Did you fire any shots as he was going to

12 the ground?

13   A.   Every time that I discharged my firearm, sir, I

14 was not paying immediate attention to where his body

15 was, upright, leaning, left, right.  I was focused on

16 the imminent threat, which was the firearm in his right

17 hand, and I was focusing on center mass where I was

18 aiming to stop the threat.

19   Q.   So are you saying you may have fired some shots

20 as he was going to the ground; you're not sure?

21    MS. KORNBLAU:  Objection.  Misstates testimony.

22    MR. GARCIA:  Join.

23    THE WITNESS:  So my intent in this, sir, was to

24 stop the threat.  And as I previously stated, as long as

25 he had that firearm in his right hand, he was an imminent

```
 1    threat.  So it was visible to me, so every time I
 2    discharged my firearm he was an imminent threat.  And I
 3    was focused on the firearm in his right hand and center
 4    mass.
 5              I was not focused on, specifically, if he was
 6    upright, facing left, facing right, leaning forward.
 7    BY MR. GALIPO:
 8         Q.   I get that.  And I think what you're telling me
 9     is you don't know if he was going to the ground during
10     your shots.  Am I understanding you correctly or not?
11              MS. KORNBLAU:  Objection.  Misstates testimony.
12              THE WITNESS:  Sir, unfortunately, I'm just
13    going to have to keep saying the same answer.  Every time
14    I -- I would discharged my firearm, it was after
15    assessing the threat of the gun in the right hand, and
16    then aiming center mass on his person.
17    BY MR. GALIPO:
18         Q.   Okay.  So you're saying you could see the gun
19     in his right hand, in between each shot, when you were
20     assessing?
21         A.   Yes, sir.  It was a rapid series of events that
22     took place, but I visibly could see the firearm in his
23     hand.
24         Q.   Did you fire any shots after he went to the
25     ground?
```

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 65

1    A.    Sir, when I stopped firing my firearm, it was

2    when he no longer posed an imminent threat, and I no

3    longer saw the firearm.  That's when I stopped firing.

4    Q.    Do you think he was an imminent threat of death

5    or serious bodily injury after he went to the ground?

6    A.    Mr. Gonzalez posed an imminent threat of

7    serious bodily injury or death as long as he possessed

8    that firearm.  It doesn't matter what position he was

9    in.  The second the firearm was no longer in his hand,

10    or visible to my partners or I, that's when he no

11    longer, in my opinion, became an imminent threat.

12    Q.    Well, when you approached him after the

13    shooting, he was chest down, wasn't he?

14    A.    He was located on his chest.  Yes, sir.

15    Q.    His head would have been further from you, his

16    feet closer?

17    A.    Correct, sir.

18    Q.    And wasn't the gun near his foot or feet?

19    A.    The gun was located near his leg area.  Yes,

20    sir.

21    Q.    Do you know when he dropped the gun during the

22    shooting sequence?

23    A.    I do not, sir.

24    Q.    Did you ever give any commands to Mr. Gonzalez

25    during the foot pursuit?

1        A.    During the foot pursuit itself, I did not give

2    verbal commands.   But based on detective Sobaszek and

3    Officer Irick, who were within closer proximity to

4    Mr. Gonzalez, as well as hearing their audible commands

5    already being given, I didn't want to confuse the

6    situation by shouting commands behind them.

7        Q.    And we're going to try to play a portion of

8    your body-worn camera, more towards the end of the foot

9    pursuit.   I may try to play it once, and then I might

10   slow it town or try to ask you some questions.

11           MR. GALIPO:   So, Alejandro, is it possible that

12   we could get a portion of Sergeant Reynoso's body-worn

13   camera up on share screen, and then we'll mark this

14   portion as Exhibit 1.

15           (Exhibit Number 1 was marked.)

16           MR. GALIPO:   And then I ask, of course, that

17   you send it to Kimberly and defense counsel, so they have

18   it.

19           Okay.   Let's stop for a moment.   I'm getting my

20   glasses because my eyes are getting worse and worse.

