# "EXHIBIT B"

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    --oOo--

4

5   GEORGE GONZALEZ,

6          Plaintiff,

7   v.                      Case No.  5:25-cv-00331-KK-DTB

8   STATE OF CALIFORNIA; CITY OF
    HEMET; PATRICK SOBASZEK;
9   ANDREW REYNOSO; SEAN IRICK;
    and DOES 1-10, inclusive,

10

11          Defendants.
    _____/

12

13

14

15

16          STENOGRAPHIC REPORTER'S TRANSCRIPT OF

17      REMOTE VIDEO DEPOSITION OF PATRICK SOBASZEK

18          WEDNESDAY, JULY 23, 2025

19

20

21

22   Reported Stenographically by:

23   KIMBERLY D'URSO, CSR 11372, RPR

24   Job No.  18114

25

Patrick Sobaszek

```
 1   plaintiff.
 2              MS. KORNBLAU:  Andrea Kornblau, on behalf of
 3   Defendants, City of Hemet and Corporal Patrick Sobaszek.
 4              MR. GARCIA:  Mario E. Garcia and Ashley Reyes,
 5   on behalf of the State of California, acting by and
 6   through the California Highway Patrol and California
 7   Highway Patrol Officer Sean Irick.
 8              (Whereupon the oath was administered to the
 9              deponent by the Certified Shorthand Reporter.)
10              THE WITNESS:  I do.
11                         EXAMINATION
12   BY MR. GALIPO:
13       Q.   Good morning.  Can you please state your name?
14       A.   Good morning.  My name is Patrick Sobaszek.
15       Q.   I was hoping I wasn't butchering your name too
16   bad yesterday, so forgive me.  I was trying my best.
17       A.   No, you're actually pretty close.  Not too far
18   off.
19       Q.   Okay.  I'll take it.
20            Have you had your deposition taken before?
21       A.   Yes.
22       Q.   On how many prior occasions?
23       A.   Two.
24       Q.   And were either one of those related to an
25   officer-involved shooting case?
```

Patrick Jurjszek

1     A.    Yes.

2     Q.    And were both of them related to that or just

3  one?

4     A.    Just one.

5     Q.    Was that in the Solis case?

6     A.    Yes.

7     Q.    And the other deposition you took, what was

8  that related to?

9     A.    That was related to a use of force and arrest

10  incident.

11     Q.    Were you named as a defendant in that case?

12     A.    Yes.

13     Q.    And what was the alleged use of force?  What

14  type of force?

15     A.    It was a general -- just excessive force and,

16  like, an unlawful arrest, I guess you could say.

17     Q.    Was the force just, like, a takedown, or a

18  Taser, or what was involved in the force?

19     A.    On my end specifically, it was a takedown.

20     Q.    Other officers were involved in other types of

21  force?

22     A.    Yes.

23     Q.    Is that case still pending, or has that

24  resolved?

25     A.    It has resolved.

Patrick Ulaszek

```
 1        Q.    And you've testified in court before; is that
 2   correct?
 3        A.    Yes, sir.
 4        Q.    Do you have an estimate as to how many times
 5   you've done that?
 6        A.    I just want to clarify:  Like, criminal and
 7   civil, or just the civil side?
 8        Q.    No.  Both, combined.
 9        A.    Probably at least a hundred times.
10        Q.    What is your current assignment?
11        A.    I am a corporal assigned to the investigations
12   bureau.
13        Q.    And what do you generally do in that
14   assignment?
15        A.    I supervise investigators under me during the
16   course of their investigative duties, as well as carry a
17   caseload of my own.
18        Q.    What type of crimes does your unit generally
19   investigate?
20        A.    We're a general investigations bureau, so we'll
21   do everything from homicides, crime against persons to
22   property crimes, robberies.  Basically, anything that
23   will get the attention of detectives above patrol level,
24   we'll handle it.
25        Q.    How long have you had that assignment?
```

Patrick Staszek

1      A.    Since April of 2024.

2      Q.    What was your assignment immediately before

3   that?

4      A.    I was a detective assigned to the Region 3 Gang

5   Task Force.

6      Q.    And how long were you in that assignment with

7   the task force?

8      A.    That was from September of 2019 to April of

9   2024.

10      Q.    During that time frame, were you at least

11   present to some extent, in the Solis case when that

12   shooting took place?

13      A.    Yes.

14      Q.    And then you were involved, obviously, in the

15   shooting of Mr. Gonzalez?

16      A.    Yes.  I was there during that incident, as

17   well.

18      Q.    And you were also present during the shooting

19   of Mr. Helman?

20      A.    Yes.

21      Q.    Were you present for any other officer-involved

22   shootings during your time on the task force?

23      A.    I was present at other officer-involved

24   shooting scenes, but I wasn't directly related to it.

25      Q.    And when you say not "directly related," what

Patrick Swatszek

1    background, can you tell me a little bit about your

2    educational background after high school?

3        A.   Yes, sir.  I -- well, I got an associate's

4    degree with a concentration of business administration,

5    and then, obviously, the academy trainings.  I went to

6    two academies, one for San Diego Sheriff's, which is a

7    correctional and court services position.  And then the

8    sworn academy after that.

9            After getting -- completing the sworn academy,

10   I finished my bachelor's degree with an emphasis in

11   business administration.

12       Q.   When did you go to the first academy in San

13   Diego?

14       A.   It would have been September of 2013.

15       Q.   And when did you go to the second academy?

16       A.   The San Bernardino Sheriff's Academy, that was

17   July of 2015.

18       Q.   What type of work did you generally do before

19   going to the academies?

20       A.   I had one part-time job out of high school,

21   which was at the Storm Stadium in Lake Elsinore, where I

22   did, like, parking.  I was, like, a parking assistant or

23   -- I don't remember what the title was.  But basically,

24   we controlled the flow of parking at the stadium.  I did

25   that for a couple months before I got hired by San Diego

1     A.   Yes, sir.

2     Q.   And with Hemet, did you have a period of field

3  training?

4     A.   I did.

5     Q.   How long was that, approximately?

6     A.   Four months.

7     Q.   And after you completed field training, were

8  you initially assigned to patrol?

9     A.   Yes.

10     Q.   And how long were you assigned to patrol before

11  your assignment changed with Hemet?

12     A.   So I started patrol December of 2015, and then

13  my next assignment was the Gang Task Force, which was

14  September of 2019.  So a little under four years.

15     Q.   At some point you had some collateral

16  assignments, such as a field training officer?

17     A.   Yes, sir.  I was a field training officer, and

18  I was also -- and I am also a member of our SWAT team.

19     Q.   During what time period were you a field

20  training officer?

21     A.   It was after I got on the Gang Team, so I don't

22  remember the exact date.  I want to say it was sometime

23  in 2021.

24     Q.   And are you still a field training officer, or

25  did that end at some point?

1    A.    I am still a field training officer.  Yes, sir.

2    Q.    And how about with the SWAT team?  Are you

3  still a member of the SWAT team?

4    A.    Yes.

5    Q.    And when did you first become a member of the

6  SWAT team?

7    A.    I want --

8    Q.    Approximately.  Approximately.

9    A.    It was probably the end -- it was towards the

10  end of 2021.

