# "EXHIBIT C"

1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                            --oOo--

4

5    GEORGE GONZALEZ,

6            Plaintiff,

7    v.                        Case No.  5:25-cv-00331-KK-DTB

8    STATE OF CALIFORNIA; CITY OF
     HEMET; PATRICK SOBASZEK;
9    ANDREW REYNOSO; SEAN IRICK;
     and DOES 1-10, inclusive,
10
             Defendants.
11   _____/

12

13

14

15

16           STENOGRAPHIC REPORTER'S TRANSCRIPT OF

17           REMOTE VIDEO DEPOSITION OF SEAN IRICK

18                  TUESDAY, JULY 22, 2025

19

20

21

22   Reported Stenographically by:

23   KIMBERLY D'URSO, CSR 11372, RPR

24   Job No.  18401

25

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions                                    Page: 1

```
 1              The witness:  Off to his right side.

 2    BY MR. GALIPO:

 3         Q.   Was it in a raised position or more down at a

 4     side position?

 5              MS. REYES:  It's vague.

 6              THE WITNESS:  I would say --

 7              MS. REYES:  Go ahead.

 8              THE WITNESS:  I would say halfway in between,

 9    slightly raised.

10    BY MR. GALIPO:

11         Q.   When you say "slightly raised," what do you

12     mean by that?

13         A.   The gun wasn't touching his thigh, but it

14     wasn't at his shoulder level.

15         Q.   Where was the gun -- I know it was in his right

16     hand, but where was it in relation to his body when you

17     were firing the shots?  Was it above his hip level or

18     below, if you know?

19              MS. REYES:  It's vague.  Calls for speculation.

20              THE WITNESS:  I don't recall the exact

21    location.

22    BY MR. GALIPO:

23         Q.   What would you estimate the distance to be from

24     you and the person you were shooting when you were

25     firing your shots?
```

1      A.    40 to 50 feet.

2      Q.    What portion of his body were you aiming at

3  when you fired your shots?

4      A.    His center mass --

5            (Simultaneous speakers.)

6  BY MR. GALIPO:

7      Q.    What was --

8      A.    -- between the shoulder.

9      Q.    I'm sorry.  Go ahead.  I cut you off because I

10  thought you were done.  But go ahead.

11      A.    Between his shoulders and his hip location.

12      Q.    And from your perspective, was that his front,

13  his side, or his back?

14      A.    From my recollection, it would have been his

15  side -- side and back.

16      Q.    What side would it have been?  The right side

17  or the left side?

18      A.    Right side.

19      Q.    Right side?  So right side and back?

20      A.    Yes.

21      Q.    Did you fire any shots as the person was going

22  to the ground?

23      A.    I stopped firing when I saw him begin to go

24  down.

25      Q.    Do you know if you fired any shots as he was

```
 1   going to the ground?

 2       A.   I can't say with 100 percent certainty, no.

 3       Q.   Did you fire any shots after he went to the

 4   ground?

 5       A.   No.

 6       Q.   Did you think, based on your training, it was

 7   appropriate to fire any shots after he went to the

 8   ground?

 9       A.   No.

10       Q.   Did you hear any shots being fired after your

11   last shot?

12       A.   I don't know.

13       Q.   Did you hear any shots being fired after he

14   went to the ground?

15       A.   I don't know.  My -- my ears had tuned things

16   out.  Everything was muffled.

17       Q.   Did you, yourself, ever give a verbal warning

18   that you were going to shoot?

19       A.   I don't think so.

20       Q.   Before we go into the incident more -- and I'm

21   going to start from the beginning in a little bit -- I

22   want to just learn a little bit more about your

23   background, starting with eduction.

24            I'm assuming you graduated from high school?

25       A.   Yes, sir.
```

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions                                    Page: 12

1    A.    It wouldn't be an estimate.  It would be more

2    of a guess.

3    Q.    Oh.  Well, let me ask you this:  Do you think

4    it's been more than 20 or 30 times that that's happened?

5    A.    No.

6    Q.    Somewhere less than 20?

7    A.    Yes.

8    Q.    Were you trained as a law enforcement officer

9    that you can shoot someone merely for seeing a gun in

10   their hand?  That fact alone?

11   A.    That fact alone, no.

12   Q.    The other three or four people that you saw

13   with guns in their hand, did you shoot any of those

14   people?

15   A.    No.

16   Q.    Had you ever been present for an

17   officer-involved shooting before the date of the

18   incident we're here to talk about?

19   A.    Yes.

20   Q.    And how many other incidents had you been

21   present when there had been an officer-involved

22   shooting?

23   A.    Two.

24   Q.    And the first one, do you know approximately

25   what year that happened?

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions                                    Page: 18

1    A.    Same assignment.

2    Q.    Is that pretty much a full-time assignment?

3    A.    Yes.

4    Q.    So let's talk a little bit about the incident,

5    and I have reviewed your statement, so I have a general

6    idea of some of the basics.

7         It sounds like there was a vehicle stop at some

8    point that led to some information regarding the

9    individual who got shot.  Is that generally correct?

10    A.    Yes.

11    Q.    And you had a partner at that time?

12    A.    Yes.

13    Q.    And do you recall who was driving your vehicle

14    that day?

15    A.    Yes.

16    Q.    And who was?

17    A.    Detective Patrick Sobaszek.

18    Q.    Did you have an understanding as to why the

19    vehicle was being pulled over?

20    A.    Yes.

21    Q.    What was your understanding?

22    A.    I believe it rolled a right turn on a red.

23    Q.    Were you --

24    A.    It didn't come to a stop --

25         (Simultaneous speakers.)

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 22

1    Q.   Did you have any specific information that

2   Mr. Gonzalez had ever, specifically, physically injured

3   anyone?

4    A.   No.

5    Q.   Did you have any specific information that

6   Mr. Gonzalez had ever verbally threatened to harm

7   anyone?

8    A.   No.

9    Q.   Did you have any specific information that

10   Mr. Gonzalez was under the influence of drugs or

11   alcohol?

12    A.   Aside from my initial observations of him and

13   his actions, I did not have any prior information, no.

14    Q.   At some point, did Mr. Gonzalez get inside that

15   vehicle?

