# "EXHIBIT D"

```
                     UNITED STATES DISTRICT COURT

                    CENTRAL DISTRICT OF CALIFORNIA

                               --oOo--



   GEORGE GONZALEZ,

              Plaintiff,

   v.                             Case No.  5:25-cv-00331-KK-DTB

   STATE OF CALIFORNIA; CITY OF
   HEMET; PATRICK SOBASZEK;
   ANDREW REYNOSO; SEAN IRICK;
   and DOES 1-10, inclusive,

              Defendants.
   _____/




                STENOGRAPHIC REPORTER'S TRANSCRIPT OF

                REMOTE DEPOSITION OF CLARENCE CHAPMAN

                      FRIDAY, JANUARY 2, 2026




   Reported Stenographically by:

   KIMBERLY D'URSO, CSR 11372, RPR

   Job No.  22375
```

1    A.   That's my understanding.  Yes, sir.

2    Q.   And before Mr. Gonzalez gets out of his car and

3  starts running away from the officers, do the officers

4  have any information that Mr. Gonzalez committed any

5  crimes involving serious injury or death to anyone?

6    A.   Not in any specificity, no.  Not with that

7  specificity, no.  He had not committed any violent crime

8  at that point.

9    Q.   And just so we're clear, you would agree that

10 the officers had no information, in terms of criminal

11 history, that Mr. Gonzalez had committed a prior crime

12 involving serious injury or death; Is that fair?

13          MS. KORNBLAU:  Objection.

14          MR. GARCIA:  Objection.  Calls for speculation.

15          MS. KORNBLAU:  Objection.  Vague as to

16 "officers."

17          MR. GALIPO:  Any of the officers.

18          THE WITNESS:  Not that I gleaned from the --

19 from the materials given to me.

20 BY MR. GALIPO:

21   Q.   And when Mr. Gonzalez gets out of his vehicle

22 after it became disabled, and started to run, do you

23 have an opinion as to whether or not it would have been

24 appropriate to use deadly force at that point?

25   A.   Not at that point, no.

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 21

1  Q. And why not?

2  A. The officers had not seen a gun at that point,

3  and Mr. Gonzalez was running away from them into an open

4  area at that point.

5  Q. And is it your understanding that several of

6  the officers gave chase to Mr. Gonzalez?

7  A. Yes, sir.

8  Q. And during the foot pursuit, is it your

9  understanding that the foot pursuit went on for some

10  period of time and some distance before the officers saw

11  a gun?

12  A. That is correct, yes.

13  Q. And prior to the officers seeing a gun, do you

14  have an opinion, during the foot pursuit, prior to them

15  seeing a gun, whether it would have been appropriate for

16  the officers to use deadly force?

17  A. It didn't appear to me that that would have

18  been justified use of deadly force, prior to the

19  officers seeing Mr. Gonzalez produce the gun.

20  Q. And based on your review of the materials, do

21  you have a general sense or estimate as to how much time

22  passed from the officers seeing the gun and the first

23  shot being fired?

24  A. The opinion on the officers, they say it was a

25  matter of a few seconds. I think Officer Irick, in his

```
 1   materials, whether, at the time of the shots,
 2   Mr. Gonzalez was still running?
 3        A.   It appears that -- when you look at the video,
 4   yes, he was still running.  When we say "running," we're
 5   talking about he's moving forward, whether it's a run or
 6   a jog.  But, yes, he's forward at a rate faster than a
 7   walk.
 8        Q.   And is he moving forward at the time of the
 9   shots, away from the officers?
10        A.   Yes.
11        Q.   Do you know, based on your review of the
12   materials, whether he sustained any gunshot wound to the
13   back?
14        A.   Yeah.  He had two gunshot wounds to the back.
15   You say "back," but -- yeah.  And one to the thigh and
16   one to the foot.
17        Q.   In your review of the videos, do you ever see
18   Mr. Gonzalez pointing a weapon at the officers at any
19   time?
20        A.   I didn't see that, no.
21        Q.   So I'd like to go to -- just looking at your
22   report, it appears that, starting on page 2, you do an
23   overview of the incident; is that correct?
24        A.   Correct.
25        Q.   And then starting on page 5, you list some of
```

