# "EXHIBIT E"

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                          --oOo--

 4

 5   GEORGE GONZALEZ,

 6            Plaintiff,

 7   v.                      Case No.  5:25-cv-00331-KK-DTB

 8   STATE OF CALIFORNIA; CITY OF
     HEMET; PATRICK SOBASZEK;
 9   ANDREW REYNOSO; SEAN IRICK;
     and DOES 1-10, inclusive,
10
              Defendants.
11   _____/

12

13

14

15

16          STENOGRAPHIC REPORTER'S TRANSCRIPT OF

17           REMOTE DEPOSITION OF KENNETH HUBBS

18                 FRIDAY, JANUARY 2, 2026

19

20

21

22   Reported Stenographically by:

23   KIMBERLY D'URSO, CSR 11372, RPR

24   Job No.  22296

25
```

```
 1      A.   Yes.  And, "Just exit, George," yes.
 2      Q.   Right.  That would be an example of
 3   de-escalation type of language?
 4      A.   Can be, yes.
 5      Q.   And so at the bottom of page 14, this
 6   "Alternative tactics, de-escalation," that section, is
 7   that taken from the Hemet policies, if you know?
 8      A.   I believe it's quoted from the Hemet policy.
 9      Q.   Okay.  And it goes on to the top of page 15?
10      A.   Yes.
11      Q.   And at the top, it talks about:  "Officers
12   should consider actions that may increase officer safety
13   and may decrease the need for using force."  Do you see
14   that?
15      A.   Yes.
16      Q.   And under A, it talks about "summoning
17   additional resources"?
18      A.   Yes.
19      Q.   Do you know if additional resources were
20   summoned in this case?
21      A.   Yes.  Sergeant Reynoso requested a canine to be
22   involved, canine and the canine's handler.  Requested
23   a --
24           (Reporter clarification.)
25           THE WITNESS:  -- 40 mm less lethal system.  And
```

