ROB BONTA
Attorney General of California
CATHERINE WOODBRIDGE
Supervising Deputy Attorney General
AMIE BEARS
Deputy Attorney General
State Bar No. 242372
MARIO E. GARCIA
Deputy Attorney General
State Bar No. 339990
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone:  (916) 210-7663
 Fax:  (916) 322-8288
 E-mail:  Amie.Bears@doj.ca.gov
*Attorneys for Defendants*
*California Highway Patrol and Officer Irick*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GEORGE GONZALEZ,**<br><br>                                  Plaintiff,<br><br>        **v.**<br><br>**STATE OF CALIFORNIA; CITY OF HEMET; PATRICK SOBASZEK; ANDREW REYNOSO; SEAN IRICK; and DOES 1-10, inclusive,**<br><br>                                  Defendants. | 5:25-cv-00331-KK-DTB<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 3 TO EXCLUDE OPINION EVIDENCE FROM, AND ANIMATIONS RECONSTRUCTIONS BY, PLAINTIFF'S EXPERT SCOTT HOLDAWAY; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF AMIE BEARS IN SUPPORT THEREOF**<br><br>Date:          April 23, 2026<br>Time:          10:30 a.m<br>Courtroom:  3<br>Judge:         The Honorable Kenly Kiya Kato<br>Trial Date:   May 11, 2026<br>Action Filed: 12/24/2024 |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE THAT prior to the trial in the above-entitled action, at the pretrial conference on April 23, 2026 or as soon thereafter as counsel may be

1

heard in in Courtroom 3 of the United States District Court located at 3470 12th Street, Riverside, CA 92501, Defendants California Highway Patrol and Officer Irick ("Defendants") will and hereby do move the Court for an order in limine precluding any testimony, opinions, reports, reconstructions, animations, or other demonstratives by plaintiff's expert Scott Holdway on the grounds that: (1) Mr. Holdaway is not qualified to render the opinions contained in his report (Fed. R. Evid. 702); (2) Mr. Holaway's opinions, reconstructions, and animations are not helpful to the jury, and, in fact, invade the province of the jury in many instances (Fed. R. Evid. 702); (3) Mr. Holdaway's opinions, reconstructions, and animations are unreliable because they are not based on sufficient facts and data (Fed. R. Evid. 702); and (4) Mr. Holdaway's opinions and animations are inaccurate and misleading and are therefore more prejudicial than probative (Fed. R. Evid. 401, 402, 403).

This motion is based upon this notice of motion, the attached memorandum of points and authorities, all pleadings and records on file in this action, and on such further authority, evidence, or argument as may be presented at or before the time of any hearing on this motion.

This Motion is made following a conference of counsel pursuant to L.R. 7-3 and L.R. 16-2.6, which took place on March 19, 2026.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **INTRODUCTION**

Defendants move in limine to exclude any testimony, opinions, reports, reconstructions, animations, or other demonstratives by plaintiffs' expert Scott Holdaway.

This litigation arises out of a non-fatal shooting following a vehicle pursuit. Plaintiff was initially contacted on a felony warrant by three members of the Riverside County Regional Gang Task Force Region 3 (GTF3 that included

California Highway Patrol (CHP) Officer Sean Irick, Hemet Police Department (HPD) Detective Patrick Sobaszek, and HPD Sergeant Andrew Reynoso. The initial contact was made while Plaintiff was standing outside of a vehicle. The three officers gave commands to take Plaintiff into custody, but he refused to comply and instead entered his vehicle where he placed a sunscreen in the window and continued to move within the vehicle. Plaintiff threw items from the vehicle and made verbal statements to officers that they would have to kill him. Despite numerous efforts to get Plaintiff to comply with commands, Plaintiff decided to drive away at a high rate of speed, at which time a pursuit ensued.

After an approximately twenty (20) minute vehicle pursuit, Plaintiff's vehicle became disabled and stuck on train tracks. Rather than surrendering, Plaintiff exited the vehicle through the driver's door and fled on foot, ignoring officer commands to stop.

A foot pursuit then ensued, continuing into an industrial complex in the 500 block of B Street where Gonzalez presented a handgun in his right hand while continuing to flee. In response to his actions, all three officers engaged Gonzalez and discharged their firearms.

Gonzalez was struck several times prior to dropping his firearm and falling to the ground. Medical aid was rendered prior to Gonzalez being transported to Riverside University Health System Medical Center in Moreno Valley where he was treated for nonfatal gunshot wound injuries. The Hemet Officers were wearing body worn cameras.

Plaintiff intends to offer evidence manipulations of the City of Hemet's body worn cameras done by plaintiff's expert Scott Holdaway.  In his various reconstructions included with his report, Mr. Holdaway attempts to reconstruct the incident in this case. Mr. Holdaway also offers opinions and "observations" concerning the incident and the evidence in the form of the addition of various graphic to the images and putting the two cameras side by side when in fact the

officers wearing the cameras were running in tandem.  Mr. Holdaway's "observations" contained in his report consist of his own interpretation and arguments regarding what the evidence shows.  None of these "observations" are dependent upon any specialized knowledge, skill, experience, training or education, but are instead attempts to invade the province of the jury. The graphics added to the videos are inaccurate and unreliable, and contain blatantly misleading information, and the reconstructions are not helpful to the jury given that the jury will have the opportunity to view actual videos, audios, and photographs of the incident. Based on Mr. Holdaway's report and his deposition testimony, Defendants respectfully requests that the court exclude Mr. Holdaway as an expert witness. Fed. R. Evid. 602, 702, 401, 402, and 403.

**ARGUMENT**

**I.     THE STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY**

Federal Rules of Evidence 702 authorizes a witness qualified as an expert by "knowledge, skill, experience, training, or education" to testify, so long as the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702 imposes an obligation on a trial judge "to ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  This basic gatekeeping obligation applies to all expert testimony.  *Kumho Tire Co, Ltd.. v. Carmichael*, 526 U.S. 137, 141 (1999).  In all cases where expert testimony is offered, the trial judge must find that the testimony is "properly grounded, well-reasoned and not speculative before it can be admitted."  *See* Fed. R. Evid. 702, Adv. Comm. Notes (2000). The proponent of the expert witness bears the burden of proving the admissibility of the expert witness's testimony. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010); *United States v. 87.98 Acres of Land More Or Less in the County of Merced*, 530 F.3d 899, 904 (9th Cir. 2008).

Case law specifically shows that this Court should exclude proposed expert testimony when the witness is not qualified to provide an opinion regarding the subject at issue. *Graff v. Baja Marine Corp.*, 310 Fed. Appx. 298 (11th Cir. 2009) (unpublished) (trial court had discretion to exclude expert testimony on the basis that the expert was unqualified in the subject matter and because the opinion of the expert was unreliable); *Bogosian v. Mercedes-Benz of North America, Inc.*, 104 F.3d 472, 476-477 (1st Cir. 1997) (trial court properly found that a proffered expert lacked the requisite education and training to provide an opinion related to the subject matter); *United States ex rel. Davis v. U.S. Training Center Inc.,* 498 Fed. Appx. 308, 320-321 (4th Cir. 2012) (unpublished decision) (it was within the trial court's discretion to exclude a portion of an expert's opinion after determining that it was outside of the area of expertise of the witness).

Case law is also clear that an expert may not base his or her opinion on speculation or conjecture. *Riegel v. Medtronic, Inc.*, 451 F.3d 104 (2d Cir. 2006), aff'd, 128 S. Ct. 999, 169 L. Ed. 2d 892 (2008) (expert's opinion was properly excluded as speculative and unreliable); *Tunnell v. Ford Motor Co.*, 245 Fed. Appx. 283, 285-287 (4th Cir. 2007), cert. denied, 128 S. Ct. 1447, 170 L. Ed. 2d 276 (2008) (unpublished decision) (trial court properly struck an expert opinion which was speculative, based upon untested methodology, and insufficiently certain); *Hathaway v. Bazany*, 507 F.3d 312, 317-319 (5th Cir. 2007) (proposed expert's testimony was speculative and unreliable under *Daubert* and thus, it was properly excluded); *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429-436 (6th Cir. 2007) (expert opinion was properly excluded because the expert was not sufficiently qualified to provide an opinion on the subject matter at issue and the opinion was based upon speculative and unreliable methodology); and *Smith v. Sears Roebuck and Co.*, 232 Fed. Appx. 780, 783 (10th Cir. 2007) (unpublished decision) (expert's opinion was speculative and unreliable because: he did not support his theories with studies; he did not account for contradictory facts that

were in evidence; and he failed to rule out possible alternative theories).

In addition, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "'An expert's opinions that are without factual basis and are based on speculation or conjecture' are inadmissible at trial … .'" *California ex rel. Brown v. Safeway, Inc.*, 615 F.3d 1171, 1181 n. 4 (9th Cir. 2010) (quoting *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2nd Cir. 2008)); *see also Guidroz-Brault v. Missouri Pacific R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (declaring that 'unsupported speculation and subjective beliefs" cannot be a basis for expert testimony). Moreover, an expert who offers no more than "a bottom line conclusion" does not assist the trier of fact. *See Baldauf*, 2006 WL 3743819, at *3; *Coachmen Industries, Inc. v. Kemlite*, 2008 WL 4858385, at *3 (N.D. Ind. Nov. 10, 2008).

Finally, expert testimony should be excluded under Rule 403 when the trial court determines that the probative value of the expert opinion is substantially outweighed by risks of prejudice, confusion of the issues, or waste of time. *United States v. Verduzco,* 373 F.3d 1022, 1033, fn. 10 (9th Cir. 2004) (expert testimony excluded under Federal Rule of Evidence 403 as unduly prejudicial).

## II.    MR. HOLDAWAY IS NOT QUALIFIED TO RENDER OPINIONS IN SEVERAL AREAS IN WHICH HE OFFERS OPINIONS AND RECONSTRUCTIONS

Mr. Holdaway is not a ballistics expert. Bears Decl., ¶ 2, Ex. 1, p. 1. His education is a degree in Digital Media Arts. He has no law enforcement or ballistics experience. *Id*., ¶ 2, Ex. 1, pp. 4-6. Mr. Holdaway admits that he is not a firearms instructor and has no certifications regarding firearms. *Id*., ¶ 3, Ex. 2, p. 12, 9-13. More importantly, Mr. Holdaway did not consult with a firearms expert to prepare his report. *Id*., ¶ 3, Ex. 2, p. 61 6- 10. His opinions lack foundation.

Mr. Holdaway's list of previous cases worked on does not specify whether he has been qualified to testify as an expert to opine on any of the issues in his report in this case. Bears Decl., ¶ 2, Ex. 1. The descriptions of these prior cases are vague and do not at any point state that Mr. Holdaway has testified as an expert in ballistics, bullet trajectory, police procedures, human factors, forensic pathology, or psychology. *Id*. Many of the cases listed do not refer to testimony as an expert at all but rather list cases in which he was hired to create animations of incidents. *Id*.

There is simply no foundation for Mr. Holdaway to offer any conclusions and opinions, and his purported "expertise" is limited to creating demonstrative evidence. Fed. R. Evid 602, 702.

Simply put, Mr. Holdaway has no specialized "knowledge, skill, experience, training, or education" beyond that of an average juror on the topics on which he purports to render opinions. Rather, Mr. Holdaway's video manipulations are biased interpretations and speculation based on his observations of some (but not all) of the videos of the incident, the accompanying audio, and a series of reports. Mr. Holdaway is not only unqualified to render such opinions, but his representation of "scientific certainty" will be misleading to a jury. Accordingly, Mr. Holdaway is not qualified to render the opinions contained in his report and reconstructions, and those opinions should be excluded.

## III.  MR. HOLDAWAY'S ALTERED VIDOES WILL NOT ASSIST THE JURY

The opinions offered by Mr. Holdaway are not admissible under Federal Rule of Evidence 702 because they will not help the trier of fact understand the evidence or determine a fact issue. *See Scott v. Sears, Roebuck & Co.*, 789 F.2d at 1055 (holding that expert testimony should not be admitted "as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance."). Moreover, when cases involve review of events captured on video, courts have held that an expert's opinion

regarding the contents of the video should not be permitted when the expert is no better suited than the jury to interpret the video's contents. *Prosper v. Martin*, 989 F.3d 1242, 1250 (11th Cir. 2021); *Morales v. Fry*, No. C12-2235-JCC, 2014 WL 12042563, at *4 (W.D. Wash. Mar. 25, 2014). Here, the jury is fully capable of watching and interpreting the contents of the videos and audio of the incident and then using their own interpretation to assist them in making the necessary factual determinations.

Likewise, credibility determinations fall squarely within the province of the jury, and expert witnesses are not permitted to offer opinions on the credibility of another witness. *United States v. Charley,* 189 F.3d 1251, 1267 (10th Cir. 1999); *Nimely v. City of New York,* 414 F.3d 381, 398 (2nd Cir. 2005); *United States v. Sine* 493 F.3d 1021, 1040 (9th Cir. 2007); *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) ("[E]xpert witnesses may not testify based on their personal view of the veracity of a lay witness's testimony"). Jurors are fully capable of determining the credibility of a witness. Therefore, any expert opinion regarding a witness's credibility will not assist the jury and should be excluded under Federal Rule of Evidence 702.  *See United State v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) ("The touchstone of [FRE 702] is whether the testimony will assist the jury").

Mr. Holdaway does nothing more than slow and stabilize, interpret and weigh the contents in his client's favor, and draw conclusions that an ordinary person can make. He then turns his interpretation of the evidence into unsupported annotations of where he believes the shots were fired and where the bullet casings went. Not only is there no foundation for his video, Mr. Holdaway's testimony will not assist the jury and it should be excluded.

## IV.    MR. HOLDAWAY'S 'S OPINIONS ARE NOT BASED ON SUFFICIENT FACTS OR DATA AND ARE THEREFORE NOT RELIABLE

Evidence that is not grounded in some sort of methodology or procedure of science is nothing more than subjective belief or unsupported speculation that does not assist the trier of fact. *Daubert*, 509 U.S. at 590. Mr. Holdaway does not rely upon any certain methodology or scientific procedure to prepare scene reconstructions that purport to show the movements and positions of the officers and the sequence and trajectories of Officer's gunshots. The methodologies described by Mr. Holdaway of simply slowing down and observing the video have not been established as one that is reliable or accepted in the relevant scientific or technical communities. *Dasho v. City of Federal. Way*, 101 F. Supp. 3d 1025, 1032 (W.D. Wash. 2015) (case involving expert opining on sequence of shots fired and trajectory; court found merely stating that universally accepted methods were used is insufficient to establish reliability). Mr. Holdaway has made no reference to his methodologies as accepted in the relevant scientific or technical community anywhere in his report, for any purpose. He simply describes his methodology, which can be summed up as slowing down and watching the videos and prepared annotations. Mr. Holdaway's opinions as set forth in his report are unsupported speculation and are inherently unreliable. As a result, his opinions should be excluded.

## V.   DEFENDANT'S OBJECTIONS TO "SIDE BY SIDE" VIDEOS OF OFFICER'S BODYWORN CAMERAS

To determine whether expert testimony is reliable, the court must assess whether the reasoning or methodology underlying the testimony is scientifically valid. Expert opinion testimony is deemed sufficiently reliable if the expert has "good grounds" for the testimony—i.e., if the expert's conclusions are based on the knowledge and experience of the expert's discipline rather than on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589; *Kumho Tire Co., Ltd.,* 526 US at 147-148.

9

To ensure the reliability of expert testimony, the trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom *the same level of intellectual rigor* that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.,* 526 U.S. at 152 (emphasis added); *Jahn v. Equine Services, PSC,* 233 F.3d 382, 388 (6th Cir. 2000); *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002). To satisfy the Rule 702 and *Daubert* requirements, an expert needs to demonstrate that their "conclusions were the fruit of a rigorous, objectively-verifiable approach— something more than mere speculation. … [E]ven a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Timm v. Goodyear Dunlop Tires North America, Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019) (internal quotes omitted).

"[A]n expert [or a video] cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Berman v. Sink*, 2016 U.S. Dist. Lexis 70048, *29-*30 (E.D. Cal. May 27, 2016) citing to *Highland Capital Mgmt L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005). Similarly, "[s]imply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702." *Sharkey v. JP Morgan Chase & Co.*, 978 F. Supp. 2d 250, 252 (S.D.N.Y. 2013). Expert testimony is also inadmissible if it "undertakes to tell the jury what result to reach," thereby "attempt[ing] to substitute the expert's judgment for the jury." *United States v. Duncan*, 42 F.3d 97, 101 (2nd Cir. 1994). Specifically, in the *Highland Capital* case, the expert, O'Shea, declared "that he conducted [his] analysis based upon his review of 'the complaint and certain other pleadings in th[e] matter,' the exhibits used during the course of the depositions, and certain deposition transcripts." *Highland Capital,* 379 F. Supp. 2d at 468. As the court stated,

> [t]o the extent that O'Shea is simply rehashing otherwise admissible
> evidence about which he has no personal knowledge, such evidence -

10

taken on its own - is inadmissible. While an expert must of course rely on facts or data in formulating an expert opinion, *see* Fed. R. Evid. 703, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence. *See Rezulin*, 309 F. Supp. 2d at 551 (rejecting portions of plaintiffs' expert's testimony that was "a narrative reciting selected regulatory events" because "such material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence") ....
*Highland Capital,* 379 F. Supp. 2d at 468-69.

