ROB BONTA
Attorney General of California
CATHERINE WOODBRIDGE
Supervising Deputy Attorney General
MARIO E. GARCIA
Deputy Attorney General
State Bar No. 339990
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6294
 Fax:  (916) 731-2120
 E-mail:  Mario.Garcia@doj.ca.gov
*Attorneys for Defendants State of California acting by and through the California Highway Patrol and Sean Irick*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GEORGE GONZALEZ,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA; CITY OF HEMET; PATRICK SOBASZEK; ANDREW REYNOSO; SEAN IRICK; and DOES 1-10, inclusive,**<br><br>Defendants. | 5:25-cv-00331-KK-DTB<br><br>**DEFENDANTS STATE OF CALIFORNIA ACTING BY AND THROUGH THE CALIFORNIA HIGHWAY PATROL AND SEAN IRICK'S NOTICE OF MOTION AND MOTION TO AMEND A JUDGMENT PURSUANT TO FED. R. CIV. PRO. RULE 59(e); DECLARATION OF MARIO E. GARCIA IN SUPPORT THEREOF; EXHIBIT 1-3**<br><br>Date:        August 27, 2026<br>Time:        9:30 a.m.<br>Courtroom:   3<br>Judge:       The Honorable Kenly Kiya Kato<br>Trial Date:  May 8, 2026<br>Action Filed: 12/24/2024 |

**TO THE COURT, PARTIES, AND ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 27, 2026, at 9:30 a.m. in Courtroom 3 of this Court, located at 3470 Twelfth Street, Riverside, California 92501, Defendants State of California acting by and through the California Highway Patrol and Sean Irick (Defendants) hereby move for an amended

1

judgment on the following grounds:

1.     The jury's finding of the future economic loss should be reduced to zero because Plaintiff failed to show substantial evidence warranting future economic damages of $120,000.00.

2.     The Court should apply Plaintiff's 45% Comparative Negligence to the $905,000.00, yielding $497,750.00 due to Plaintiff's own negligence.

3.     The Court should offset Plaintiff's damages award with those of the Settling Defendants City of Hemet, Andrew Reynoso, and Patrick Sobaszek because they also discharged their weapons causing the same injuries and they were all joint and severally liable to Plaintiff.

Our office initiated a meeting and confer call on July 6, 2026. On July 9, 2026, Defendants' counsel sent an e-mail stating the grounds for this motion to continue the July 6, 2026, discussions. Shortly after sending the e-mail, Defendants' counsel called Plaintiff's counsel to conduct a meet and confer telephone conference call but Defendants' counsel was unable to speak with Plaintiff's counsel, so Defendants' counsel left a voicemail. (Declaration of Mario E. Garcia, ¶ 3.)

For the reasons set forth, Defendants respectfully request that the Court amend the judgment pursuant to Federal Rules of Civil Procedure 59 (e).

Dated:  July 14, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
CATHERINE WOODBRIDGE
Supervising Deputy Attorney General

*/s/ Mario E. Garcia*
MARIO E. GARCIA
Deputy Attorney General
*Attorneys for Defendants State of California acting by and through the California Highway Patrol and Sean Irick*

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiff sued CHP and Sean Irick for (1) Fourth Amendment – Excessive Force pursuant to 42 U.S.C. § 1983, (5) Battery, (6) Negligence, and the (7) Violation of California Civil Code § 52.1 (Bane Act) arising out of a non-fatal shooting involving Officer Irick and several other City of Hemet law enforcement officers.

The jury trial commenced on May 8, 2026. The trial concluded on the afternoon of May 12, 2026. The jury deliberated and returned a verdict on May 14, 2026, in favor of Plaintiff for $3,620,000.00 allocated as follows: $750,000.00 in past pain and suffering and emotional distress, $2,750,000.00 in future pain and suffering and emotional distress, and $120,000.00 in future economic loss. Jury Verdict Form, ECF No. 152. The verdict forms were unclear as to the apportionment of damages to each cause of action. *Id.* The jury attributed 45% of comparative negligence to Plaintiff. *Id.* On June 16, 2026, over the objection of Defendants, the Court entered judgment for the entire $3,620,000.00 ignoring the jury's assigning of 45% comparative negligence to Plaintiff. ECF Nos. 152, 159, 165.

### STANDARD OF REVIEW

Rule 59(e) states "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." A motion brought under rule 59(e) may seek "'reconsideration of matters properly encompassed in a decision on the merits.'" *United States ex rel. Hoggett v. Univ. of Phoenix*, 863 F.3d 1105, 1108 (9th Cir. 2017) (quoting *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174 (1989).) This requires a "substantive change of mind by the court." *Id*. (quoting *Bordallo v. Reyes*, 763 F.2d 1098, 1102 (9th Cir. 1985)); see also *Tattersalls, Ltd. v. DeHaven*, 745 F.3d 1294, 1299 (9th Cir. 2014). Whether a Rule 59(e) motion should be

3

granted is within the discretion of the district court. *McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999) (en banc); see also *Turner v. Burlington Northern Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003). In most contexts, such a motion "should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *McDowell*, 197 F.3d at 1255 (quoting *389 Orange St. Partners v. Arnold,* 179 F.3d 656, 665 (9th Cir. 1999)); see also *Brighton Collectibles, LLC v. Believe Productions, Inc.,* Case No. 2:15-cv-00579-CAS(ASx), 2018 WL 1381894, at *6 (C.D. Cal. Mar. 15, 2018) (denying rule 59(e) motion to reduce jury's damage award, applying the "highly unusual circumstances" standard and finding the jury's award supported by substantial evidence). However, a district court may also grant such a motion if it is "necessary to correct manifest errors of law or fact upon which the judgment is based" or if "the motion is necessary to 'prevent manifest injustice.'" *Turner*, 338 F.3d at 1063; see also *Nelson v. Equifax Info. Servs., LLC,* 522 F.Supp. 2d 1222, 1238-39 (C.D. Cal. 2007) ("since the jury's award of statutory damages is a manifest error of law, defendant is not precluded from raising the issue in its 59(e) motion[.]").

## ARGUMENT

### I.   THE JURY'S FINDING OF THE FUTURE ECONOMIC LOSS SHOULD BE REDUCED TO ZERO.

The jury awarded $120,000.00 in future economic loss to Plaintiff. However, there was no evidence to support this figure.

In considering a motion brought under Rule 59(e), "[a] jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).) The court is

to "afford 'substantial deference to a jury's finding of the appropriate amount of damages.'" *Harper v. City of Los Angeles*, 533 F.3d 1010, 1028 (9th Cir. 2008) (citing *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996) ); see also *United States v. CB & I Constructors, Inc.*, 685 F.3d 827, 839 (9th Cir. 2012) (affirming jury award of $28.8 million in damages as "not grossly excessive or against the clear weight of the evidence."). Therefore, a court should not alter a jury's assessment of the amount of damages to be awarded unless: (1) the amount is "grossly excessive or monstrous"; (2) the evidence "clearly does not support the damage award"; or (3) the award "could only have been based on speculation or guesswork." *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1216 (9th Cir. 1983) (internal quotations omitted); see also *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 957 (9th Cir. 2011) (affirming district court's denial of defendant's motion to amend judgment to reduce the jury's award of damages); *Harper*, 533 F.3d at 1028 (rejecting a challenge on appeal to the jury's award of damages in a civil rights action); *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir. 1986).

"Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Brown v. County of Riverside*, 565 Fed.Appx. 658, 660 (9th Cir. 2014) citing to *Land Constr. Co. v. Royal Bank of Can.,* 833 F2d 1365, 1371 (9th Cir. 1987.)