21   BY MR. GALIPO:

22       Q.    Can you see that, first of all, on your screen,

23   Sergeant?

24       A.    Yes, sir.

25       Q.    Okay.   It looks like the time that I could

1    recognize who is who?

2         A.    Yes, sir.

3         Q.    Can you please tell me who's on the left and

4    who's on the right as we look at this?

5         A.    So Detective Sobaszek is on the far right, and

6    closer to the center is Officer Sean Irick.

7              MR. GALIPO:    Okay.    Now, let's play it again.

8    And I'm going ask Alejandro to stop it a few times and

9    just ask you a few clarifying questions.    And I'll note

10   for the record where we stop it.

11             (Video being placed.)

12             MR. GALIPO:    Okay.    Let's stop.    We stopped it

13   at about 20:04:19.

14   BY MR. GALIPO:

15        Q.    Was that, like, the first right turn that you

16   referenced earlier?

17        A.    Yes, sir.

18        Q.    And I think you already told me, before the

19   first right turn, you had not seen the firearm in

20   Mr. Gonzalez's hand during the foot pursuit; is that

21   fair?

22        A.    Yes, sir.    I did not observe a firearm in his

23   hand.

24        Q.    Okay.    And then you go through this part we're

25   looking at.    And then there's going to be another right

```
 1   motion?  And I'll tell you when -- when to stop.  First,
 2   we might just play it through.  Yeah.
 3            This is Exhibit 2, starting at 20:04:15, in
 4   slow motion, half speed, I think.
 5            (Video being played.)
 6            MR. GALIPO:  Stop.  Okay.
 7            We stopped it at 20:04:42.
 8   BY MR. GALIPO:
 9       Q.   You see your hands look like they're kind of --
10    oh, strike that.  This would be Sobaszek's hands;
11    correct?
12       A.   Correct, sir.
13       Q.   Sorry.
14            MR. GALIPO:  Go forward a little bit.
15            (Video being played.)
16            MR. GALIPO:  Stop.
17            Okay.  I stopped it at 20:04:46.
18   BY MR. GALIPO:
19       Q.   Can we see -- can you at least see Mr. Gonzalez
20    in this view?
21       A.    In this still photograph, I can see
22    Mr. Gonzalez, yes.
23       Q.   Would you agree we're generally looking at the
24    back side of his body?
25       A.   Mr. Gonzalez is in active motion, fleeing from
```

1    officers, so I don't -- obviously, because this is

2    paused, it's not giving an accurate depiction of what

3    angles are a hundred percent seen; but, in general, you

4    see some of his back, yes.

5        Q.   Okay.  And do you know -- can you tell from

6    looking at this still, paused at 20:04:46, whether the

7    shots had started yet or not?

8        A.   I can't tell.  This isn't a live video, sir, or

9    what had happened in real events.  So this is just a

10   frozen video, so I don't know if the shots began or not

11   right now.

12       Q.   Okay.

13           MR. GALIPO:  Are we able to go -- okay.  Let's

14   continue to play it in slow motion.

15           (Video being played.)

16           MR. GALIPO:  We stopped it at 20:04:51.

17   BY MR. GALIPO:

18       Q.   Did you notice, in watching this, that there

19   were shots fired both as he was going to the ground and

20   on the ground?

21       A.   I didn't specifically see that he was on ground

22   there, but I did observe rounds being fired as he was

23   progressing towards the floor.

24           MR. GALIPO:  Let's just show it to the sergeant

25   one more time, that last portion.

```
 1            THE WITNESS:  That's not what I said, sir.  I'm
 2   saying in this particular freeze frame where you have it
 3   paused right here, I'm not able to determine if there's a
 4   firearm.  It didn't appear that there is, in my
 5   perception, on this still footage.  That's all I'm
 6   saying, sir.
 7            MR. GALIPO:  So let's just go back a little bit
 8   then, if we can, Alejandro.
 9            Okay.  That's fine.  20:04:49.  You went back
10   further.
11            That's fine, too.  20:04:36.  Go ahead and
12   play.
13            (Video being played.)
14            MR. GALIPO:  Okay.  That's good.  We stopped it
15   at 20:04:58.
16   BY MR. GALIPO:
17       Q.   You can hear the shots; would you agree?
18            MS. KORNBLAU:  Objection.  Calls for
19   speculation.
20            THE WITNESS:  There's definitely loud sounds
21   that could be consistent with a firearm.  It could be
22   other things, sir.
23            But I do want to note that if you play that
24   video again, you can actually see, after officers have
25   stopped shooting, that that firearm is thrown out after
```

1    officers have stopped shooting.