11    Q.    How old are you, currently?

12    A.    31.

13    Q.    How tall are you?

14    A.    5'7, on a good day.

15    Q.    On a good day?  Okay.  I got that.

16          How much do you currently weigh on a good day?

17    A.    165 pounds.

18    Q.    And I don't know whether good is more or less.

19  I guess that's subject to debate.

20          Did you do anything, generally, in the time

21  frame of the shooting, in other words, the year or two

22  before, to keep in shape?

23    A.    Yes, sir.

24    Q.    What did you do, generally, to keep in good

25  physical condition?

1    A.   I'd workout approximately five to six days out

2    of the week.  My workouts consisted of, usually, between

3    an hour and an hour and a half of strength training,

4    like weights training, and followed by, usually, about a

5    mile and a half to two mile run after that.

6    Q.   And you would do that five or six times a week?

7    A.   Yes, sir.

8    Q.   Would you characterize yourself as being in

9    generally good physical condition at the time of the

10   shooting incident?

11   A.   Yes.

12   Q.   Had you seen in the course of your work, prior

13   to the incident with Mr. Gonzalez, other than

14   Mr. Helman, had you seen suspects with firearms in their

15   hand before?

16   A.   Yes.

17   Q.   And do you have an estimate on how many

18   occasions you had observed that in your work as a police

19   officer?

20   A.   I just want to clarify "in their hand," like,

21   you're talking about actually holding the firearm;

22   correct?

23   Q.   For purposes of this question, yes.

24   A.   Okay.  If we're including Mr. Helman and

25   Mr. Gonzalez, probably, like, five.  Five or six.

1    Q.    Okay.  So when you say -- it really doesn't

2    matter.  We can do the math.

3          So aside from Mr. Helman and Mr. Gonzalez, are

4    you saying maybe three or four other times?

5    A.    Yes, sir.

6    Q.    And had you been in foot pursuits before the

7    incident with Mr. Gonzalez?

8    A.    Yes.

9    Q.    Do you have an estimate or any range as to how

10   many foot pursuits you've been in?

11   A.    At least 20.

12   Q.    In some of those foot pursuits, did it end up

13   being that the person you were chasing was armed?

14   A.    Yes.

15   Q.    Had you had occasions where people ran from you

16   with firearms and then tossed or tried to toss the

17   firearm during the foot pursuit?

18   A.    Yes.

19   Q.    Did you have training that sometimes people

20   will run from police officers if they have illegal items

21   on them, such as contraband or firearms?

22        MS. KORNBLAU:  Objection.  Vague.

23        THE WITNESS:  I mean, I don't know if it's

24   necessarily we had training on it.  But, yeah, I mean,

25   people would run from me and try to discard contraband,

1    yes.

2    BY MR. GALIPO:

3        Q.   And were you trained or based on your

4    experience, people would sometimes run and try to

5    discard firearms, if they could?

6        A.   Yes.

7        Q.   Were you trained that you can shoot someone

8    merely for running away from you, that fact alone?

9            MS. KORNBLAU:  Objection.  Vague.

10            THE WITNESS:  I mean, there's certain scenarios

11   where you could.  It would just kind of depend at the

12   situation.

13            So, I mean, it's kind of hard to answer that

14   question without any, you know, factual background or...

15   BY MR. GALIPO:

16       Q.   Okay.  That's fair.  I'll get more specific.  I

17   understand what you're getting to.

18            How about seeing a gun in someone's hand?  Were

19   you trained you can shoot someone for that fact alone,

20   merely seeing a gun in their hand?

21            MS. KORNBLAU:  Objection.  Vague.

22            THE WITNESS:  Again, kind of like my last -- it

23   kind of lacks the detail of, you know, why we're there

24   and what's going on.  So, I mean, it's hard to give a yes

25   or no just based off that question.

1    BY MR. GALIPO:

2        Q.    Okay.    I'm just wondering, were you trained

3    that if someone's running from you, you could

4    automatically shoot them?

5            MS. KORNBLAU:    Objection.    Vague.

6            THE WITNESS:    If you're just giving me the

7    scenario that someone is running, then, no.

8    BY MR. GALIPO:

9        Q.    How about were you trained you can shoot

10    someone automatically if you see a gun in their hand?

11            MS. KORNBLAU:    Objection.    Vague.

12            THE WITNESS:    Again, without certain facts,

13    it's hard to answer.    But if you're just giving me the

14    scenario of I see someone running with a gun with no

15    other basis, then, no.    We weren't trained we could just

16    shoot them.

17    BY MR. GALIPO:

18        Q.    So let's talk a little bit -- I think you

19    mentioned that the incident with Mr. Helman happened

20    before the incident with Mr. Gonzalez; is that correct?

21        A.    Yes.

22        Q.    And in the Solis case, it's my recollection

23    that you did not specifically see Mr. Solis at the time

24    the shots were fired; is that accurate?

25        A.    Correct.

1        MS. KORNBLAU:  Objection.  Attorney-client and

2   litigation privilege.

3        I'm going to instruct this witness not to

4   answer.

5        MR. GALIPO:  Are you going to follow your

6   attorney's instruction?

7        THE WITNESS:  Yes.

8        MR. GALIPO:  This gets a bit tedious, as you'll

9   see.

10  BY MR. GALIPO:

11       Q.   Did you shoot Mr. Helman as he was running away

12   from you?

13       MS. KORNBLAU:  Objection.  Attorney-client and

14  litigation privilege.

15       I'm going to instruct this witness not to

16  answer.

17  BY MR. GALIPO:

18       Q.   Did Mr. Helman ever point a gun at you?

19       MS. KORNBLAU:  Same objection.

20       MR. GALIPO:  Are you going to follow your

21   attorney's advice?

22       THE WITNESS:  Yes.

23  BY MR. GALIPO:

24       Q.   Were you aiming at Mr. Helman's back when you

25   fired?

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 22

Paul Dorwek

```
 1                MS. KORNBLAU:  Objection.  Attorney-client

 2   litigation privilege.

 3                Instruct not to answer.

 4                MR. GALIPO:  Are you going to follow your

 5   attorney's advice.

 6                THE WITNESS:  Yes.

 7   BY MR. GALIPO:

 8        Q.   How many shots did you fire at Mr. Helman?

 9                MS. KORNBLAU:  Objection.  Attorney-client and

10   litigation privilege.

11                Instruct not to answer.

12                MR. GALIPO:  Are you going to follow your

13   attorney's advice?

14                THE WITNESS:  Yes.

15   BY MR. GALIPO:

16        Q.   Did you give Mr. Helman any verbal warning you

17    were going to shoot him?

18                MS. KORNBLAU:  Objection.  Attorney-client and

19   litigation privilege.

20                Instruct not to answer.

21                MR. GALIPO:  Are you going to follow your

22   attorney's advice?

23                THE WITNESS:  Yes.

24   BY MR. GALIPO:

25        Q.   Did you ever see any objects in Mr. Helman's
```

1    hand or hands before you fired?

2              MS. KORNBLAU:  Objection.  Attorney-client and

3    litigation privilege.