16    A.   Yes.

17    Q.   For approximately how long did you observe him

18   outside the vehicle before he got inside?

19    A.   Seconds.

20    Q.   And when you say "seconds," I know -- I don't

21   know if it was just two or three or 30 or 40.  Can you

22   give me any range?

23    A.   Based on my recollection, less than 30 seconds.

24    Q.   And during the time period that he was outside

25   the vehicle, before he got in, did you see any weapons

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 27

1    on him?

2          A.    No.

3          Q.    Did it look like he was trying to shoot anyone

4    at that time?

5          A.    No.

6          Q.    Did you see him physically harming anyone at

7    that time?

8          A.    No.

9          Q.    When he got in the vehicle, was there anyone

10   else in the car at that time?

11         A.    I did not see anybody else, no.

12         Q.    At some point, did the vehicle leave that area?

13         A.    Yes.

14         Q.    Did it leave by backing up or going in some

15   other direction?

16         A.    It was backed in to its spot at the house, so

17   it drove forward, which would have been a northerly

18   direction, and cut through the front yard.

19         Q.    Did it hit any other vehicles as it was

20   leaving?

21         A.    No.

22         Q.    How long was Mr. Gonzalez in the car after

23   getting in, before it left that area?

24         A.    Approximately, ten minutes.

25         Q.    During that ten minutes, did you see any --

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 28

1    led you to believe he likely had a weapon; is that a

2    fair statement?

3         A.    Yes.

4         Q.    Did you think, based on your training, it would

5    have been appropriate to shoot him when he was in the

6    car, making these movements you described?

7         A.    Not at that time, no.

8         Q.    There was a vehicle pursuit at some point?

9         A.    Yes.

10        Q.    And eventually, was his vehicle disabled?

11        A.    Yes.

12        Q.    Can you give me just an estimate as to how long

13   the vehicle pursuit lasted, approximately?

14        A.    Approximately, 20 minutes.

15        Q.    And any estimate as to the distance from where

16   it started to where it ended, approximately?

17        A.    Fifteen miles, 16 miles.

18        Q.    To your knowledge, were there any actual auto

19   collisions during the pursuit?

20        A.    Involving other vehicles?

21        Q.    Yes.  In other words, other than his vehicle

22   coming to a crash at the end, any information you had

23   that his vehicle collided with another vehicle, or other

24   vehicles collided, or anything like that?

25        A.    No.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 30

1    Q.    At some point after the vehicle became

2    disabled, did you see Mr. Gonzalez get out and start

3    running?

4    A.    Yes.

5    Q.    Were you back in your patrol car as a passenger

6    during the vehicle pursuit?

7    A.    Yes.

8    Q.    And do you recall where you were in the

9    pursuit?  In other words, were you the closest vehicle

10   following, the second back, or did that change?

11   A.    We were what we would call "primary," the

12   number one closest unit, through the entirety of the

13   pursuit.

14   Q.    During the pursuit, did you actually see any

15   firearms while the pursuit was going on in

16   Mr. Gonzalez's vehicle?

17   A.    No.

18   Q.    Did you have the impression he was trying to

19   shoot at you at any time during the pursuit?

20   A.    No.

21   Q.    Based on your training, did you think it would

22   have been appropriate to shoot at him during the

23   pursuit?

24   A.    No.

25   Q.    When he got out of the car at the end of the

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 31

```
 1    pursuit, did he get out on the driver's side?

 2          A.    I don't remember if --

 3                (Simultaneous speakers.)

 4    BY MR. GALIPO:

 5          Q.    If you recall.

 6          A.    I don't remember.

 7          Q.    You're not sure what side he got out of?

 8          A.    I don't recall that detail, no.

 9          Q.    Okay.  That's fine.

10                When he got out of the vehicle, whatever side

11    it was, do you recall if you were in your car still or

12    out?

13          A.    I was still in the car when he got out and was

14    running.

15          Q.    And do you have an estimate as to how far you

16    were from him when he first got out of the vehicle?

17          A.    I don't.

18          Q.    Okay.  Do you know, for example, if it was

19    within 50 feet or not?

20          A.    I don't.  And if I was to give you a number, it

21    would be a guess.

22          Q.    Okay.  That's fine.  I don't want you to guess.

23    Sometimes you might be able to give a range, but if you

24    don't feel comfortable with that, that is fine.

25                Prior to Mr. Gonzalez getting out of the
```

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 32

1  vehicle, did you have any information from any source

2  that he had seriously injured or killed anyone?

3       A.    No.

4       Q.    Prior to him getting out of the vehicle, did

5  you have any information from any source that he had

6  physically injured anyone?

7       A.    No.

8       Q.    And finally, prior to him getting out of the

9  vehicle, did you have any specific information that he

10  had verbally threatened to harm anyone?

11       A.    No.

12       Q.    When he got out of the vehicle, was he running

13  initially in a manner that led you to believe that he

14  had a firearm on his person?

15       A.    Yes.

16       Q.    Was he essentially holding, like, his right

17  waistband area, to some extent, with his right hand?

18       A.    He was holding his waistband area.  I don't

19  recall which hand.  But he was hunched over, holding

20  something.

21       Q.    As if to possibly keep it from falling out?

22       A.    Yeah.  I don't know at that point what his

23  motivation for that was.

24       Q.    Okay.  But you've seen similar conduct before,

25  with people running and holding their waistbands?

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 33

1    A.    Yes.

2    Q.    When he first got out of the vehicle, did he

3    turn and try to shoot at either you or your partner?

4    A.    No.

5    Q.    When he first got out of the vehicle, did you

6    see a gun in either one of his hands?

7    A.    I did not.

8    Q.    When he started running, was he running towards

9    you or away from you?

10    A.    Away.

11    Q.    Was it your initial impression that he was

12    trying to get away from you?

13    A.    Yes.

14    Q.    And you and your partner gave pursuit, in

15    essence, a foot pursuit?

16    A.    Yes.

17    Q.    When you started the foot pursuit, do you have

18    an estimate as to how far behind him you were?

19    MS. REYES:  Vague.  Calls for speculation.

20    BY MR. GALIPO:

21    Q.    Yeah.  In distance, basically.

22    A.    I'd approximate a hundred feet.

23    Q.    And was you and your partner generally close to

24    each other during that time?