1  and opportunity"?  Are those all requirements that you
2  were looking for, in terms of the imminency?
3      A.   Not requirements.  They were the elements that
4  the officers either saw or perceived.  So not
5  requirements.  I'm not going to talk about the word --
6  I'm writing it down right now -- we're not talking about
7  requirements.  We're talking about the circumstances of
8  the contact.
9           Okay.  Let's talk about intent.  The intent was
10 to evade.  And I think it's undisputed that there was a
11 18-minute vehicle pursuit.  The willingness would --
12 would -- that would enter into the threat assessment was
13 the words of Mr. Gonzalez saying, "You're going to have
14 to kill me."  That shows a willingness to resist.
15           The physical ability, that would be the
16 possession of a gun, based on the statements of the
17 victim of the TRO and, eventually, the observation of the
18 officer.
19           The possession of the gun represents a means.
20 So if you have a gun -- and I'm going to be true to your
21 first question -- you ask me this in every deposition.
22 The ability -- a person holding a gun, does that gun have
23 the ability to cause harm?  Can officers shoot?  No.
24 It's just the ability.
25           The gun is capable of doing that.  The means

1   and the opportunity are something different.  When the
2   suspect turns towards the officers, that is the means of
3   pointing the gun at them.  And the opportunity is
4   basically the pulling of the trigger.  And we've already
5   discussed that the officers don't have to wait until
6   they're actually fired on or see down the barrel of a gun
7   before they can take defensive action.
8         So now we have intent, pursuit.  We have the
9   willingness, which are statements of the suspect.  We
10  have the physical ability, which is the gun.  And the
11  means and opportunity are the turning towards the
12  officers while holding the gun in his right hand.
13        So we've satisfied all five of those.  One,
14  two, three, four, five.  Right.
15     Q.   Okay.  Based on your review of the materials,
16  did Mr. Gonzalez ever verbally threaten to kill any of
17  the officers?
18     A.   Not to my knowledge.
19     Q.   And you mention, in response to your
20  explanation of those requirements, that Mr. Gonzalez
21  turned and pointed the gun at the officers.  Do you
22  remember saying that?
23     A.   Yeah.  He turned while holding the gun.  It
24  depends on what officer and what witness you're talking
25  about.

1   A.   There again, Counsel, I'm in your world, and I
2   don't stand a chance against you.
3   Q.   Okay.  And then paragraph 13, we talked about
4   you're referencing Penal Code 835(a), and the case of
5   Tennessee v. Garner?
6   A.   Correct.
7   Q.   Also, Learning Domain 20?
8   A.   Correct, yes.
9   Q.   Going to the top of page 12.  The last few
10  lines -- I think we talked about this -- you're
11  referencing that:  "Sergeant Reynoso, like others, did
12  not observe anyone in the backdrop of the shooting"?
13  A.   Correct.
14  Q.   Paragraph 15, you talk about:  "There has to be
15  a sufficiency of fear to use deadly force"; correct?
16  A.   Correct.
17  Q.   Paragraph 18 on page 13, you talked about the
18  issue of "contagious or sympathetic fire"?
19  A.   Correct.
20  Q.   Why did you have that as part of your opinions
21  in this case?
22  A.   Because there was a lot of discussion in
23  Sergeant Reynoso's deposition about him hearing a shot.
24  And I think there tended to be an indication that
25  Sergeant Reynoso was firing only because he heard a

1  shot.
2          But he explains, you know, more so in detail --
3  I think it was on page 48 of his deposition, yeah, he
4  hears a shot -- I think he called it a "pop" -- but he
5  also sees the gun.
6          So two things can be true at the same time.
7  They're not mutually exclusive.  So I can hear a pop and
8  I can see a gun, and my reaction would necessarily be
9  consistent with what the sergeant did at this point in
10 time.
11         And that's why I had to put -- I thought
12 reflective, sympathetic, contagious, those kinds of
13 situations and questions arise in every case where
14 there's more than one officer involved.
15         You and I have been involved in many cases
16 where there's been multiple officers who are firing at
17 what they perceive the same target, and it all comes
18 down to sensory perception:  What the officers see,
19 hear, smell.  And those things can all come together to
20 form the opinion, and that's why I put it in.
21         That's a long way around the block, but that's
22 why I put in "contagious fire," in case I'm asked a
23 question about Sergeant Reynoso hearing something
24 auditory, and then reacting to it with deadly force, in
25 the absence of all other factors existing at the time.

```
1    STATE OF CALIFORNIA)
                        ) ss:
2    COUNTY OF BUTTE    )

3
              I, KIMBERLY E. D'URSO, do hereby certify:
4

5             That the witness named in the foregoing

6    deposition was present remotely and duly sworn to testify

7    to the truth in the within-entitled action on the day and

8    date and at the time and place therein specified;

9             That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12            That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15            Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19            That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21            IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 10th day of January, 2026.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```