```
 1        A.   I've got it.
 2        Q.   I think it's on page 29?
 3        A.   Yes.  I believe that Sergeant Reynoso fired six
 4   rounds.  He thought he had fired six and, in fact,
 5   likely did fire six.
 6             Detective Sobaszek believed that he fired seven
 7   or eight, but likely fired a total of ten.
 8             And Officer Irick from the CHP, I believe, I
 9   believe he fired five rounds, and likely fired a total
10   of ten.
11        Q.   In your experience as a law enforcement
12   officer, had you been in foot pursuits before?
13        A.   I have.
14        Q.   Had you been in foot pursuits of individuals
15   with firearms?
16        A.   I have, yes.
17        Q.   And did some of those individuals, based on
18   your experience, attempt to discard the firearm during
19   the foot pursuit?
20        A.   There were some occasions where I believe that
21   did happen.
22        Q.   And is it your experience as a police officer
23   that sometimes individuals engage in foot pursuits if
24   they have firearms on them, and they know they're not
25   supposed to, because they don't want to get caught with
```

George Gonzalez v. State of California, et al.
Focus Litigation Solutions

Page: 26

1  it?

2     A.  I can't give you their -- their -- I can't tell
3  you what was in their mind.

4     Q.  Right.  But were you trained as a police
5  officer that happens sometimes?

6     A.  That's not the way the police officers are
7  specifically trained.  Does it happen sometimes?  I
8  would say yes.

9     Q.  Were you trained that sometimes people will try
10 to toss firearms during foot pursuits?

11    A.  I am aware that they will sometimes toss
12 firearms, but that's not necessarily how police officers
13 are trained.  They will usually go back and look for a
14 firearm afterwards to see if it had been tossed.

15        But if they're aware the suspect has the
16 firearm while they are running, their primary focus is
17 on the suspect and the firearm the suspect is in
18 possession of.  Not running along, expecting the suspect
19 to throw the firearm away; but rather, running after the
20 suspect and anticipating the suspect may be an imminent
21 threat to the officer or someone else with that farm.

22    Q.  Do you have estimate as to how many foot
23 pursuits you had been in as a law enforcement officer?

24    A.  Far too many.

25    Q.  Do you have any range that you can give us?

1  looking -- and turning and looking back at the officers.
2      Q.   So when you say it was "very early in the foot
3  pursuit," if the foot pursuit --
4      A.   No, not early in the foot pursuit.
5      Q.   Oh.
6      A.   Not early in the foot pursuit.  At the end of
7  the foot pursuit.  But very contemporary with seeing the
8  gun in Mr. Gonzalez's hand and Mr. Gonzalez turning
9  toward the officers, and then the shots are fired.
10     Q.   And how much time passed, based on you're
11 review, from the turn to the first shot?
12     A.   It's very, very quick.  Certainly, less than a
13 second.  I can't tell you in milliseconds, but it's --
14 it's very quick.
15          ==Going frame by frame in the video of Detective==
16 ==Sobaszek's video, body-worn camera video, you can==
17 clearly see Mr. Gonzalez turning, and his face facing
18 the deputies, while he's still running and his right
19 hand is up.
20          In the video, it's not clear enough to be able
21 to see what's in that hand, but the actions are
22 consistent with what the officers observed when they saw
23 the gun in his hand, and him turning, looking over his
24 shoulder back at the pursuing officers.
25     Q.   Is that uncommon, in your experience?  Someone

1  me?  You have 27:40-28:46?
2      A.   Yes.  That would be run time on his body-worn
3  camera.  So it would not be what it says -- the time
4  which is on the Axon body-worn camera frame, but it
5  would be the run time in running the video.
6          So running the video, when it gets to 27:40 to
7  28:46 is when those statements were made during the
8  pursuit, foot pursuit.
9      Q.   Okay.  So the 28:46, that would be about the
10 time of, "You're going to get shot, dude?
11     A.   Yes, that would be about the time.
12     Q.   And then do you have a reference, time-wise, on
13 his body-worn camera as to when the shots occurred?
14     A.   I likely do.  Let me see if I can find it for
15 you.
16         I'm not sure I can find that right now.  I
17 probably have to look that up and look at the video
18 again.
19     Q.   Okay.
20     A.   I try to go by whichever -- each of the video
21 and identify on the videos, because the time frames on
22 the warehouse video is different than the time frames on
23 the body-worn camera.  In fact, it even goes to hundreds
24 of a thousands of a second on that warehouse video.
25     Q.   Okay.  Going to page 26 of your report, you

1    have figures 3, 4, 5, and 6.  Do you see those?

2         A.   I do.

3         Q.   And these are coming from what camera, if you

4    know?

5         A.   The stationary camera, security camera inside

6    the building of the juice factory.

7         Q.   Okay. Okay.  And then am I understanding the

8    first one, so figure 3, the time, would it be 8:04 and

9    37 seconds?

10        A.   Yes.  And then --

11        Q.   Point-768 would be a portion of the next

12   second?

13        A.   Correct.  That's the way I interpreted it, yes.

14        Q.   Okay.  And that shows Gonzalez running down the

15   left side of the walkway?

16        A.   Correct.

17        Q.   Any knowledge of any gun in his hand at that

18   point?

19        A.   I believe that at that point, and throughout

20   the pursuit, he was trying to maintain control of what

21   was likely the firearm that was in his waistband.  So he

22   was swinging with a normal running gait with his left

23   hand, and his right hand was holding the object that

24   turned out to be likely the firearm, with his right

25   hand.

1        Go ahead.

2        THE WITNESS: Sorry. I believe it was from an

3   officer at the hospital.

4   BY MR. GALIPO:

5        Q.   Oh, okay.

6             The -- on page 26, you have towards the bottom,

7   it's kind of like in dark bold: "You're going have to