Moreover, no expert and no video may "supplant the role of counsel in making argument[s] at trial, and the role of the jury [in] interpreting the evidence." *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001); *accord Rezulin, supra*, 309 F. Supp. 2d at 541. An expert's opinion and a video, must be rejected, where they "[do] no more than counsel for the [plaintiff] will do in argument, i.e., propound a particular interpretation of [defendant]'s conduct", or an interpretation of the evidence). *Primavera, supra*, 130 F. Supp. 2d at 530. The creation of a "side by side" video impermissibly seeks to improperly invade the province of the jury by offering a view of the incident that did not occur. Given that the above "observations" are merely Mr. Holdaway's own interpretations of the evidence that require no specialized education, experience, knowledge, skill, or training – and include opinions regarding the credibility of the involved officers – they should be excluded.

## CONCLUSION

Mr. Holdaway's video lacks foundation, misrepresents the evidence, and he himself lacks no personal knowledge and has no expertise to make the opinions he provides. The video is nothing more than an inadmissible attempt to supplant the jury's role in interpreting the evidence. Based on the forgoing, Defendants will and hereby do move the Court for an order in limine precluding any testimony,

11

opinions, reports, reconstructions, animations, or other demonstratives by plaintiffs' expert Scott Holdaway.

Dated:  March 26, 2026                          Respectfully submitted,

ROB BONTA
Attorney General of California
CATHERINE WOODBRIDGE
Supervising Deputy Attorney General


*Amie Bears*

AMIE BEARS
Deputy Attorney General
*Attorneys for Defendants*
 *California Highway Patrol and*
*Officer Irick*

## DECLARATION OF AMIE BEARS

I, AMIE BEARS declare as follows:

1.    I am a duly appointed Deputy Attorney General and am assigned to represent Defendant CHP and Officer Irick in the above-captioned action.  The facts set forth herein are within my personal knowledge.

2.    Attached hereto as Exhibit 1 is a true and correct copy of Scott Holdaway's report.

3.    Attached hereto as Exhibit 2 are true and correct copies of relevant excerpts from the deposition of Scott Holdaway taken on January 22, 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 26, 2026, at Sacramento, California.

/s/  Amie Bears
Amie Bears

13

# EXHIBIT 1

# CURRICULUM VITAE

## SCOTT HOLDAWAY

**FORENSIC VIDEO ANALYST**

CVisualEvidence LLC
2441 W 205th St., Suite C102, Torrance, CA 90501
Phone: (310) 831-8900
Scott@CVisualEvidence.com

## EMPLOYMENT HISTORY

**FORENSIC VIDEO ANALYST**
CVisualEvidence LLC
Torrance, CA
(2019 – present)
Video clarification, timing, graphics, stabilization, conversions

**INSTRUCTOR, EDITOR, AND MEMBERSHIP SERVICES**
PADNET (Public Access Digital Network)
Long Beach, CA
(2019)
Video production and editor. Instructed classes on digital video editing

## EDUCATION AND ACADEMIC BACKGROUND

**BACHELOR OF ARTS DEGREE**
Major in Digital Media Arts
California State University, Dominguez Hills
Carson, CA
(2017 – 2019)
*Honors: Dean's List Fall 2017, Spring 2018, Fall 2018, Spring 2019, Graduating with University Honors, 2019 - Magna Cum Laude*

**ASSOCIATE OF ARTS DEGREE**
Major in Digital Media Arts
Long Beach City College
Long Beach, CA
(2014 – 2017)
*Received a Certificate of Accomplishment in Fundamentals of Digital Media Art*

**LEVA - LEVEL 3: THE PRINCIPLES OF FORENSIC VIDEO/IMAGE COMPARE AND CONTRAST**
*40-hour course* (February 2025)

**AXON INVESTIGATE (FORMERLY INPUT-ACE) RECERTIFICATION**
*5-hour course* (October 2024)

**LEVA - LEVEL 2: DIGITAL MULTIMEDIA EVIDENCE PROCESSING**
*40-hour course* (July 2024)

**LEVA - LEVEL 1: FORENSIC VIDEO ANALYSIS & THE LAW**
*40-hour course* (May 2024)

**LEVA - ADVANCED VIDEO EXAMINATION**
*24-hour course* (February 2024)

**LEVA - COURTROOM TESTIMONY FOR EXPERT WITNESSES**
*24-hour course* (January 2023)

**INPUT-ACE - INTRO & BEST PRACTICE**
*4-hour course* (September 2022)

**INPUT-ACE - VIDEO REVIEW AND WORKFLOW**
*4-hour course* (September 2022)

**INPUT-ACE - NARRATIVE REPORTS**
*4-hour course* (August 2022)

**INPUT-ACE - WORKFLOW AND TECHNICAL CONSIDERATIONS**
*4-hour course* (August 2022)

**INPUT-ACE - CASE MANAGEMENT**
*4-hour course* (August 2022)

**INPUT-ACE - INTRO TO INPUT-ACE**
*4-hour course* (August 2022)

**INPUT-ACE - DIGITAL MULTIMEDIA EVIDENCE**
*1-hour webinar* (July 2022)

**INPUT-ACE - ASPECT RATIO: RESIZING AND INTERPOLATION**
*1-hour webinar* (July 2022)

**INPUT-ACE - GETTING STARTED**
*1-hour webinar* (July 2022)

## CERTIFICATIONS AND COMMISSIONS

**LEVA - FORENSIC VIDEO TECHNICIAN CERTIFICATION**
(2024 - Present)

**AXON INVESTIGATE - OPERATOR CERTIFICATION**
(2022 - Present)

**AXON INVESTIGATE - EXAMINER CERTIFICATION**
(2022 - Present)

**STATE OF CALIFORNIA NOTARY PUBLIC**
(2019 - Present)


## COURTROOM TESTIMONY

**Lam vs. State of California**
The Superior Court of California, County of Los Angeles – Airport Courthouse
May 2024
*Philip Kent Cohen, APC*

**Rusanovskaya vs. City of Los Angeles**
The Superior Court of California, County of Los Angeles – Van Nuys Courthouse East
April 2023
*Panish Shea Ravipudi LLP*


## DEPOSITION TESTIMONY

**Valdivia vs. City of Covina**
June 2025
*The Law Offices of Dale K. Galipo*

**Scott vs. Riverside**
May 2025
*Balaban & Spielberger LLP*

**Kress vs. Union Pacific Railroad Company**
March 2025
*Panish Shea Ravipudi LLP*

**Mitschiener vs. The Parking Spot**
March 2024
*Panish Shea Ravipudi LLP*

**Murillo vs. City of Los Angeles**
January 2024
*The Law Offices of Dale K. Galipo*

**Tabares vs. The City of Huntington Beach**
May 2023
*The Law Offices of Dale K. Galipo*

**Rusanovskaya vs. City of Los Angeles**
April 2023
*Panish Shea Ravipudi LLP*

**IM vs. CHP**
November 2022
*Carrillo Law Firm LLP*

**McClain vs. City of Pasadena**
September 2022
*Carrillo Law Firm LLP*

**Sesma vs. State of California**
July 2022
*The Law Offices of Dale K. Galipo*


## EVIDENCE ACCEPTED IN COURT WITHOUT TESTIMONY

**Simpson vs. Loma Linda**
October 2025
*Balaban & Spielberger LLP*

**XM vs. Gonco**
September 2024
*Panish Shea Ravipudi LLP*

**Loeser vs. Norcal Beverage Co., Inc**
April 2024
*Greene Broillet & Wheeler LLP*

**Greener, Jack vs. Del Mar Jiu Jitsu**
March 2023
*Panish Shea Ravipudi LLP*

**Murillo vs. City of Los Angeles**
September 2022
*The Law Offices of Dale K. Galipo*

**French vs. City of Los Angeles**
October 2021
*The Law Offices of Dale K. Galipo*

**Lee vs. Pacific Dining Group**
August 2021
*Panish Shea Ravipudi LLP*


## FEE SCHEDULE

**Forensic Video Analysis:**          $ 250.00 per hour

**Deposition and Trial Testimony:**   $ 300.00 per hour


*UPDATED 11-24-2025*

*Gonzalez vs. City of Hemet*

**Scott Holdaway**
Forensic Video Analyst
CVisualEvidence LLC
2441 W 205th Street, Suite C102
Torrance, CA 90501

I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

## 1. Summary Report of Evidence Examination

On April 27th, 2024, our office was contacted by Trent Packer to retain my professional services to analyze the videos provided.

Case Materials Received:
- Shooting Officer BWC - HPD Ofcr. Patrick Sobaszek.mp4
- Shooting Officer BWC - HPD Sergeant Andrew Reynoso.mp4
- 42. Incident Report. OIS Scene. by Inv. Mendoza. 031524.pdf
- 60. Incident Report. Charting. CHP Ofcr. Irick. by Inv. Manjarrez. 020224.pdf
- 61. Incident Report. Charting. by Dpty. Ditfurth. 071524.pdf

## 2. Scope of Work Performed

Using the case materials received, I have created 7 videos. Each video comes with an uncompressed (.bmp) image sequence, PDF, and .mp4 version of the video.

- Officer Sobaszek BWC with graphics.mov
- Officer Reynoso BWC with graphics.mov
- Officer Sobaszek BWC - 4x enlargement and stabilized.mov
- Officer Sobaszek BWC - 4x enlargement and stabilized with graphics.mov
- Officer Sobaszek and Reynoso BWC - Side by side.mov
- Officer Sobaszek and Reynoso BWC - Side by side with graphics.mov
- 4x Enlargement and Stabilization Comparison.mov

## 3. Technical Characteristics of the Multimedia Evidence

Shooting Officer BWC - HPD Ofcr. Patrick Sobaszek.mp4
There is an on-screen time/date stamp represented in this body worn camera (BWC) video that begins on 1/24/2024 at 19:35:58 and ends on 1/24/2024 at 20:52:56. The total running time of the video is 1 hour, 16 minutes, and 57 seconds. The recorded images are 1280x720 pixels, h.264 encoding with a frame rate of 29.99 frames per second (fps). This video has a stereo audio track.

Shooting Officer BWC - HPD Sergeant Andrew Reynoso.mp4
There is an on-screen time/date stamp represented in this BWC video that begins on
1/24/2024 at 19:36:05 and ends on 1/24/2024 at 20:52:54. The total running time of the
video is 1 hour, 16 minutes, and 49 seconds. The recorded images are 1280x720
pixels, h.264 encoding with a frame rate of 30 frames per second (fps). This video has a
stereo audio track.

## 4. My Production of Video Exhibits

Officer Sobaszek and Reynoso BWC - Side by side with graphics.mov
This exhibit is an 18-second clip of *Shooting Officer BWC - HPD Ofcr. Patrick
Sobaszek.mp4* and *Shooting Officer BWC - HPD Sergeant Andrew
Reynoso.mp4* synchronized and played side by side on one screen. A frame
counter has been added at the lower right-hand corner of each video that starts
on 0 on the first frame of the original full-length footage and then sequentially
numbers each individual frame. The videos have been synchronized using
visual cues that can be seen in both videos at the same time. Timers and
synchronization are accurate within a margin of one or two frames. A yellow
timer has been added that starts in the negative and counts forward toward
positive until it reaches zero. The frame where the timer turns to zero is aligned
with the first indication of a gunshot being fired, which is gun smoke leaving
Officer Sobaszek's firearm on frame 51829 of his BWC video. The timer turns
green when it reaches 0 and remains green as it counts forward in the positive.
Text graphics have been added to sequentially number the gunshots being
fired and identify which officer fired each shot. Blue circles are placed around
the first frame of video where a visual indication of a gunshot being fired
occurs. Bullet casings seen in Officer Sobaszek's BWC video are tracked with
circle graphics. The pink circles track bullet casings that appear to come from
Officer Sobaszek's firearm, and the orange circles track bullet casings that
appear to come from Officer Irick's firearm. A text box has been added to the
lower left that keeps track of how many gunshots each officer has fired, as well
as the total number of gunshots fired. A green circle graphic has been added to
frame 51857 of Officer Sobaszek's BWC video to indicate the first frame of
video where the firearm is no longer in the person of interest's hand. A green
circle has also been added to frame 51865 of Officer Sobaszek's BWC video to
indicate when the firearm appears to land on the ground. This video comes
with an uncompressed (.bmp) image sequence, PDF, and .mp4 version of the
video.

**Synchronizing the videos:**



*A reflection of Officer Reynoso's light (yellow circle) **is not seen** in either video. (green circle)*



*On the next frame, a reflection of Officer Reynoso's light (yellow circle) **is seen** in both videos at the same time. (green circle)*



*The reflection of Officer Reynoso's light **goes away** in both videos on the next frame at the same time.*

<u>Officer Sobaszek and Reynoso BWC - Side by side.mov</u>
This exhibit is a duplicate of *Officer Sobaszek and Reynoso BWC - Side by side with graphics.mov*, except the graphics have been removed. (The frame counter graphic is not removed because it identifies each frame of video with a number to reference).

<u>Officer Sobaszek BWC with graphics.mov</u>
This exhibit is a duplicate of *Officer Sobaszek and Reynoso BWC - Side by side with graphics.mov*, except Officer Reynoso's BWC Video has been removed. The text box in the lower left and the circle graphics that track bullet casings have also been removed.

<u>Officer Reynoso BWC with graphics.mov</u>
This exhibit is a duplicate of *Officer Sobaszek and Reynoso BWC - Side by side with graphics.mov*, except Officer Sobaszek's BWC Video has been removed. The text box in the lower left and the circle graphics that track bullet casings have also been removed.

<u>Officer Sobaszek BWC - 4x enlargement and stabilized with graphics.mov</u>
This exhibit is a duplicate of *Officer Sobaszek BWC with graphics.mov* except Officer Sobaszek's BWC video has been enlarged and stabilized. Only frames of video where the person of interest can be seen have been stabilized. The text box in the lower left and the circle graphics that track bullet casings have also been removed.

<u>Officer Sobaszek BWC - 4x enlargement and stabilized.mov</u>
This exhibit is a duplicate of *Officer Sobaszek BWC - 4x enlargement and stabilized with graphics.mov* except all graphics have been removed (The frame counter graphic is not removed because it identifies each frame of video with a number to reference).

<u>4x Enlargement and Stabilization Comparison.mov</u>
This exhibit plays 3 versions of Officer Sobaszek's BWC synchronized on one screen. The video on the left is the original video that has not been enlarged or stabilized. The video in the middle is a 4x enlargement of the original video, but it has not been stabilized. The video on the right is a 4x enlargement of the original video, but it has been stabilized.

## 5. Indications of Gunshots in the Media:
In the exhibit *Officer Sobaszek and Reynoso BWC - Side by side with graphics.mov*, blue circles are used to annotate indications that a gunshot has occurred. Below is a list that documents which BWC and frame number each gunshot indication occurred on, along with a brief description of what is being annotated by the blue circles.

<u>Indications in the media of gunshots being fired by Officer Reynoso</u>
Reynoso BWC - Frame 51661 – Gun smoke and recoil
Reynoso BWC - Frame 51672 – Gun smoke and recoil
Reynoso BWC - Frame 51680 – Gun smoke and recoil
Reynoso BWC - Frame 51685 – Gun smoke and recoil
Reynoso BWC - Frame 51691 – Gun smoke and recoil
Reynoso BWC - Frame 51697 – Gun smoke and recoil

Indications in the media of gunshots being fired by Officer Sobaszek
Sobaszek BWC – Frame 51829 – Gun smoke and recoil
Sobaszek BWC – Frame 51836 – Gun smoke, muzzle flash, and recoil
Sobaszek BWC – Frame 51843 – Gun smoke and recoil
Sobaszek BWC – Frame 51849 – Gun smoke and recoil
Sobaszek BWC – Frame 51866 – Gun smoke and recoil
Sobaszek BWC – Frame 51877 – Gun smoke and recoil
Sobaszek BWC – Frame 51885 – Gun smoke and recoil
Sobaszek BWC – Frame 51893 – Gun smoke and recoil
Sobaszek BWC – Frame 51899 – Gun smoke and recoil
Sobaszek BWC – Frame 51908 – Gun smoke and recoil

In the video titled *Officer Sobaszek and Reynoso BWC - Side by side with graphics*, 5 bullet casings that appeared to come from Officer Sobaszek's firearm were tracked with a pink circle

Indications in the media of gunshots being fired by Officer Irick
Sobaszek BWC – Frame 51851 – Muzzle Flash
Sobaszek BWC – Frame 51859 – Gun smoke and recoil
Sobaszek BWC – Frame 51866 – Gun smoke against dark background
Sobaszek BWC – Frame 51873 – Muzzle flash
Sobaszek BWC – Frame 51880 – Muzzle flash
Sobaszek BWC – Frame 51887 – Muzzle flash
Sobaszek BWC – Frame 51894 – Gun smoke against dark background
Sobaszek BWC – Frame 51901 – Gun smoke against dark background
Sobaszek BWC – Frame 51908 – Gun smoke against dark background

In the video titled *Officer Sobaszek and Reynoso BWC - Side by side with graphics*, 8 bullet casings that appeared to come from Officer Irick's firearm were tracked with an orange circle.