Here, the issue is not whether Plaintiff provided a lack of substantial evidence, but that Plaintiff did not provide any evidence at all. There is simply no evidence whatsoever to support $120,000.00 in economic damages. At trial, Plaintiff only testified as to his past and current physical health conditions. The only evidence tenuously supporting any sort of future economic damage is that Plaintiff testified that he had an "appointment scheduled with the gastro surgeon." (Declaration of Mario E. Garcia ¶ 4 at Exhibit (Ex.), 2.) This evidence, at best, is

5

speculative as to Plaintiff's need for any future medical treatment because he has not yet been seen by the surgeon or any other medical providers. There was no medical evidence presented that Plaintiff needs to go to a doctor or undergo any future medical care. Certainly, there was no evidence that Plaintiff required any type of future medical procedure he would have to undergo. Moreover, Plaintiff did not provide any medical expert who could opine as to Plaintiff's future damages. Plaintiff only produced Dr. Ryan O'Connor, an emergency room doctor, who testified as to the trajectory of the bullets within Plaintiff's body and emergency treatment on the date of the incident. (Garcia Decl., ¶ 5 at Ex. 3.) Plaintiff's expert was not qualified as an expert on, nor did he, testify to Plaintiff's future medical care. Not only did Plaintiff fail to show what future treatment would be necessary, he did not provide any expert to establish whether any future medical treatment would be needed. As such, Plaintiff failed to provide any substantial evidence to warrant future damages in the amount of $120,000.00. Thus, the Court should withdraw future economic damages against Defendants. Therefore, the judgment should be reduced by $120,000.00 which was not supported by any evidence, let alone substantial evidence.

## II. THE COURT SHOULD APPLY PLAINTIFF'S 45% COMPARATIVE NEGLIGENCE TO THE $905,000.00 ALLOCATED TO THE NEGLIGENCE CLAIM.

### A. Plaintiff is Only Entitled to $905,000 Per Claim Against Defendants.

The Court has discretion to allocate the damages award given that the joint verdict forms did not indicate how much damages should be allocated to each claim independently. According to Ninth Circuit, where the verdict does not differentiate between claims in awarding damages, the Court has discretion regarding how to allocate the damages awarded and the Court has a general obligation to uphold

lawful jury awards wherever possible. *Paterson v. California Dept. of General Services*, No. 05-CV-00827-MCE-JFM, 2008 WL 4186037, *1 (E.D. 2008) citing to *Passantino v. Johnson & Johnson Consumer Prod., Inc.,* 212 F.3d 493, 509-510 (9th Cir.2000); *Pavon v. Swift Transp. Co.,* 192 F.3d 902, 910-911 (9th Cir.1999).

Here, the joint verdict did not allow the jury to reduce the award by the amount of 45%. Clearly, the jury determined that Plaintiff was partially at fault as evidenced by its verdict apportioning 45% fault to Plaintiff. Failing to reduce the judgment by 45% is contrary to the jury's finding and would be an abuse of discretion. The $3,620,000.00 award should be divided equally by four, yielding $905,000.00 per claim. Thus, Plaintiff should be entitled to $905,000.00 for each claim.

**B.      The Negligence Claim is Subject to Reduction Based on the Jury's Determination of Plaintiff's Comparative Fault.**

Plaintiff's state claims against Defendants consist of Battery, Negligence, and the Bane Act pursuant California Civil Code § 52.1."Under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), when a federal court exercises diversity or pendent jurisdiction over state law claims, 'the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.'" *Flores-Haro v. Slade*, No. 12-cv-01616-MO, 2018 WL 4931991, *2 (Or. 2018) citing to *Erie R. Co. v. Tomkins*, 304 U.S. 64. In other words, when it comes to damages, the laws of the State of California are applied.

California state law provides that a Negligence claim can be reduced when a jury finds comparative fault. "California has applied a system of comparative negligence 'under which liability for damage will be borne by those whose negligence caused it in direct proposition to their respective fault.'" *Weaver v. U.S. Dept. of Agriculture, Forest Service,* No. 10-cv-01523-AWI-BAM, 2013 WL 144974, *5 (E.D. 2013); citation omitted. Under comparative fault principles, a

Plaintiff's negligence reduces the damages awarded in proportion to the amount of negligence attributable to the Plaintiff. *Id*. citing *Diaz v. Carcamo,* 51 Cal.4th 1148, 1156 (2011).

The jury returned a verdict deeming Plaintiff 45% comparatively negligent for his actions on the day of the incident. As such, Plaintiff's recovery of $905,000.00 for the negligence claim should be reduced by 45% yielding $497,750.00. Accordingly, Plaintiff should only recover $497,750.00 for the negligence cause of action instead of $905,000.00.

### III. THE COURT SHOULD OFFSET PLAINTIFF'S DAMAGES AWARD WITH THOSE OF THE SETTLING DEFENDANTS.

Just prior to trial, Plaintiff settled with defendants the City of Hemet, Andrew Reynoso, and Patrick Sobaszek who were sued for: (1) Fourth Amendment – Excessive Force pursuant to 42 U.S.C. § 1983; (2) Municipal Liability – Ratification pursuant to 42 U.S.C § 1983; (3) Municipal Liability – Inadequate Training pursuant to 42 U.S.C. § 1983; (4) Municipal Liability - Unconstitutional Custom, Practice, or Policy pursuant to 42 U.S.C. § 1983 (5) Battery; (6) Negligence; and (7) Violation of California Civil Code § 52.1 (Bane Act). The Court should offset Plaintiff's awarded damages with those recovered in mediation from the City of Hemet, Andrew Reynoso, and Patrick Sobaszek who settled prior to trial. California law allows a non-settling tortfeasor to set off the amount of a jointly liable tortfeasor's settlement against damages awarded at trial. Cal. Code Civ. Proc. § 877; *Rashidi v. Moser* (2014) 60 Cal.4th 718, 722. Courts must allow juries to "apportion liability to a nonparty" including "defendants who settled before trial and nonjoined alleged tortfeasors" *K.J.P. v. County of San Diego*, 621 F.Supp.3d 1097. (S.D. 2022). In *K.J.P.,* decedent's wife and children brought an action against San Diego County and San Diego County Deputy sheriffs for federal and state excessive force claims, negligence, and wrongful death.

Plaintiffs voluntarily dismissed some of the deputies by stipulation and another deputy was dismissed at summary judgment. *Id.* at 1132. The Court ruled that under California law, the Court was required to ask the jury to apportion fault to nonparties because the fault of nonparties is relevant for comparative fault damages considerations. *Id.* at 1133.The Court cited to *Romine v. Johnson Controls, Inc.*, 224 Cal. App. 4th 990, 1011 quoting that "[I]t is error for a trial court not to allow the jury to assess the comparative fault of defendants who settled before trial." *Id.* As a result, it was proper for the jury to apportion a percentage of fault to the officers and as such apportionment may still be relevant for reducing any damages award. *Id.*

> In *Velez v. Roche*, 335 F.Supp.2d 1022, 1042, the Court held:
> A nonsettling defendant may claim an offset for amounts paid in settlement by other defendants only if two conditions are met. **First, the nonsettling defendant must demonstrate that the settlement and award (against which the offset is sought) were for the same injury.** See *Getty Petroleum Corp. v. Island Transp. Corp.,* 862 F.2d 10, 15 (2d Cir.1988) (in trademark infringement case, upholding district court's decision not to offset because nonsettling defendants failed to establish that payments made to plaintiff by settling defendants were for same injury); *Banks ex rel. Banks V. Yokemick*, 177 F.Supp.2d 239. 264 (S.D.N.Y.2001) (in § 1983 case, stating that, for set-off rule to apply, "whether state or federal, the settlement must be predicated on the tortfeasors' liability for damages attributable to on the same injury"). **Second, the injury must be indivisible such that there is joint and several liability among the settling and nonsettling defendants.** See *Goad v. Macon County*, 730 F.Supp. 1425, 1426 (M.D.Tenn.1989) (in § 1983 case, stating that, "if the claims against the settling defendants were separate and distinct claims from the trial defendants, the losing trial defendants cannot call for a set-off"); *Hoffman v. McNamara,* 688 F.Supp. 830, 831 (D.Conn.1988)

*Id.* emphasis added.