2            So if you can show that video, again, you can

3    see that.  So, again, the firearm on his person in his

4    immediate hand.  That's the imminent threat, sir.  This

5    is not my view.  This is Detective Sobaszek's.  I had a

6    different perspective, a different view, but I'm just

7    saying that he still posed an imminent threat.

8    BY MR. GALIPO:

9        Q.   You said that there could be other -- they

10    could be gunshots or some other sound.  What other sound

11    did you have in mind?

12            MS. KORNBLAU:  Objection.  Calls for

13    speculation.

14            Go ahead.

15            THE WITNESS:  It's a commercial building, sir.

16    There's all kinds of things going on.  I've been around

17    plenty of commercial buildings.

18            (Reporter clarification.)

19            THE WITNESS:  I've been around plenty of

20    commercial environments, and there have been things,

21    noises from whether forklifts or backfire of cars, things

22    that sound like gunfire.

23            So, yes, there were shots fired here, but I

24    can't tell you specifically at the end of this video that

25    every one of those was a gunshot.  I don't know.

```
 1              MR. GALIPO:  Okay.  We can take it down.

 2         Thank you, Alejandro.

 3    BY MR. GALIPO:

 4         Q.   And lastly -- and we spoke about this to some

 5    extent already.  We talked about the standard and the

 6    training that applies to the use of deadly force.

 7    Remember us talking about the imminent threat of death,

 8    or serious bodily injury, and the opportunity, ability,

 9    and intent to immediately cause death or serious bodily

10    injury as a standard?  Do you recall that?

11         A.   I recall it, sir.

12         Q.   Okay.  And your training, with respect to the

13    use of the deadly force, is also that you should

14    consider your backdrop; is that fair?

15         A.   Absolutely, sir.

16         Q.   And that you are responsible to justify every

17    shot?  Is that also accurate?

18         A.   Yes, sir.

19         Q.   And that you should assess, if you can, both

20    before and during the shooting sequence?

21         A.   You should be constantly assessing, yes, sir.

22         Q.   And part of the reason for the importance of

23    the assessment is to determine whether additional shots

24    are necessary?

25         A.   The assessment is for the totality of the
```

1   circumstances, yes:  Is the threat still present, and

2   has your backdrop changed?  And there's other variables

3   that may come into play.

4       Q.   And part of the training is to give a verbal

5   warning that you're going to use deadly force when

6   feasible; correct?

7       A.   Correct, sir.  "When feasible" being the key

8   terminology.

9       Q.   How was it determined that you fired six shots,

10  if you know?

11      A.   I had done a tactical check of my magazines,

12  sir, so I was able to determine that I fired six rounds.

13      Q.   You did the check yourself?

14      A.   I did the check, sir.  In addition, there was a

15  charting.  I apologize.  That's the terminology.  After

16  any officer-involved or deputy-involved shooting,

17  there's a charting that takes place.

18      Q.   Okay.  Can you explain to me how you did the

19  check?

20      A.   I don't recall specifically when, sir, the

21  time, but it was post the officer-involved shooting.

22  And prior to being charted, I checked my magazines, and

23  my -- as far as the round count.

24      Q.   And how many rounds were left?

25      A.   Well, from 17, plus one, that would be 18

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 82

```
 1   STATE OF CALIFORNIA)
                        ) ss:
 2   COUNTY OF BUTTE    )

 3
             I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5           That the witness named in the foregoing

 6   deposition was present remotely and duly sworn to testify

 7   to the truth in the within-entitled action on the day and

 8   date and at the time and place therein specified;

 9           That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12           That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15           Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19           That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21           IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 29th day of August, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```