4              Instruct not to answer.

5              MR. GALIPO:  I think I'm satisfied for today

6    for this purpose, and understanding we're going to be

7    taking his deposition.  I was told -- I think we had set

8    the date of August 21st, and I was told there might be an

9    issue with that date.  The 28th may be a problem for my

10   office.  So maybe before we're done today, since we have

11   the corporal here, we can confirm a date that works for

12   everybody.

13             MS. KORNBLAU:  Sure.

14             MR. GALIPO:  Okay.

15   BY MR. GALIPO:

16        Q.   So let's go to the Gonzalez case.  And you were

17    at least listening in on the deposition that took place

18    yesterday?

19        A.   Yes.

20        Q.   And that would have been the deposition of CHP

21    Officer Sean Irick?

22        A.   Yes.

23        Q.   With respect to Mr. Gonzalez, had you ever seen

24    Mr. Gonzalez before the day that you shot him?

25             MS. KORNBLAU:  Objection.  Misstates and

```
 1   hospital with gunshot wounds after the incident.
 2        Q.   Did you observe any areas of gunshot wounds on
 3   him?
 4        A.   I did see one, yes.
 5             (Reporter clarification.)
 6   BY MR. GALIPO:
 7        Q.   And where did you see the one gunshot wound?
 8        A.   It was on his left leg.
 9        Q.   And did you see the actual wound or bleeding
10   associated with the wound or both?
11        A.   I just saw blood coming down from his leg.
12        Q.   What type of firearm did you fire from when
13   shooting at Mr. Gonzalez?
14        A.   It was a Gen 5 Glock 17, 9 millimeter
15   semi-automatic handgun.
16        Q.   How many rounds did you fire?
17        A.   Ten.
18        Q.   How do you know it was ten rounds?
19        A.   Because after the incident, the Riverside
20   Sheriff's Department does what they call "charting," and
21   they count the number of rounds in the handgun.  So my
22   handgun is always loaded with 18 rounds, and there were
23   eight rounds left in it after the incident.
24        Q.   So just doing the math, that told you you fired
25   ten rounds?
```

Paul Gonzalez

```
 1        A.    Yes, sir.
 2        Q.    And the weapon you had was a semi-automatic
 3   weapon?
 4        A.    Correct.
 5        Q.    And did you have to press the trigger for each
 6   shot?
 7        A.    Yes.
 8        Q.    Were you intentionally pressing the trigger?
 9        A.    Yes.
10        Q.    And so in this case, you would have
11   intentionally pressed the trigger ten times; is that
12   correct?
13        A.    Correct.
14        Q.    Where were you aiming on Mr. Gonzalez's body
15   when you started firing?
16        A.    Center mass.
17        Q.    What was center mass, from your perspective?
18   His front, his back, or something else?
19        A.    It was the center of his body.
20        Q.    What was the center of his body, from your
21   perspective?
22        A.    The center of his body.  I mean, I don't know
23   how to describe center of a body.
24        Q.    Well, was he facing you, or did he have his
25   back to you when you fired?
```

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 27

```
 1   threat," meant at the time you were firing or before you

 2   were firing?  So can you clarify that, please?

 3       A.   Yes.  So as Mr. Gonzalez is running, at this

 4   point, since we skipped a bunch of stuff, he's running

 5   with a firearm in his hand.  Mr. Gonzalez turns to his

 6   left, exposing -- I could see the front of his body as

 7   he's turning towards me and my partners with a firearm,

 8   and that is when I begin to shoot at his center mass.

 9       Q.   Were you shooting at his back?

10       A.   I was shooting at his center mass at the time

11   that I saw the threat and reacted to it.

12       Q.   Was his back exposed to you when you were

13   firing?

14       A.   I mean, yeah, I guess you could say half of it.

15   He was sideways.

16       Q.   What half of his back was exposed to you when

17   you were firing?

18            MS. KORNBLAU:  Objection.  Vague.

19            THE WITNESS:  I don't really understand how to

20   describe half of his back.

21   BY MR. GALIPO:

22       Q.   I don't know if it was the right side of his

23   back or the left side of his back.  I'm not sure when

24   you say "half" what you're referring to.

25       A.   Well, he's turning to the left, so it would
```

```
 1    have been the left side of his back.
 2         Q.    Okay.  When you were firing your ten shots,
 3    could you see the gun?
 4         A.    Yes.
 5         Q.    Could you see the gun for all ten shots?
 6         A.    Yes.
 7         Q.    Could you see his face when you were firing the
 8    ten shots?
 9         A.    No.  I wasn't focused on his face.
10         Q.    Did you hear any shots before you fired your
11    first shot?
12         A.    No.
13         Q.    Did you fire any shots as he was going to the
14    ground?
15         A.    I don't recall if I was firing as he's falling
16    to the ground.
17         Q.    Did you fire any shots after he made contact
18    with the ground?
19         A.    I don't know.
20         Q.    Have you watched the body-worn camera footage?
21         A.    I have.
22         Q.    Which body-worn camera footage have you
23    watched?
24         A.    I watched mine, as well as Sergeant Reynoso's.
25         Q.    How many times have you watched yours?
```

```
 1          A.    Three times.

 2          Q.    When was the first time you watched it?

 3          A.    The first time would have been before my FID

 4      interview.

 5          Q.    When was the second time?

 6          A.    What?  Three days ago, maybe.  Two or three --

 7          Q.    And when was the --

 8                (Simultaneous speakers.)

 9      BY MR. GALIPO:

10          Q.    I'm sorry?

11          A.    I said probably two to three days ago.

12          Q.    And when was the third time you watched it?

13          A.    That would have been this morning.

14          Q.    Have you ever watched it slowed down?

15          A.    Yes.

16          Q.    On how many occasions?

17          A.    Just one.

18          Q.    Have you ever watched it frame by frame?

19          A.    No.

20          Q.    Do you have an estimate as to how many meetings

21      you have attended regarding this case?

22          A.    "Meetings," as in with my attorney or, like --

23          Q.    Any meetings.  Total meetings regarding this

24      case.

25          A.    Well, if we're counting the FID interview,
```

1    what, three.

2        Q.    How much time passed from you first seeing a

3    firearm in Mr. Gonzalez's hand and you firing your first

4    shot?

5        A.    I don't know.    Approximately, probably less

6    than five seconds.

7        Q.    When you say "less than five seconds," can you

8    do any better on your estimate?    In other words, do you

9    know if it was one to three seconds or any other range?

10            MS. KORNBLAU:    Objection.    Asked and answered.

11            MR. GALIPO:    You may answer.

12            THE WITNESS:    The best guess I gave you is

13    within five seconds.

14    BY MR. GALIPO:

15        Q.    Is that an estimate based on your recollection

16    in watching the video?

17        A.    Correct.

18        Q.    Did you say anything to Mr. Gonzalez in between

19    seeing the firearm and shooting?

20        A.    I know there was commands given to him.    I know

21    Officer Irick told him to "Drop it" right before the

22    shooting.    I want to say I said something to the effect

23    of "Get down" before the -- before the shooting.