25    A.    Yes.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 34

1    Q.    Did you have your gun out when you started the

2    foot pursuit?

3    A.    Yes.

4    Q.    And if you know, did your partner, Detective

5    Sobaszek -- I hope I'm pronouncing it right.  He'll tell

6    me, I'm sure, soon.  Did he have his gun out?

7    A.    I don't know.

8    Q.    And you had your gun out, in part, because you

9    believed he might possibly have a gun?

10    A.    I believed he had a firearm, yes.

11    Q.    Did you have a -- were you assigned a body-worn

12    camera at the time?

13    A.    No.

14    Q.    Does CHP give any of their officers body-worn

15    cameras, if you know?

16    A.    My understanding is there are two areas in the

17    north that are pilot areas, where they're issued prior

18    to them being issued to the rest of the state.

19    Q.    So they're trying it in a few other areas?

20    That's your general understanding?

21    A.    Yes.

22    Q.    But up to present, based on your knowledge, do

23    CHP officers, in general, have body-worn cameras?

24    A.    In general, the highway patrol does not issue a

25    body camera.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 35

1      Q.    And do you have any understanding as to why

2   not.

3      A.    It's above my head.

4      Q.    Okay.  Did you have any type of audio recording

5   device on your person at the time?

6      A.    No.

7      Q.    The -- was the vehicle you were in, did it have

8   a video recording, like an MVARS, or something else?

9      A.    No.

10     Q.    So I take it during this foot pursuit, there

11  were some slight changes in direction or in areas you

12  were at?

13     A.    Yes.

14     Q.    And it sounds like there was a part of the foot

15  pursuit that went on, and then at some point, you were

16  in this narrow area.  Does that sound correct?

17     A.    Yes.

18     Q.    Can you just explain to me, basically, the

19  direction or the area of the foot pursuit before you got

20  to that narrow area?

21     A.    Perricone Juices is kind of like an industrial

22  juicing facility, so it has truck ramps, pallets,

23  fencing.  And so that's kind of the landscape of what we

24  were traveling through.  There were several right turns

25  that were blind during the foot chase, as we got further

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 36

 1   into the actual business area of the commercial

 2   facility.

 3       Q.    Okay.  So do you have an estimate as to how

 4   long the foot pursuit went on before that first right

 5   turn, either in distance or timing?

 6       A.    10 to 15 seconds.

 7       Q.    And the distance between yourself and

 8   Mr. Gonzalez during that time frame, would it be about

 9   that hundred feet, or did that change?

10       A.    It changed.  We were, I guess, making ground on

11   him.  We were closing the distance.

12       Q.    Okay.  Do you think you got within 50 or 60

13   feet at that time, or what would be your estimate?

14       A.    I'd say, estimate, 50 feet, is the closest we

15   got to him.

16       Q.    So during that approximate 10 to 15 seconds

17   before the first right turn, did you ever see

18   Mr. Gonzalez turn and point a gun at you or your

19   partner?

20       A.    No.

21       Q.    Did you ever see a gun in his hand during that

22   first 10 to 15 seconds before the right turn?

23       A.    No.

24       Q.    And then after that right turn, do you have an

25   estimate as to how far you traveled or the timing before

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 37

1    the next right turn?

2         A.    I do not.

3         Q.    Do you know if it was more or less than a

4    hundred feet until that next right turn?

5         A.    It was less than that.

6         Q.    Less than a hundred feet?

7         A.    Yeah.

8         Q.    So between the first right turn and the second

9    right turn, did Mr. Gonzalez ever turn and point a gun

10   at you?

11        A.    No.

12        Q.    Did you see any gun in his hand during the

13   first right turn and the second right turn?

14        A.    No.

15        Q.    Prior to the first right turn, based on your

16   training, did you think it would have been appropriate

17   to shoot him?

18        A.    No.

19        Q.    Prior to the second right turn, based on your

20   training, did you think it would have been appropriate

21   to shoot him?

22        A.    No.

23        Q.    After the second right turn, was there some

24   distance before you got to this narrow place?

25        A.    There was -- yeah, there was a distance, but I

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 38

1    -- I don't know how far.

2        Q.    Okay.  So after the second right turn but

3    before you got to this narrow place, did Mr. Gonzalez

4    turn and point a gun at you, prior to getting to the

5    narrow place?

6        A.    No.

7        Q.    Did you see a gun in either one of his hands

8    prior to getting to the narrow place?

9        A.    No.

10       Q.    Based on your training, did you think it would

11   have been appropriate to shoot him prior to getting to

12   the narrow place?

13       A.    No.

14       Q.    This narrow place -- I'm calling it a "narrow

15   place."  Can you describe it for me, please?

16       A.    So it's a concrete pathway, basically, with a

17   chain-link fence that would have been on our left, and a

18   commercial truck dock, elevated cement ramp with a truck

19   parked on it on the right.  And there's this -- what I

20   would call a "narrow pathway" that goes by on both --

21   with the fence on one side and the truck dock on the

22   other.

23       Q.    Do you have any estimate as to how long this

24   narrow pathway was?

25       A.    60 feet.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 39

1      Q.    Have you ever gone back to the area, just to do
2  a walk-through?
3      A.    No.
4      Q.    These estimates, in part, are based on your
5  recollection of the incident and also looking at the
6  video footage?
7      A.    I would say they're based mainly on my
8  independent recollection of that night.
9      Q.    Okay.  And this narrow place or pathway that
10  you described, were you -- you, yourself, in this narrow
11  pathway when you fired your shots, or was it after you
12  had passed that pathway that you started firing?
13      A.    To the best of my recollection, we had just
14  cleared it.  We had just passed it.
15      Q.    At some point, did you see Mr. Gonzalez running
16  this narrow pathway?
17      A.    Yes.
18      Q.    And during that time frame, was the distance
19  still about 50 feet or so?
20      A.    Yeah, approximately.
21      Q.    During the time he was in that narrow pathway
22  running away from you, did you see him turn towards you
23  with a gun at any point?
24      A.    Not at that point.
25      Q.    Did you think, based on your training, it would

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 40

1    have been appropriate to shoot him as he was running

2    through the narrow pathway?