8   kill me"?

9             Do you see that?

10       A.   Yes.

11       Q.   Did you hear that statement on any recording?

12       A.   I could hear Gonzalez's voice, but I could not

13  make out exactly what he was saying.

14       Q.   Okay. So at least when you listened to the

15  recordings of Mr. Gonzalez, did you ever make out that

16  he said, "You're going to have to kill me"?

17       A.   I could not hear it well enough, no.

18       Q.   And I think you indicated that the quality of

19  the video was such that you could not see an object in

20  Mr. Gonzalez's right hand when it was raised? Is that

21  what you're saying?

22            MS. KORNBLAU: Objection. Misstates testimony.

23            THE WITNESS: I could see his hand being

24  raised. I could not tell what was in his hand.

25  BY MR. GALIPO:

1    Q.   Okay.
2         Did you ever see Mr. Gonzalez point a firearm
3    at the officers in any of the video you looked at?
4         MS. KORNBLAU:  Objection.  Calls for
5    speculation.
6         THE WITNESS:  No.  I could not see that on the
7    videos.  The videos are not that great.
8    BY MR. GALIPO:
9    Q.   And then I'm on page 27 now.  So this is the
10   time frame you have:  8:04 and 44 seconds, with the
11   raised right hand, looking back?
12   A.   Correct.
13   Q.   And you don't know when the shots happened in
14   relation to this time frame?
15   A.   Almost instantly from there, because it's when
16   he disappears from view behind that hanging tarp or
17   covering, because he -- once he gets behind there, he
18   goes down.
19   Q.   Well, aren't we able to get the timing from
20   Sobaszek's body-worn camera?
21   A.   I believe so, yes.  But it doesn't show this
22   angle.  On this angle, this the time -- the time period.
23   Q.   In Sobaszek's body-worn camera, can you see him
24   with a gun in his right hand, raised?
25   A.   You can see his right hand raised and his head

1    turned back over his left shoulder, looking at deputies.
2    I cannot tell on the video what's in his right hand.
3        Q.   Okay.  But obviously, in that body-worn camera,
4    from that point going forward, we'd be able to time it
5    as to when the first shot occurred?
6        A.   Yes.
7        Q.   And then on page 27, under this image you have
8    depicted, you mention that Sobaszek:  "Fired his pistol
9    at the center mass area of Gonzalez, his back, and left
10   side of his back."
11           Do you see that sentence?
12       A.   Yes.
13       Q.   So did you get that, in part, from Sobaszek's
14   deposition testimony, that he was aiming at the back and
15   left side of the back when he fired?
16       A.   From his deposition and from his interview.
17       Q.   Are you aware from your review of the materials
18   that there were multiple shots fired while Mr. Gonzalez
19   was going to the ground, and also after he was on the
20   ground?
21       A.   I can't tell you exactly where he was in
22   reference to moving and moving to the ground when each
23   round hit.  He was hit multiple times, and he went to
24   ground.  Exactly where he was hit, at what point, I
25   can't tell you.

1  Q. But in looking at Sobaszek's body-worn camera
2  footage, you do see Mr. Gonzalez bending forward at some
3  point, and then going to the ground afterwards?
4  A. Yes.
5  Q. And you can hear when the shots are occurring,
6  in relation to that, on the video; is that fair?
7  MS. KORNBLAU: Objection. Vague.
8  THE WITNESS: You can hear all of -- well, I
9  can't tell you if you can hear all the shots, because I
10 don't know if I could count individually, each one of
11 them. But you can hear multiple gunshots while the
12 suspect is being impacted and then going to the ground.
13 BY MR. GALIPO:
14     Q. I guess my question is, based on your review as
15 an expert in this case, when you looked at the videos,
16 did you note that there were shots being fired as he was
17 going to the ground and on the ground?
18         MS. KORNBLAU: Objection. Vague.
19         Go ahead.
20         THE WITNESS: I -- I think that it's possible.
21 I just cannot tell you conclusively exactly where he was
22 in reference to being fully upright, to being on the
23 ground, when each round impacted him.
24 BY MR. GALIPO:
25     Q. And just so my question is clear, I wasn't

1  shoot them?
2     A.  I believe he did say that he raised the gun,
3  which would have made it visible to the officers. But I
4  don't believe that he said that he was shooting at the
5  officers or that he intended to shoot at the officers.
6     Q.  Right. And he never said he turned towards
7  them or pointed his weapon at them either; is that fair?
8        MS. KORNBLAU: Objection. Vague.
9        THE WITNESS: I don't recall him making that
10 exact statement. I would just have to refer to what he
11 did say in his report.
12 BY MR. GALIPO:
13    Q.  On page 31 of your report, you have a section
14 that talks about gunshot wounds to the suspect's back or
15 after falling to the ground?
16    A.  Yes.
17    Q.  Why did you include a section on wounds to the
18 back?
19    A.  There was likely at least one wound to his
20 back. Generally, if somebody is running away, they have
21 their back towards you and they are looking over their
22 shoulder and they are pointing or preparing to fire a
23 weapon at the officers. Impact wounds are logical to
24 impact the suspect in the back.
25    Q.  But in this case, isn't it true that, at the

```
1   STATE OF CALIFORNIA)
                       ) ss:
2   COUNTY OF BUTTE    )

3
             I, KIMBERLY E. D'URSO, do hereby certify:
4

5            That the witness named in the foregoing

6   deposition was present remotely and duly sworn to testify

7   to the truth in the within-entitled action on the day and

8   date and at the time and place therein specified;

9            That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12           That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15           Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19           That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21           IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 11th day of January, 2026.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```