If any additional media is received later, I may supplement my report based on that information.
Regards,

**Scott Holdaway** | CVisualEvidence LLC

# EXHIBIT 2

# In the Matter of:

## GEORGE GONZALEZ

## vs

## STATE OF CALIFORNIA

# SCOTT HOLDAWAY

# January 22, 2026



NATIONWIDE LEGAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GEORGE GONZALEZ,                          )
                                          )
                                          )
          Plaintiff,                      )
                                          )
v.                                        )   Case No.:
                                          )   5:25-CV-00331-KK-DTB
STATE OF CALIFORNIA; CITY OF HEMET )
PATRICK SOBASZEK; ANDREW REYNOSO;   )
SEAN IRICK; AND DOES 1-10,          )
INCLUSIVE,                          )
                                          )
          Defendants.                     )
_____)

DEPOSITION OF SCOTT HOLDAWAY

THURSDAY, JANUARY 22, 2026

ZOOM APPEARANCE

Reported by:  Kelly Wabbel, CSR No. 14736, CVR

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GEORGE GONZALEZ,                    )
                                   )
                                   )
           Plaintiff,              )
                                   )
v.                                 )   Case No.:
                                   )   5:25-CV-00331-KK-DTB
STATE OF CALIFORNIA; CITY OF HEMET )
PATRICK SOBASZEK; ANDREW REYNOSO;  )
SEAN IRICK; AND DOES 1-10,         )
INCLUSIVE,                         )
                                   )
           Defendants.             )
_____)


-oOo-

DEPOSITION OF SCOTT HOLDAWAY,

taken by the attorney for the Defendants; City of Hemet,

Patrick Sobaszek, and Andrew Reynoso, commencing at the hour

of 2:01 p.m., on Thursday, January 22, 2026, conducted remotely,

before Kelly Wabbel, Certified Shorthand Reporter No. 14736, CVR,

in and for the State of California.

APPEARANCES:


FOR THE PLAINTIFF GEORGE GONZALEZ:

LAW OFFICE OF DALE K. GALIPO
BY:   BRENDON JOHNSON, ESQUIRE
21800 BURBANK BOULEVARD, SUITE 310
WOODLAND HILLS, CALIFORNIA 91367
818.347.3333
bjohnson@galipolaw.com


FOR THE DEFENDANTS CITY OF HEMET,
PATRICK SOBASZEK, AND ANDREW REYNOSO:

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
BY:   ANDREA KORNBLAU, ESQUIRE
801 SOUTH FIGUEROA STREET, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90017
213.624.6900
andrea.kornblau@manningkass.com


FOR THE DEFENDANTS STATE OF CALIFORNIA, ACTING BY AND
THROUGH THE CALIFORNIA HIGHWAY PATROL, AND OFFICER
SEAN IRICK:

OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF
CALIFORNIA
BY:   AMIE BEARS, ESQUIRE
2550 MARIPOSA MALL, ROOM 5090
FRESNO, CALIFORNIA 93721
559.705.2312
Amie.Bears@doj.ca.gov

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                                    01/22/2026                                    Page 4

                                    I N D E X

EXAMINATION                                                                PAGE

BY MS. KORNBLAU                                                           6, 62

BY MS. BEARS                                                                58

BY MR. JOHNSON                                                             66


                                   E X H I B I T S


EXHIBIT NO.            DESCRIPTION                                        PAGE

   1           NOTICE OF DEPOSITION                                          6

   2           PLAINTIFF'S EXPERT DESIGNATIONS                              6

   3           MR. HOLDAWAY'S REPORT                                        7

Zoom Appearance; Thursday, January 22, 2026;

2:01 p.m.

THE COURT REPORTER:  Good afternoon.  We are now on the record.  My name is Kelly Wabbel.  I am the Certified Shorthand Reporter and Deposition Officer for today's proceeding.  My California license number is 14736.

Today's date is January 22, 2026.  The time is 2:01 p.m.  This is the deposition of Scott Holdaway, being taken in the matter of Gonzalez versus State of California, et al., pending in the United States District Court, Central District of California.  The case number is 5:25-CV-00331-KK-DTB.

The deposition is taking place over the Zoom application with all attendees appearing remotely and the transcript of this deposition will be handled pursuant to code.

Will Counsel please state your appearances for the record, beginning with the noticing attorney.

MS. KORNBLAU:  Good afternoon.  Andrea Kornblau, on behalf of the City of Hemet, Detective Patrick Sobaszek, and Sergeant Andrew Reynoso.

MS. BEARS:  Good afternoon.  Amie Bears, on behalf of the California Highway Patrol and Officer Irick.

MR. JOHNSON:  Good afternoon.  Brendan Johnson,

from the Law Offices of Dale K. Galipo, on behalf of the

Plaintiff.


                    SCOTT HOLDAWAY,

having been first duly sworn, was examined and testified

                    as follows:


                    EXAMINATION


BY MS. KORNBLAU:

    Q    Good afternoon, Mr. Holdaway.  My name is Andrea

Kornblau, as I just stated.  I represent the City of

Hemet.  Would you please state and spell your full name

for the record?

    A    My name is Scott Holdaway.  That is S-C-O-T-T;

last name, H-O-L-D-A-W-A-Y.

    Q    And I will be attaching as Exhibit 1 to this

transcript the Deposition Notice and Subpoena of the

witness.

         (EXHIBIT NO. 1 MARKED.)

         MS. KORNBLAU:  Exhibit 2 will be Plaintiff's

Expert Designations.

         (EXHIBIT NO. 2 MARKED.)

         MS. KORNBLAU:  Exhibit 3 will be Mr. Holdaway's

report in this case.

(EXHIBIT NO. 3 MARKED.)

BY MS. KORNBLAU:

Q    Mr. Holdaway, did you prepare any other report aside from the one that appears to be ten pages?

A    No.  That's the only report.  And that's probably my CV and report all in one.

Q    Yes, it is.  Can you give me an estimate as to how many times you have been deposed, before today?

A    About ten times.

Q    And one of those ten times, I took your deposition.  Do you remember that?

A    You do look familiar.

Q    Would you like me to go through the admonitions again or can we dispense with those?

A    We can -- we can skip those.

Q    I'll just remind you, though, if I ask a question and you do not understand it, please let me know.  Okay?

A    Okay.

Q    Have you ever testified in court in your capacity as an expert in a civil case?

A    Yes.  On my CV, there's one instance I know of.

Q    On page 3 it says, Courtroom Testimony, and there are two cases listed.  One is Lam versus State of California.  The other one is R-U-S-A-N-O-V-S-K-A-Y-A versus City of Los Angeles.  Do you remember those cases?

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                                01/22/2026                                Page 8

A    Yeah.

Q    Were those trials?

A    The Lam versus California case was a preliminary trial.  And the Rusanovskaya -- I'm not sure how to pronounce it, that was a civil trial.

Q    So one is a criminal trial.  The other one is a civil trial?

A    Right.

Q    And these are both state court cases, not federal; is that right?

A    I believe so.

Q    You don't know?

A    Not for certain.  I don't believe so.

Q    Is there a different standard, as it relates to expert witnesses in state court than in federal court?

A    I believe one requires a Rule 26 report and the other may not.

Q    What about the standard for testimony?

A    I'm not really sure.  Yeah, I don't know.

Q    Have you reviewed anything in preparation for your deposition today?

A    I briefly looked at my report and some of the videos that I delivered.

Q    Did you write the report yourself?

A    Yes.

Q    Did you work in collaboration with anyone?

A    No.

Q    When did you start working as an expert?

A    I believe it was maybe 2022, 2023, somewhere in there.

Q    Is all of your work as an expert listed in your report?

A    Yeah.

Q    Who initially contacted you in connection with this case?

A    Yeah, I know that's on the report also.  I believe it was Trent Packer.

Q    When did he first contact you?

A    I believe it was November of '24.

Q    How did he initially contact you?

A    I don't remember.  I want to say, e-mail.

Q    Has Mr. Packer communicated with you since then, by e-mail?

A    I don't recall.

Q    Have you communicated with any other attorneys regarding this case, aside from Mr. Packer?

A    Marcel.

Q    And how have you communicated with Marcel?

A    I believe we spoke on the phone.

Q    Have you also communicated with him by e-mail?

A      I don't recall.

Q      What is Marcel's last name?

A      I may not pronounce it correctly but Sincich, Sincich.

Q      If you have been communicating with him or his office and also Mr. Packer, would you still have those e-mails?

A      I think so.

Q      Would there be any reason to delete them?

A      No.

Q      So if we were to send you a subpoena, you could produce all of the e-mail communications, correct?

A      I believe so.

Q      What were you asked to do in this case?

A      I was asked to analyze the provided body worn cameras and stabilize the footage and see if I can do my best to figure out how many gunshots were fired and which officer fired which shot.

Q      Were you able to do all of those things?

A      I did my best.  I believe I -- yes.  I believe a lot of the indications of, like, gunshots occurring that I found are strong indications that that occurred.

Q      When you say, indications of gunshots, what do you mean?

A      It would be -- I mean, just without repeating it

back, like an indication could be of muzzle flash or smoke

coming out of the gun's barrel, something like that.

Q    What is a muzzle flash?

A    A muzzle flash would be, I guess, fire or a flame

that is caught coming out of the muzzle of the barrel.

Q    How did you determine that?

A    By looking at the video.

Q    So you didn't read the Officers' testimony, their

depo transcripts?

A    No.

Q    So if they were not able to identify a muzzle

flash, how can you?

A    I'm sorry.  What?  I'm lost on what?

Q    Okay.  So you did not review any of the

transcripts by any of the Officers; is that correct?

A    That is correct.  I didn't read any depositions

or anything.

Q    And you said that you believe a muzzle flash

would be fire or flame; is that right?

A    Yeah.  It's an explosion happening inside of the

barrel.  Yeah, it would be -- I don't know if that's the

technical word for it, but it would be a flame or some

kind of fire seen coming out of the barrel.

Q    Are you an expert in ballistics?

A    No.

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                              01/22/2026                              Page 12

Q    Do you own a gun?

A    No.

Q    Do you know how guns operate?

A    The basics.

Q    And where did you learn the basics on how guns operate?

A    Just being around people who own them and use them and other life experiences, I guess.

Q    Are you a firearms instructor?

A    No.

Q    Do you have any certifications regarding the use of firearms?

A    No.

Q    How are you qualified, then, to determine what a muzzle flash is?

A    By reviewing the footage and seeing something that resembles that occur, in the place where you would expect that to occur.

Q    And it sounds like you're uncertain about what you just said.

        MR. JOHNSON:  Objection.  Argumentative.

        THE WITNESS:  I'm not necessarily uncertain.  I'm just, kind of, just trying to answer the question.

BY MS. KORNBLAU:

Q    Okay.  We'll come back to this when we go through

your report in detail.  Do you do video forensic analysis?

A    Yes.

Q    Have you served as an expert in video forensic analysis?

A    Yes.

Q    How many times?

A    Ten times or so.

Q    And again, those ten times or so would be listed in your report; is that correct?

A    Correct.

Q    In terms of this case, have you been retained to serve as a video forensic analysis?

A    I'm not sure what the terminology was used.

Q    So you're not sure if you were asked to serve as a video forensic analyst; is that right?

A    That sounds like what I'm typically retained as, yeah, as a forensic video analyst.

Q    But were you retained in that capacity for this case?

A    Yes.

Q    And where is that listed?

A    I don't -- I'm not sure.

Q    Do you intend to offer any opinions in this case as a video forensics analyst?

A    I mean, they -- I don't know if I necessarily

label them like opinions, but I am analyzing the videos
that were provided and, you know, doing my best to
annotate what I believe is happening and make sense of the
events that are occurring, based on what I'm seeing in the
footage.

Q    You just didn't present that as an opinion; is
that correct?

A    Correct.

Q    How many videos were you provided?

A    Two videos.

Q    And what were the titles of those videos?

A    One had Officer Reynoso's name in it and the
other one had Officer Sobaszek's name in the file name,
but I don't recall the exact file name.

Q    Okay.  So you said Officer Reynoso.  Did you mean
Sergeant Reynoso?

A    Yes.  I'm sorry.  My apologies.

Q    And then, you said Officer Sobaszek.  Did you
mean Detective Sobaszek?

A    Yes.  My apologies.

Q    Were you given parameters as to what was to be
done with those two videos?

A    No, I don't believe so.  And what do you mean by
parameters?  I guess I should clarify.

Q    Were you given instructions on what to do with

those two videos?

A    Other than what I said earlier, they wanted me to try to stabilize it and account for gunshots being fired.

Q    So those were the only instructions you were given; was just to stabilize the video and to identify gunshots?

A    Yes, I believe so.

Q    And you were told to identify gunshots based on your perception of the videos, correct?

A    Correct.

Q    And, again, you don't have any expertise as it relates to firearms, correct?

MR. JOHNSON:  Asked and answered.  You can answer.

THE WITNESS:  That is correct.

BY MS. KORNBLAU:

Q    Did you form any opinions as to what happened in the video you were asked to edit?

A    No.  I don't have any opinions on that.

Q    So you didn't form any opinions as to when a gunshot occurred?

A    I did.

Q    Okay.  Any other opinions that you're making in this case?

A    Everything would be in my report from, you know,

what I analyzed in the videos and annotated.  And it's

documented in the report.

Q    Do you intend to offer any opinions related to
the contents of the videos that you enhanced and broke
into frames, other than as it relates solely to video
enhancement?

A    I mean, like I said, I annotated when I thought
there were indications of gunshots occurring.  As long as
that falls within what you're saying, then I think that
would be correct.

Q    I was asking for information.  But what
background information were you provided as to what was
happening on each video?

A    I was -- I was provided by Marcel a couple
documents that are also in the report under materials
received that -- I used them for just a very specific
reason.  It was -- the report saying how many shots each
Officer may have fired or something along those lines.

Q    Can you direct me to where in your report it says
materials received?

A    It should be near the top.  If my CV is first and
then, the report, it should be close to the top of the
report.  It should be like two videos and then, a couple
documents, I believe, after that.

Q    It's under the heading, Summary Report of

Evidence Examination, and then, it says, Case Materials

Received. It looks like two body worn camera videos and

then, three incident reports?

A    That is correct. And those are the body cam

videos I was saying I couldn't remember the exact name of

earlier.

Q    What was the significance of asking you to review

incident reports?

A    It actually wasn't even until after I had done

most of the work on this case that Marcel provided me with

these documents, saying that there was information inside

these reports saying how many -- either how many shots

each Officer shot or maybe it was, how many casings were

missing. I don't recall the exact language, but the

documents essentially just went over each Officer and how

many shots that they -- were fired.

Q    How many shots that who thought were fired?

A    I don't know who wrote the report. It was

provided to me by Marcel and he told me in the documents

where to find the information on how many were fired by

each Officer.

Q    Okay. What work did you commence after being

retained?

A    I'm sorry. What was that?

Q    What work did you commence after being retained?

What work did you do with the videos?

A    Okay.  So in my report, I go through the different videos I created.  I believe it was seven videos.  And I stabilized the footage, I enlarged the footage, and I annotated the videos, to indicate indications of gunshots, essentially.

Q    How long did it take you to do all those things?

A    The stabilization takes a while, but I don't have a number.

Q    Well, you billed for your work in this case, correct?

A    The company that I work for does all of the billing and stuff.  I don't -- I don't do any of that.

Q    Can you give me an estimate as to much time you spent enhancing videos?

A    Just for this case or like?

Q    For this case.  Let's even do it by video.  So one body worn camera video for Detective -- you have Officer, but Patrick Sobaszek.  How much time did you spend enhancing Detective Sobaszek's video?

MR. JOHNSON:  Counsel -- I just want to -- I'm sorry.  I'm just going to object as vague, as far as enhancing goes.  This came up a moment ago.  When you're saying enhancing, do you also mean all the annotations and all the other work done?

MS. KORNBLAU:  Yes.

MR. JOHNSON:  I guess, I'm just not clear.  Okay.  All right.  Thank you.

BY MS. KORNBLAU:

Q    And Mr. Holdaway, if you don't understand the question, you said you would let me know, correct?

A    Correct.

Q    Okay.  So how much time did you spend enhancing Detective Sobaszek's body worn camera video footage?

A    I don't know, off the top of my head.

Q    Can you give me an estimate?

A    No.

Q    Was it seconds; was it hours; can you generally give me an idea?

A    Hours, yes.

Q    Okay.  And how long was this entire incident?

A    What constitutes as the incident?

Q    Well, you reviewed the videos.  So how long was the shooting incident?  The gunshots that you were tasked to analyze; was that seconds or was that hours, that this took place?

A    You're saying from when the very first gunshot occurred to when the very last gunshot occurred?

Q    Yes.

A    That was seconds.  That was not hours.

Q    So Officers did not have hours to view enhanced perspective what was occurring during the incident.  Would you agree?

A    Yes.

Q    What fee did you charge Plaintiff for your services on this case?

A    That is at the bottom of my CV, as well.

Q    Do you have your report handy?

A    I don't.  I actually -- I printed a copy, and I don't have it with me, unfortunately.

Q    So this might be a little more difficult when I'm asking you questions about your report, if you don't have access to it.  But I'll bring it up on the screen later if I need to.  All right.  It may have been helpful to have a copy, though, present, you know, during the deposition, but.  Okay.

So are you a member of any association related to video enhancement or audio analysis or anything related to your line of work?

A    You know, real quick, I think I do have a copy digitally on here I can bring up, if it would help.

Q    Yes, it would.

A    All right.  Let me see.  It looks like that's just the Deposition Notice.