Given that Sergeant Andrew Reynoso, Detective Patrick Sobaszek, and Officer Sean Irick discharged their weapons at Plaintiff which caused Plaintiff

injuries and Officer Reynoso and Detective Sobaszek settled prior to trial, the Court should offset Plaintiff's jury award against Defendants with those obtained from the City of Hemet, Sergeant Reynoso, and Detective Sobaszek through settlement.

## CONCLUSION

Based on the foregoing reasons, this Court should amend the judgment and withdraw the future economic damages of $120,000.00 because there was no evidence presented to support this amount. The Court should also amend the judgment to apportion 45% fault on Plaintiff as determined by the jury verdict. Finally, the Court should amend the judgment and reduce the award by sum received by the settling defendants, City of Hemet and its officers.

Dated: July 14, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
CATHERINE WOODBRIDGE
Supervising Deputy Attorney General


*/s/ Mario E. Garcia*
AMIE C. BEARS
Deputy Attorney General
MARIO E. GARCIA
Deputy Attorney General
*Attorneys for Defendants State of California acting by and through the California Highway Patrol and Sean Irick*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants CHP and Sean Irick,

certifies that this brief contains 2391 words, which:

X complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated July 14, 2026.


Dated: July 14, 2026                         Respectfully submitted,

                                             ROB BONTA
                                             Attorney General of California


                                             */s/ Mario E. Garcia*
                                             MARIO E. GARCIA
                                             *Attorneys for Defendants State of
                                             California acting by and through the
                                             California Highway Patrol and Sean
                                             Irick*

**DECLARATION OF MARIO E. GARCIA**

I, MARIO E. GARCIA, declare as follows:

1.      I am licensed to practice law before the courts in the State of California, and I am a Deputy Attorney General with the State of California and I am one of the attorneys of record of Defendants State of California acting by and through the California Highway Patrol and Sean Irick (collectively "Defendants").

2.      I have personal knowledge of the matters set forth herein and if called upon as a witness could and would testify competently thereto.

3.      Deputy Attorney General Amie Bears initiated the meet and confer with Plaintiff's counsel Marcel Sincich and Trenton Packer on July 6, 2026. I was unavailable that day. As a follow up, I sent an e-mail to Plaintiff's counsel Marcel Sincich and Trenton Packer explaining the grounds for our Federal Rules of Civil Procedure Rule 59, subd. (e), on July 9, 2026. Deputy Attorney General Amie and I called Plaintifff's counsel Marcel Sincich shortly after the sending the e-mail, we called him but he did not answer so we left him a detailed voicemail. We will continue following up. A true and correct copy of the e-mail sent to Plaintiff's counsel is attached hereto and identified as "Exhibit 1."

4.      Plaintiff George Gonzalez (Plaintiff) testified at a trial and a portion of his trial testimony transcript was used in the analysis of Defendants' Rule 59, subd. (e), motion. True and correct portions of Plaintiff's trial testimony are attached hereto and identified as "Exhibit 2."

5.      Plaintiff retained Dr. Ryan O'Connor, an emergency physician, who testified at trial with respect to the bullet trajectories within Plaintiff's body immediately following the shooting and Plaintiff's treatment in the emergency room. True and correct portions of Dr. O'Connor's trial testimony are attached hereto and identified as "Exhibit 3."

I declare under penalty of perjury under the laws of the State of California that the above information is true and correct to the best of my knowledge.

Executed on 14th day of July 2026, in Los Angeles County, California.


/s/ *Mario E. Garcia*

Mario E. Garcia

# EXHIBIT 1

| | |
|---|---|
| **From:** | Mario Garcia |
| **To:** | dalekgalipo@yahoo.com; Marcel Sincich; Trenton Packer |
| **Cc:** | Catherine Woodbridge; Jessica Marek; Amie Bears; Judith Milch |
| **Subject:** | Gonzalez v. CHP et al.; Meet and Confer regarding Defendant Rule 59(e) motion |
| **Date:** | Thursday, July 9, 2026 5:04:00 PM |
| **Attachments:** | image001.png |

Good Afternoon Dale, Marcel, and Trent,

Defendants CHP and Sean Irick intend on filing a motion amending the judgment pursuant to FRCP 59, subd. (e.). Defendants CHP and Sean Irick's (Defendants) grounds for the motion are as follows:

1. The Court should amend the judgment removing the future economic damages in the amount of $120,000.00 entirely because Plaintiff failed to provide any substantial evidence warranting future economic damages. Thus, Plaintiff will only recover $3,500,000.00

2. If the Court denies our request to amend the judgment removing the $120,000, Defendants request that that the $3,620,000 first be divided equally into 4 for the 4 separate causes of action against Defendants yielding $905,000.00 per claim. Then, with respect to the $905,000 negligence claim, we ask that the Court amend the judgment reducing the portion allocated to the Negligence claim to be reduced by 45% thereby yielding $497,750 instead of $905,000.00. The sum would then be $3,212,750.00. Regardless of whether the Court would grant request #1, we would divide each claim equally. So, either $3,620,000 divided by 4 or $3,500,000 divided by 4, and then we would reduce the Negligence claim's portion by 45% comparative negligence.

3. We request that the Court amend the judgment by setting off the amount of the settling tortfeasors' (City of Hemet, Andrew Reynoso, and Sobaszek) settlement against the damages awarded at trial because the (1) settlement and award were for the same injuries and (2) the injury were indivisible as there is joint and several liability among settling defendants and nonsettling defendants.

I will call you shortly to discuss.

Thanks.

Respectfully,

Mario E. Garcia
Deputy Attorney General
Tort & Condemnation Section
California Department of Justice
Office of the Attorney General

300 S. Spring Street, Suite 1702
Los Angeles, California 90013
Phone: (213) 269-6294
E-Mail: Mario.Garcia@doj.ca.gov



# EXHIBIT 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

HONORABLE KENLY KIYA KATO, U.S. DISTRICT JUDGE

GEORGE GONZALEZ,                          )
                                          )
                    Plaintiff,            )
                                          )
     v.                                   )          Case No.
                                          )     CV 25-331 KK (DTBx)
CITY OF HEMET, et al.,                    )
                                          )          Volume 2
                    Defendants.           )     (Pages 195 - 454)
_____      )


REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
JURY TRIAL:  DAY TWO
MONDAY, MAY 11, 2026
8:24 AM
RIVERSIDE, CALIFORNIA


MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET
RIVERSIDE, CALIFORNIA  92501
MYRAPONCECSR@GMAIL.COM


UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

        LAW OFFICES OF DALE K. GALIPO
        BY:  DALE K. GALIPO
        BY:  MARCEL F. SINCICH
             Attorneys at Law
        21800 Burbank Boulevard, Suite 310
        Woodland Hills, California  91367
        (818) 347-3333

        GRECH, PACKER & HANKS
        BY:  TRENTON C. PACKER
             Attorney at Law
        7095 Indiana Avenue, Suite 200
        Riverside, California  92506
        (951) 682-9311


**FOR THE DEFENDANTS STATE OF CALIFORNIA, acting by and through
the California Highway Patrol and Sean Irick:**

        ROB BONTA
        Attorney General of California
        DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL
        BY:  AMIE COLLINS BEARS
        BY:  MARIO EDUARDO GARCIA
             Deputy Attorneys General
        1300 I Street
        Sacramento, California  95814
        (916) 210-7663

Mr. Galipo, would you like to call your next witness at this time?