24        Q.    Okay.    Just so we're clear, I'm talking about

25    this time frame in between you seeing the firearm and

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 32

1       Q.   Did you have -- strike that.

2            You initially, on the day of the shooting, saw

3    Mr. Gonzalez outside of a vehicle; is that correct?

4       A.   Correct.

5       Q.   And based on your training, did you think it

6    would have been appropriate to shoot him when he was

7    outside of that vehicle?

8            MS. KORNBLAU:  Objection.  Vague.

9            THE WITNESS:  Yeah, I mean, it depends.  What

10   factors are we talking about?  Is there anything else?

11   Are we just talking about this situation in general?

12   BY MR. GALIPO:

13       Q.   In this situation, based on what you observed

14   Mr. Gonzalez doing, did you think it was appropriate to

15   shoot him when you saw him initially outside the

16   vehicle?

17       A.   I mean, that wasn't the case here, so, no.

18       Q.   Did you ever see him outside the car, or not?

19       A.   Yes.

20       Q.   For how long did you see him outside the car?

21       A.   On the initial approach, I mean, it was

22   probably, I don't know, five seconds, maybe, if that.

23       Q.   Did he do anything at that time that, in your

24   mind, would have justified shooting him in that

25   approximate five seconds before he got in the car?

```
1          A.   No.

2          Q.   And then, how long was he in the car for before

3     it started moving?

4          A.   Approximately, eight or nine minutes.

5          Q.   Based on what you observed him doing inside the

6      car, did you think it was appropriate to shoot him?

7               MS. KORNBLAU:  Objection.  Vague.

8               THE WITNESS:  Based on the totality of the

9     circumstances at the time, yeah.  I think that he -- he

10    could have been shot, based on his actions, his

11    noncompliance, his reach around the car, his history of

12    guns.  He's a violent person.  He's supposed to have a

13    gun.

14               All the information with the way he's acting,

15    yes, I would say he -- it would have been justifiable to

16    shoot him at that point, yes.

17    BY MR. GALIPO:

18         Q.   Okay.  So from your perspective, you thought it

19     would have been appropriate to shoot him when he was in

20      the car based on what you observed?

21         A.   Yes.

22               MS. KORNBLAU:  Objection.  Misstates testimony.

23    Vague.

24               But go ahead.

25               THE WITNESS:  Yes, I did.
```

1    Q.    And you were the primary car in the vehicle

2    pursuit?

3    A.    I was.

4    Q.    And you were driving?

5    A.    Correct.

6    Q.    And then at some point, the car that you were

7    pursuing that Mr. Gonzales was driving crashed or became

8    disabled?

9    A.    Yes.

10    Q.    Was that near some railroad tracks?

11    A.    Correct.

12    Q.    Did you observe Mr. Gonzales get out of the

13    car?

14    A.    Yes.

15    Q.    Where were you when he got out of the car?

16    A.    I was in the driver's seat of my vehicle.

17    Q.    Did you think, based on what you observed, it

18    was appropriate to shoot him when he initially got out

19    of the car?

20        MS. KORNBLAU:  Objection.  Vague.  Incomplete

21    hypothetical.

22        THE WITNESS:  Again, you know, without any more

23    information -- can you rephrase the question or --

24    BY MR. GALIPO:

25    Q.    Sure.  You have training with respect to when

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 38

1    you can and cannot use deadly force; is that correct?

2        A.    Correct.

3        Q.    And you heard me go over some of it with the

4    officer yesterday?

5        A.    Correct.

6        Q.    And part of it is someone having the present

7    ability, opportunity, and apparent intent to immediately

8    cause death or serious bodily injury.  That's part of

9    your training; correct?

10       A.    Correct.

11       Q.    I'm just wondering, based on your training and

12   what you observed Mr. Gonzales do when he first got out

13   of the car, did you, in your mind, think it was

14   appropriate to shoot him at that point?

15       A.    As he's getting out of the car, no.

16       Q.    And could you see his hands at all as he was

17   getting out of the car?

18       A.    Yes.

19       Q.    After he got out of the car, did he start

20   running away from you?

21       A.    He did.

22       Q.    And we heard that there were some right turns

23   you had to make during the foot pursuit?

24       A.    Correct.

25       Q.    I think you described them in your statement as

1    THE WITNESS:  Well, I mean, there's a lot of

2    factors that go into that.  Obviously, the totality of

3    circumstances in this case.  I guess, what we haven't

4    really clarified here is his actions during the foot

5    pursuit.

6         Would you like me to elaborate on that more so

7    I can answer the question?

8    BY MR. GALIPO:

9    Q.   Well, before -- right now, I'm taking into

10   everything you observed up to that first right turn, and

11   we'll go through it after our break.

12        I understand you thought he had a gun.  I

13   understand that it appeared that he was holding his

14   waistband as he was running, swinging his left arm, and

15   the right arm more holding the waistband.  Is that your

16   recollection?

17   A.   Yes.  Yeah.  Yeah.

18   Q.   And I'm not saying that's everything.  But

19   everything that you observed -- and I'll give you a

20   chance to describe that after the break -- I'm just

21   wondering, did you think, based on what you observed in

22   that first hundred yards, it was appropriate to shoot

23   him, based on your training?

24        MS. KORNBLAU:  Objection.  Vague.

25        THE WITNESS:  If we're answering that off face

1    value in that first hundred yards, no.

2    BY MR. GALIPO:

3        Q.    And then after the right turn, you went some

4    distance before another right turn?

5        A.    Correct.

6        Q.    And how long was that distance between the two

7    rights turns, approximately?

8        A.    I couldn't say on that one.  I know it was

9    shorter than the first right turn.  But I couldn't

10   really give you a good estimation on how much shorter.

11       Q.    But somewhat less than a hundred yards?

12       A.    Yeah.  It would be -- it was less than the

13   first one for sure, yes.

14       Q.    And then during that second part, between the

15   two right turns, based on everything you observed and

16   based on your training, did you think it would have been

17   appropriate to shoot him at that time?

18           MS. KORNBLAU:  Objection.  Vague.

19           THE WITNESS:  No.

20   BY MR. GALIPO:

21       Q.    And then at some point, did you get to this --

22   this narrow pathway that I spoke to the officer about

23   yesterday?

24       A.    Are we talking about, like, between -- there's,

25   like, a truck ramp or something?

1      Q.    You were there and I wasn't, so maybe you can

2  help me out.  I know you had to make the first right

3  turn and then the second right turn, and then after the

4  second right turn, which way did the pursuit go until

5  you got to that narrow place?  And maybe it's what

6  you're referring to.

7      A.    I mean, I don't know what "the narrow place" is

8  that you're referring to.  If I think of a place that's

9  narrow, it would be that truck ramp.  But I want to make

10  sure we're talking about the same thing.

11      Q.    Okay.  We probably are.  I just got that narrow

12  pathway because that's the way the officer described it

13  yesterday.  So I was thinking maybe you're familiar with

14  what he was trying to describe.  But you're thinking the

15  truck ramp was the narrow portion?

16      A.    Correct.

17      Q.    Okay.  How long was this truck ramp,

18  approximately?

19      A.    I would estimate, about a hundred feet.

20      Q.    Before Mr. Gonzalez got to that narrow truck

21  ramp, I'll call it -- are you comfortable with that?