3         A.   No.

4              MS. KORNBLAU:  Objection.  Calls for a legal

5    conclusion.

6    BY MR. GALIPO:

7         Q.   Your answer was "No"; is that correct?

8         A.   Yes.

9              MR. GALIPO:  Okay.  We've been going about an

10   hour.  Is it good for everyone to have, like, a

11   ten-minute break?

12             THE CERTIFIED STENOGRAPHER:  Yes, please.

13             MR. GALIPO:  Okay.  So why don't we have the

14   videographer take us off the record, please.

15             THE VIDEOGRAPHER:  Sure.

16             We're off the record at 2:02 p.m.

17             MR. GALIPO:  Okay.  Thank you, Dennis.

18             (Break taken.)

19             THE VIDEOGRAPHER:  We're back on the record.

20   The time is 2:16 p.m.

21   BY MR. GALIPO:

22        Q.   Prior to getting to that narrow area we

23   discussed, did you give any commands to Mr. Gonzalez?

24        A.   Yes.

25        Q.   What commands do you recall giving?

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 41

1          A.    Yes.

2          Q.    Was there a time when both Mr. Gonzalez and

3    yourself were in this narrow area?

4          A.    To my recollection, yes.

5          Q.    So he would have been getting towards the end

6    of it just as you were getting in the beginning portion

7    of it?

8          A.    That's how -- that's how I recall it, yes.

9          Q.    And -- and do you recall relative to you and

10   your partner, as you were running, who was more on the

11   right and who was more on the left?

12         A.    I was on the left, and Corporal Sobaszek was on

13   the right.

14         Q.    And were you kind of even, or was one of you

15   slightly ahead of the other?

16         A.    I believe Sobaszek was immediately in front of

17   me to my right --

18         Q.    And when you say --

19               (Simultaneous speakers.)

20               THE WITNESS:   -- in close proximity to each

21   other.

22   BY MR. GALIPO:

23         Q.    So, right.  That was my follow-up.

24               When you say "immediately" in front of you to

25   your right, are you talking maybe, like, 2 or 3 feet in

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 43

1    A.    5 or 6 feet.

2    Q.    Could you see in the earlier parts of the

3    pursuit that we talked about, going to the first right

4    turn, and the second right turn, and then through the

5    narrow pathway -- could you see both of Mr. Gonzalez's

6    hands, or were there times where you could only see one

7    of his hands or neither of his hands?

8    A.    I -- I don't recall that, specifically, at

9    that -- at that moment in time.

10   Q.    When you first saw the gun, would it have been

11   in Mr. Gonzalez's right hand?

12   A.    Yes.

13   Q.    And where was his right hand with the gun in

14   it, relative to his body when you first saw it?

15   A.    He was picking it up to his right and turning

16   to his right, so blading off to the right, as he was

17   looking back over his left shoulder, pointing the gun

18   toward -- back -- spinning back towards us.

19   Q.    Okay.  So let me just break this down a little

20   bit.

21   When you first saw the gun, you would have been

22   about 5 or 6 feet past the narrow pathway?

23   A.    Approximately, yes.

24   Q.    And then how far would you say Mr. Gonzalez was

25   from you when you first saw the gun?

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 45

1        A.    Maybe 30 to 40 feet.

2        Q.    And had he stopped running, or was he still

3    moving away from you when you first saw the gun?

4        A.    My -- my visual interpretation of it was he was

5    slowing down, his gate was slowing.  So as he's turning,

6    like I said, with the gun in his right hand and blading

7    off to his right, his stride is slowing down.

8        Q.    But he wasn't stationary?

9        A.    To the best of my recollection, he wasn't

10   stationary.

11       Q.    Okay.  Do you know which compass direction you

12   were going when you went through that narrow pathway?

13       A.    I do not.

14       Q.    Okay.  I understand your impression was he was

15   slowing down, but was he still moving away from you when

16   you first saw the gun?

17       A.    Yes.

18       Q.    And when you -- prior to you first seeing the

19   gun, had you ever seen Mr. Gonzalez looking over his

20   left shoulder or right shoulder during the pursuit,

21   before you first saw the gun?

22       A.    I don't specifically recall it.

23       Q.    And when you first saw the gun -- and I think

24   you've kind of described it -- but I'm just wondering,

25   was it down by his side?  Was it above his shoulder?

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 46

1  Was it above his head?  Can you describe where it was in

2  relation to his body?

3      A.   It was coming up from his right, just under his

4  shoulder height.

5      Q.   Okay.  Did you ever see him raise it over his

6  shoulder?

7      A.   Not that I recall, no.

8      Q.   And I guess this answer will be no, but did you

9  ever see him raise the gun above his head?

10     A.   No.

11     Q.   After you saw the gun go up towards his

12  shoulder, did you ever see it go lower again?

13     A.   I --I don't know.  I don't -- I don't recall

14  that.

15     Q.   At some point after you saw the gun, did you

16  see Mr. Gonzalez look over one of his shoulders?

17     A.   I'm sorry.  Can you repeat that?

18     Q.   Sure.  After you saw the gun, did you see

19  Mr. Gonzalez look over either one of his shoulders?

20     A.   Yes.  As he -- when he raised the gun, he

21  looked back over his left shoulder.

22     Q.   Okay.  And did he look over his left shoulder

23  once or more than once?

24     A.   From my recollection, it was that one glance --

25  that one look back over his shoulder to look back at us.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 47

1    Q.   One to two seconds, approximately?

2    A.   Yes.  I feel it prudent to mention at this time

3  while this is all going on and he's looking over his

4  left shoulder, he yells, "Stop, I'm going to do it," or

5  something to that effect.  "Stop, I'll do it," or "Stop,

6  I'm going to do it," simultaneously with these actions.

7    Q.   Okay.  So you're saying that you saw the gun

8  near his right shoulder, he's looking over his left

9  shoulder, and he's saying something to the effect,

10  "Stop, or I'll do it"?

11    A.   "Stop, I'm gonna do it," or "Stop, I'll do it."

12  Something to that effect.

13    Q.   And are you able to hear that clearly on the

14  body-worn camera audio that you have reviewed?

15    A.   I can't say I listened for that specifically,

16  no.  I didn't go through it for that.