Q    Okay.  We'll come back to it.  Are you certified

in video enhancement?

A    I've taken courses that have certified me in their programs.

Q    So do you have certification in video enhancement?

A    I have a certification through Axon Investigate and iNPUT-ACE.

Q    What type of body worn camera did Detective Sobaszek have, at the time of the incident?

A    I'm sorry.  I didn't mean to say iNPUT-ACE.  That was LEVA. I'm sorry.

Q    Okay.  What type of body worn camera did Detective Sobaszek have, at the time of this incident?

A    They were Axon body worn cameras.

Q    How do you know that?

A    Well, the videos had a Axon Investigate watermark on them.

Q    What model?

A    I don't recall if they were 2 or 3.

Q    Do you know how body worn cameras work?

A    To what extent?

Q    Do you know how they operate?

A    Yes.

Q    And how do they operate?  How do they work?

A    They record video at a determined frame rate and

resolution.

Q    Is that the extent of your knowledge about Axon body worn cameras?

A    No.  I just, kind of, want to know more specifically what you want to know.

Q    What kind of software do these body worn cameras use?

A    You mean, like, when the footage gets uploaded from the camera or, like, what are you talking about?

Q    Sure.  I mean, you're the expert here.  So I'm just asking how, generally, these cameras, Axon cameras, what kind of software they run on?

A    I mean, Axon has software that their cameras run on.

Q    So what kind of software were these cameras using?

A    Whatever the station was using.  I mean, I'm not sure.

Q    Do you have a degree from a university?

A    Yes, from Cal State, Dominguez Hills.

Q    And I think I asked this before, but I don't know if I got an answer.  But are you certified in video enhancement?

A    Yes.

Q    Are you certified in any way related to your work

in video enhancement?

A    I'm sorry.  That sounded like the same question.

Q    It was.  What about certifications in video forensic analysis?

A    I don't think I have a certification with those words on it.

Q    Have you ever been retained by a government entity to conduct video forensic analysis?

A    Yeah.  I think on my report, there's one for the DOJ.

Q    It would be listed in your report, correct?

A    That is correct, yes.

Q    Of your work in video enhancements, what percentage of those cases are you retained by plaintiffs?

A    I believe there are only one or two defense on there and then, the rest are plaintiff.  I'm not sure what the percentage is.

Q    When you say one or two defense or defendants, do you mean civil defendants or criminal defendants?

A    Civil.

Q    And am I using the correct terminology, what you did, the work in this case was video enhancement; is that correct or is there some other terminology that you would use?

A    Sometimes, I like to use the word clarify.

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                    01/22/2026                                   Page 24

Q    What's the difference between clarify and enhance?

A    I wouldn't say there's a difference.  I think maybe, sometimes, enhancement just has a connotation of, like, special effects or something.

Q    Oh.  So you didn't use any special effects in creating seven videos?

A    I was referring to more of like a Hollywood movie special effects and, you know.

Q    So circles, text boxes, that kind of thing, right?  Special effects.

A    I can't hear anything right now.  I'm sorry.  My computer wigged out.  What was your question?

Q    So you said when you hear special effects, you think Hollywood.  Well, are special effects circles, highlighting, text boxes?  Would that be considered special effects?

A    I would call them annotations.

Q    Okay.  So are annotations special effects?

A    I don't know what the definition of special effects is, technically.  So I wouldn't be able to answer that.

Q    Okay.  Do you consider yourself to be an expert on police practices, tactics, or procedures?

A    No.

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                          01/22/2026                          Page 25

Q    And you're not a medical doctor, correct?

A    Correct.

Q    You're not a licensed psychologist or psychiatrist, correct?

A    Correct.

Q    And is it accurate to say you don't have the expertise to testify about a subject's range of motion, mobility, or physical limitations; is that correct?

A    Correct.

Q    And is it accurate to say that you do not have the expertise to testify about toxicology?

A    Correct.

Q    And you would not consider yourself an expert in biomechanics or biomechanical engineering?

A    Correct.

Q    Do you have any expertise in officer performance, dynamics, reaction times, or associated studies?

A    I do not.

Q    Would it be accurate to say you do not have experience in police use of force procedures or defensive tactics?

A    Yes.

Q    Do you have any experience in crime scene reconstruction or forensic incident reconstruction?

A    No.

Q    Are you a member of any professional organization that involves forensic examination of evidence at a scene?

A    No.

Q    Do you have any training or experience in shooting reconstruction?

A    No.

Q    Do you have any certification in crime scene or incident reconstruction?

A    No.

Q    Do you have any firearms training?

A    No.

Q    Is it your understanding that the primary purpose of an expert is to provide specialized knowledge and assistance to the court, specifically the judge and jury, in understanding complex issues or evidence that requires specialized expertise?

A    Yes.

Q    Please give us a summary of the specialized knowledge you possess that qualifies you to assist the court in understanding the issues or evidence in this case.

A    I think by annotating what I believe are indications of the gunshots occurring in the media and stabilizing the footage, it allows the viewer to better understand the events that are taking place.

Q    And can't they just watch the videos, the original videos themselves, and do the same thing?

A    No.  The stabilization requires a lot of work.

Q    And when you say that you created stabilization or you enhanced these videos with the stabilization, were the officers perceiving the incident with stabilization?

MR. JOHNSON:  Calls for speculation.  Lacks foundation.  You can answer.

THE WITNESS:  They -- I don't know.  Cameras are stabilized.  People just have their vision.  I mean, camera footage can be stabilized.  He was there in person. He's, like, not a camera.

BY MS. KORNBLAU:

Q    So what you did, then, was you're providing video footage to a jury that is not the perspective of the Officers.  Is that fair to say?

A    Yes.  The camera is different from his eyes.

Q    Are you familiar with the California Commission on Peace Officer Standards and Training or POST?

A    No.

Q    And then, would it be accurate to say that you are not an expert on POST learning domains, standards, or training?

A    Correct.

Q    Are you familiar with the term peer reviewed?

A     Yes.

Q     What does that mean?

A     A peer reviews your work.

Q     Okay.  Have you ever participated in any peer review studies?

A     No.

Q     Have you ever authored any peer review studies?

A     No.

Q     Any studies regarding gunshots?

A     No.

Q     And I previously asked you how many hours you've spent so far on this case.  And you said you could not give me an estimate.  Can you give me one now?

A     No.  No.

Q     For this case, other than those three incident reports that you have listed on page 6 of your report, did you review any other police reports, incident reports, audio, video, or other case related documents, other than the two videos that you referred to in your report?

A     Everything I reviewed is listed under Case Materials Received.  I think it was three documents and two videos.

Q     As it relates to the videos, do you intend to offer any opinions as to what the Officers were doing, during the incident?

A    No.   Just indications of gunshots occurring. That's all.

Q    So you're not giving any opinions that Officers were firing their guns during the incident; is that correct?

A    Yes.

Q    Do you intend to offer any opinions as to the detention of Mr. Gonzalez in this case?

A    I'm sorry.  Say that again?

Q    Do you intend to offer any opinions as to the detention of Mr. Gonzalez in this case?

A    No.

Q    Do you intend to offer any opinions as to what is captured on the video and audio, as opposed to your methodology for editing and enhancing video and audio?

A    As opposed to?

Q    So do you intend to offer any opinions as to what is captured on the video and audio?  Because what you did was or it seems that you're trying to say that maybe you created videos by editing and enhancing the videos, correct?

A    I created versions of the video or enlarged and stabilized it and added various annotations.

Q    Okay.  Are you offering opinions as to what exactly is captured on the video?

A    Yeah.  Like, in my report, when I annotate something and note what I believe that I think that is. Is that what you mean?

Q    So when you're -- you said annotating things in the video.  That is based on your own perception, correct?

A    Correct.

Q    And you don't have any expertise as it relates to firearms, correct?

A    Just working on cases like these and analyzing videos where gunshots are occurring.

Q    And when you're saying you're analyzing when gunshots are occurring, it's based on your perception of the videos; is that correct?

A    To -- I mean, yes.  Yes.

Q    Have you reviewed the reports of any other experts in this case?

A    I don't believe so.  Like I said, I was given those three documents, but I just read a very specific, like, sentence or two from each.  That's it.

Q    And you said earlier that you did not review any deposition transcripts, correct?

A    Correct.

Q    Did you review any statements from any witnesses or involved officers in this case?

A    No.

Q    Did you review any scene photographs?

A    No.  I don't think so.

Q    Have you ever been to the scene of the incident?

A    No.

Q    So you never went to the scene of the incident to clarify what the videos were showing?

A    Correct.

Q    So in terms of your testimony in this case, have you formed any opinions in connection with your work in this case?

A    Like I said, noting in my report what I'm finding in the video.  I'm not sure if that classifies like an official opinion or not.

Q    Okay.  You're not going to be offering any opinions as to the use of force or police tactics or procedures; is that correct?

A    Correct.

Q    In terms of your work on this case, would it be accurate to say that all you did was enhance the video image quality and create frame by frame stills and put it into PDFs and stabilized videos?

A    I also annotated it.

Q    Did you change the videos in any way?

A    Yes.

Q    So you changed the body worn camera video footage

of Detective Patrick Sobaszek?

A    They are different from the originals I received, correct.

Q    And did you also change the body worn camera video footage of Sergeant Andrew Reynoso?

A    Yeah.  Once I do anything to the footage, it's technically considered different or changed.

Q    Did you add events or objects to any of the video or still frame images that you processed, that were not there before?

A    Yeah.  Like, the text box and the graphics.

Q    For any of the videos and the stills or other digital media that you created or processed in this case, is there any content that you deleted?

A    No.  I don't believe so.

Q    Do any of the text boxes or circles or any other annotations, do those cover up any aspect of the view of what was in the footage?

A    I mean, technically, there is something behind the circles that I drew.  So, you know, on a pixel level, the circles are covering whatever is behind them.

Q    Did you alter or manipulate any of the videos, still images, or other digital media in this case or in any way omit or change any incident events?

A    I'm not sure what you mean by changed incidents

or events, but I didn't rearrange any sequence of events.

Q    Did you alter or manipulate any of the videos?

A    Yeah.  Like I said, like, once I do anything to them, even putting text over it or something, it's technically altered.

Q    On page 6 of your CV and report, the first paragraph says, I have personal knowledge of the facts set forth herein, except as to those as stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

Is that accurate?

A    Yeah.

Q    Where have you stated that facts are based on your information and belief, within your report?

A    Right.  Like I was saying, I'm not sure if annotating the videos and, you know, analyzing what I believe to be happening would qualify as, you know, an official opinion that I would state in the report.

Q    Do you know what personal knowledge is?

A    It's what you know, yes.

Q    And you weren't present at the scene of the incident, correct?

A    Correct.

Q    So you would not have personal knowledge of the

events that occurred, correct?

A    Just what I've been told.

Q    Okay.  So that's hearsay.  So you don't have personal knowledge, correct?

A    I mean, I've never been to the location and seen it.

Q    And you didn't state in your report that certain things are stated on information and belief, correct?

A    I'm sorry.  One more time?

Q    You didn't state anywhere in your report that certain things were based on your information and belief; is that correct?

A    I believe I said I've annotated indications of gunshots occurring.

Q    How did you determine what portion of the body worn camera video footage to select for use in your creation?

A    I knew that the -- I knew that the incident was an officer involved shooting.  So after finding that in the footage, I kind of tracked back to when the person they were running after could be seen.  And I started the footage there and let it go up until the shooting and after.

Q    Paragraph 4 of your report states that you converted BWC into a different format; is that correct?

A    What part of the report does it say that?

Q    Paragraph 4, under My Production of Video Exhibits.

A    Okay.  That may be referring to the .mov files I provided and the other formats that I provided, that aren't MP4.

Q    So you converted the body worn camera video footage into a different format; is that correct?

A    When I exported the footage, I did not want to further compress it.  So I exported it uncompressed, which is a different format than what it was delivered to me in before.

Q    So did you convert the body worn camera video footage into a different format?

A    Yes.

Q    You stated that you added an on-screen timer; is that right?

A    Yes.

Q    Why did you do that?

A    I believe it was, when I spoke to Marcel, he was interested in -- he noticed that the timing of the -- leading up to the incident.

Q    But isn't there already a timer or a clock, of some sort, in the BWC footage?

A    There's a time date stamp that's overlaid on the

Axon body cameras.

Q    So why not just use the clock that's actually in the original footage?

A    It seems easier to not have to do the math and have a countdown in seconds on the screen already there. And, yeah.

Q    So under Number 2, paragraph Number 2, Scope of Work Performed, it says, Using the case materials received, I have created 7 videos.

So you're not analyzing; but rather, you're creating new videos in this case.  Seven, in fact, correct?

A    Correct.  Well, I analyzed them and created new videos, as well.

Q    And then, again, in paragraph 2, Scope of Work, you have a few bullet points.  The first one says, Officer Sobaszek BWC with graphics.mov.

With graphics, are these graphics that the Officer saw at the time of the incident?

A    No.

Q    Okay.  And then, bullet point Number 3 says, Officer Sobaszek BWC four times enlargement and stabilized.mov.

Did Detective Sobaszek view this incident in four times enlargement?

A     I don't believe so, no.

Q     Did Officer or Detective Sobaszek view this incident in a stabilized mode?

A     No.  Not like I provided with the camera footage.

Q     So did any of the Officers have the benefit of any of these enhancements, at the time of the incident?

A     No.  I mean -- no.  No.

Q     So how is it helpful, then?

A     Being able to just review documentation of what happened, you know, as opposed to not having any video, at all.

Q     So you are attempting to create and enhance videos after the incident.  Using, you said, annotations, text boxes, circles, squares, that were not available to the Officers at the time of the incident.  And you're further conducting a very time-consuming frame by frame analysis of it; is that correct?

A     Yeah.  I looked at the videos frame by frame.

Q     And under paragraph 4, My Production of Video Exhibits, the first paragraph, it says, Officer Sobaszek and Reynoso BWC side-by-side with graphics.  This exhibit is an 18 second clip of Shooting Officer BWC-HPD Officer Patrick Sobaszek and Shooting Officer, Sergeant, Andrew Reynoso synchronized and played side-by-side on the screen.

How did you determine the length of the clip?

A    I mean, it tells you in the program the duration of the clip that you select, with a range that you select.

Q    Why did you select the range that you did, which was 18 seconds?

A    I started prior to the incident, when the Officer started to catch up to the person running and when the person running was able to be seen, I started the video there and played it up until the incident.

Q    When you said, when the person is able to be seen, what does that mean?  By you?

A    Yes.  I'm the one who looked at the video, yeah.

Q    So you're not enhancing this based on the perspective of an Officer?

A    I'm not sure what that means.

Q    Going on, on paragraph 4, it says, a frame counter has been added at the lower right-hand corner of each video.

Is that correct?

A    Yes.

Q    So, again, that's something you added to the video as a counter?

A    Right.  I added the frame counter.  So each individual frame can be identified.

Q    And then, it says a yellow timer has been added

that starts in the negative and counts forward toward

positive until it reaches zero.

        Why did you add a timer?

A    To indicate the approximate amount of time that

is passing, leading up to the indication of the first

gunshot being fired.

Q    And what is the first incident or indication of a

gunshot being fired?

A    It was a muzzle flash -- or a gun smoke coming

out of a barrel.

Q    You said the frame where the timer turns to zero

is aligned with the first indication of a gunshot being

fired, which is gun smoke leaving Officer Sobaszek's

firearm on frame 51829 of his BWC video.  But wouldn't gun

smoke indicate that a gun has already been fired and isn't

being fired?

        MR. JOHNSON:  Objection.  It's outside the scope.

        MS. KORNBLAU:  Then, why is it his opinion?

        MR. JOHNSON:  Well, I mean, I maintain my

objection.  You know, we talked earlier about, you know,

not having training in the function of a firearm.  And I

think the question is, you know, getting into that more so

than what's being suggested.  But, you know, he can answer

it, but I maintain my objection.

BY MS. KORNBLAU:

Q    Go ahead, Mr. Holdaway, if you understand my question.

A    I'm sorry.  Can you repeat it?

MS. KORNBLAU:  Can we please have the Court Reporter read back my question?

(RECORD READ.)

MR. JOHNSON:  Same objection.

THE WITNESS:  Yeah, I'm not sure how to navigate the terminology.

BY MS. KORNBLAU:

Q    In this case, seconds and split seconds matter.  Would you agree with that?

MR. JOHNSON:  Argumentative.

THE WITNESS:  Say it one more time?

BY MS. KORNBLAU:

Q    In this case, would you agree that seconds and even split seconds matter?

MR. JOHNSON:  Same objection.

THE WITNESS:  Yeah, I don't know that that's a question for me.  I don't know how to answer it.  It seems like you're asking me, like, in their -- in the Officer's experience, do these seconds matter, in this incident.

BY MS. KORNBLAU:

Q    Well, you added a timer in the videos, right?  So it mattered to you, correct?

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                    01/22/2026                         Page 41

A     I think being able to see a timer on the screen while viewing what is occurring can be helpful.

Q     But here you said, blue circles are placed around the first frame of a video where a visual indication of a gunshot being fired occurs.

And what I'm asking you is, if we already see smoke, then wouldn't that gunshot already have been fired? The smoke occurs after the gun is fired.  You're saying, the smoke is indicating or is the first indication of a gunshot being fired.

Do you understand the difference?