MR. GALIPO:  Yes.  Thank you.  I'd like to call George Gonzalez, please.

THE COURT:  Thank you.

Mr. Gonzalez, please step forward.  Take the witness stand.

THE COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, ma'am.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat and state and spell your first and last name for the record.

THE WITNESS:  My name is George Falcon Lara Gonzalez.  G-e-o-r-g-e, F-a-l-c-o-n, L-a-r-a, G-o-n-z-a-l-e-z.

THE COURT:  Thank you.

Mr. Galipo, you may proceed.

MR. GALIPO:  Thank you, Your Honor.

GEORGE FALCON LARA GONZALEZ,

the plaintiff herein, was sworn and testified as follows:

**DIRECT EXAMINATION**

BY MR. GALIPO:

Q.   Mr. Gonzalez, following this shooting, is it your

understanding you were in the hospital for a couple weeks?

A.    Yes, sir.

Q.    And after your discharge from the hospital, did you continue to have any pain or any problems?

A.    Very much so.

Q.    Can you tell me what parts of your body you continue to have pain in?

A.    My abdomen, um, my colon, my thigh, my foot, my ribs, my knee, and just like headaches.

Q.    Do you have -- did you have any continued issues with your digestive system?

A.    Yes, sir.

Q.    I know it might be a little embarrassing and I apologize for that.  But what type of issues did you have?

A.    Um, well, since they -- they took my guts out and they put them back in, it's -- my body is not used to digesting that way.

Q.    Let me stop you for just a second.

I don't need necessarily an explanation of why you think it happened, but just what issues did you have?  In other words --

A.    It's hard for me to pass stool and I leak mucus from my colon and blood and feces.

Q.    I know this isn't a pleasant topic, but what do you do or have to do to deal with that issue of leaking mucus or

**UNITED STATES DISTRICT COURT**

feces or blood?

A.    I've done a lot of different things.  I've worn diapers.  I've put toilet paper.  I've tried a tampon.  I have tried pads.  I've tried different soaps.  I've tried using wipies.  I've tried duct tape.  I've tried a lot of things.

Q.    Is it -- does it -- does it affect you on a daily basis?

A.    Yes, sir.

Q.    How does it affect you?

A.    It's -- it smells.  It smells like, um -- it smells like mucus, it smells like -- doesn't smell right.  It smells like you're -- smell like your insides kind of -- like, um -- it's a very harsh smell.  Sometimes people don't want to smell that.

Q.    You -- you -- you have children; is that right?

A.    Yes, I do.

Q.    Are you hoping to have some type of a medical procedure to -- to help fix the problem you currently have?

A.    Yes, I am.  I have an appointment scheduled to the gastro surgeon.

Q.    Okay.  In terms of your foot pain and thigh pain, have those gotten better to some extent over time?

A.    Yeah.  Just, like, arthritis and, like, just, my foot -- my foot feels okay now, but my thigh, I get, like, cramps where the muscle is torn, and when it's cold, my knee

hurts a lot.

Q.   The rib fractures, they were, I take it, very painful for the first few months?

A.   Yeah.  It was hard, like, to sneeze or cough, laugh.

Q.   Are you hopeful that if you get further medical treatment, that your problem that you're having with your fecal incontinence will get better?

A.   Yeah.  I'm hoping.  I've been doing a lot of exercises.  I'm hoping that surgery will -- will -- will help.

MR. GALIPO:  Thank you, Mr. Gonzalez.

That's all I have, Your Honor.

THE COURT:  Thank you.

Ms. Bears.

**CROSS-EXAMINATION**

BY MS. BEARS:

Q.   Mr. Gonzalez, we met briefly earlier.

Describe the -- the cramps and the foot pain that you have.

A.   Um, it's like my leg, my foot might lock up.  And it's like -- it will want to -- like, my toes want to, like, close.  The bottom of my foot will arch, like, the arch of my foot will get, like, in a -- a locking position and it's hard to -- hard to get it out.  My -- and in my thigh, it just -- like, um -- it's like a sharp pain, just like you could feel the muscle from the bottom to the top just kind of lock and,

**UNITED STATES DISTRICT COURT**

um, I have to, like, rub -- rub real hard on my thigh or try to walk it out or just stay real still until it goes away.

Q.    Do you always walk with the assistance of a cane or a walker?

A.    No, not always.  If I'm just going short distance. It's more for like long distance and if my knee is hurting, if I've gained weight.

Q.    So you only need the -- the assistance of, like, a cane or a walker if it's a long distance?

A.    More than -- more than like 30 feet.

Q.    And you mentioned that you -- you do have an appointment with a gastro surgeon.  Other than having this appointment with the gastro surgeon, have you had any consultations regarding remedying the -- the fecal incontinence?

A.    Yes.  I have to see my primary care physician.  I've seen a lot of -- I've seen a lot of different, um, like, nurses and stuff about it.  But, um --

Q.    So did they recommend that you do the follow-up with this -- I believe you said it was a gastro person, the gastro surgeon?

A.    Yeah.  They did the referral.

Q.    And you said that right -- afterwards, you had pain in your abdomen and colon.  Do you still have that pain?

A.    Um, in my abdomen, it's been two years.  But the

356

pain is residing in my abdomen.  It's still -- I still get,
like, cramps all in my muscles, like my abs.  It locks up or,
like, if I stretch wrong, I go to grab something, it'll lock.
And then I have to, like, figure out how to make it go away.  I
get pain all on my sides right here (indicating).  Um, my veins
are pretty messed up, and now I've got to use like hot and cold
packs to get my veins to act right.

Q.    What do you mean "your veins"?

A.    Because the operation, they cut through my -- they
cut through a lot of my -- they cut my body open and it's
hard -- my insides don't act right all the time.

Q.    When you say they don't act right, besides --

A.    I'm not a doctor.

Q.    -- the incontinence that you told us about, was
there anything else?

A.    To be honest, I'm not a doctor and I haven't figured
out what the problem is yet.

Q.    But just your own personal experience, besides the
incontinence that you told us about, is there anything else
that is related, you believe, to that wound?

A.    Yeah.  But it's very embarrassing.  I don't --

Q.    And I don't -- I don't want to embarrass you at all.
But we -- we do want to kind of know what your -- what your
damages are.  So -- okay, my purpose is definitely not to
embarrass you, so I'll go and move on and leave it at that.

**UNITED STATES DISTRICT COURT**

A.      Thank you.

MS. BEARS:  Okay.  Thank you.

THE COURT:  Mr. Galipo.

MR. GALIPO:  No further questions.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Gonzalez, you may step down.

Mr. Galipo, would you like to call your next witness at this time?

MR. GALIPO:  We would.  I believe he's in the witness room and Mr. Sincich will get him, please.

THE COURT:  And is this Mr. Noble?

MR. GALIPO:  Yes.  Thank you, Your Honor.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat and state and spell your first and last name for the record.

THE WITNESS:  Jeff Noble, J-e-f-f N-o-b-l-e.

THE COURT:  Thank you.

Mr. Galipo, you may proceed.

454

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF RIVERSIDE      )
                         )
STATE OF CALIFORNIA      )


           I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.




                         DATED THIS 11TH DAY OF MAY, 2026.