22      A.    Yes.

23      Q.    Before he got to the truck ramp, based on what

24  you observed and your training, did you think it was

25  appropriate to shoot him?

1      A.   Well, at this point, things had kind of

2   changed.   As we made that last turn coming up to that

3   truck ramp, there was workers out there.   There was two

4   workers near one of the trucks, in the kind -- kind of

5   by the narrow truck ramp that we're running towards, as

6   well as workers in a building straight ahead that he was

7   running to.

8            So, I mean, at this point, yeah, I think you

9   could articulate, you know, he's running with his actions

10  of holding his waistband, unnatural swing.   No one runs

11  with one arm in front of them.   He's obviously holding

12  something in his waistband, which I presumed to be a gun.

13  That, at that point, yes, I think you are justified to

14  shoot him.

15      Q.   Okay.   So in your mind, before he got to the

16  truck ramp, you thought, based on your training and your

17  observations, it was appropriate to shoot him.   Am I

18  understanding you correctly?

19      A.   Yes.   I think it would be justifiable to shoot

20  him at that point, yes.

21      Q.   Had you visibly seen a firearm up to that

22  point?

23      A.   Based on the totality of the circumstances,

24  again, you know, with all the information I mentioned

25  earlier, and his actions in the vehicle, even leading up

1   to the ending of the foot pursuit, yes.  I think he had,

2   you know, justifiable actions to shoot him at that

3   point, yes.

4        Q.   Okay.  I understand your testimony.  I guess

5   what I'm wondering, I know you believed he had a gun for

6   all the reasons you've stated.  I'm just wondering if

7   you had seen the firearm yet.

8        A.   As he's running towards that truck ramp, the

9   short and narrow truck ramp --

10        Q.   At any time before he got to the truck ramp,

11   did you actually see a firearm?

12        A.   I had not seen the firearm come out of his

13   waistband at that point, no.

14        Q.   Okay.  And then during the time he was running

15   across or through the truck ramp, based on your

16   training, did you think it was appropriate to shoot him?

17        A.   Yes.

18        Q.   And did you see a firearm at any time while he

19   was running through this truck ramp?

20        A.   I had not seen the firearm go in his pants yet,

21   no.

22        Q.   And then at some point, did you see him get

23   past this truck ramp?

24        A.   I did.

25        Q.   And were you in this truck ramp when you fired,

1    or was it after you got past the truck ramp?

2        A.    It was after I got past the truck ramp.

3        Q.    And do you have an estimate as to how far past

4    the truck ramp you got before you fired your first shot?

5        A.    I don't know how far past it it was.

6        Q.    Do you have any estimate at all?

7        A.    I can give you a within.

8        Q.    Okay.

9        A.    I would say within 30 yards.

10       Q.    And how about timing?  Do you have any timing

11   estimate as to how much time passed from exiting the

12   truck ramp to you firing your first shot?

13       A.    Approximately, no more than 10, 15 seconds,

14   maybe, at the most.

15       Q.    And what would you estimate -- excuse me --

16   what would you estimate the distance between you and

17   Mr. Gonzalez, when you fired the first shot?

18       A.    I would say approximately 25 yards.

19       Q.    Did you have any information before that day

20   that Mr. Gonzalez ever seriously injured or killed

21   anyone?

22       A.    Yes.

23       Q.    Who did you have information --

24       A.    Let me reframe that.  I wouldn't say -- I mean,

25   I don't know if you would classify it as "seriously."

1    That's kind of vague.  But I know he had domestic

2    violence charges, which indicates he was, you know,

3    violent.  I don't know to what extent that violence was,

4    but it was a felony.  So there was at least visible

5    injury on our victim.

6         Q.    Okay.  So what I'm asking is a little bit more

7    of a specific question.  Did you have any evidence that

8    he had seriously injured anyone where you actually saw

9    the injuries?  Saw photos?  Had specific information?

10             MS. KORNBLAU:  Objection.  Asked and answered.

11             THE WITNESS:  No.  Not directly, no.

12   BY MR. GALIPO:

13        Q.    And do you know what, specifically, the extent

14   of the injury was, if any, in that domestic case, or did

15   you know at the time?

16        A.    No.  Just -- like I said, just based off it

17   being a felony, obviously there was some kind of visible

18   injury.  But to what extent, I don't -- I don't know.  I

19   can't speak about what extent it was.

20        Q.    Right.  I mean, my understanding, and correct

21   me if I'm wrong, for there to be a felony domestic

22   violence, there could be any visible injury, even a

23   bruise?

24        A.    Correct.

25        Q.    And did you know at the time whether that he

1    had actually been convicted of that as opposed to

2    charged?

3         A.   No.  I don't think there was -- there wasn't a

4    conviction, no.

5         Q.   Okay.  Anything else that you had

6    informationally that he had ever injured anyone before

7    in his life?

8         A.   No.

9              MR. GALIPO:  Okay.  Is this a good time for

10   everyone to take a ten-minute break?

11             MS. KORNBLAU:  Yes.

12             MR. GALIPO:  Okay.  We'll let Dennis take us

13   off.

14             THE VIDEOGRAPHER:  We are off the record.  The

15   time is 11:06 a.m.

16             (Break taken.)

17             THE VIDEOGRAPHER:  We are back on the record.

18   The time is 11:20 a.m.

19   BY MR. GALIPO:

20        Q.   Okay.  So just going back for a moment, earlier

21   on, before the vehicle pursuit, when Mr. Gonzalez was in

22   the car for the eight or nine minutes, do you know the

23   time frame I'm referring to?

24        A.   Yes.

25        Q.   Did you see a gun at any time during that time

1    frame, in the car or on Mr. Gonzalez?

2        A.    Mr. Gonzalez had something in his hand on

3    initial approach once he got into the vehicle.    I

4    couldn't determine if it was a firearm a hundred percent

5    or not, that he was kind of stuffing into his jacket or

6    waistband area.

7        Q.    Okay.   So that would have been before he got in

8    the car?

9        A.    No, sir.   It would have been like right after

10    he got into the vehicle, like on the initial approach.

11        Q.    Okay.   Did it appear to you during the

12    approximate eight or nine minutes that Mr. Gonzalez was

13    in the vehicle, that he was trying to shoot anyone?

14        A.    No.

15        Q.    During the initial part of the foot pursuit,

16    before you got to that first right turn, did it appear

17    to you that Mr. Gonzalez was trying to shoot anyone?

18            MS. KORNBLAU:   Objection.   Vague.

19            THE WITNESS:   No.

20    BY MR. GALIPO:

21        Q.    In between the two right turns, did it appear

22    to you that Mr. Gonzalez was trying to shoot anyone?

23            MS. KORNBLAU:   Objection.   Vague.

24            THE WITNESS:   No.

25    BY MR. GALIPO:

1   can put up or screen share Exhibit 2, please.  Can we

2   make it a little larger, possibly?

3           Thank you.

4   BY MR. GALIPO:

5       Q.   Can you see this on your screen?

6       A.   Yes.

7       Q.   First of all, does it look to be like a still

8   taken from your body-worn camera?

9       A.   Yes.

10          MS. KORNBLAU:  Objection.  It hasn't been

11  authenticated, and we haven't played the entire video at

12  this point, so I'll object to the use of still photos.