17    Q.   When you reviewed the body-worn camera

18  footage -- well, when was the last time you reviewed

19  that?

20    A.   The day before yesterday.

21    Q.   Okay.  Where were you when you reviewed it?

22    A.   Just on my work laptop at home.

23    Q.   Okay.  Have you seen it, like, looking at it

24  frame by frame, for example?

25    A.   I have slowed it down before.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 49

1    Q.    And do you think the distance between you and

2    Mr. Gonzalez was about 30 or 40 feet when you started

3    firing?

4    A.    I'd estimate 40 to 50.

5    Q.    And part of your -- at least part of your

6    target area would have been his back, from your

7    perspective.  Is that fair?

8    A.    Yes, part of the target area.

9    Q.    And if -- I'm going to try this with the hands

10   of a clock.  So like, for example, if when you fired

11   your shots, Mr. Gonzalez was at the 12:00 o'clock, at

12   the top of the clock, facing up towards the 12, would

13   you have been, like, directly behind him at the 6 or

14   maybe offset, like at the 5 or the 7?  Can you give me

15   an estimate in that regards?

16   A.    If he was at the 12, the way I recall it, I

17   would have been on the other side of the clock.  He

18   would have -- I would have been more on the 1 or 2,

19   given his location from us.

20   Q.    Okay.

21   A.    He was up and offset to the left, based on my

22   memory.

23   Q.    Okay.  Yeah, because earlier you told me that

24   you were seeing more of his right side and his back.

25   Does that sound right?

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 52

```
 1        A.    Yes.

 2        Q.    Did you have the impression as to whether any

 3   of your shots were striking him?

 4        A.    I saw a change in his behavior.  He started to

 5   fall.

 6        Q.    And after how many shots did you see him

 7   starting to fall?

 8        A.    I was not keeping count.

 9        Q.    And when he started to fall, did you at least

10   have the impression that he had been struck by at least

11   some of the shots?

12        A.    I had that impression, yes.

13        Q.    And are you saying that you immediately stopped

14   shooting once you saw him starting to fall?

15        A.    When I saw him start to fall over, my

16   impression was that he was hit.

17        Q.    And did you immediately stop shooting when you

18   saw him starting to fall?

19             MS. REYES:  Asked and answered.

20             Go ahead.

21             THE WITNESS:  Yes.

22   BY MR. GALIPO:

23        Q.    And why did you stop shooting once you saw him

24   starting to fall?

25        A.    At that point, I didn't see him as a threat any
```

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 53

1    longer, for that moment in time.

2         Q.   Do you know if he dropped the gun during any of

3    the sequence of the shots?

4         A.   I only know he dropped the gun because after

5    the volley of fire as we approached, I saw the gun on

6    the ground next to him.

7         Q.   Closer to his feet?

8         A.   I don't remember the exact location, other than

9    that it was on the ground next to him.

10        Q.   Did you -- did you notice when reviewing the

11   video in slow motion or frame by frame, that he dropped

12   the gun during the shots?

13        A.   I didn't -- I didn't review that part in slow

14   motion.

15        Q.   Do you recall how he fell to the ground,

16   whether it was chest down or some other way?

17        A.   To me, it looked like he fell down towards his

18   left shoulder and front chest area, falling down towards

19   the left onto his, I guess, left chest area before

20   coming to a rest on his chest or in a prone position.

21        Q.   And when he was in that position, was he still

22   about that 50 -- approximately 50 feet from you,

23   initially?

24        A.   I -- I don't know.  I don't know the answer to

25   that, because then we started advancing.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 54

1    Q.    Were you aware at some point there were other

2    shots being fired, other than your shots?

3    A.    Yes.

4    Q.    And when did you become aware of that?

5    A.    After I started firing, I could see and/or hear

6    Sobaszek's pistol next to me, muffled.  I could -- I

7    could -- I could see it firing.

8    Q.    Was it your impression that you were the first

9    one to fire?

10    MS. KORNBLAU:  Objection.  Calls for

11    speculation.

12    MS. REYES:  I'm going to join.

13    Go ahead.

14    THE WITNESS:  When I initially started firing,

15    I -- I -- I didn't know who fired first.  It was only

16    after review at a later time that I -- that I knew those

17    facts.

18    BY MR. GALIPO:

19    Q.    What is your understanding now as to who fired

20    first?

21    A.    My understanding now is Detective Sobaszek

22    fired first, and then I fired.

23    Q.    And what's that understanding based on?

24    A.    Review of the video.

25    Q.    At the time you're saying you thought you had

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 55

```
 1    fired first?

 2         A.    I'm saying at the time I just didn't know.  I

 3    didn't have any impression.  I just didn't know who

 4    fired first.

 5         Q.    But you were at some point aware that your

 6    partner was firing?

 7         A.    Yes.

 8         Q.    Did Mr. Gonzalez ever turn towards you and

 9    point the gun at you?

10         A.    He turned -- when he bladed to the right with

11    the gun in his right hand, it appeared like it was

12    pointing back towards my direction.

13         Q.    Did he ever turn to the left towards you with

14    his upper body facing you?

15              MS. KORNBLAU:  Objection.  Vague.

16              THE WITNESS:  No, not that I can recall.

17    BY MR. GALIPO:

18         Q.    If, hypothetically, he did not point -- turn

19    towards you or point a gun at you, do you think, based

20    on your training, it would have been appropriate to

21    shoot him?

22              MS. REYES:  Vague.  Incomplete hypothetical.

23              Go ahead.

24              MS. KORNBLAU:  Calls for a legal conclusion.

25    BY MR. GALIPO:
```

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 56

```
 1        Q.    You may answer.
 2        A.    Based on the imminent threat that he presented
 3   to both me and the workers present, yes; because he did
 4   display the firearm going back towards me at our
 5   location, and he made that statement that I took as a
 6   direct threat.
 7        Q.    Okay.  So let me just break this down a little
 8   bit.  After you went through the narrow pathway, did you
 9   see any employees nearby, just before you fired your
10   shots?
11        A.    We had passed, I want to say, approximately two
12   employees.  There was one on, to my recollection, the
13   diesel ramp.  Maybe there was two there, but I had
14   passed one to two employees of this business.
15        Q.    Did you see Mr. Gonzalez try to attack either
16   of those employees?
17        A.    I did not.
18        Q.    Did you see him point a weapon at either one of
19   those employees?
20        A.    I did not.
21        Q.    So after getting through this narrow pathway,
22   did you see any other employees near you or your partner
23   or Mr. Gonzalez, just before you fired?
24        A.    Behind Mr. Gonzalez was a -- offset to his
25   right or our right was a door and a window, some type of
```

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 57

1    maybe Plexiglass.  I'm not sure what it was.  And the

2    lights were on, and it appeared to me that there were

3    people in there.  That this place was open for business.