MR. JOHNSON:  Just, same objection as earlier. You know, it sounds like it's outside the scope.  But you can answer, Scott.

THE WITNESS:  Yeah, it seems -- I wasn't necessarily trying to pinpoint at what point in the process that event occurred, but just --

BY MS. KORNBLAU:

Q     Then, why did you write in your report and put a blue circle around it and say, this is the first frame where there's a visual indication of a gunshot being, in the process of, being fired occurs?

A     I was trying to say, it was an indication of that event.  Not necessarily, here is the orders of that event that happened and this was step two of those orders that

happens when a firearm is discharged.

MR. JOHNSON:  Counsel, we've been going about an hour.  Would it be okay if we took a ten minute break?

MS. KORNBLAU:  Yes.

MR. JOHNSON:  Okay.  Thank you.

THE COURT REPORTER:  Okay.  We are off the record at 3:04 p.m.

(BREAK TAKEN.)

THE COURT REPORTER:  Back on the record at 3:14 p.m.

BY MS. KORNBLAU:

Q    Good afternoon, Mr. Holdaway.  You understand you're still under oath, correct?

A    Correct.

Q    And did you speak with Mr. Johnson during the break?

A    No.

Q    So before the break, we were talking about paragraph 4, My Production of Video Exhibits.  And I was asking you about the gunshots that you say were indicated or that you believe were indicated, when you saw gun smoke leaving Officer Sobaszek's firearm in a specific frame in his BWC video.  Do you recall that?

A    Yeah.  We were talking about that frame.

Q    Does gun smoke appear after a gun has been fired?

A    I mean, I'm not a gun expert, but that seems like it would, yeah.

Q    So gun smoke would indicate a bullet has already been fired, correct?

A    Yes.

Q    So then, it's not accurate when you say that the gun smoke indicates a gunshot being fired?

MR. JOHNSON:  Argumentative.

THE WITNESS:  Yeah, I think it's maybe the tense of the way I worded it that might be confusing.  If I had said has been or something, you know, that more strongly indicates a time frame, I guess.  But I'm, you know, making -- yeah, I'm analyzing the video and observing.

BY MS. KORNBLAU:

Q    When you're analyzing the video in frames, doesn't exactly that moment in time matter?  So before and after or during; wouldn't that tense make a difference?

A    A difference in what?

Q    So if you're saying something occurs before and you meant after and we're talking about one frame in a video, doesn't it matter?

A    Every -- any frame can matter.  Yeah, I'm not sure where you're going with it.

Q    Okay.  How long does it take for gun smoke to appear after an Officer pulls the trigger on a firearm?

MR. JOHNSON:  Lacks foundation.

THE WITNESS:  Yeah, I don't -- that's not my scope.

BY MS. KORNBLAU:

Q    Then, why did you write that gun smoke indicates that a gunshot is being fired, if that exceeds the scope of your abilities?

A    Because your question is indicating timing and how a firearm reacts.

Q    So you weren't analyzing timing or how a gun is reacting, when you're referring to a gun recoil, a muzzle flash, and gun smoke?

A    I am referring to a gunshot as, I guess, you can see it as an event.  And then, I'm noting indication of that event.  So I mean, my apologies if I made it seem like I was -- I don't know, placing a time frame on that. But it was simply, I'm saying, here is an indication of a gunshot occurring.

Q    And I'm trying to understand what you mean when you're saying a gunshot is occurring when you're referencing gun smoke.

A    Yeah.  That seems tied to the event of a gunshot. That seems part of that event.

Q    How do you know that?

A    In my experience editing a lot of these body worn

cameras, I've seen a lot of firearms.

Q    With zero experience with firearms?

A    I've fired a gun before.

Q    And that qualifies you, then, to identify where in the process a gunshot is occurring?

A    No.  You just said zero experience.  So that's why I said that.

Q    Okay.  So your experience, your personal experience, firing or discharging a firearm qualifies you to then analyze a video and make a determination or indicate where a gunshot is being fired.  Is that what you're saying?

A    I don't think -- that is not solely what I'm relying upon to observe a gunshot being fired.  But I think having fired one in the past wouldn't hurt.

Q    Okay.  It wouldn't hurt, but would it qualify you as an expert in this case analyzing gunshots?

A    By itself, I wouldn't say, no.

Q    So you're not qualified to identify gunshots; is that correct?

A    I -- I'm going off of my experience editing these videos where I have seen gunshots fired.

Q    And under paragraph 4, you say a text box has been added to the lower left that keeps track of how many gunshots each Officer has fired, as well as the total

number of gunshots fired.

And as we just discussed, you don't -- you're not qualified to give opinions as an expert regarding gunshots, right?

A    Right.  I'm analyzing the video and annotating what I'm seeing, as I analyze the videos.

Q    But if you're not an expert in gunshots, how can you annotate what you see?

A    Because I've worked with those videos a lot and I've seen it happen a lot on the videos.  And that's what I'm working with, are the videos.

Q    On page 9 of your report, under Officer Sobaszek BWC with graphics, it says this Exhibit is a duplicate of Officer Sobaszek and Reynoso BWC except Officer Reynoso's BWC Video has been removed.  The text box in the lower left and the circle graphics that track bullet casings have also been removed.

What does that mean?

A    It's a -- it sounds like you're reading I duplicated that video but removed the graphics.  So it's a version without the graphics.

Q    So you tracked bullet casings; is that correct?

A    Yeah.  I put circles around them and annotated them and tracked them, as they moved around the frame.

Q    How did you know what a bullet casing was?

A    Again, working with these videos, it's something that you often see when observing these.

Q    But as an expert, how are you qualified to identify a bullet casing?

A    I mean, I've seen them come through the screen and I'm doing my best to keep track of them, as they go through the frame.

Q    My question is a little different, though.  I asked you what qualifies you as an expert to identify bullet casings?

A    My experience reviewing these body worn camera videos and seeing gunshots and casings and muzzle flashes and gun smoke.

Q    So based on your review of the videos in this case, you were able to determine what a bullet casing was?

A    It seems very probable that those would be bullet casings.

Q    And when you use the word, probable, is that the standard for an expert?  If something is probable, then that's a sufficient standard to give an expert opinion?

A    In -- I've done training through LEVA where they touched on different probabilities and likeliness of things happening.  But it's not something I'm talking about in this case.

Q    And then, on the third paragraph on page 9 it

says, Officer Sobaszek BWC four times enlargement and stabilized with graphics.

Q    You said Officer Sobaszek's BWC video has been enlarged and stabilized.  How did you make that change to the video?

A    I enlarged the -- I enlarged the video.  And then, stabilized the frames, to help keep the individual in the center of the frame.

Q    And then, it says only frames of video where the person of interest can be seen have been stabilized.

What is the person of interest?

A    The person they are running after.

Q    You seem to ask that as a question.  When you say, the person they're running after, what do you mean?

A    In the videos, the Officers are pursuing somebody.

Q    And who was that person?

A    Mr. Gonzalez.

Q    How do you know that?

A    The case name.

Q    Okay.  And so when you said, though, you enlarged it four times and then, stabilized the video.  We went over this a little bit earlier, but is this how the Officers perceived the video?

A    They don't perceive the incident the same way a

camera does.

Q    Have you heard of 20/20 hindsight?

A    Yes.

Q    Would you say that your work in this case was 20/20 hindsight of the incident?

A    I mean, I'm reviewing footage of the incident after it has occurred.  So I guess if that qualifies as 20/20 hindsight, then, yeah.

Q    Okay.  Or we can say four times, you know, hindsight, I guess, since you enlarged it by four times, but so going down to the next paragraph.  It says that you removed counters and graphics and you identify each frame of video with a number to reference.

What does that mean?

A    The frame counters are placed in the video to identify each unique frame of video.

Q    What is a recoil?

A    It would be when the force of a gunshot pushes.

Q    Sir, it seems like you're using terminology that you don't, yourself, understand.

MR. JOHNSON:  Argumentative.

THE WITNESS:  I'm not a firearms expert.

BY MS. KORNBLAU:

Q    Right.  So you're using a word, recoil, and you don't even understand what that means?

MR. JOHNSON:  Argumentative.

THE WITNESS:  I've seen a lot of firearms fired on Axon body cam footage.

BY MS. KORNBLAU:

Q    Okay.  Then, what is a recoil?

A    It's the movement of the firearm after it's fired.

Q    Movement of a firearm.  What does that mean?

A    When the firearm is used, there is force from that.  And as a response, I've observed in the past, that it will move the firearm in the officer's hands, in a quick fashion.

Q    Okay.  What part of the gun moves?

MR. JOHNSON:  Just, again, to the extent that it's, you know, outside of the scope.  But you can answer.

MS. KORNBLAU:  And if it's outside the scope, then why are we using the word?

MR. JOHNSON:  Well, I don't -- I don't -- well, I mean, I think you're -- I think now we're getting into the words or a word or words that are being used.

MS. KORNBLAU:  It's on page 9.  It's on page 9 of his report.  And then --

MR. JOHNSON:  -- I'm not objecting to, and I don't disagree, that the word recoil is used.  But he's given his explanation of recoil.  And now, the question

is, what part of the gun is moved.  And that's all I'm objecting to.  I'm not objecting to -- I'm not disagreeing with you, with the fact that the term recoil was used, but.

BY MS. KORNBLAU:

Q    All right.  So Mr. Holdaway, I need to get specific with you because when you're discussing in a single frame that you can identify a recoil, which is an action as you've just described.  And I'll help you out. It's the slide on the gun.  Okay.  So that's an action and you're identifying that in a single frame.  How can you identify an action, a recoil, in one single frame?

A    You compare it to the frames around it.  When you can toggle through a video frame by frame and analyze the movements of things, you can see when something jumps.  So it's not necessarily a single frame that I'm looking at. Things are compared in comparison to the frames before and after it.  So it's not just analyzed by itself.

Q    Okay.  But on page 9, you've written indications in the media of gunshots being fired by Officer -- Sergeant Reynoso.  And you identify a specific frame for gun smoke and recoil, which is an action.  And it's frame 51661 and several others.

So that's one frame and you're identifying or saying that there is an indication of a recoil, which is

an action.  Do you understand what I'm asking?

A     Yeah.  I mean, to say that something has occurred, it needs a point in time to reference that to.

Q     And you've got one frame where you're saying the recoil.  I don't know if you're saying --

A     That's the --

Q     -- so okay.  Going on, you've got indications in media of gunshots being fired.  Being fired.  Not before, not after, being fired by Officer Sobaszek.  You're identifying specific frames.  You have 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 frames.  And you are saying gun smoke, recoil, and muzzle flashes, indicate that a gun is being fired by Sobaszek.

Do you understand my question?

A     I didn't hear the question.  But I heard what you said.  I didn't hear the question.

Q     So you're identifying ten frames.  And you are saying that these ten frames indicate that gunshots are being fired by Officer Sobaszek; is that correct?

A     I'm saying, when reviewing the media, I found indications of gunshots that were fired.

Q     Okay.  So when you say --

A     -- indications can vary.

Q     What do you mean by that?

A     Just based on what the camera is capturing.

Q    No.  What do you mean, it can vary?

A    It depends on what the camera captures.  It depends on what the indication would be.

Q    Okay.  So you're analyzing and you've written down frame 51829, you wrote gun smoke and recoil.  Did those things happen at the same time?

A    Again, that's -- I can't give opinions on the precise timing of those events; how long it takes to go from one to the other.

Q    So what is the significance of you creating frame 51829 and then, labeling that gun smoke and recoil?

A    Because I was tasked with trying to figure out how many gunshots were fired and which Officer fired how many shots.  And I did that by reviewing the footage, frame by frame, and using my experience of reviewing body cam footage and gunshots occurring in that footage, to then look at this footage and apply that.

Q    So you applied your experience viewing other cases as qualifications for reviewing the video in this case?

A    I mean, that plus the training and experience I have in, you know, digital media.

Q    But not in guns?

A    Right.  I can't give an opinion on, you know, how long it takes a bullet to exit the barrel or, you know,

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                          01/22/2026                          Page 54

what kind of gun it was, anything like that.  No.  I'm
observing.

    Q    Okay.  So when you write, frame 51829 gun smoke
and recoil, so where in the process is the bullet?  Is it
in the gun?  Has it already left the gun?  What's the
process of where the bullet is?

    A    I don't see the bullet.  I just see the gun, so I
circled that.  I'm just, like I said, I'm observing what
is in the footage.  If I didn't circle it, then I probably
didn't talk about it in the report, either.

    Q    So what, exactly, and we're talking about split
seconds here, when we're dealing with recoil, gun smoke.
So, again, what is the significance of one single frame
where you've identified gun smoke and recoil?

    A    That would be the first frame of an indication
that a gunshot has occurred.

    Q    But you wrote gun smoke and recoil.  And those
two things don't happen at the same time.  So what exactly
does that mean?

    A    It could have been the shutter speed of the
camera.  The movements are very fast.  So if the shutter
was open for, you know, a longer duration of time because
the lighting was low, it could have held it open a little
longer and captured more of the movement than it would
have if the shutter speed was very high and capturing very

quick photos instead.

Q    So video footage doesn't necessarily show what occurred in realtime because there could be a delay is what you just said; is that right?

A    I wouldn't say that.  I would say video captures it at different increments on typically hundredths or thousandths of a second variables.

Q    Okay.  So you wrote in the video titled, Officer Sobaszek and Reynoso BWC Side by Side with graphics, 5 bullet casings that appeared to come from Officer Sobaszek's firearm were tracked with a pink circle.

Why do you write casings that appeared to come from Officer Sobaszek's firearm?

A    It looked like the general flow of the casings I tracked with the purple circle all went down one direction of the screen.  And then, the ones that I circled in orange were coming more from the left of the screen.

Q    Those don't seem like very certain things.  You said, general flow.  What does that mean?

A    Well, all of the purple casings seem to come down in the same general area.  And all of the casings in orange appear to come down in the same general area.  And, again, like I said, I'm just doing my best to make sense of what's happening.

Q    How can you say with certainty when you are

identifying bullets, you're saying five bullet casings that appeared to come from Officer Sobaszek's firearm. You're going to testify as an expert.  Are you going to say, with certainty, that those five bullet casings were, in fact, from Officer Sobaszek's firearm?

A    No.  I think that's why I used the word, appeared, in the report.

Q    So how is that helpful to a jury versus confusing them?

A    Because as part of trying to find out how many gunshots were actually fired, there were a lot that were fired in a short amount of time.  And it was an indication, just another little piece of information that could help figure that out.  So I circled them.

And instead of just making them all, you know, the same color, which would maybe be a little more disorienting, I did my best to separate them based on where they were coming from.  But, like I said, I used the word appeared because I'm not 100 percent certain which shell is coming from where.

Q    Okay.

A    But I did want to circle them, just to note that those are, you know, there.

Q    How many shooters were involved in this case?

A    I believe it was three.

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                                01/22/2026                                Page 57

Q    You don't know for sure?

A    Well, there's three people in the video that I have.

Q    You also wrote, in the video titled Officer Sobaszek and Reynoso BWC 8 bullet casings that appeared to come from Officer Irick's firearm were tracked with an orange circle.

Did you write that?

A    Yeah.

Q    And, again, how do you know that 8 bullet casings, in fact, came from Irick's firearm or, again, are you just making an assumption?

A    Yeah, like I said, given the task to figure out how many gunshots were fired and which Officer fired which shot, part of that was circling these bullet casings because they are an indication the shot has occurred.  So I wanted to include those.  So I circled them and did my best to separate them, based on the general vicinity of the frame that they were coming down on.  I used the word appeared because, again, I'm not certain.

Q    And you said you did your best.  But could you have been mistaken?

A    Sure.

Q    How do bullet casings leave a gun?

A    I've typically seen them ejected out.

Q    Do they always go in the same exact path?

A    I -- like I said, I'm not an expert in firearms. I don't know.

Q    So when you're identifying bullet casings that appear to come from one person's gun versus another, you cannot be certain that the gun you're identifying or the person you're identifying in connection with the gun is accurate?

A    No.  Like I said, I used the word appeared and I did my best to sort them based on the vicinity they were coming from.  You know, one casing could be from the other guy or something.  I'm not sure.

MS. KORNBLAU:  Those are all the questions that I have, Mr. Holdaway.  I will turn it over to Ms. Bears, if she has any questions.

MS. BEARS:  Actually, after Ms. Kornblau's extensive examination of you, I just want to re-iterate a few things, without being duplicative.


FURTHER EXAMINATION


BY MS. BEARS:

Q    Have you had other cases where you were told to look for gunshots, similar to this?

A    Yeah.

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                    01/22/2026                    Page 59

Q    Other than your CV?

A    Probably.

Q    What year?

A    Most likely, yes.

Q    Most likely, yes.  And let's just go through the cases you've had, particularly with Mr. Galipo's office. You have Valdivia versus City of Covina case in June of last year.  In that one, were you asked to identify gunshots?

A    I'm not certain what case that was, but I think it was.

Q    Do you remember what the case was about, at all?

A    Not off the top.

Q    That's the most recent one.  That's just June of 2025.  Let's go to Scott versus Riverside, May of '25. What was that case about?

A    That one was an officer involved shooting.

Q    What were you asked to do in that case?

A    I believe that was figuring out when gunshots occurred or finding indications of gunshots.  And I forget.  There was something about a trailer.  I don't recall, though.