                         /S/ MYRA L. PONCE
                         _____
                         MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                         FEDERAL OFFICIAL COURT REPORTER




**UNITED STATES DISTRICT COURT**

# EXHIBIT 3

195

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

HONORABLE KENLY KIYA KATO, U.S. DISTRICT JUDGE

GEORGE GONZALEZ,                        )
                                        )
                Plaintiff,              )
                                        )
   v.                                   )        Case No.
                                        )   CV 25-331 KK (DTBx)
CITY OF HEMET, et al.,                  )
                                        )        Volume 2
                Defendants.             )   (Pages 195 - 454)
_____)

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
JURY TRIAL:  DAY TWO
MONDAY, MAY 11, 2026
8:24 AM
RIVERSIDE, CALIFORNIA

MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET
RIVERSIDE, CALIFORNIA  92501
MYRAPONCECSR@GMAIL.COM

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    LAW OFFICES OF DALE K. GALIPO
    BY:  DALE K. GALIPO
    BY:  MARCEL F. SINCICH
        Attorneys at Law
    21800 Burbank Boulevard, Suite 310
    Woodland Hills, California  91367
    (818) 347-3333

    GRECH, PACKER & HANKS
    BY:  TRENTON C. PACKER
        Attorney at Law
    7095 Indiana Avenue, Suite 200
    Riverside, California  92506
    (951) 682-9311


**FOR THE DEFENDANTS STATE OF CALIFORNIA, acting by and through
the California Highway Patrol and Sean Irick:**

    ROB BONTA
    Attorney General of California
    DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL
    BY:  AMIE COLLINS BEARS
    BY:  MARIO EDUARDO GARCIA
        Deputy Attorneys General
    1300 I Street
    Sacramento, California  95814
    (916) 210-7663

322

RYAN O'CONNOR, M.D.,

called as a witness by the plaintiff, was sworn and testified as follows:

**DIRECT EXAMINATION**

BY MR. GALIPO:

Q.    Good afternoon, Doctor.

A.    Good afternoon.

Q.    Could you tell the ladies and gentlemen of the jury what type of doctor you are?

A.    Well, from my medical practice, I'm an emergency room doctor.

Q.    Why don't we start with your educational background, if you would.

A.    Certainly.  I attended Georgetown University for my undergraduate studies and premedicine studies, graduating from there in 1997.

I then went on to New York Medical College where I attended medical school and graduated from there with an M.D. degree in 2002.

I then did a residency in emergency medicine at Beth Israel Medical Center in Manhattan.  It was a three-year program that I finished in 2005.

Q.    Let me stop you for just a moment.  Some jurors may know about what a residency program is, but can you explain what that is?

**UNITED STATES DISTRICT COURT**

A.     Residency is specialty training for medicine.  So when you finish four years of medical school, you have your M.D. and people call you doctor, but you're not particularly qualified to practice medicine independently.  So you do additional training in a specific field of study.  That's called the residency.

So in my case, after four years of medical school and becoming a doctor, I did an additional three years studying emergency medicine at Beth Israel Medical Center.  I finished that program in 2005 and I've been board certified in practicing as an emergency room doctor since that date.

Q.     It's probably somewhat obvious, but what, generally, is the area of emergency medicine?

A.     Well, emergency medicine is a relatively new specialty that focuses on identifying from a general patient population those that have life- or limb-threatening emergencies and putting them through the system to receive the appropriate treatment.  So I need to identify -- if someone comes in with chest pain, I need to figure out if they're having heartburn or if they're having a heart attack, and if they're having a heart attack, I need to get in touch with the cardiology team and get them as fast as possible up to the cath lab so that they can get a procedure to intervene, as an example.

Q.     And in addition to your medical degree, do you have

any other degree?

A.    I have an additional degree.  I got a master's degree in criminalistics from California State University of Los Angeles.  I just got that degree at the end of 2021.

Q.    And what is that subject area, criminalistics?

A.    Criminalistics is also known as criminal science, and it's a broad field of study that encompasses all the different areas of the scientific investigation of crime.  So, as an example, classes that I took for that master's degree included crime scene investigation, DNA analysis, trace evidence analysis, forensic toxicology, forensic anthropology, forensic pathology.  I also did an internship at the Los Angeles County Coroner's Office.  I spent 200 hours there observing autopsies being performed.

So the field of criminalistics encompasses all these different areas of investigation of crime through scientific means.

Q.    In addition to your practice as an emergency room doctor, have you also served as an expert consultant on medical issues in cases?

A.    Yes, I have.  I started consulting as a medical expert largely on criminal cases about 18 years ago, and I have worked with multiple attorneys in -- throughout the state of California -- I've testified throughout the state of California during that time.

**UNITED STATES DISTRICT COURT**

Q.    And have you -- you've been a consultant, an expert medical consultant, on both civil cases and criminal cases?

A.    Largely on criminal cases, but I have worked on a few civil cases.

Q.    And are you sometimes called upon to give opinions regarding gunshot wounds?

A.    Yes.

Q.    And your experience as an emergency room physician, I take it, sometimes people come in with gunshot wounds that need to be treated?

A.    Yes, of course.

Q.    And you talked about this time you spent at the coroner's office.  Did you get some additional knowledge and training with respect to the pathway or trajectory of bullets within the body?

A.    Yes.

Q.    Have you testified in other courts or other cases on the subject of gunshot wounds?

A.    I have, yes.

Q.    And at some point, were you asked -- I believe maybe initially by Mr. Packer's office, although I'm not clear -- to look at some medical records and information in this case, to look at, for example, the gunshot wounds and the pathway of those wounds in the body?

A.    Yes.

UNITED STATES DISTRICT COURT

Q.    If you recall, did you look at paramedic or ambulance records?

A.    Yes.

Q.    And how about hospital records?  Did you look at those?

A.    Yes, I did.  There were hospital records from about a two-week hospitalization after Mr. Gonzalez was shot.

Q.    At some point in time, did you write a report regarding some of your opinions?

A.    I did, yes.

Q.    Did you also look at some photos of the wounds?

A.    Yes.  There were photos of the gunshot wounds that were taken in the hospital during the course of treatment of those wounds.

Q.    Just starting with the basics, how many gunshot wounds did George Gonzalez sustain?

A.    There were three in total.  There were two entrance wounds and then there was one graze wound or tangential gunshot wound.

Q.    Let's start with the -- when you say "entrance wound," I take it you're meaning entering the body?

A.    Yeah.  A bullet will enter the body and create an entrance wound and then from there it either stays in the body, at which point the entrance wound is the only wound, or it can continue and leave the body and then you'll have an entrance

wound and an exit wound, so it stays -- um, the two bullets that enter the body stay in the body.

Q.    Okay.  Can you tell the ladies and gentlemen of the jury where on the body those entrance wounds were?

A.    There was one to the left mid back.  There was one to the left mid thigh, and there was one on the lateral aspect, the outside aspect of the thigh.  And then there was one on the bottom of the left foot just behind the ball of the foot.

Q.    Okay.  And in terms of the thigh, do you recall which thigh it was?

A.    The left thigh.

Q.    And in terms of the foot, do you recall which foot it was?

A.    The left foot.

Q.    Let's talk about that wound just for a moment.  I think you used the word "tangential"?

A.    Yes.

Q.    Can you explain to the jury what you mean by that?

A.    Well, the common layman's term is a "graze wound." Something that's tangential, I guess if you remember geometry, if you have a circle and a line that just touches it in one point so it just kind of touches it very -- right at the edge. That's a tangential wound or a graze wound.

Q.    Okay.  And you're referring to the wound to the foot?

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    The wound to the left back, where -- after entering the body, where did that go within the body, based on the medical records?

A.    It entered the back and proceeded towards the front of the chest.  On the way there, it passed through the eighth and ninth ribs on the side, fracturing those ribs.  And then the bullet came to rest just under the skin of the left chest, kind of in the area of the nipple or the pectoralis muscle.

Q.    Did it -- if you recall, did it bruise the left lung?

A.    Yes.  That was an injury associated with that gunshot wound, the fracture of the two ribs and bruising of the lung underneath those ribs.