13          MR. GALIPO:  You can object to it.  Your

14  objection is noted.  But I think he said "Yes."

15  BY MR. GALIPO:

16      Q.   Does that look to be the area, generally

17  speaking, where the shooting occurred?

18      A.   Yes.

19      Q.   And can you see, at least in this image -- and

20  I think the time at the top is 20:04 and 46 seconds.

21  Can you see Mr. Gonzalez?

22      A.   Yes.

23      Q.   And do you know where Officer Irick was in

24  relation to you, just prior to you firing your shots?

25          MR. GARCIA:  Objection.  Calls for speculation.

```
 1  BY MR. GALIPO:

 2       Q.   If you know.

 3       A.   Yes.

 4       Q.   And where was he in relation to you?

 5       A.   He was on my left side.

 6       Q.   In this image we're looking at, can you at

 7   least see a portion of Mr. Gonzalez's back?

 8            MS. KORNBLAU:   Objection.  Vague.

 9            THE WITNESS:   In this image, yes, I can.

10  BY MR. GALIPO:

11       Q.   Are you able to see his right hand or a firearm

12   in this image?

13       A.   No, it's too blurry to -- to tell.

14       Q.   Okay.  Does he appear to be looking over his

15   left shoulder in this image?

16       A.   No.

17       Q.   Can you -- does he appear to be turned to his

18   left towards you in this image?

19       A.   No.

20       Q.   Can you tell, simply by looking at this image,

21   whether the shots had started yet or not?

22       A.   No.

23       Q.   And from looking at this image, can you in any

24   way -- I think you said earlier about 25 yards from you,

25   at the time you fired.  Is that still an estimate that
```

1    you're comfortable with?

2        A.    Yes.

3        Q.    Okay.  Let's look at Exhibit 3, please.

4              (Exhibit Number 3 was marked.)

5              MR. GALIPO:  This is a -- is that three --

6    there's three, I think.

7              Can you make that a little bit larger, please?

8    BY MR. GALIPO:

9        Q.    And just prior to you firing your first shot,

10   was Mr. Gonzalez still running away from you?

11       A.    Prior to me firing my first shot, he was

12   turning with a gun in his hand up above his chest,

13   turning towards me.

14       Q.    Okay.  Was he running, or did he stop and was

15   stationary?

16       A.    I mean, he had slowed down to turn, so he

17   wasn't -- he wasn't stationary, no; but he had

18   definitely slowed down.

19       Q.    Okay.  Was he turned towards you at the time

20   you actually fired your first shot?

21       A.    Well, I mean, this is where it's important to

22   where we're skipping a lot of pertinent details.  If you

23   go back a second before this, when I start firing, you

24   clearly see Mr. Gonzalez turning with a gun in his hand

25   towards me and my partner.  I'm reacting to that threat.

```
 1    that he looked over his left shoulder at some point, but
 2    you never said he was turning to his left?  Isn't that
 3    fair?
 4              MS. KORNBLAU:  Objection.  Vague.
 5              THE WITNESS:  Yeah.  Sir, I mean, I don't have
 6    the transcript in front of me.  If that's what it says,
 7    then, I mean, yeah, that's what I said.
 8    BY MR. GALIPO:
 9         Q.   Can you tell from looking at Exhibit 3, whether
10    the shots have started yet or not?
11         A.   Yeah.  I would say here, yes, just based off
12    the -- looks like, you know, the gunpowder, I guess you
13    could say, coming out of my barrel, and the flash -- the
14    muzzle flash, it would appear to be that's on the
15    screen.
16         Q.   Okay.  All right.
17              MR. GALIPO:  Let's go to Exhibit 4, please.
18              (Exhibit Number 4 was marked.)
19              MR. GALIPO:  We can enlarge it slightly.
20    BY MR. GALIPO:
21         Q.   And can you tell from looking at this image
22    whether there's gunshots going on at this time?
23         A.   I cannot, no.
24         Q.   Does Mr. Gonzalez appear to be slightly bent or
25    hunched over in this, if you can tell?
```

1      Q.    Okay.    And is Mr. Gonzalez's back, based on

2    this image, generally to you at this time?

3      A.    Yes.

4      Q.    Would you at least agree he's not turned

5    towards you in this image?

6            MR. GARCIA:    Objection.    It calls for

7    speculation.

8            THE WITNESS:    Yeah.    In this image, he's

9    generally not turning towards us, no.

10   BY MR. GALIPO:

11     Q.    Okay.    And can you see a gun at least in this

12   image on Mr. Gonzalez?

13     A.    It's also too blurry to tell.

14           MR. GALIPO:    Okay.    Let's look at Exhibit 7,

15   please.

16           (Exhibit Number 7 was marked.)

17   BY MR. GALIPO:

18     Q.    Can you tell by looking at this image whether

19   any shots are being fired?

20     A.    No, I cannot.

21     Q.    Do you have any estimate as to how much time

22   passed from your first shot to your tenth shot?

23     A.    I would estimate three seconds, maybe, four.

24   Three or four seconds.

25     Q.    Okay.

```
 1              MR. GALIPO:  Can we go to Exhibit 8, please.

 2              (Exhibit Number 8 was marked.)

 3   BY MR. GALIPO:

 4         Q.    Can you tell in this image whether you're

 5   firing or not?

 6         A.    I cannot.

 7         Q.    Do you see -- I don't know if that appears to

 8   be some smoke towards the top or not.  Can you tell?

 9         A.    No.  I can't tell what it is.  It might be

10   smoke, and maybe it's just a blur or the glim of the

11   light.

12         Q.    Okay.  Would you agree that Mr. Gonzalez is not

13   turned towards you in this image?

14         A.    I mean, again, he's -- he's favoring kind of

15   left.  But, yeah, he's not completely turned towards us,

16   no.

17         Q.    And would you agree his back, at least, is

18   presented to you in this image?

19         A.    Yes.

20              MR. GALIPO:  Could we go to the next exhibit.

21   I think we're up to 9.

22              (Exhibit Number 9 was marked.)

23              MR. GALIPO:  And I'll note the time on this is

24   20:04:48.

25   BY MR. GALIPO:
```

1      Q.   Does it appear in this image that Mr. Gonzalez

2    is in the process of going to the ground?

3            MS. KORNBLAU:  Objection.  Vague.  Calls for

4    speculation.

5            MR. GARCIA:  Join.

6            THE WITNESS:  Yeah.  Either crouching down or

7    falling to the ground, either one of those two.  He's

8    definitely lowered his body position.

9    BY MR. GALIPO:

10     Q.   And can you tell from looking at this image

11   whether you're firing at this point?

12     A.   I cannot tell, no.

13     Q.   From the -- your first shot to your tenth shot,

14   were you generally firing in rapid succession?

15           MS. KORNBLAU:  Objection.  Vague.

16           THE WITNESS:  Yes.

17   BY MR. GALIPO:

18     Q.   Were you assessing in between shots?

19     A.   Yes.  I was -- each shot I was taking, I was

20   focused on that firearm.

21     Q.   So you would have been assessing for each one

22   of your ten shots, prior to firing?