4         Q.   I'm wondering whether you actually saw any

5    person?

6         A.   At that moment, I did -- I did not.

7         Q.   So you told me earlier that just because

8    someone has a gun in their hand, that fact alone, you

9    could not shoot someone, based on your training.  Do you

10   recall that?

11        A.   Yes.

12        Q.   I guess what I'm wondering -- and you told me

13   earlier also, that when Mr. Gonzalez was, you know,

14   running away, the first right turn, the second right

15   turn, going through this narrow pathway, you had not

16   seen a gun yet, and based on your training, you did not

17   think it was appropriate to shoot him at that point.  Do

18   you recall us talking about that?

19        A.   Yes.

20        Q.   So I'm kind of asking you a hypothetical based

21   on your training.  If you had just seen him take out the

22   gun, with a gun in his hand -- this is my

23   hypothetical -- but not point it at you, not turn

24   towards you, just running away from you with the gun in

25   his hand, do you understand my hypothetical?

1        A.    Yes.

2        Q.    I realize it's different from what you're

3    saying happened.  But I'm just wondering, did you, in

4    your mind, think, based on your training, you could

5    shoot him just for running away with the gun in hand if

6    he had not turned towards you or pointed the gun towards

7    you?

8        A.    No.

9             MS. REYES:   Incomplete hypothetical.

10   BY MR. GALIPO:

11        Q.    Your answer is no?

12        A.    No.

13        Q.    Is that correct?

14        A.    No.

15        Q.    No, you can't shoot him or no, it's not

16   correct.  This is why I'm confused.

17        A.    No, given your hypothetical, with no other

18   facts, no.

19        Q.    And when you say, "No," you're saying no, based

20   on your training, you could not use deadly force under

21   that hypothetical.  Am I understanding you correctly?

22        A.    Yes.

23        Q.    So just because you thought he had a gun or

24   even saw a gun and he's running away, under the facts of

25   this case, you would agree you would need more to use

1    deadly force?

2         A.   In this specific case, I believe there was

3    more.

4         Q.   I get that part.  I'm just talking more about

5    your training.  I mean, you're not trained, are you, to

6    shoot people who are running away from you that you

7    think have a gun, or even if you see a gun, if they're

8    just running away; is that fair?

9         A.   Yeah.  Absent a bunch of other facts, no.

10        Q.   Right.  Because I think even at the end of your

11   statement, the attorney is asking you about the ability,

12   the opportunity, and the apparent intent.  Do you recall

13   those questions --

14        A.   Yes.

15        Q.   -- at the end of your statement?

16             And is it your understanding that based on

17   police officer standards and training and the revised

18   Penal Code, that those are requirements for an officer

19   to use deadly force?

20        A.   Yes.

21        Q.   And do I have it right that the person would

22   have to have the present ability, opportunity, and

23   apparent intent to immediately cause death or serious

24   bodily injury?

25        A.   That's my understanding, yes.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 60

1    Q.    That's why, in this case, the issue of pointing

2    the weapon and turning towards you was important?

3    A.    Coupled with the threat.

4    Q.    And can you -- the verbal threat, you're saying

5    you're not sure if you can hear it on the body-worn

6    camera or not?

7    A.    I haven't listened for it to tell you whether

8    it's there or not.  I can't tell you.

9    Q.    Okay.  But can you remind me, again, what you

10   recall hearing?

11   A.    Something to the effect, "Stop, I'm gonna do

12   it."  "Stop, I'll do it."  One of those phrases.

13   Q.    Okay.  Was the foot pursuit being dispatched or

14   communicated so that other officers knew you were in a

15   foot pursuit?

16   A.    Yes.  I believe that was broadcast by the

17   helicopter.

18   Q.    Was the helicopter, to your knowledge, still

19   overhead, even during the foot pursuit?

20   A.    Yes, to my knowledge.

21   Q.    Because the helicopter had been following the

22   vehicle pursuit, and then after that we have the foot

23   pursuit?

24   A.    Correct.

25   Q.    You have training with respect to setting up

1    perimeters and containments in foot pursuit situations?

2        A.    Yes.

3        Q.    You have training with taking cover, when you

4    can, if you think someone has a firearm?

5        A.    Yes.

6        Q.    You have training in the concept of

7    de-escalation?

8        A.    Yes.

9        Q.    Let me ask you just a few questions about your

10   training with respect to the use of deadly force.

11   Obviously, you're trained that deadly force is the

12   highest level of force an officer can use?

13       A.    Yes.

14       Q.    Are you trained that shooting someone center

15   mass is likely to cause death or serious bodily injury?

16       A.    Yes.

17       Q.    As part of your uniform, do you have a

18   ballistic vest to protect you against, to some extent,

19   of being shot in the upper torso area?

20       A.    To some extent, yes.

21       Q.    And just like we just learned, you're trained

22   that deadly force should only be used if there's an

23   imminent or immediate threat of death or serious bodily

24   injury?

25       A.    Yes.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions                                          Page: 62

```
 1        Q.    And then we have the components we talked
 2   about:  the ability, the opportunity, and the apparent
 3   intent?
 4        A.    Yes.
 5        Q.    Are you trained that you're responsible to
 6   justify each of your shots?
 7        A.    Yes.
 8        Q.    Are you trained to give a verbal warning before
 9   using deadly force, when feasible?
10        A.    Yes, when feasible.
11        Q.    Are you trained to consider your background or
12   backdrop when using deadly force?
13        A.    Yes.
14        Q.    Did you see any people in your backdrop or
15   background when you fired?
16        A.    No.
17        Q.    What was, essentially, your background or
18   backdrop?
19        A.    It was a wall, a wall of the building.
20        Q.    Did you have any training, either at the
21   academy or thereafter, about controlling your fear or
22   not overreacting in certain situations?
23        A.    I mean, just in general to keep a calm head and
24   stay objective.
25        Q.    Okay.  Have you had any training on the concept
```

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 63

1    of contagious or sympathetic fire?