Q    Just to concentrate on other cases with Mr. Galipo, Murillo versus City of Los Angeles.  It's about a year ago or two years ago, January '24.  Do you

remember what that one was?

A    Yeah.  I believe that one was an officer involved shooting.

Q    And what were you tasked to do in that case?

A    I believe that one was an enlargement.  Maybe I de-interlaced some footage, if I'm remembering correctly. Yeah.

Q    It looks like the last time you had evidence accepted at court without testimony was October of '25, Simpson versus Loma Linda.  What was that case about?

A    That case was a patient -- that was a patient at a hospital that was in an altercation with the security, I believe.

Q    Not a forensics gunshot type thing, like this case?

A    No.  I don't believe there was a gunshot in that one.

Q    Okay.  Looking at just your second most recent one to that, where your evidence was accepted in court. And that's XM versus Gonco in September of '24.  So jump back now awhile.  What was that case about?

A    Okay.  That one was something was -- something broke at a grocery store.  That one didn't involve a gunshot.

Q    So now, just going back.  And there's one more in

'24, Loeser versus Norcal Beverage.  That's also where your evidence was accepted in court without testimony.  What was that case about?

A    I don't recall that one, unfortunately.  I'm sorry.

Q    As part of your preparation to be an expert witness, have you ever consulted with a firearms expert as to how to identify the various components of how a gun works?

A    No.

Q    Have you ever, to your knowledge, had any of your reports excluded from being used at trial?

A    Not to my knowledge.

Q    And then, looking -- I didn't see -- let me scroll up here, make sure I'm not correct.  I see courtroom testimony, just two cases.  Lam versus State of California and that was in May of '24.  What was that case about?

A    You said, Lam versus California?

Q    Yes.

A    Okay.  That was a sexual assault case.

Q    And then, you talked a little bit about the Rusanovskaya versus City of Los Angeles and that was April of '23.

MS. BEARS:  And I'll give the Court Reporter the

spelling of that one later.

BY MS. BEARS:

Q    What was that case about?

A    That one was an officer involved shooting.

Q    And what were you asked to do in that case?

A    That did involve a gunshot.  I don't remember exactly.  But that one did -- it was an officer involved shooting, involving a gunshot.

Q    Okay.  So it looks like from your CV, the only time in the last four years that you have testified in court regarding any type of gunshot was in April of '23.  Was it analyzing body cam videos, similar to this case?

A    Yeah.  I believe it was the same Axon body cam.

Q    And if you were asked to remove the graphics from your still videos, would you be able to do that?

A    Yeah.  I think I provided ones without graphics.

MS. BEARS:  That's all the questions I have for you.


FURTHER EXAMINATION


BY MS. KORNBLAU:

Q    Just a few more quick follow-ups.  On page 8 of your report, under Synchronizing the videos, there is a sentence that says, a reflection of Officer Reynoso's

light, yellow circle, is not seen in either video, green circle.

What do you mean by Reynoso's light?

A    If you look in the videos -- it's easier to see if you, kind of, toggle through it left to right.  But it appears some kind of a flashlight or something illuminates.

Q    So you don't even know what you're identifying?  You're saying, something?

A    Well, like I said, I'm not a firearms expert.  But it appeared that a light came on and you can see the reflection of that in the mirror.  And it aligns with the other video of that coming on and off.

Q    Okay.  And you said, a flashlight.  So are you saying, then, that Sergeant Reynoso was holding his flashlight at the same time he was holding his firearm or what is the significance of this light?

A    I wasn't saying he was holding it or anything.  It was just something that emitted light, that was able to be seen somewhere else in another camera.

Q    You said something was emitted.  But then, why in your report are you identifying that light as belonging to Officer Reynoso?

A    I believe you can see it in the camera.

Q    What camera?

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                01/22/2026                                    Page 64

A    I put the screenshots in my report and I circled them, so you could see.

Q    I don't understand.  You said a camera.  You said Officer Reynoso's light.  And then, you said, flashlight.  Are you talking about a tactical light?

A    It's circled in the report, if you can pull it up, I can show you what I'm talking about.  It's -- yeah, the screenshots are there.

Q    Okay.  Yeah.  What you're circling, it looks like it's something on a fence or on a wall.  But you're saying a reflection of Officer Reynoso's light is not seen in either video.  I just want to understand what that means, when you're saying Officer Reynoso had a light.  What light are you talking about?

A    Yeah, I don't know the make and model or serial number of what he's holding, but he has something that looks like it's emitting light, as a flashlight would.

Q    In which hand?

A    I need to look at the photos.  I don't know.

Q    What's the significance of Reynoso's light?

A    Well, there's multiple throughout the video.  I could find others.

Q    How about any?  What is the significance of identifying any of the Officer's light?

A    Yeah.  I was trying to answer that.  What I was

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                    01/22/2026                    Page 65

going to say is that, the light was used to synchronize

the videos.  It's something that can be seen in two

different cameras happening at the same time.  So those

events can be aligned to synchronize the videos.

Q    But you are, again, identifying this reflection

of light as coming from Officer Reynoso.  So I don't

understand the significance of the light?

A    It's seen in the wall, where it's circled.  It

seems there's maybe a mirror or something reflective up

there, that reflects the light.

Q    So you don't know what the light is, though?

A    Yeah.  I don't know the make or model or whatever

of what he has.

Q    You don't know if it's a flashlight that you hold

with your hand; you don't know if it's a tactical light

that would have been mounted on a firearm; is that

correct?

A    I don't know what its capabilities are.

Q    And you don't know if there's any relation,

whatsoever, to any gunshot when you see this reflection of

light; is that correct?

A    I didn't note anywhere that I associated that.

MS. KORNBLAU:  Those are all the questions that I

have.  Thank you, Mr. Holdaway.

MS. BEARS:  Okay.  I have nothing further.  And

Madam Reporter, the spelling of that case is on the expert

report, if you need to reference that.  I would like a

copy, digital only.

        MR. JOHNSON:  I'm sorry.  I'm sorry.  I'm going

to have a couple questions.

        MS. BEARS:  Okay.

        MR. JOHNSON:  It's okay.  I would like five

minutes to go over my notes.  If that's okay with

everyone.

        MS. KORNBLAU:  Okay.

        THE COURT REPORTER:  Off the record at 3:56 p.m.

        (BREAK TAKEN.)


                    FURTHER EXAMINATION


BY MR. JOHNSON:

    Q    Hello, Mr. Holdaway.  Just briefly, Counsel was

just asking some questions about your report under the

section, Synchronizing Videos.  And there was some

discussion about this light.  Do you remember that?

    A    Yes.

    Q    Did the light have any significance other than

for the purpose of synchronizing the videos?

    A    No.

    Q    Okay.  So could it have been any easily

identifiable event that you can see in both cameras that could have synchronized the videos?

MS. KORNBLAU: Objection. Vague and ambiguous.

THE WITNESS: Yes.

BY MR. JOHNSON:

Q   And then, I'm sorry if this was answered before, but earlier in the deposition, you were asked some questions, generally, about how the videos were changed. Did you remove anything from the videos?

MS. KORNBLAU: Objection. Asked and answered.

THE COURT REPORTER: When the videos are enlarged, sometimes they've been cropped down to a smaller frame. So, technically, you know, some of the outsides of the frames may be removed on the enlarged versions.

BY MR. JOHNSON:

Q   Anything else?

A   No.

MR. JOHNSON: Okay. That's all I have.

MS. KORNBLAU: No further questions for me.

MR. JOHNSON: Nothing else for me.

THE COURT REPORTER: Mr. Johnson, are you ordering a copy of the transcript?

MR. JOHNSON: Not today. I've got your information, though, if we want to do so in the future.

THE COURT REPORTER: Okay. And Mr. Holdaway, is

your e-mail, the best e-mail for you, on your CV to review
this transcript?

THE WITNESS:  Yes, it is.

THE COURT REPORTER:  Okay.  Thank you.  We are
going off the record at 4:04 p.m.

(PROCEEDINGS CONCLUDED AT 4:04 P.M.)

**DECLARATION UNDER PENALTY OF PERJURY**

I, SCOTT HOLDAWAY, the witness herein, declare under penalty of perjury that I have read the foregoing in its entirety; and that the testimony contained herein is a true and accurate transcription of my testimony elicited at said time and place.

Executed this _____ day of _____, 20____.

_____

SCOTT HOLDAWAY

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                           01/22/2026                           Page 70

I, Kelly Wabbel, Certified Shorthand Reporter licensed in the State of California, License No. 14736, hereby certify that the deponent was by me duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with Computer-Aided Transcription: That the foregoing is a full, complete, and true report of said proceeding.

I further certify that I am not interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificate null and void.

In witness whereof, I have hereunto set my hand this Date      day of Month        , Year    .

_____

Kelly Wabbel, CSR No. 14736, CVR

**Exhibits**

**Exhibit 1- HOLDAWAY** 4:11

**EXHIBIT 2 HOLDAWAY** 6:21, 23

**EXHIBIT 3- HOLDAWAY** 4:13

---

**1**

**1** 6:17,20 52:10

**10** 52:11

**100** 56:19

**14736** 5:7

**18** 37:22 38:5

---

**2**

**2** 6:21,23 21:19 36:7,15 52:10

**20/20** 49:2,5,8

**2022** 9:4

**2023** 9:4

**2025** 59:15

**2026** 5:1,8

**22** 5:1,8

**23** 61:24 62:11

**24** 9:14 59:25 60:20 61:1,17

**25** 59:15 60:9

**26** 8:16

**2:01** 5:2,9

---

**3**

**3** 6:24 7:1,22 21:19 36:21 52:10

**3:04** 42:7

**3:14** 42:10

**3:56** 66:11

---

**4**

**4** 34:24 35:2 37:19 38:16 42:19 45:23 52:10

---

**4:04** 68:5,6

---

**5**

**5** 52:10 55:9

**51661** 51:23

**51829** 39:14 53:5,11 54:3

**5:25-CV-00331-KK-DTB** 5:13

---

**6**

**6** 28:16 33:6 52:10

---

**7**

**7** 36:9 52:11

---

**8**

**8** 52:11 57:5,10 62:23

---

**9**

**9** 46:12 47:25 50:21 51:19 52:11

---

**A**

**abilities** 44:7

**accepted** 60:9,19 61:2

**access** 20:13

**account** 15:3

**accurate** 25:6,10,19 27:21 31:19 33:12 43:6 58:8

**action** 51:9,10,12,22 52:1

**add** 32:8 39:3

**added** 29:23 35:16 38:17,21,23, 25 40:24 45:24

**admonitions** 7:13

**afternoon** 5:3,20,23,25 6:11 42:12

**agree** 20:3 40:12,16

**ahead** 40:1

**aligned** 39:12 65:4

---

**aligns** 63:12

**alter** 32:22 33:2

**altercation** 60:12

**altered** 33:5

**ambiguous** 67:3

**Amie** 5:23

**amount** 39:4 56:12

**analysis** 13:1,4,12 20:18 23:4,8 37:17

**analyst** 13:15,17,24

**analyze** 10:15 19:20 45:10 46:6 51:14

**analyzed** 16:1 36:13 51:18

**analyzing** 14:1 30:9,11 33:17 36:10 43:13,15 44:10 45:17 46:5 53:4 62:12

**Andrea** 5:20 6:11

**Andrew** 5:22 32:5 37:23

**Angeles** 7:25 59:24 61:23

**annotate** 14:3 30:1 46:8

**annotated** 16:1,7 18:5 31:22 34:13 46:23

**annotating** 26:22 30:4 33:17 46:5

**annotations** 18:24 24:18,19 29:23 32:17 37:13

**apologies** 14:17,20 44:15

**Appearance** 5:1

**appearances** 5:18

**appeared** 55:10,12 56:2,7,19 57:5,20 58:9 63:11

**appearing** 5:15

**appears** 7:4 63:6

**application** 5:15

**applied** 53:18

**apply** 53:17

**approximate** 39:4

**April** 61:23 62:11

**area** 55:21,22

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                          01/22/2026                    Index: Argumentative..civil

**Argumentative** 12:21 40:13
  43:8 49:21 50:1

**aspect** 32:17

**assault** 61:21

**assist** 26:19

**assistance** 26:14

**association** 20:17

**assumption** 57:12

**attaching** 6:17

**attempting** 37:12

**attendees** 5:15

**attorney** 5:19

**attorneys** 9:20

**audio** 20:18 28:18 29:14,15,18

**authored** 28:7

**awhile** 60:21

**Axon** 21:6,14,16 22:2,11,13 36:1
  50:3 62:13

---

**B**

**back** 11:1 12:25 20:25 34:20
  40:5 42:9 60:21,25

**background** 16:12

**ballistics** 11:24

**barrel** 11:2,5,21,23 39:10 53:25

**based** 14:4 15:8 30:5,12 33:14
  34:11 38:13 47:14 52:25 56:17
  57:18 58:10

**basics** 12:4,5

**Bears** 5:23 58:14,16,22 61:25
  62:2,17 65:25 66:6

**beginning** 5:19

**behalf** 5:21,24 6:1

**belief** 33:9,15 34:8,11

**belonging** 63:22

**benefit** 37:5

**Beverage** 61:1

**billed** 18:10

**billing** 18:13

**biomechanical** 25:14

**biomechanics** 25:14

**bit** 48:23 61:22

**blue** 41:3,20

**body** 10:15 17:2,4 18:18 19:9
  21:8,12,14,20 22:3,6 31:25 32:4
  34:15 35:7,13 36:1 44:25 47:11
  50:3 53:15 62:12,13

**bottom** 20:7

**box** 32:11 45:23 46:15

**boxes** 24:10,16 32:16 37:14

**break** 42:3,8,16,18 66:12

**Brendan** 5:25

**briefly** 8:22 66:17

**bring** 20:13,21

**broke** 16:4 60:23

**bullet** 36:16,21 43:3 46:16,22,25
  47:4,10,15,16 53:25 54:4,6,7
  55:10 56:1,4 57:5,10,15,24 58:4

**bullets** 56:1

**BWC** 34:25 35:24 36:17,22
  37:21 39:14 42:23 46:13,14,15
  48:1,3 55:9 57:5

**BWC-HPD** 37:22

---

**C**

**Cal** 22:20

**California** 5:6,11,12,24 7:24 8:3
  27:18 61:17,19

**call** 24:18

**called** 33:10

**Calls** 27:7

**cam** 17:4 50:3 53:16 62:12,13

**camera** 17:2 18:18 19:9 21:8,12
  22:9 27:11,12,17 31:25 32:4
  34:16 35:7,13 37:4 47:11 49:1
  52:25 53:2 54:21 63:20,24,25
  64:3

**cameras** 10:16 21:14,20 22:3,6,
  11,13,15 27:9 36:1 45:1 65:3
  67:1

**capabilities** 65:18

**capacity** 7:19 13:18

**captured** 29:14,18,25 54:24

**captures** 53:2 55:5

**capturing** 52:25 54:25

**case** 5:12 6:25 7:20 8:3 9:10,21
  10:14 13:11,19,23 15:24 17:1,10
  18:10,16,17 20:6 23:22 26:21
  28:12,15,18,20 29:8,11 30:16,24
  31:8,10,18 32:13,23 36:8,11
  40:11,16 45:17 47:15,24 48:20
  49:4 53:20 56:24 59:7,10,12,16,
  18 60:4,10,11,15,21 61:3,17,21
  62:3,5,12 66:1

**cases** 7:23,25 8:9 23:14 30:9
  53:19 58:23 59:6,23 61:16

**casing** 46:25 47:4,15 58:11

**casings** 17:13 46:16,22 47:10,
  12,17 55:10,12,14,20,21 56:1,4
  57:5,11,15,24 58:4

**catch** 38:7

**caught** 11:5

**center** 48:8

**Central** 5:12

**certainty** 55:25 56:4

**certification** 21:4,6 23:5 26:7

**certifications** 12:11 23:3

**certified** 5:5 20:25 21:2 22:22,
  25

**change** 31:23 32:4,24 48:4

**changed** 31:25 32:7,25 67:8

**charge** 20:5

**circle** 41:20 46:16 54:9 55:11,15
  56:22 57:7 63:1,2

**circled** 54:8 55:16 56:14 57:17
  64:1,6 65:8

**circles** 24:10,15 32:16,20,21
  37:14 41:3 46:23

**circling** 57:15 64:9

**City** 5:21 6:12 7:25 59:7,24
  61:23

**civil** 7:20 8:5,7 23:19,20

**clarify** 14:24 23:25 24:1 31:6

**classifies** 31:12

**clear** 19:2

**clip** 37:22 38:1,3

**clock** 35:23 36:2

**close** 16:22

**code** 5:17

**collaboration** 9:1

**color** 56:16

**commence** 17:22,25

**Commission** 27:18

**communicated** 9:17,20,23,25

**communicating** 10:5

**communications** 10:12

**company** 18:12

**compare** 51:13

**compared** 51:17

**comparison** 51:17

**competently** 33:11

**complex** 26:15

**components** 61:8

**compress** 35:10

**computer** 24:13

**concentrate** 59:23

**CONCLUDED** 68:6

**conduct** 23:8

**conducting** 37:16

**confusing** 43:10 56:8

**connection** 9:9 31:9 58:7

**connotation** 24:4

**considered** 24:16 32:7

**constitutes** 19:17

**consulted** 61:7

**contact** 9:13,15

**contacted** 9:9

**content** 32:14

**contents** 16:4

**convert** 35:13

**converted** 34:25 35:7

**copy** 20:9,15,20 66:3 67:22

**corner** 38:17

**correct** 10:12 11:15,16 13:9,10 14:7,8 15:9,10,12,15 16:10 17:4 18:11 19:6,7 23:11,12,21,23 25:1,2,4,5,8,9,12,15 27:24 29:5, 21 30:5,6,8,13,21,22 31:7,16,17 32:3 33:23,24 34:1,4,8,12,25 35:8 36:12,13 37:17 38:19 40:25 42:13,14 43:4 45:20 46:22 52:19 61:15 65:17,21