Q.    And that bullet, you're saying, remained in the body, at least initially?

A.    Yes.

Q.    And then how about the shot to the left thigh? Where did that go after entering the body?

A.    So the shot that entered the outside of the left thigh ended up in the right lower abdomen.  So it went into the side of the left thigh through all the muscle, into the pelvis, into the abdomen, and across from the left side to the right side of the abdomen, and it ended up resting near a muscle called the "soleus muscle" near the back.

**UNITED STATES DISTRICT COURT**

Q.    The -- the trajectory of the shots within the body, do you generally describe the trajectory of the shots within the body with the body in an anatomical position?

A.    Yeah.  As I learned doing my internship in the coroner's office and just general anatomy, because the body is mobile, you want to have a standard for which you're describing everything.  This is true in clinical medicine as well.

So there's something called a "neutral anatomic position."  And if you think of somebody standing facing you, toes pointed forward, arms at the side, and palms forward, that's a neutral anatomic position, and the coroner will describe injuries and trajectories related to that position, which often does not reflect the position that the body was in when those injuries occurred.  But for consistency with description, that is how all the notations are made on an autopsy report, for example.

Q.    Okay.  So with the body in an anatomical position, what was the trajectory in the body of the gunshot wound to the left back?

A.    The gunshot wound to the left back traveled from back to front and it also traveled upwards.

Q.    And would the back of the individual, in this case Mr. Gonzalez, have to be exposed to the shooter to get that entrance wound?

A.    Yes.

Q.    How do you -- in this case, did you have information as to whether the shooters were upright as opposed in some other position?

A.    I was provided with body-worn camera video that showed the shooting incident and to my understanding, the officers that were shooting at Mr. Gonzalez were standing.

Q.    And how -- how do you get an upward trajectory, for example, for a shot to the back?

MS. BEARS:  Objection.  Beyond the scope of expertise.

THE COURT:  Overruled.

THE WITNESS:  So there's a few different ways that's possible.  If someone is standing and someone is down below -- let's say someone is standing on a roof and someone's on the ground and shooting upwards, the bullet is going to be traveling upwards.

If the two people are standing on level ground and the bullet in the body has an upwards trajectory, that means that the body is not in a neutral anatomic position.  That means that the body is in a different position, likely bent forward or perhaps lying on the ground.

So if someone is lying on the ground and someone standing on that same ground is shooting at them, the bullet will enter and then travel upwards as it were relative to the person's anatomy.

BY MR. GALIPO:

Q.    So in your opinion, Doctor, could it be consistent with the upper body leaning forward in the process of going to the ground?

A.    Yes.

MS. BEARS:  Objection.  Calls for speculation. Beyond the scope of expertise.

THE COURT:  Overruled.

BY MR. GALIPO:

Q.    And you mention that the eighth and ninth ribs were fractured?

A.    Yes.

Q.    And the bullet came to rest near which ribs?

A.    From the X-ray images and the CT images, the bullet came to rest in the front of the chest around the area of the fifth rib.

Q.    There's an exhibit book there.  I think -- there's two of them, actually.  I think -- -- I think it's the other one, Doctor, I've been told by Mr. Sincich.

There are tabs, and I know it's a bit far into it, but can you turn to Exhibit 151.

(Exhibit No. 151 for identification.)

THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    Can you take a moment just to look at those few

332

pages.

Have you seen those before?

A.    I have, yes.

Q.    And were those important to you in your analysis of this case?

A.    Yes, they were.

Q.    Can you explain to the jury what those documents are and how they were important to you?

A.    Can I remove them from the binder to display to the jury or --

Q.    Well, you can remove them from the binder, but until the judge says we can display them -- why don't we first describe what they are?

A.    Yes.

Q.    We'll take it one step at a time.

A.    So I'm looking at two images, black and white images for Exhibit 151.  And these are CT scan scout films.  So, when you get a CT scan -- maybe you've had one before -- you lie on a table and there's sort of a big round machine that you pass through.  Before they do the actual scan, which is in slices, they get what looks more like an X-ray.  It's just a single picture from the top and from the side.  So these two images represent a scout film from a CT scan.

Q.    Okay.  And how are these helpful to you in your analysis?  Let's see if we can first describe it.

UNITED STATES DISTRICT COURT

A.    It confirms the upward trajectory of the gunshot wound that entered the back and ended up in the chest.  You can actually see a nice trail of shrapnel in a diagonal fashion going upwards.  When you're looking at these images -- metal is very white, almost bright white, and so it shows up very clearly against a largely back background -- black background, excuse me.  And you can see that the shrapnel trail progresses upwards diagonally.

Q.    Okay.

MR. GALIPO:  May I confer with counsel for one moment?

THE COURT:  Yes.

(Off-the-record discussion between counsel.)

MR. GALIPO:  Your Honor, we -- if it's acceptable to the Court, we have an agreement -- as for now at least for demonstrative purposes -- we could talk about other issues later -- and this is from Exhibit 151.

THE COURT:  Yes.  And so are you seeking to publish all three pages or just --

MR. GALIPO:  Just the two and at this point for demonstrative purposes only.  The two that show the -- kind of like a diagnostic study.

THE COURT:  All right.  So it looks like the last two.

MR. GALIPO:  The last two.  I apologize for how it's

paginated.

THE COURT:  Yes.  You may publish those last two.

MR. GALIPO:  Okay.

BY MR. GALIPO:

Q.    Doctor, can you please explain to the jury what we're looking at and how this was helpful to your analysis?

A.    So this is a CT scan, scout view.  It's a lateral view, meaning it's a view from the side.

Your Honor, am I allowed to stand to point to --

THE COURT:  Yes.

THE WITNESS:  Thank you, Your Honor.

So you can see when the scan was being taken, the patient was lying flat on a table, so this is actually rotated 90 degrees.  Here's the table they're lying on.  This is the bullet that's in the abdomen.  But what we're talking about now is the bullet that ended up in the chest just under the skin here (indicating).  And then here is where the eighth and ninth ribs are that were broken, and you can see these little, white dots are fragments of the bullet that are breaking off after it strikes the rib.  And you can see how that trail is very clearly diagonal going in an upward direction from back to front.

BY MR. GALIPO:

Q.    Okay.  And then I know we're going to get to it in a few minutes.  But are you saying that the shot that entered the

thigh is somehow related to that bullet in the abdomen?

A.    Yes.  That's correct.

Q.    So what was the trajectory of the shot to the thigh?

A.    It was from left to right and upwards.

Q.    And then if we could look at the other image for demonstrative purposes.

THE COURT:  So we're looking at the fourth page?

MR. GALIPO:  Yes.  Thank you, Your Honor.

BY MR. GALIPO:

Q.    Are you able to see that on your screen, Doctor?

A.    Yes, I am.

Q.    Was that also in some way important to you in your analysis?

A.    Yes, it was.

Q.    Can you explain why to the jury, please?

A.    Well, again, because of the nature of CT scan images, you can very clearly see the bullets and bullet fragments in the body.  This image is a front to back, so it's a little bit easier to read.  You can --

THE WITNESS:  May I stand again, Your Honor?

THE COURT:  Yes.

THE WITNESS:  You can see the -- the lungs and the heart up here (indicating), and this is the abdomen.  The entrance wound for the -- this bullet is somewhere down here on the thigh -- I think we're going to talk about that more later.

And then here's the chest bullet fragment and then all these smaller fragments that are lower.

Because it's a shot front to back, it flattens everything out.  So on the side you can kind of see the nice diagonal.  Here, you can appreciate that the bullet is higher than the, um, fragments below it, but you can't really see the -- the front-to-back aspect of this shot.