23     A.   Correct.  As I'm making visual down my sites,

24   I'm focusing on center mass and that firearm, and the

25   imminent threat of Mr. Gonzalez possessing that firearm.

1        Q.   Would you agree, at least, in this image,

2   Exhibit 9, you do not see Mr. Gonzalez turn towards you?

3              MS. KORNBLAU:  Objection.  Leading.  Vague.

4              MR. GARCIA:  Join.

5              THE WITNESS:  Yeah.  I mean, I -- yeah, he's

6   kind favoring left, but he's not turned towards me, no.

7   BY MR. GALIPO:

8        Q.   Do you see a firearm in this image on Mr.

9   Gonzalez?

10       A.   I can't tell either.  It's too blurry.

11             MR. GALIPO:  Can we go to Exhibit 10, please.

12             (Exhibit Number 10 was marked.)

13   BY MR. GALIPO:

14       Q.   When Mr. Gonzalez went to the ground, did he

15   generally go forward to the ground, if you recall?

16       A.   Yes, and he ended up on his stomach.

17       Q.   Can you tell from looking at Exhibit 10 whether

18   you're firing at this time?

19       A.   I cannot.

20             MR. GALIPO:  Going to Exhibit 11.

21             (Exhibit Number 11 was marked.)

22   BY MR. GALIPO:

23       Q.   Can you tell from looking at this image whether

24   you're firing at this time?

25       A.   No, sir.

1        Q.   Does Mr. Gonzalez in this image appear to be

2    either near the ground or on the ground?

3             MS. KORNBLAU:  Objection.  Compound.  Vague.

4    Calls for speculation.

5             THE WITNESS:  Yeah.  It appears his -- like

6    he's kneeling almost.

7             MR. GALIPO:  Okay.  Let's look at -- I'm losing

8    track.  Was that --

9             THE CERTIFIED STENOGRAPHER:  That was 11.

10             MR. GALIPO:  Let's look at Exhibit 12.

11             (Exhibit Number 12 was marked.)

12    BY MR. GALIPO:

13        Q.   Is that generally how you recall Mr. Gonzalez's

14    body position when he went to the ground?

15             MS. KORNBLAU:  Objection.  Vague.

16             THE WITNESS:  No.  I mean, I don't really

17    recall, like, the in between of him, like, kneeling or --

18    I recall him once he was on the ground, that he was kind

19    of flat out on his belly.  But I don't recall him kind of

20    hunched over like that, no.

21    BY MR. GALIPO:

22        Q.   Okay.  Do you recall when you approached him

23    after the shooting, the firearm being close to his feet?

24        A.   Yes.

25        Q.   And did you kick it away at that point?

1    A.   Yes, sir.

2    Q.   Are you aware that he dropped the firearm at

3  some point during the shots?

4         MS. KORNBLAU:  Objection.  Vague.

5         THE WITNESS:  I wasn't aware he dropped it at

6  his feet until after the shots were done being fired.

7  BY MR. GALIPO:

8    Q.   And I think you indicated that just before the

9  shots, you heard your partner yell, "Drop it."

10    A.   Yes, sir.

11    Q.   Can you tell from looking at Exhibit 12,

12  whether you were firing any shots at this point?

13         MS. KORNBLAU:  Objection.  Asked and answered.

14         THE WITNESS:  I cannot.

15         MR. GALIPO:  Going to Exhibit 13.

16         (Exhibit Number 13 was marked.)

17  BY MR. GALIPO:

18    Q.   Can you tell from looking at this image whether

19  you're still firing shots at this point?

20    A.   I cannot.

21    Q.   Same question for Exhibit 14.

22         (Exhibit Number 14 was marked.)

23         THE WITNESS:  I cannot, no.

24         MR. GALIPO:  And two more exhibits, 15 -- and

25  I'll note the time is 20:04:49.

1           At some point, did it appear to you that Mr.

2  Gonzalez was getting tired at the end of the foot

3  pursuit?

4           MS. KORNBLAU:   Objection.   Calls for

5  speculation.

6  BY MR. GALIPO:

7      Q.   Based on your observations.

8      A.   Yeah.   I mean, either he was getting tired or I

9  was getting faster.   But at that point, we were catching

10  up to him for sure, so...

11      Q.   Okay.   I would be surprised if Mr. Gonzalez was

12  running one or two miles, five days a week, but I guess

13  we'll find out.

14           After you saw the firearm in Mr. Gonzalez's

15  hand, was Mr. Gonzalez still running forward?

16      A.   Yes.

17      Q.   Did you see any civilians in the background or

18  backdrop when you were firing your shots?

19      A.   At the time I started firing, no.   But there

20  was that window, like, leading into the building that

21  was straight ahead, that when we came around that

22  corner, that one straightaway, I could see people

23  working in there.   But the time that I started firing

24  shots, I didn't see anyone through that window, no.

25      Q.   Okay.   So the people that you saw would have

1    been before you fired the shots.  Is that fair?

2        A.    Correct.

3        Q.    And am I understanding you correctly, the

4    people that you saw appeared to be in the building and

5    you saw them through the window?

6        A.    Yeah.  Well, there was two -- there was a

7    couple workers outside in that truck bay, and then the

8    people inside the building.

9        Q.    The people outside, you had already passed them

10   at the time of the shooting?

11       A.    Yes.

12       Q.    You didn't see Mr. Gonzalez try to attack them,

13   did you?

14       A.    No.

15       Q.    When you saw the firearm in Mr. Gonzalez's

16   hand, were those people still visible at that time

17   through the window?

18       A.    No.

19       Q.    Now, when you kicked the firearm, did the

20   magazine separate, if you recall?

21       A.    Yes, it did.

22       Q.    Can you explain what you observed in that

23   regard?

24       A.    So when I went up to kick it, I don't know if

25   I, like, kind of fumbled it and missed, but I kind of,

```
 1    like, almost stepped on top of it and, like, swiped it,
 2    if that makes sense.  And when I did that, I noticed the
 3    magazine come out of the firearm, as it was like,
 4    sliding on the ground.
 5        Q.   And I think you've already told me this, but
 6    with Mr. Gonzalez prone or chest down after the
 7    shooting, his head would have been further from you than
 8    his feet, the manner he fell.  Is that correct?
 9        A.   Correct.
10        Q.   And the gun that you saw was some distance
11    close by, but some distance from his feet?
12        A.   Yeah.  It was off on the right side, like on
13    his -- off his right foot, probably, you know, within --
14    I don't know -- a foot or two.
15        Q.   Okay.  Now, did anyone handcuff Mr. Gonzalez
16    after the shooting?
17        A.   Yes.
18        Q.   And do you know who handcuffed him?  Was it
19    Officer Reynoso?
20        A.   I think it was a couple people.  I think it was
21    Officer Reynoso and possibly Officer Godward.  I'm not
22    too sure on Godward, but I know Sergeant Reynoso was
23    involved in the handcuffing, and there was another
24    person assisting him.
25        Q.   How -- did you hear Mr. Gonzalez say anything
```

1   after the shooting?

2       A.   Yes.   I recall him saying, "Kill me."   He was

3   saying, "Kill me."   And I know he was screaming, like,

4   "Ow," or something like that.   "Ow," or something to

5   that effect.