2        A.    I don't know if I've had training on it, but

3    I'm familiar with the topic.

4        Q.    Okay.  Basically, some -- one person shoots and

5    then another person starts shooting, that type of

6    reaction?

7        A.    That's my understanding of it, yes.

8        Q.    Did you ever have the impression that

9    Mr. Gonzalez was shooting at you?

10        A.    At that -- at that point, I don't believe he

11    was able to fire a round.  But at that moment, I

12    couldn't say a hundred percent conclusively.

13        Q.    Did you -- you approached him at some point

14    after the shooting; correct?

15        A.    Yes.

16        Q.    You saw the gun on the ground; you're just not

17    exactly sure where?

18        A.    It was -- it was off to his right someplace.

19        Q.    Do you have -- I know you said you fired seven

20    shots or more; correct?

21        A.    It was an estimation, yes.

22        Q.    Do you have an understanding now as to how many

23    shots in total were fired?

24        A.    I do not.

25        Q.    Did you notice any wounds on Mr. Gonzalez when

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 64

1    you approached him?

2         A.    I saw some blood coming from his mouth and some

3    blood on his leg.    That's -- that's all I recall seeing

4    before I was moved away.

5         Q.    Do you know if he was handcuffed?

6         A.    After the fact?

7         Q.    Yes.    Or when you were at the scene or based on

8    your review?

9         A.    I can't say I reviewed for that.    I don't -- I

10   don't remember him being handcuffed or if I was even

11   standing there when he was handcuffed.

12        Q.    Did you try to apply any, like, seals to his

13   wounds?

14        A.    No.    I was immediately relieved by a Hemet

15   police officer.    There was an RSO deputy.    So shortly

16   after the approach, we were, I guess, taken away or

17   separated from the incident.

18        Q.    You mentioned earlier that you stopped firing

19   when he started to go to the ground because the threat

20   level had changed.    Is that fair?

21        A.    Yes.

22        Q.    And if I'm understanding your testimony, from

23   your viewpoint, based on your training, it would have

24   been inappropriate to shoot him after he was on the

25   ground?

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 65

```
 1              MS. REYES:  It's vague.  Calls for speculation.
 2              THE WITNESS:  Yes.
 3              (Simultaneous speakers.)
 4              (Reporter clarification.)
 5    BY MR. GALIPO:
 6         Q.   And why, based on your training, would it be
 7    inappropriate to shoot him after he was on the ground?
 8         A.   He was -- from my perspective, he was on the
 9    ground and the gun was to his right.  He was no longer
10    in possession of the firearm.
11         Q.   Would you agree, if you had observed him drop
12    the firearm, it would be inappropriate to fire shots
13    after you observe him drop the firearm?
14         A.   Yes.
15         Q.   And you told me earlier you told him to "drop
16    it," but that was some time before this shooting; is
17    that correct?
18         A.   The time I recall telling him.  I don't recall
19    if just prior to I said anything.  I don't recall that.
20         Q.   Do you have -- the time you do recall telling
21    him to "Drop it" or words to that effect, do you know
22    how long before the shooting that was?
23         A.   No.
24         Q.   Based on your training and experience, is it
25    your understanding that sometimes people run from the
```

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 66

1    police because they don't want to get caught with

2    illegal items on them, such as weapons or contraband?

3        A.    Yes.

4        Q.    And based on your training and experience, is

5    it your understanding that sometimes people that have

6    firearms on them that don't want to get caught with the

7    firearms, may run and even try to discard the firearm

8    during the foot pursuit?

9        A.    Yes.

10        Q.    And is it your experience when people are

11    running from the police and trying to discard the

12    firearm, they may try to do it in an area or place where

13    they can't be seen by the officers pursuing them, like

14    after they round a corner or something to that effect?

15        A.    Yes.

16        Q.    Have you had that situation happen to you,

17    where people try to discard a firearm in a foot pursuit?

18        A.    Yes.

19        Q.    Did you ever see Mr. Gonzalez attempt to enter

20    in any of these doors you've talked about, from the

21    building?

22        A.    Personally, I did not.

23        Q.    Did you see him attempt to take any hostage?

24        A.    I did not.

25        Q.    Did you see him attempt to harm any civilian?

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 67

1    A.    During this foot pursuit?

2    Q.    Yes.

3    A.    No.

4    Q.    So I have a few questions about your statement,

5    and I'm going to put my glasses on, so I can see.  But a

6    lot of this we already covered.  So if there's, like, a

7    pause now between my questions, it's because I'm just

8    reviewing portions that I underlined, and if we already

9    covered it, I'm just going to skip it.  So bear with me,

10   and then in about another ten minutes or so, we'll take

11   our last break?

12         Does that sound okay?

13   A.    Sounds good.

14   Q.    Okay.  The date of the statement says

15   January 29th, 2024.  Does that sound about right?

16   A.    Sounds about right.

17   Q.    Do you know why there was that time frame

18   between the incident and the statement?

19   A.    I don't.

20   Q.    So it sounds like you were not even aware that

21   Officer Reynoso was somewhat behind you at the time you

22   fired your shots?

23   A.    That is correct.

24   Q.    Are you now aware that he was firing, to some

25   extent, past your location?

1          A.    Yes.

2                MS. KORNBLAU:    Objection.

3     BY MR. GALIPO:

4          Q.    Do you remember in your statement -- do you

5     have a copy of your statement handy, by the way?

6          A.    I do not.

7          Q.    Okay.  Do you recall in your statement saying

8     that you told him to "drop it" shortly before you shot

9     him?

10         A.    Sometime before I shot him, yes, I remember

11    that I said, "Drop it."

12         Q.    Could you hear that or do you remember hearing

13    that when you listened to the audio from the body-worn

14    camera?

15         A.    I can't -- I can't say I listened for it,

16    specifically.

17         Q.    When -- with respect to your training on

18    commands, were you trained to try to give commands in a

19    clear -- loud, clear voice, so that they could be

20    understood?