**correctly** 10:3 60:6

**Counsel** 5:18 18:21 42:2 66:17

**countdown** 36:5

**counter** 38:17,22,23

**counters** 49:12,15

**counts** 39:1

**couple** 16:14,23 66:5

**courses** 21:2

**court** 5:3,12 7:19 8:9,15 26:14, 20 40:4 42:6,9 60:9,19 61:2,25 62:11 66:11 67:11,21,25 68:4

**courtroom** 7:22 61:16

**cover** 32:17

**covering** 32:21

**Covina** 59:7

**create** 31:20 37:12

**created** 18:3 27:4 29:20,22 32:13 36:9,13

**creating** 24:7 36:11 53:10

**creation** 34:17

**crime** 25:23 26:7

**criminal** 8:6 23:19

**cropped** 67:12

**CV** 7:6,21 16:21 20:7 33:6 59:1 62:9 68:1

— **D** —

**Dale** 6:1

**date** 5:8 35:25

**de-interlaced** 60:6

**dealing** 54:12

**defendants** 23:18,19

**defense** 23:15,18

**defensive** 25:20

**definition** 24:20

**degree** 22:19

**delay** 55:3

**delete** 10:9

**deleted** 32:14

**delivered** 8:23 35:11

**depends** 53:2,3

**depo** 11:9

**deposed** 7:8

**deposition** 5:5,9,14,16 6:18 7:11 8:21 20:15,24 30:21 67:7

**depositions** 11:16

**Designations** 6:22

**detail** 13:1

**Detective** 5:21 14:19 18:18,20 19:9 21:8,13 32:1 36:24 37:2

**detention** 29:8,11

**determination** 45:10

**determine** 11:6 12:14 34:15 38:1 47:15

**determined** 21:25

**difference** 24:1,3 41:11 43:17, 18

**difficult** 20:11

**digital** 32:13,23 53:22 66:3

**digitally** 20:21

**direct** 16:19

**direction** 55:15

**disagree** 50:24

**disagreeing** 51:2

**discharged** 42:1

**discharging** 45:9

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                    01/22/2026                    Index: discussed..firing

**discussed** 46:2

**discussing** 51:7

**discussion** 66:20

**disorienting** 56:17

**dispense** 7:14

**District** 5:11,12

**doctor** 25:1

**documentation** 37:9

**documented** 16:2

**documents** 16:15,24 17:11,15, 19 28:18,21 30:18

**DOJ** 23:10

**domains** 27:22

**Dominguez** 22:20

**drew** 32:20

**duly** 6:5

**duplicate** 46:13

**duplicated** 46:20

**duplicative** 58:18

**duration** 38:2 54:22

**dynamics** 25:17

**E**

**e-mail** 9:16,18,25 10:12 68:1

**e-mails** 10:7

**earlier** 15:2 17:6 30:20 39:20 41:12 48:23 67:7

**easier** 36:4 63:4

**easily** 66:25

**edit** 15:18

**editing** 29:15,20 44:25 45:21

**effects** 24:5,6,9,11,14,15,17,19, 21

**ejected** 57:25

**emitted** 63:19,21

**emitting** 64:17

**engineering** 25:14

**enhance** 24:2 31:19 37:12

**enhanced** 16:4 20:1 27:5

**enhancement** 16:6 20:18 21:1, 5 22:23 23:1,22 24:4

**enhancements** 23:13 37:6

**enhancing** 18:15,20,23,24 19:8 29:15,20 38:13

**enlarged** 18:4 29:22 48:4,6,21 49:10 67:12,14

**enlargement** 36:22,25 48:1 60:5

**entire** 19:16

**entity** 23:8

**essentially** 17:15 18:6

**estimate** 7:7 18:14 19:11 28:13

**et al** 5:11

**event** 41:17,24 44:14,15,22,23 67:1

**events** 14:4 26:25 32:8,24 33:1 34:1 53:8 65:4

**evidence** 17:1 26:2,15,20 60:8, 19 61:2

**exact** 14:14 17:5,14 58:1

**examination** 6:8 17:1 26:2 58:17,20 62:20 66:14

**examined** 6:5

**exceeds** 44:6

**excluded** 61:12

**exhibit** 6:17,20,21,23,24 7:1 37:21 46:13

**Exhibits** 35:3 37:20 42:19

**exit** 53:25

**expect** 12:18

**experience** 25:20,23 26:4 40:22 44:25 45:2,6,8,9,21 47:11 53:15, 18,21

**experiences** 12:8

**expert** 6:22 7:20 8:15 9:3,6 11:24 13:3 22:10 24:23 25:13 26:13 27:22 43:1 45:17 46:3,7 47:3,9,19,20 49:22 56:3 58:2 61:6,7 63:10 66:1

**expertise** 15:11 25:7,11,16

26:16 30:7

**experts** 30:16

**explanation** 50:25

**explosion** 11:20

**exported** 35:9,10

**extensive** 58:17

**extent** 21:21 22:2 50:14

**eyes** 27:17

**F**

**fact** 36:11 51:3 56:5 57:11

**facts** 33:7,14

**fair** 27:16

**falls** 16:9

**familiar** 7:12 27:18,25

**fashion** 50:12

**fast** 54:21

**federal** 8:10,15

**fee** 20:5

**fence** 64:10

**figure** 10:17 53:12 56:14 57:13

**figuring** 59:19

**file** 14:13,14

**files** 35:4

**find** 17:20 56:10 64:22

**finding** 31:11 34:19 59:20

**fire** 11:4,19,23

**firearm** 39:14,21 42:1,22 43:25 44:9 45:9 50:6,8,9,11 55:11,13 56:2,5 57:6,11 63:16 65:16

**firearms** 12:9,12 15:12 26:10 30:8 45:1,2 49:22 50:2 58:2 61:7 63:10

**fired** 10:17,18 15:3 16:18 17:16, 17,20 39:6,8,13,15,16 41:5,7,8, 10,22 42:25 43:4,7 44:6 45:3,11, 14,15,22,25 46:1 50:2,7 51:20 52:8,9,12,19,21 53:13 56:11,12 57:14

**firing** 29:4 45:9

**flame** 11:4,19,22

**flash** 11:1,3,4,12,18 12:15 39:9 44:12

**flashes** 47:12 52:12

**flashlight** 63:6,14,16 64:4,17 65:14

**flow** 55:14,19

**follow-ups** 62:23

**footage** 10:16 12:16 14:5 18:4,5 19:9 22:8 26:24 27:11,15 31:25 32:5,6,18 34:16,20,22 35:8,9,14, 24 36:3 37:4 49:6 50:3 53:14,16, 17 54:9 55:2 60:6

**force** 25:20 31:15 49:18 50:9

**forensic** 13:1,3,12,15,17 23:4,8 25:24 26:2

**forensics** 13:24 60:14

**forget** 59:21

**form** 15:17,20

**format** 34:25 35:8,11,14

**formats** 35:5

**formed** 31:9

**forward** 39:1

**found** 10:22 52:20

**foundation** 27:8 44:1

**frame** 21:25 31:20 32:9 37:16,18 38:16,23,24 39:11,14 41:4,20 42:22,24 43:12,20,22 44:16 46:24 47:7 48:8 49:12,15,16 51:8,11,12,14,16,21,22,24 52:4 53:5,10,15 54:3,13,15 57:19 67:13

**frames** 16:5 43:15 48:7,9 51:13, 17 52:10,11,17,18 67:14

**full** 6:13

**function** 39:21

**future** 67:24

### G

**Galipo** 6:1 59:24

**Galipo's** 59:6

**general** 55:14,19,21,22 57:18

**generally** 19:13 22:11 67:8

**give** 7:7 18:14 19:11,14 26:18 28:13 46:3 47:20 53:7,24 61:25

**giving** 29:3

**Gonco** 60:20

**Gonzalez** 5:10 29:8,11 48:18

**Good** 5:3,20,23,25 6:11 42:12

**government** 23:7

**graphics** 32:11 36:18 37:21 46:13,16,20,21 48:2 49:12 55:9 62:14,16

**graphics.mov.** 36:17

**green** 63:1

**grocery** 60:23

**guess** 11:4 12:8 14:24 19:2 43:12 44:13 49:7,10

**gun** 12:1 39:9,13,14,15 41:8 42:21,25 43:1,3,7,24 44:5,10,11, 12,21 45:3 47:13 50:13 51:1,10, 22 52:11,12 53:5,11 54:1,3,5,7, 12,14,17 57:24 58:5,6,7 61:8

**gun's** 11:2

**guns** 12:3,5 29:4 53:23

**gunshot** 15:21 19:22,23 39:6,8, 12 41:5,7,10,21 43:7 44:6,13,18, 20,22 45:5,11,14 49:18 54:16 60:14,16,24 62:6,8,11 65:20

**gunshots** 10:17,21,23 15:3,6,8 16:8 18:6 19:19 26:23 28:9 29:1 30:10,12 34:14 42:20 45:17,19, 22,25 46:1,4,7 47:12 51:20 52:8, 18,21 53:13,16 56:11 57:14 58:24 59:9,19,20

**guy** 58:12

### H

**H-O-L-D-A-W-A-Y** 6:16

**hand** 64:18 65:15

**handled** 5:16

**hands** 50:11

**handy** 20:8

**happen** 46:10 53:6 54:18

**happened** 15:17 37:10 41:25

**happening** 11:20 14:3 16:13 33:18 47:23 55:24 65:3

**head** 19:10

**heading** 16:25

**hear** 24:12,14 52:15,16

**heard** 49:2 52:15

**hearsay** 34:3

**held** 54:23

**helpful** 20:14 37:8 41:2 56:8

**Hemet** 5:21 6:13

**high** 54:25

**highlighting** 24:16

**Highway** 5:24

**Hills** 22:20

**hindsight** 49:2,5,8,10

**hold** 65:14

**Holdaway** 5:9 6:4,11,15 7:3 19:5 40:1 42:12 51:6 58:14 65:24 66:17 67:25

**Holdaway's** 6:24

**holding** 63:15,16,18 64:16

**Hollywood** 24:8,15

**hospital** 60:12

**hour** 42:3

**hours** 19:13,15,20,25 20:1 28:11

**hundredths** 55:6

**hurt** 45:15,16

### I

**idea** 19:14

**identifiable** 67:1

**identified** 38:24 54:14

**identify** 11:11 15:5,8 45:4,19 47:4,9 49:12,16 51:8,12,21 59:8 61:8

**identifying** 51:11,24 52:10,17 56:1 58:4,6,7 63:8,22 64:24 65:5

**illuminates** 63:7

**image** 31:20

**images** 32:9,23

**incident** 17:3,8 19:16,17,19 20:2 21:9,13 25:24 26:8 27:6 28:15,17,25 29:4 31:3,5 32:24 33:23 34:18 35:22 36:19,24 37:3,6,13,15 38:6,9 39:7 40:22 48:25 49:5,6

**incidents** 32:25

**include** 57:17

**increments** 55:6

**indicating** 41:9 44:8

**indication** 11:1 39:5,7,12 41:4,9,21,23 44:14,17 51:25 53:3 54:15 56:13 57:16

**indications** 10:21,22,23 16:8 18:6 26:23 29:1 34:13 51:19 52:7,21,23 59:20

**individual** 38:24 48:7

**information** 16:11,12 17:11,20 33:8,15 34:8,11 56:13 67:24

**informed** 33:9

**initially** 9:9,15

**input-ace** 21:7,10

**inside** 11:20 17:11

**instance** 7:21

**instructions** 14:25 15:4

**instructor** 12:9

**intend** 13:23 16:3 28:23 29:7,10,13,17

**interest** 48:10,11

**interested** 35:21

**Investigate** 21:6,16

**involve** 60:23 62:6

**involved** 30:24 34:19 56:24 59:17 60:2 62:4,7

**involves** 26:2

**involving** 62:8

**Irick** 5:24

**Irick's** 57:6,11

**issues** 26:15,20

---

**J**

**January** 5:1,8 59:25

**Johnson** 5:25 12:21 15:13 18:21 19:2 27:7 39:17,19 40:7,13,18 41:12 42:2,5,15 43:8 44:1 49:21 50:1,14,18,23 66:4,7,16 67:5,15,18,20,21,23

**judge** 26:14

**jump** 60:20

**jumps** 51:15

**June** 59:7,14

**jury** 26:14 27:15 56:8

---

**K**

**Kelly** 5:4

**kind** 11:23 12:23 22:4,6,12,15 24:10 34:20 54:1 63:5,6

**knew** 34:18

**knowledge** 22:2 26:13,19 33:7,20,25 34:4 61:11,13

**Kornblau** 5:20 6:10,12,21,24 7:2 12:24 15:16 19:1,4 27:13 39:18,25 40:4,10,15,23 41:18 42:4,11 43:14 44:4 49:23 50:4,16,21 51:5 58:13 62:22 65:23 66:10 67:3,10,19

**Kornblau's** 58:16

---

**L**

**label** 14:1

**labeling** 53:11

**Lacks** 27:7 44:1

**Lam** 7:23 8:3 61:16,19

**language** 17:14

**Law** 6:1

**leading** 35:22 39:5

**learn** 12:5

**learning** 27:22

**leave** 57:24

**leaving** 39:13 42:22

**left** 45:24 46:16 54:5 55:17 63:5

**length** 38:1

**LEVA** 21:11 47:21

**level** 32:20

**license** 5:6

**licensed** 25:3

**life** 12:8

**light** 63:1,3,11,17,19,22 64:4,5,11,13,14,17,20,24 65:1,6,7,10,11,15,21 66:20,22

**lighting** 54:23

**likeliness** 47:22

**limitations** 25:8

**Linda** 60:10

**lines** 16:18

**listed** 7:23 9:6 13:8,21 23:11 28:16,20

**location** 34:5

**Loeser** 61:1

**Loma** 60:10

**long** 16:8 18:7 19:16,18 43:24 53:8,25

**longer** 54:22,24

**looked** 8:22 37:18 38:12 55:14

**Los** 7:25 59:24 61:23

**lost** 11:13

**lot** 10:21 27:3 44:25 45:1 46:9,10 50:2 56:11

**low** 54:23

**lower** 38:17 45:24 46:15

---

**M**

**Madam** 66:1

**made** 44:15

**maintain** 39:19,24

**make** 14:3 43:17 45:10 48:4 55:23 61:15 64:15 65:12

**making** 15:23 43:13 56:15 57:12

**manipulate** 32:22 33:2

**Marcel** 9:22,23 16:14 17:10,19 35:20

**Marcel's** 10:2

**MARKED** 6:20,23 7:1

**materials** 16:15,20 17:1 28:21 36:8

**math** 36:4

**matter** 5:10 40:11,17,22 43:16, 21,22

**mattered** 40:25

**matters** 33:11

**means** 38:15 49:25 64:12

**meant** 43:20

**media** 26:23 32:13,23 51:20 52:8,20 53:22

**medical** 25:1

**member** 20:17 26:1

**methodology** 29:15

**minute** 42:3

**minutes** 66:8

**mirror** 63:12 65:9

**missing** 17:14

**mistaken** 57:22

**mobility** 25:8

**mode** 37:3

**model** 21:18 64:15 65:12

**moment** 18:23 43:16

**motion** 25:7

**mounted** 65:16

**mov** 35:4

**move** 50:11

**moved** 46:24 51:1

**movement** 50:6,8 54:24

**movements** 51:15 54:21

**moves** 50:13

**movie** 24:8

**MP4** 35:6

**multiple** 64:21

**Murillo** 59:24

**muzzle** 11:1,3,4,5,11,18 12:15 39:9 44:11 47:12 52:12

---

**N**

---

**navigate** 40:8

**necessarily** 12:22 13:25 41:16, 24 51:16 55:2

**negative** 39:1

**Norcal** 61:1

**note** 30:2 56:22 65:22

**notes** 66:8

**Notice** 6:18 20:24

**noticed** 35:21

**noticing** 5:19

**noting** 31:11 44:14

**November** 9:14

**number** 5:6,12 18:9 36:7,21 46:1 49:13 64:16

---

**O**

---

**oath** 42:13

**object** 18:22

**objecting** 50:23 51:2

**objection** 12:21 39:17,20,24 40:7,18 41:12 67:3,10

**objects** 32:8

**observe** 45:14

**observed** 50:10

**observing** 43:13 47:2 54:2,8

**occur** 12:17,18

**occurred** 10:22 15:21 19:23 34:1 41:17 49:7 52:3 54:16 55:3 57:16 59:20

**occurring** 10:21 14:4 16:8 20:2 26:23 29:1 30:10,12 34:14 41:2 44:18,20 45:5 53:16

**occurs** 41:5,8,22 43:19

**October** 60:9

**offer** 13:23 16:3 28:24 29:7,10, 13,17

**offering** 29:24 31:14

**office** 10:6 59:6

**officer** 5:5,24 10:18 14:12,13,15, 18 16:18 17:13,15,21 18:19 25:16 27:19 34:19 36:16,19,22 37:2,20,22,23 38:6,14 39:13 42:22 43:25 45:25 46:12,14 48:1, 3 51:20 52:9,19 53:13 55:8,10,13 56:2,5 57:4,6,14 59:17 60:2 62:4, 7,25 63:23 64:4,11,13 65:6