BY MR. GALIPO:

Q.    Okay.  Thank you for that.

And let's talk --

MR. GALIPO:  We can take that down.  Thank you, Mr. Sincich.

BY MR. GALIPO:

Q.    Let's talk for a moment about the shot to the thigh. You say the shot to the left thigh ended up in the abdomen?

A.    Yes.

Q.    So what would be the trajectory of that shot with the body in an anatomical position?

A.    It is left to right and upwards.

Q.    And how would you describe the upward component of that trajectory?

A.    Well, the entrance wound is in the middle of the left thigh on the outside of the thigh.  The bullet came to rest on the right side of the abdomen.  So there's a very clear diagonal upwards trajectory through the body.

Q.    And given the -- the fact that the shooters were standing upright when they shot, how could you get a shot to enter the thigh and travel upward into the abdomen?

A.    Uh, based on all the evidence I saw, including the body-worn camera video, I believe that Mr. Gonzalez was in the process of falling or already on the ground when the gunshot wound to the thigh occurred.

Q.    And why would, in your opinion, that position be consistent with that?

A.    If two people are standing on level ground and one is shooting at the other person, you'll have the back-to-front trajectory.  If someone is falling or lying on the ground when it's going back to front, it's also going to traverse upwards relative to how the body's positioned.  So there has to be a change in the body position from the neutral to explain the trajectory of these bullets.

Q.    So in your opinion, the shot to the thigh, Mr. Gonzalez was either going to the ground or on the ground?

A.    Yes.

Q.    And what did that bullet pass through in the body after entering?

A.    The musculature of the leg, and then when it entered into the abdominal cavity, it hit part of the colon and tore a hole in the colon, and then came to rest on the right side of the abdomen.

Q.    Now we have another exhibit.  If you could look at 152.

(Exhibit No. 152 for identification.)

BY MR. GALIPO:

Q.    Were those some other imaging -- images that you looked at with respect to the trajectory of the gunshot wound to the thigh?

A.    Yes.

Q.    We have --

MR. GALIPO:  May I confer with counsel?

THE COURT:  Yes.

(Off-the-record discussion between counsel.)

MR. GALIPO:  Your Honor, I think -- just on one page, which looks like the side or lateral view, I think it's --

THE COURT:  The fourth page?

MR. GALIPO:  Yes.  Let me just make sure -- yes, it is, Your Honor.

And we've slightly -- by agreement modified the area of the genitals, just for privacy.

THE COURT:  Very well.

And are you requesting to publish?

MR. GALIPO:  Yes, just for demonstrative purposes.

THE COURT:  Yes.

///

BY MR. GALIPO:

Q.    Are you able to see that on your screen, Doctor?

A.    Yes.

Q.    Was this another image -- imaging that you looked at that was helpful to your analysis?

A.    Yes.

Q.    Can you explain to the jury how it was helpful?

A.    It demonstrates position of the bullet that ended up in the abdomen, and it helps to see relative to the entrance wound how distinctly upwards the trajectory of this bullet was.

Q.    And just -- I don't know if you can approach the image.  Can you show the upward trajectory?

A.    So this image is very similar.  It's a CT scan scout film, so you can see the table back here the person is lying on.  So when the image is being taken, they're lying flat on their back, we rotate it 90 degrees.

The entrance wound was where I'm pointing more or less to the middle of the thigh on the outside portion of the thigh.  The bullet -- I can't even reach -- is all the way up there.  You see the little kind of bright white sort of -- there we go -- there.  That's the bullet.  So the bullet traveled from -- you can see here there's a paper clip that's open.  That's a very commonly used notation from the emergency room doctor to demonstrate where an entrance wound is.  Here.  So here is the entrance wound.  And that's where the bullet

ended up.  So you can see how very clearly upwards that trajectory was in the neutral anatomic position.

MR. GALIPO:  May I confer with counsel for a moment?

THE COURT:  Yes.

(Off-the-record discussion between counsel.)

BY MR. GALIPO:

Q.    There's one other view -- I'm sorry -- that we're going to show -- that I meant to show -- the front view modified.

THE COURT:  And that's page 3 of 152?

MR. GALIPO:  Yes.  Sorry, Your Honor.

THE COURT:  Yes.

BY MR. GALIPO:

Q.    And what does this show?

A.    This is an image that shows a front view, and, again, it's the legs and pelvis.  You can see the -- where the bullet came to rest in the right lower portion of the abdomen. And you can see the entrance wound on the left thigh.  You can actually see the paper clip.  There's a little -- little thin line -- I'll stand here, demonstrate -- this would be the paper clip that we were looking at before.  So you can see very clearly here -- since this is the front view, you can see very clearly how it went from -- here's the left to the right and -- and very clearly upwards.

MR. GALIPO:  Okay.  Thank you, Mr. Sincich.

BY MR. GALIPO:

Q.    So just so it's clear, how is that trajectory to the thigh consistent with someone, for example, being on the ground?

A.    If someone is lying on the same ground that the shooter is standing on, then the angle of the bullet when it enters the leg will be traveling up the body to where we see it resting.  So it's very consistent with what we see in this image.

Q.    And you -- you stated you did review the ambulance records and hospital records?

A.    Yes.

Q.    Was there any issue, based on your review of the records, with blood loss?

A.    Yes, there was.

Q.    Can you explain that, please?

A.    The ambulance that treated the patient at the scene of the shooting noted that there was about a liter of blood present at the scene.  And in the emergency room on the way to the operating room, the patient received a blood transfusion because of unstable vital signs and blood loss.

Q.    So a liter of blood -- how many liters does a person have -- let's say, a male adult about the age of Mr. Gonzalez in their system?

A.    Average adult male has about 5 liters of blood in

their body.

Q.    So this would be 20 percent of the total blood supply?

A.    Yes.

Q.    Is that a critical amount from a medical perspective?

A.    Yeah.  A patient that loses that much blood will be in the early to middle stages of hemorrhagic shock.

Q.    Was the -- based on your review of the medical records, was the bullet close to any vital parts of the body?

A.    This bullet specifically, based on the reading of the CT scan, came to rest, I mentioned, near the soleus muscle, and right next to the bullet, as well, was the internal iliac artery, which is one of the main arteries in the body.  So this is one of the situations where if the bullet had traveled just an inch or two further, it would have hit the artery and the outcome might have been very different in that case.

Q.    And what type of treatment, generally, did Mr. Gonzalez receive in the hospital?

A.    From the emergency room, they stabilized him initially with a blood transfusion.  He was rushed to the operating room where they performed a procedure called an exploratory laparotomy.  So they put him under anesthesia and then they did an incision from the top of his stomach all the way down to the pubic bone and opened up his belly and explored

the entire abdomen for signs of injury.  I mentioned they found the damage to the colon that needed to be repaired.  And they were also able to locate and remove the bullet that we've been looking at in these images.

Q.    And how long, approximately, was he in the hospital for?

A.    I believe about two weeks.

Q.    Was there any issues that you noted with respect to infection?

A.    He developed an abdominal infection.  So he started making a lot of pus in his abdomen and got sick from that. They had to take him back to the operating room to do another surgical procedure to drain the infectious material and to put in a drain into the abdomen so that it could continue to drain the infection over the next several days while they were treating him with intravenous antibiotics.

Q.    You mentioned you looked at a few photographs of the injuries?

A.    Yes.

Q.    Can you turn to Exhibit 20, please.

(Exhibit No. 20 for identification.)

THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    Is that a photograph that you understand was taken at the hospital?

A.    Yes.

Q.    And that depicts Mr. Gonzalez on the hospital bed?

A.    Yes.

Q.    And what particular injury or injuries is noted in this photo?

A.    This is the graze wound to the bottom of the left foot.

Q.    Can you look at Exhibit 21, the next exhibit, please?

(Exhibit No. 21 for identification.)