6       Q.   Did he appear to be in pain to you from the

7   gunshots?   Was that your impression?

8           MS. KORNBLAU:   Objection.   Calls for

9   speculation.

10          THE WITNESS:   Yeah, based off of the "Ow," I

11  would say so.

12  BY MR. GALIPO:

13      Q.   Did you have any physical injuries from this

14  incident?

15      A.   Besides some sore legs, no.

16      Q.   Have you gone back to that area to do any

17  walkthrough since the shooting?

18      A.   No, sir.   I have not.

19      Q.   Did you -- were you aware that there were other

20  officers in the pursuit, other than just you and

21  Officer Irick?

22      A.   Yes.

23      Q.   And how were you aware of that?

24      A.   Well, behind me was our partners, our task

25  force partners.   It was Sergeant Reynoso and

1    Deputy Irick.  They were in a car together.  I saw them
2    behind us during the pursuit.
3            And then I also saw our K9 unit behind them.
4    And I think it was even aired on the radio that they
5    were involved in the pursuit, as well.
6        Q.    You indicated in your statement -- and I think
7    you told me this today -- at some point, you recall or
8    believe you said, "Drop it."  Do you recall that?
9        A.    Yes.
10       Q.    Are you just saying you're not sure when you
11   said that, whether it was before or after you saw the
12   firearm?
13       A.    Correct.
14       Q.    But you do believe you heard Irick say, "Drop
15   it" shortly before the shooting?
16       A.    Yes.
17       Q.    Sorry for the pause.  I'm just looking at your
18   statement and most of this we already covered.
19       A.    Oh, no problem.
20       Q.    Do you recall in your statement saying, "I was
21   just aiming towards his, like, back area"?
22       A.    Yes.
23            MS. KORNBLAU:  Objection.  Vague.
24   BY MR. GALIPO:
25       Q.    Did you see him drop the firearm at some point?

1    Q.   Did you notice in watching it again that there

2    was at least some shots fired after he went to the

3    ground?

4         MS. KORNBLAU:   Objection.  Asked and answered.

5         MR. GARCIA:   Joined.

6    BY MR. GALIPO:

7    Q.   You may answer.

8    A.   Yeah.   It looks like within that split second

9    of him hitting the ground, I do hear some gunshots.   You

10   know, but again, like I explained earlier, the, you

11   know, time to process something and react to it; right?

12        So, you know, that's within, what, a split

13   second, if a second, if even that.   So, I mean -- but,

14   yeah, looking at the video, there is some gunshots going

15   off as he's hitting ground, yes.

16   Q.   And could you tell if any of those were your

17   shots from looking at the video?

18   A.   I couldn't tell.

19   Q.   All right.   Let's just look at it one last

20   time, just last five or ten seconds, and just look to

21   see if it -- you could tell if any of those were your

22   shots.

23        MR. GALIPO:   And we're going to -- we have it

24   at 20:04:29.   That's fine.

25        (Video being played.)

1          MR. GALIPO:  Okay.  You can stop it.

2   BY MR. GALIPO:

3       Q.   Were you able to tell from looking at the video

4   of your gun and the recoil and the smoke or muzzle

5   flash, whether you fired a couple of those shots after

6   he went to the ground?

7            MS. KORNBLAU:  Objection.  Asked and answered.

8            THE WITNESS:  Yeah.  It appeared there might

9   have been a shot or two as he's hitting the ground.

10  BY MR. GALIPO:

11      Q.   Okay.  And it appeared, at least by looking at

12  your gun, that those shots -- at least some of those

13  shots came from you?

14           MS. KORNBLAU:  Objection.  Asked and answered.

15           THE WITNESS:  Yes.

16  By MR. GALIPO:

17      Q.   Okay.  Thank you.

18           MR. GALIPO:  You can take that down, Alejandro.

19   Thank you.

20  BY MR. GALIPO:

21      Q.   So lastly -- I think we've covered this pretty

22  much -- your training with respect to the use of the

23  deadly force, were you trained it was the highest level

24  of force an officer can use?

25      A.   Yes.

Panel Soucek

1  Q.   And were you trained that shooting someone

2  center mass is likely to cause death or serious bodily

3  injury?

4  A.   Yes.

5  Q.   And we talked a little bit about the training

6  where there has to be the present ability, opportunity,

7  and apparent intent to immediately cause death or

8  serious bodily injury.  Is that your understanding?

9  A.   Correct.

10  Q.   Are you trained that you should consider your

11  background or backdrop when firing?

12  A.   Yes.

13  Q.   And are you trained that you're responsible to

14  justify each of your shots?

15  A.   Yes.

16  Q.   Are you trained that you should assess before

17  shooting and during the shooting sequence, if you can?

18  A.   Yes.

19  Q.   Are you trained to give a verbal warning before

20  using deadly force when feasible?

21  A.   Yes.

22  Q.   How long did you stay at the scene of the

23  shooting before you left?

24  A.   It was quite a while.  I know we were here,

25  like, in the general area for a little bit, and then we

```
 1        A.    Yes.
 2        Q.    And do you know how long it takes for you to
 3   pull the trigger and for the bullet to come out of the
 4   gun and for that muzzle flash and smoke to appear?
 5        A.    No, I don't.
 6        Q.    But it would be sometime after you pull the --
 7   make the decision to pull the trigger, and then your
 8   brain sends a signal to your hand to pull the trigger,
 9   and then for the bullet to come out of the gun, and then
10   for the muzzle flash to appear, and then for the smoke
11   to appear.  Would you agree with that?
12        A.    Yeah.  The round would have already left the
13   barrel at that point.
14              (Reporter clarification.)
15   BY MS. KORNBLAU:
16        Q.    I'm going to share my screen and show you a
17   still shot, since we've been showing still shots all
18   day.
19              MR. GALIPO:  Not all day, just for ten minutes.
20   BY MS. KORNBLAU:
21        Q.    So Corporal Sobaszek, can you see the still
22   shot that's on my screen?
23        A.    Yes.
24        Q.    Can you describe what that is?
25        A.    That -- so that would be me.  In front of me
```

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 82

1  STATE OF CALIFORNIA)
                     ) ss:
2  COUNTY OF BUTTE    )

3

        I, KIMBERLY E. D'URSO, do hereby certify:
4

5       That the witness named in the foregoing

6  deposition was present remotely and duly sworn to testify

7  to the truth in the within-entitled action on the day and

8  date and at the time and place therein specified;

9       That the testimony of said witness was reported

10 by me in shorthand and was thereafter transcribed through

11 computer-aided transcription;

12      That the foregoing constitutes a full, true and

13 correct transcript of said deposition and of the

14 proceedings which took place;

15      Further, that if the foregoing pertains to the

16 original transcript of a deposition in a federal case,

17 before completion of the proceedings, review of the

18 transcript [ ] was [ ] was not requested.

19      That I am a certified stenographic reporter and

20 a disinterested person to the said action;

21      IN WITNESS WHEREOF, I have hereunder subscribed

22 my hand this 2nd day of August, 2025.

23 _____

24 KIMBERLY D'URSO, CSR NO. 11372, RPR

25