21         A.    Yes.

22         Q.    And were you trained to attempt to give the

23    person an opportunity to comply with your commands if

24    you can safely do so?

25         A.    Yes.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 69

1    Q.   Do you recall in your statement saying that

2    after you told him to drop it, he took a couple more

3    paces and then you fired?

4    A.   Yeah.  I believe that's -- that's how it

5    transpired.

6    Q.   Was that the first time, to your knowledge, you

7    ever saw Mr. Gonzalez in person?

8    A.   To the best of my knowledge, that's the first

9    time I saw him.

10   Q.   Did you have the impression that Mr. Gonzales

11   was getting tired, or I think you said, "Running out of

12   gas" in your statement?

13   A.   Yes.

14   Q.   Were you also getting tired at that point?

15   A.   I -- I don't recall being very fatigued.

16   Q.   Probably from all your good running exercises?

17   A.   Occasionally.

18   Q.   Would you at least agree in your initial

19   interview or statement, you never said that Mr. Gonzalez

20   turned towards you before you shot?

21   A.   I don't recall.  I -- I -- I believed he was

22   producing a firearm with his right hand and blading,

23   turning his upper torso.  So that was my belief at the

24   time.

25   Q.   Okay.  I'm just -- again, I'm just going by

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 70

1    your statement, and I realize it was, like, taken five

2    days afterwards.  And I've looked at it pretty

3    carefully.  I'm sure you have, too.

4          Would you agree you never used the term

5    "bladed" or "turned towards you" in your statement?

6    A.   I don't have it in front of me, but if that's

7    what it says, then that was the statement.

8    Q.   Okay.

9          MR. GALIPO:  Okay.  If it's okay with everyone,

10   we can take our last break, at least for me.  Does seven

11   minutes work for everyone?

12         THE CERTIFIED STENOGRAPHER:  Yes.

13         MR. GALIPO:  We'll come back at 3:15 or so.

14         Dennis, you can take us off record, please.

15         THE VIDEOGRAPHER:  We are off the record.  The

16   time is 3:08 p.m.

17         (Break taken.)

18         Videographer:  We are now back on the record.

19   The time is 3:19 p.m.

20   BY MR. GALIPO:

21   Q.   Did you have any physical injury related to the

22   incident?

23   A.   No.

24   Q.   Are you aware of anyone, other than

25   Mr. Gonzalez, having physical injuries related to the

1    incident?

2          A.    I don't know if it's relevant, but a deputy was

3    bit by a canine during this incident.

4          Q.    A police canine?

5          A.    Yes.

6          Q.    I don't know if it's relevant, but it's sad to

7    hear that.

8          A.    So somebody was injured in the course of this

9    event, but maybe not specific to Mr. Gonzalez.

10         Q.    Got it.  Well, I'm sorry to hear that.

11              I saw some reference to one of the deputies

12   being injured.  I didn't realize he was bit.  So, I

13   think that would definitely classify as an injury, at

14   least in my mind.

15              So I think you told me earlier, from seeing the

16   gun, initially, to you firing was maybe one or two

17   seconds.  Does that sound right?

18         A.    Yes.

19         Q.    Was Mr. Gonzalez pointing a gun at you when you

20   fired your shots?

21         A.    When I began firing, what I saw was the gun up

22   towards my direction.

23         Q.    Are you saying he was pointing the gun at you

24   when you were firing?

25         A.    The gun was in his right hand, back towards my

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 72

1    A.    To -- the only ones I know about, I'd said

2    there's the two I've been involved in, and there was one

3    before my time.  And I don't know about anything else,

4    if there's others; so, three.

5    Q.    Okay.  To your knowledge, were all of these

6    shootings found to be within policy, if you know?

7    A.    I believe they were all determined to be in

8    policy, yes.

9            MR. GALIPO:  Okay.  That's all the questions I

10   have.  Thank you very much, and I'm going to turn it

11   over to Ashley.

12                        EXAMINATION

13   BY MS. REYES:

14   Q.    Okay.  I just have some follow-up questions for

15   you, Officer Irick, so I'm going to skip around, so I

16   apologize ahead of time.

17           Okay.  I want to go back and talk to you a

18   little bit about what happened prior to the shooting,

19   prior to the foot pursuit, and prior to the vehicle

20   pursuit.

21           Now, it's my understanding, based on your

22   testimony earlier, that Mr. Gonzalez -- when you reached

23   the property of the female that had called, reporting

24   him in her front yard, at some point, Mr. Gonzalez had

25   gone into his vehicle for about ten minutes.  Is that --

1    vehicle pursuit began.

2         Can you describe what Mr. Gonzales's driving

3    was like during that vehicle pursuit?

4         A.   In short terms, it was reckless.  He was

5    traveling at high speeds.  He ran stop signs.  He ran

6    red lights.  He ran into a dip in the road and bottomed

7    out his vehicle, creating a shower spark, almost losing

8    control.

9         He came up on a slower-moving vehicle at a very

10   high rate of speed.  Luckily, that vehicle was able to

11   dodge to the right, narrowly missing Mr. Gonzalez's

12   vehicle, and narrowly missing that motorist.

13        As the pursuit continued up Sanderson, he drove

14   wrong way.  He drove in -- he drove northbound in the

15   southbound lanes.

16        Q.   And roughly, how long was the vehicle pursuit?

17        A.   Approximately, 20 minutes.

18        Q.   And then leading up to the foot pursuit, from

19   the time you got out of the vehicle and up until the

20   time of the shooting, how long would you estimate the

21   foot pursuit was, in that time frame?

22        A.   A minute and a half, a minute and 20 seconds.

23        Q.   Okay.  So a lot shorter than the vehicle

24   pursuit?

25        A.   Yes.

George Gonzalez v. State of California, City of Hemet, Et Al.

Focus Litigation Solutions

Page: 77

```
 1   STATE OF CALIFORNIA)
                        ) ss:
 2   COUNTY OF BUTTE    )

 3
            I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5          That the witness named in the foregoing

 6   deposition was present remotely and duly sworn to testify

 7   to the truth in the within-entitled action on the day and

 8   date and at the time and place therein specified;

 9          That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12          That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15          Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 31st day of July, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```