**officer's** 40:21 50:11 64:24

**officers** 11:15 20:1 27:6,16 28:24 29:3 30:24 37:5,15 48:15, 24

**Officers'** 11:8

**Offices** 6:1

**official** 31:13 33:19

**omit** 32:24

**on-screen** 35:16

**open** 54:22,23

**operate** 12:3,6 21:22,24

**opinion** 14:6 31:13 33:19 39:18 47:20 53:24

**opinions** 13:23 14:1 15:17,19, 20,23 16:3 28:24 29:3,7,10,13, 17,24 31:9,15 46:3 53:7

**opposed** 29:14,16 37:10

**orange** 55:17,22 57:7

**ordering** 67:22

**orders** 41:24,25

**organization** 26:1

**original** 27:2 36:3

**originals** 32:2

**outsides** 67:13

**overlaid** 35:25

## P

**p.m.** 5:2,9 42:7,10 66:11 68:5,6

**Packer** 9:12,17,21 10:6

**pages** 7:4

**paragraph** 33:7 34:24 35:2 36:7,15 37:19,20 38:16 42:19 45:23 47:25 49:11

**parameters** 14:21,24

**part** 35:1 44:23 50:13 51:1 56:10 57:15 61:6

**participated** 28:4

**passing** 39:5

**past** 45:15 50:10

**path** 58:1

**patient** 60:11

**Patrick** 5:21 18:19 32:1 37:23

**Patrol** 5:24

**PDFS** 31:21

**Peace** 27:19

**peer** 27:25 28:3,4,7

**pending** 5:11

**people** 12:7 27:10 57:2

**perceive** 48:25

**perceived** 48:24

**perceiving** 27:6

**percent** 56:19

**percentage** 23:14,17

**perception** 15:9 30:5,12

**performance** 25:16

**Performed** 36:8

**person** 27:11 34:20 38:7,8,10 48:10,11,12,14,17 58:7

**person's** 58:5

**personal** 33:7,20,25 34:4 45:8

**perspective** 20:2 27:15 38:14

**phone** 9:24

**photographs** 31:1

**photos** 55:1 64:19

**physical** 25:8

**piece** 56:13

**pink** 55:11

**pinpoint** 41:16

**pixel** 32:20

**place** 5:14 12:17 19:21 26:25

**placing** 44:16

**plaintiff** 6:2 20:5 23:16

**Plaintiff's** 6:21

**plaintiffs** 23:14

**played** 37:24 38:9

**point** 36:21 41:16 52:3

**points** 36:16

**police** 24:24 25:20 28:17 31:15

**portion** 34:15

**positive** 39:2

**possess** 26:19

**POST** 27:19,22

**practices** 24:24

**precise** 53:8

**preliminary** 8:3

**preparation** 8:20 61:6

**prepare** 7:3

**present** 14:6 20:15 33:22

**previously** 28:11

**primary** 26:12

**printed** 20:9

**prior** 38:6

**probabilities** 47:22

**probable** 47:16,18,19

**procedures** 24:24 25:20 31:16

**proceeding** 5:6

**PROCEEDINGS** 68:6

**process** 41:17,22 45:5 54:4,6

**processed** 32:9,13

**produce** 10:12

**Production** 35:2 37:19 42:19

**professional** 26:1

**program** 38:2

**programs** 21:3

**pronounce** 8:5 10:3

**provide** 26:13

**provided** 10:15 14:2,9 16:12,14 17:10,19 35:5 37:4 62:16

**providing** 27:14

**psychiatrist** 25:4

**psychologist** 25:3

**pull** 64:6

**pulls** 43:25

**purple** 55:15,20

**purpose** 26:12 66:23

**pursuant** 5:16

**pursuing** 48:15

**pushes** 49:18

**put** 31:20 41:19 46:23 64:1

**putting** 33:4

## Q

**qualifications** 53:19

**qualified** 12:14 45:19 46:3 47:3

**qualifies** 26:19 45:4,9 47:9 49:7

**qualify** 33:18 45:16

**quality** 31:20

**question** 7:16 12:23 19:6 23:2 24:13 39:22 40:2,5,20 44:8 47:8 48:13 50:25 52:14,15,16

**questions** 20:12 58:13,15 62:17 65:23 66:5,18 67:8,19

**quick** 20:20 50:12 55:1 62:23

## R

**R-U-S-A-N-O-V-S-K-A-Y-A** 7:24

**range** 25:7 38:3,4

**rate** 21:25

**re-iterate** 58:17

**reaches** 39:2

**reacting** 44:11

**reaction** 25:17

**reacts** 44:9

**read** 11:8,16 30:18 40:5,6

**reading** 46:19

**real** 20:20

**realtime** 55:3

**rearrange** 33:1

**reason** 10:9 16:17

**recall** 9:19 10:1 14:14 17:14 21:19 42:23 59:22 61:4

**received** 16:16,20 17:2 28:21 32:2 36:9

**recent** 59:14 60:18

**recoil** 44:11 49:17,24 50:5,24,25 51:3,8,12,22,25 52:5,11 53:5,11 54:4,12,14,17

**reconstruction** 25:24 26:5,8

**record** 5:4,19 6:14 21:25 40:6 42:6,9 66:11 68:5

**reference** 49:13 52:3 66:2

**referencing** 44:21

**referred** 28:19

**referring** 24:8 35:4 44:11,13

**reflection** 62:25 63:12 64:11 65:5,20

**reflective** 65:9

**reflects** 65:10

**related** 16:3 20:17,18 22:25 28:18

**relates** 8:14 15:12 16:5 28:23 30:7

**relation** 65:19

**relying** 45:14

**remember** 7:11,25 9:16 17:5 59:12 60:1 62:6 66:20

**remembering** 60:6

**remind** 7:16

**remotely** 5:15

**remove** 62:14 67:9

**removed** 46:15,17,20 49:12 67:14

**repeat** 40:3

**repeating** 10:25

**report** 6:25 7:3,5,6 8:16,22,24 9:7,11 13:1,9 15:25 16:2,15,17, 19,22,23,25 17:18 18:2 20:8,12 23:9,11 28:16,19 30:1 31:11 33:6,15,19 34:7,10,24 35:1 41:19 46:12 50:22 54:10 56:7 62:24 63:22 64:1,6 66:2,18

**Reporter** 5:3,5 40:5 42:6,9 61:25 66:1,11 67:11,21,25 68:4

**reports** 17:3,8,12 28:16,17 30:15 61:12

**represent** 6:12

**requires** 8:16 26:15 27:3

**resembles** 12:17

**resolution** 22:1

**response** 50:10

**rest** 23:16

**retained** 13:11,16,18 17:23,25 23:7,14

**review** 11:14 17:7 28:5,7,17 30:20,23 31:1 37:9 47:14 68:1

**reviewed** 8:20 19:18 27:25 28:20 30:15

**reviewing** 12:16 47:11 49:6 52:20 53:14,15,19

**reviews** 28:3

**Reynoso** 5:22 14:15,16 32:5 37:21,24 46:14 51:21 55:9 57:5 63:15,23 64:13 65:6

**Reynoso's** 14:12 46:14 62:25 63:3 64:4,11,20

**right-hand** 38:17

**Riverside** 59:15

**Rule** 8:16

**run** 22:12,13

**running** 34:21 38:7,8 48:12,14

**Rusanovskaya** 8:4 61:23

---

### S

**S-C-O-T-T** 6:15

**scene** 25:23 26:2,7 31:1,3,5 33:22

**scope** 36:7,15 39:17 41:13 44:3, 6 50:15,16

**Scott** 5:9 6:4,15 41:14 59:15

**screen** 20:13 36:5 37:25 41:1 47:5 55:16,17

**screenshots** 64:1,8

**scroll** 61:15

**seconds** 19:13,20,25 36:5 38:5 40:11,16,17,22 54:12

**section** 66:19

**security** 60:12

**select** 34:16 38:3,4

**send** 10:11

**sense** 14:3 55:23

**sentence** 30:19 62:25

**separate** 56:17 57:18

**September** 60:20

**sequence** 33:1

**Sergeant** 5:22 14:16 32:5 37:23 51:21 63:15

**serial** 64:15

**serve** 13:12,14

**served** 13:3

**services** 20:6

**set** 33:7

**sexual** 61:21

**shell** 56:20

**shooters** 56:24

**shooting** 19:19 26:5 34:19,22 37:22,23 59:17 60:3 62:4,8

**short** 56:12

**Shorthand** 5:5

**shot** 10:18 17:13 57:15,16

**shots** 16:17 17:12,16,17 53:14

**show** 55:2 64:7

**showing** 31:6

**shutter** 54:20,21,25

**Side** 55:9

**side-by-side** 37:21,24

**significance** 17:7 53:10 54:13 63:17 64:20,23 65:7 66:22

**similar** 58:24 62:12

**simply** 44:17

**Simpson** 60:10

**Sincich** 10:3,4

**single** 51:8,11,12,16 54:13

**Sir** 49:19

**skip** 7:15

**slide** 51:10

**smaller** 67:12

**smoke** 11:1 39:9,13,15 41:7,8,9 42:21,25 43:3,7,24 44:5,12,21 47:13 51:22 52:11 53:5,11 54:3, 12,14,17

**Sobaszek** 5:22 14:18,19 18:19 21:9,13 32:1 36:17,22,24 37:2, 20,23 46:12,14 48:1 52:9,13,19 55:9 57:5

**Sobaszek's** 14:13 18:20 19:9 39:13 42:22 48:3 55:11,13 56:2,5

**software** 22:6,12,13,15

**solely** 16:5 45:13

**sort** 35:24 58:10

**sounded** 23:2

**sounds** 12:19 13:16 41:13 46:19

**speak** 42:15

**special** 24:5,6,9,11,14,15,17,19, 20

**specialized** 26:13,16,18

**specific** 16:16 30:18 42:22 51:7, 21 52:10

**specifically** 22:5 26:14

**speculation** 27:7

**speed** 54:20,25

**spell** 6:13

**spelling** 62:1 66:1

**spend** 18:20 19:8

**spent** 18:15 28:12

**split** 40:11,17 54:11

**spoke** 9:24 35:20

**squares** 37:14

**stabilization** 18:8 27:3,4,5,6

**stabilize** 10:16 15:3,5

**stabilized** 18:4 27:10,11 29:23 31:21 37:3 48:2,4,7,10,22

**stabilized.mov.** 36:23

**stabilizing** 26:24

**stamp** 35:25

**standard** 8:14,18 47:19,20

**standards** 27:19,22

**start** 9:3

**started** 34:21 38:6,7,8

**starts** 39:1

**state** 5:10,18 6:13 7:23 8:9,15 22:20 33:19 34:7,10 61:16

**stated** 6:12 33:8,11,14 34:8 35:16

**statements** 30:23

**states** 5:11 34:24

**station** 22:17

**step** 41:25

**stills** 31:20 32:12

**store** 60:23

**strong** 10:22

**strongly** 43:11

**studies** 25:17 28:5,7,9

**stuff** 18:13

**subject's** 25:7

**subpoena** 6:18 10:11

**sufficient** 47:20

**suggested** 39:23

**summary** 16:25 26:18

**sworn** 6:5

**synchronize** 65:1,4

**synchronized** 37:24 67:2

**synchronizing** 62:24 66:19,23

---

**T**

---

**tactical** 64:5 65:15

**tactics** 24:24 25:21 31:15

**takes** 18:8 53:8,25

**taking** 5:14 26:25

**talk** 54:10

**talked** 39:20 61:22

**talking** 22:9 42:18,24 43:20 47:23 54:11 64:5,7,14

**task** 57:13

**tasked** 19:19 53:12 60:4

**technical** 11:22

**technically** 24:21 32:7,19 33:5 67:13

**tells** 38:2

**ten** 7:4,9,10 13:7,8 42:3 52:17,18

**tense** 43:9,17

**term** 27:25 51:3

**terminology** 13:13 23:21,23 40:9 49:19

**terms** 13:11 31:8,18

**testified** 6:5 7:19 62:10

**testify** 25:7,11 33:11 56:3

**testimony** 7:22 8:18 11:8 31:8 60:9 61:2,16

**text** 24:10,16 32:11,16 33:4 37:14 45:23 46:15

**thing** 24:10 27:2 60:14

**things** 10:19 18:7 30:4 34:8,11 47:23 51:15,17 53:6 54:18 55:18 58:18

**thought** 16:7 17:17

**thousandths** 55:7

**Thursday** 5:1

**tied** 44:22

**time** 5:8 18:14,19 19:8 21:9,13 34:9 35:25 36:19 37:6,15 39:4 40:14 43:12,16 44:16 52:3 53:6 54:18,22 56:12 60:8 62:10 63:16 65:3

**time-consuming** 37:16

**timer** 35:16,23 38:25 39:3,11 40:24 41:1

**times** 7:8,9,10 13:6,7,8 25:17 36:22,25 48:1,22 49:9,10

**timing** 35:21 44:8,10 53:8

**titled** 55:8 57:4

**titles** 14:11

**today** 7:8 8:21 67:23

**today's** 5:6,8

**toggle** 51:14 63:5

**told** 15:8 17:19 34:2 58:23

**top** 16:21,22 19:10 59:13

**total** 45:25

**touched** 47:22

**toxicology** 25:11

**track** 45:24 46:16 47:6

**tracked** 34:20 46:22,24 55:11,15 57:6

**trailer** 59:21

**training** 26:4,10 27:19,23 39:21 47:21 53:21

**transcript** 5:16 6:18 67:22 68:2

**transcripts** 11:9,15 30:21

**Trent** 9:12

**trial** 8:4,5,6,7 61:12

**trials** 8:2

**trigger** 43:25

**true** 33:10

**turn** 58:14

**turns** 39:11

**type** 21:8,12 60:14 62:11

**typically** 13:16 55:6 57:25

---

**U**

**uncertain** 12:19,22

**uncompressed** 35:10

**understand** 7:17 19:5 26:25 40:1 41:11 42:12 44:19 49:20,25 52:1,14 64:3,12 65:7

**understanding** 26:12,15,20

**unique** 49:16

**United** 5:11

**university** 22:19

**uploaded** 22:8

---

**V**

**vague** 18:22 67:3

**Valdivia** 59:7

**variables** 55:7

**vary** 52:23 53:1

**version** 46:21

**versions** 29:22 67:14

**versus** 5:10 7:23,25 8:3 56:8 58:5 59:7,15,24 60:10,20 61:1, 16,19,23

**vicinity** 57:18 58:10

**video** 11:7 13:1,3,12,15,17,24 15:5,18 16:5,13 18:17,18,20 19:9 20:18 21:1,4,25 22:22 23:1,3,8, 13,22 27:14 28:18 29:14,15,18, 22,25 30:5 31:12,19,25 32:5,8 34:16 35:2,7,13 37:10,19 38:8, 12,18,22 39:14 41:4 42:19,23 43:13,15,21 45:10 46:5,15,20 48:3,5,6,9,22,24 49:13,15,16 51:14 53:19 55:2,5,8 57:2,4 63:1, 13 64:12,21

**videos** 8:23 14:1,9,10,11,22 15:1,9 16:1,4,23 17:2,5 18:1,3,4, 5,15 19:18 21:16 24:7 27:1,2,5 28:19,22,23 29:20 30:10,13 31:6, 21,23 32:12,22 33:2,17 36:9,11, 14 37:13,18 40:24 45:22 46:6,9, 10,11 47:1,12,14 48:15 62:12,15,

24 63:4 65:2,4 66:19,23 67:2,8,9, 11

**view** 20:1 32:17 36:24 37:2

**viewer** 26:24

**viewing** 41:2 53:18

**vision** 27:10

**visual** 41:4,21

---

**W**

**Wabbel** 5:4

**wall** 64:10 65:8

**wanted** 15:2 57:17

**watch** 27:1

**watermark** 21:16

**whatsoever** 65:20

**wigged** 24:13

**witnesses** 8:15 30:23

**word** 11:22 23:25 47:18 49:24 50:17,20,24 56:6,19 57:19 58:9

**worded** 43:10

**words** 23:6 50:20

**work** 9:1,6 17:10,22,25 18:1,10, 12,25 20:19 21:20,24 22:25 23:13,22 27:3 28:3 31:9,18 36:8, 15 49:4

**worked** 46:9

**working** 9:3 30:9 46:11 47:1

**works** 61:9

**worn** 10:15 17:2 18:18 19:9 21:8,12,14,20 22:3,6 31:25 32:4 34:16 35:7,13 44:25 47:11

**write** 8:24 41:19 44:5 54:3 55:12 57:8

**written** 51:19 53:4

**wrote** 17:18 53:5 54:17 55:8 57:4

---

**X**

**XM** 60:20

GEORGE GONZALEZ vs STATE OF CALIFORNIA
SCOTT HOLDAWAY                    01/22/2026                    Index: year..Zoom

## Y

**year**  59:3,8,25

**years**  59:25 62:10

**yellow**  38:25 63:1

## Z

**Zoom**  5:1,14