BY MR. GALIPO:

Q.    Tell me what wounds this photo shows.

A.    This shows abrasions to his knees or scratches to his knees.

Q.    Exhibit 23.

(Exhibit No. 23 for identification.)

BY MR. GALIPO:

Q.    What does that show?

A.    This is the gunshot wound to the left thigh.  It's not from the day of the -- of the incident.  It's from later on, because it has some signs of healing already.

Q.    Exhibit --

MR. GALIPO:  What was the last one?  Was that 22?  Or 23?

THE COURT:  23.

**UNITED STATES DISTRICT COURT**

BY MR. GALIPO:

Q.    23.

A.    Oh.  Sorry.  The left thigh is 22, excuse me.  Did I describe the wrong one?

Q.    I might have missed -- so that was the one you just did was 22.

(Exhibit No. 22 for identification.)

BY MR. GALIPO:

Q.    The next one is 23?

A.    Yes.

Q.    And what does 23 show?

A.    23, as well, is the graze wound of the bottom of the foot at a date after the shooting because there's signs of healing.

Q.    And 24 and 25 also show the foot?

(Exhibit Nos. 24 and 25 for identification.)

THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    And at the end, prior to discharge, he was at least found to be stable enough to be released from the hospital.  Is that your understanding?

A.    Yes.  Yes.

Q.    Does that mean that someone has no more problems or pains or just stable enough to be released?

A.    The latter, they're stable enough to be released.

MR. GALIPO:  Thank you very much.

Nothing further at this time, Your Honor.

THE COURT:  Thank you.

Ms. Bears.

**CROSS-EXAMINATION**

BY MS. BEARS:

Q.    Hello, Dr. O'Connor.

A.    Hello.

Q.    Just some follow-up questions --

A.    Certainly.

Q.    -- from counsel.

You mentioned one of the entries was -- you said it was a torn hole in the colon.  Could you describe that injury?

A.    It's -- in the medical records it's described as a serosal injury, so the substance of the colon -- the colon is like a tube, so the -- the substance of the colon was damaged by the bullet passing through and that needed to be repaired.

Q.    So a serosal injury, is that compared to a different type of injury to the colon?

A.    There's different types of injuries that can occur, yes.

Q.    And is a serosal injury more of a superficial injury to the colon?

A.    Yeah.  So as we described before, you know, you know, a bullet can go -- enter and then exit.  This is more of

a graze wound of the colon, but it was enough where it needed to be closed and repaired.

Q.    In your review of the records, did Mr. Gonzalez require a colostomy bag because of the repair to the colon?

A.    No.

Q.    Did you examine Mr. Gonzalez yourself?

A.    I did not.  I'm not his doctor.  He's not my patient.  All of my statements and opinions are based on the discovery, including the medical records that I've reviewed for this case.

Q.    So you also mentioned -- I mean, you looked at a photograph of the entrance wound.  You described it in your report as a dramatic elliptical shape.  What does that mean?

A.    Well, often when you think of a gunshot wound, you think of a round hole, which is certainly true if the bullet is entering perpendicular.  The elliptical shape indicates that the bullet was entering at an angle.  So the -- the more dramatic the angle that the bullet is entering, the larger the oval or elliptical shape that will be produced.

Q.    And did you observe any circular injuries to Mr. Gonzalez's body on your review of the records?

A.    No.

Q.    You talked about the injury to the foot as a graze wound.  Was that from the heel to the toe or vice versa?

A.    In my opinion, the direction that the bullet was

traveling was from the heel towards the toe.

Q.    And, Doctor, you mentioned this with questions from counsel.  You took your examination from the neutral anatomical position.  Is that correct?

A.    That's correct.

Q.    Did your analysis include any factors as to the body being in motion when the injuries occurred?

A.    It's -- it's a consideration because at the time of the shooting, most likely the body is not in the neutral anatomic position, so the body can be in a different position or it can be in motion.

Q.    Did you form any opinions about any lasting injuries, any lasting effects of the injuries to Mr. Gonzalez?

A.    The majority of the medical records that were provided were from the duration -- the hospitalization related to the shooting itself.  I was only given limited medical records following the initial hospitalization.  So I do have some opinions about what was presented in those medical records.

Q.    So is it your testimony today basically -- are you informing the jury of the pathways of the bullets as they entered the body from a neutral anatomical position?

A.    Largely, yes.

MS. BEARS:  Thank you.  No further questions.

THE COURT:  Thank you.

**UNITED STATES DISTRICT COURT**

Mr. Galipo?

MR. GALIPO:  Very briefly.

**REDIRECT EXAMINATION**

BY MR. GALIPO:

Q.    You mentioned that he had to have certain surgery with respect to the colon; is that correct?

A.    Yes.

Q.    The trajectory of the shot to the upper back, you basically said it's back to front and upward.  Am I understanding you correctly?

A.    Yes.

Q.    I notice you did not say it was left to right.

A.    I didn't see any dramatic left-to-right trajectory. It's possible that it could have been slightly off of the midline.  But the most obvious is front to -- back to front and then upwards as the side of the eighth and ninth ribs were broken, and the bullet ended up resting over the fifth rib.  So quite distinctly upwards.

Q.    And that, again, is consistent with the back being to the shooter and the body bent forward?

A.    Yes.

Q.    And in terms of the body in motion, you said you did watch the video of this incident?

A.    I did, yes.

Q.    You could hear the gunshots as you're seeing the

body moving?

A. Yes.

Q. And was that at least consistent, in your mind, with the shots that we have, the shots occurring as Mr. Gonzalez was going to the ground or on the ground?

A. Yes.

MR. GALIPO: Thank you. That's all I have.

THE COURT: Thank you.

Anything further, Ms. Bears?

MS. BEARS: Yes. Briefly.

**RECROSS-EXAMINATION**

BY MS. BEARS:

Q. When the -- sorry. When the bullet enters the body, can the trajectory of the bullet be changed by hitting ribs or other bones?

A. Yes.

Q. And did -- in your analysis, is that a possibility in this matter?

A. Yes.

MS. BEARS: Thank you. No further questions.

THE COURT: All right. May we excuse Dr. O'Connor at this time?

MR. GALIPO: Yes. Thank you, Your Honor.

THE COURT: Thank you, Dr. O'Connor. You are excused.

454

# CERTIFICATE OF OFFICIAL REPORTER

COUNTY OF RIVERSIDE      )
                         )
STATE OF CALIFORNIA      )


          I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


                              DATED THIS 11TH DAY OF MAY, 2026.



                              /S/ MYRA L. PONCE
          _____
                  MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                    FEDERAL OFFICIAL COURT REPORTER


# UNITED STATES DISTRICT COURT

# CERTIFICATE OF SERVICE

Case Name:    **Gonzalez v. State of California,
et al.**                              No.    **5:25-cv-00331-KK-DTB**

I hereby certify that on <u>July 14, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **DEFENDANTS STATE OF CALIFORNIA ACTING BY AND THROUGH THE CALIFORNIA HIGHWAY PATROL AND SEAN IRICK'S NOTICE OF MOTION AND MOTION TO AMEND A JUDGMENT PURSUANT TO FED. R. CIV. PRO. RULE 59(e)**

- **[PROPOSED] ORDER TO DEFENDANTS' FEDERAL RULE OF CIVIL PROCEDURE RULE 59(E) MOTION; DECLARATION OF MARIO E. GARCIA IN SUPPORT THEREOF; EXHIBIT 1-3**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>July 14, 2026</u>, at Los Angeles, California.


Lenee Pandino                                        *Lenee Pandino*
Declarant                                              Signature

SD2025300206
68584284.docx