# "EXHIBIT 1"

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

HONORABLE KENLY KIYA KATO, U.S. DISTRICT JUDGE

GEORGE GONZALEZ,                          )
                                          )
                    Plaintiff,            )
                                          )
     v.                                   )          Case No.
                                          )     CV 25-331 KK (DTBx)
CITY OF HEMET, et al.,                    )
                                          )        Volume 1
                    Defendants.           )     (Pages 1 - 194)
_____)

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
JURY TRIAL:  DAY ONE
FRIDAY, MAY 8, 2026
9:14 AM
RIVERSIDE, CALIFORNIA

_____

**MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET
RIVERSIDE, CALIFORNIA  92501
MYRAPONCECSR@GMAIL.COM

UNITED STATES DISTRICT COURT

138

Q.    And that's a semiautomatic weapon?

A.    Yes.

Q.    And do you need to press the trigger for each shot?

A.    Yes.

Q.    And you would normally have 15 in the magazine; is that correct?

A.    Yes.

Q.    And 1 in the chamber?

A.    Yes.

Q.    For a total fully loaded of 16 rounds?

A.    Yes.

Q.    And is it your understanding that sometimes after a officer-involved shooting, they do a round count on the officer's gun?

A.    That is my understanding.

Q.    And is it your understanding that they do that in part to see how many rounds are left?

A.    Yes.

Q.    And then doing the simple math to figure out how many rounds were fired?

A.    Yes.

Q.    And here at least would you agree, based on this exhibit, there were six rounds left.  We see five from the magazine and one from the chamber?

A.    Yes.

Q.    So doing simple math, if you had 16 total and 6 were left, that means you fired 10 rounds.   Is that fair?

A.    Yes.

Q.    And during opening statement, your counsel said that you fired a shot.  You would agree you fired more than one shot?

A.    Yes, sir.

Q.    So at some point, did you and your partner have contact with two women in a car that shift?

A.    Yes, on a traffic stop.

Q.    Okay.  And that was for not completely stopping for a stop sign or something to that effect?

A.    Red light.

Q.    A red light.

Kind of a rolling right on red?

A.    Yes.

Q.    And one of those -- I think there was two sisters in the car.  Is that your recollection?

A.    Yes.

Q.    And one of them was Yvette Nieves and she turned out to be the girlfriend or ex-girlfriend of George Gonzalez?

A.    Yes.

Q.    And were numbers exchanged at that point?  Did you either give her your cell phone or vice versa?

A.    My partner, Detective Sobaszek, had prior contact

A.    We made two rights and then on to a straightaway.

Q.    Okay.  That second right, did you again slow down to see whether he was possibly going to take a position to ambush you?

A.    I remember being concerned and slowing down.

Q.    And did he try to ambush you; in other words, was he waiting for you, facing you with a gun pointed when you came around the corner?

A.    No.

Q.    Now, during this time frame, as you're running the first part before you make a right turn and now you're describing the second part before you make your second right turn, where are you positioned relative to the other officers, if you know?

A.    As we made it to the first turn, Detective Sobaszek passed me.  I slowed up, he kept going so he -- he was ahead of me.  So then, for the next -- the next right, he was ahead of me.  And then in the straightaway, he was just ahead of me about 2, 3 feet.

Q.    Okay.  So it sounds like initially you were the one closest to Mr. Gonzalez, but at some point, Detective Sobaszek passed you?

A.    Yes.

Q.    And then you stood relatively close together?

A.    Yes.

Mr. Gonzalez for running away even if you saw a gun in his hand if it didn't create this imminent or immediate threat of death. Would you agree with that?

A.    If it didn't create that immediate threat of death or serious injury.

Q.    Right.  So all the same facts and circumstances we have in this case -- you know, the front yard, the -- in the vehicle for some time, the vehicle pursuit, the foot pursuit, thinking he had a gun, even seeing it in his hand -- if he's running away from you, you would agree, based on your training, if it wasn't an imminent or immediate threat of death or serious bodily injury, you cannot use deadly force.  You would at least agree with that?

A.    I would say that running in a public place, a warehouse, with a firearm is an immediate threat to the public.

Q.    But it has to be an immediate threat of death or serious bodily injury; true?

A.    Correct.

Q.    And that's an important distinction based on the training; correct?

A.    Correct.

Q.    And, in fact, you recall us talking in your deposition about whether based on your training you thought it would have been appropriate to shoot Mr. Gonzalez for running away with a gun in his hand if he had not turned towards you or

pointed the gun towards you.

Do you recall that question in your deposition?

A.    Yes.

Q.    And you said, no, it would not be appropriate.

Do you recall that?

A.    Yes.

Q.    So I just want to follow up on that.

At the time of your deposition, when I asked you, you agreed that, based on your training, you could not shoot Mr. Gonzalez for running away with a gun in his hand if he had not turned towards you or pointed the gun towards you -- do you remember agreeing with that in your deposition?

A.    Yes.

Q.    And your deposition obviously -- although it wasn't in court -- you understood there was a court reporter taking down what was being said?

A.    Yes.

Q.    And you understood that your testimony was being taken under oath?

A.    Yes.

Q.    And did you ever make any changes to your deposition testimony after the deposition?

A.    No.

Q.    Also, would you agree that part of your training on the use of deadly force is that you're responsible to justify

164

every shot?

A.    Yes.

Q.    And part of the training is the importance of assessing before you shoot, if feasible; correct?

A.    You always assess your target, yes.

Q.    Right.  I mean, you want to assess whether or not there's that ability, opportunity, and apparent intent to immediately cause death.  That's part of the assessment?

A.    Yes.

Q.    And then, even during the shooting sequence, if you can, you want to assess to see if that immediate threat of death is still there?

A.    If you can, yes.

Q.    So I want to now focus on the time frame after going through the narrow pathway.

Are you with me time-wise?

A.    Yes.

Q.    Do you recall a few seconds before you fired, you or one of the other officers saying "drop it" or words to that effect?

A.    Someone said -- I believe it was me, but somebody, yes, said "drop it."

Q.    Okay.  And you believe it was potentially you who said that just from listening to the audio?

A.    Yes.

see Mr. Gonzalez -- and this would be after he exited the narrow pathway -- look over his left shoulder?

A.      Yes.

Q.      And at some point before the shots started, did you see the gun raise up somewhere on his right side?

A.      Yes.

Q.      And do you believe you said "drop it" before you saw the gun raise up on the right side or after for that last time?

A.      I don't know.

Q.      You're not sure?

A.      I don't know.

Q.      Okay.   I'd like to show you Exhibit 92, by agreement.

MS.  BEARS:   I have no objection to the photo itself.

MR.  GALIPO:   Thank you.

Exhibit 92, please.

THE COURT:   So 92 will be admitted.

(Exhibit No.  92 for identification and received into evidence.)

BY MR. GALIPO:

Q.      Are you able to see this on your screen?

A.      Yes.

Q.      And does this appear to be a portion of the foot pursuit after Mr. Gonzalez went through that narrow pathway?

A.      It appears to be, yes.

UNITED STATES DISTRICT COURT

being there, everything's real-time and everything's happening really fast.

Q.   Okay.  In this image, just looking at it on your screen, does Mr. Gonzalez appear to be looking back towards you?

A.   It's pretty blurry, but I -- it appears to depict that.

Q.   Can you see a gun anywhere in this image?

A.   Not in this image.

Q.   Does Mr. Gonzalez appear to be pointing a gun at you in this image?

A.   No.  It doesn't appear in this image.

MR. GALIPO:  I'd like to --

May I confer with counsel for a moment?  I'd like to --

THE COURT:  Of course, yes.

MR. GALIPO:   -- show Exhibits 93 through 98, but I'll give them all to counsel.

MS. BEARS:  No objection to the photos themselves.

THE COURT:  All right.  So, Counsel, we are admitting 93 through 98; is that correct?

MR. GALIPO:  Correct, Your Honor.

THE COURT:  All right.  Those will be admitted.

(Exhibit Nos. 93 - 98 for identification and received into evidence.)

171

BY MR. GALIPO:

Q.      If we could look at Exhibit 93.

Are you able to see this on your screen?

A.      Yes.

03:06PM Q.      Does Mr. Gonzalez appear to be looking back towards you in this image?

A.      Based on this still image, it doesn't look like it to me.

Q.      Do you see a gun in his hand in this image?

03:06PM A.      I don't see a gun in his hand in this image.

Q.      Does he appear to be pointing a gun at you in this image?

A.      It doesn't appear that way, no.

Q.      When you fired your first shot, was Mr. Gonzalez 03:06PM stationary or was he still moving away from you?

A.      To the best of my recollection, he was still moving away.

MR. GALIPO:   If we could look at Exhibit 94, please.

BY MR. GALIPO:

03:06PM Q.      Did you hear any shots being fired before you fired your first shot?

A.      No.

Q.      You didn't hear Detective Sobaszek firing just to your right before you started firing?

03:07PM A.      I heard his gun firing.  I don't know if it was

**UNITED STATES DISTRICT COURT**

before or after I started firing.

Q.    In this image, again, can you see Mr. Gonzalez turn towards you?

A.    No.

Q.    Can you see a gun?

A.    No.

MR. GALIPO:    Exhibit 95.

BY MR. GALIPO:

Q.    Can you tell if the shots have started yet?  Can you tell, just by looking at this image and being familiar with this case, whether the shots have started yet?

A.    Not based on a still image, no.

Q.    How many times would you say you have looked at the body-worn camera footage in this case all together?

A.    Maybe eight, ten times.

Q.    Okay.  Have you ever looked at it slowed down?

A.    I attempted to, using just like Windows Media Player.  But it's not very sophisticated.  It was real choppy.

Q.    Have you ever looked at it frame by frame?

A.    No.

Q.    Can you tell by looking at this image, Exhibit 95, whether you started shooting yet or not?

A.    Just based on these still images, I can't tell you because --

Q.    Okay.

A.    -- in my mind, it's real-time.  Everything is moving fast.  It's not glimpse by glimpse.  So I can't ascertain just from still images whether or not I started shooting or I finished shooting.

Q.    Would you at least agree with me, when you started shooting -- you were using your sights; correct?

A.    Yes.

Q.    Would you agree with me that when you started shooting using your sights, you could not see the gun?

A.    I didn't know where the gun was.

Q.    Would you agree you could not see the gun when you started shooting?  It may be the same answer as you don't know where it was, but I just want to clarify that point.

A.    Yeah, I don't -- I don't know where it was.  So I'll say no, I don't know where.

Q.    So when you say you don't know where it was, no, you're at least agreeing you could not see the gun when you started shooting.  Is that a fair statement?

A.    To explain this, I saw the gun in his right hand up by his shoulder.  To me, it appeared the barrel was tending or tilting back towards my location when he looked over that left shoulder.  That's when I produced my firearm and started firing a series of shots.

Q.    Okay.

A.    Once I started firing the series of shots, I wasn't

focused on the gun anymore.  I was just focused on him as the threat.

Q.    Okay.  Thank you for that.

But my question is, just so I'm clear, is whether you could see the gun when you started shooting.  And I take it your answer is no?

A.    I wasn't focused on it, so no.

MR. GALIPO:  Exhibit 96, please.

BY MR. GALIPO:

Q.    Again, same questions whether you could see the gun -- whether you see the gun in this image or not?

A.    No.

Q.    Whether it appears Mr. Gonzalez is turned back towards you in this image?

A.    No.

Q.    Do you know if you were firing any shots at this time or not?

A.    No.

Q.    By looking at this image, does it appear to you that Mr. Gonzalez is trying to shoot you?

A.    Not from this image, no.

MR. GALIPO:  If we can go to Exhibit 97, please.

BY MR. GALIPO:

Q.    Again, same questions; you would agree it would be the same answers:  Don't see a gun, doesn't look like he's

175

turning towards you, doesn't look like he's trying to shoot you.

Would you agree with that?

A. Based on this still image, no.

Q. You would agree with it, yes?

A. Yes.

MR. GALIPO: And Exhibit 98 in this series.

BY MR. GALIPO:

Q. Same questions, you would agree that Mr. Gonzalez is not turned towards you, you don't see a gun, it doesn't appear that he's trying to shoot you in this image.

Would you agree with all that?

A. Yes.

Q. I take it that you were hoping, even before you saw the gun, that he would drop it?

A. Yes.

Q. And obviously after you saw it, you were hoping he'd drop it as well?

A. Yes.

Q. Do you know how much time passed, approximately, from you seeing the gun to you firing your first shot?

A. 1 to 2 seconds.

Q. And do you think that you told him to drop it in that 1 to 2 seconds between seeing the gun and firing your first shot?

UNITED STATES DISTRICT COURT

A.    Again, I don't know.

Q.    At some point do you see Mr. Gonzalez start to go to the ground?

A.    Yes.

Q.    And based on your training, did you think it was appropriate to keep shooting him as he's going to the ground?

A.    To me, it appeared that although he was still a threat, it had lessened.  So that's when I stopped firing, as he went to the ground.

Q.    Okay.  So would you at least agree, based on your training, when you saw him going to the ground, you felt it was not an immediate threat of death at that point?

A.    Yes.

Q.    And you yourself had the impression, at least, that, before he went to the ground, at least one of your shots struck him.  Is that fair?

A.    I had that impression.

Q.    And when you watch the videos in this case, I take it they would be from Detective Sobaszek and Sergeant Reynoso from their body-worn cameras?

A.    Yes.

Q.    And also I take it you looked at the surveillance video from the juice factory?

A.    Yes.

Q.    And the body-worn camera videos have audio?

A.    They do.

Q.    And when you watched the videos, did you note that shots were being fired as Mr. Gonzalez was going to the ground?

A.    After review of the camera, I did hear the shots.

Q.    Shots while he was going to the ground?

A.    While he was falling.

Q.    And in reviewing the videos, including the audio, did you see that shots were fired after Mr. Gonzalez was on the ground?

A.    After review of the video, it appeared that there was -- I don't know how many shots, but a shot when he was on the ground.

Q.    Isn't it fair, Officer Irick, that there were multiple shots fired after Mr. Gonzalez was on the ground?

A.    I can't say I reviewed specifically for how many or multiples, but it appeared to me that at least one.

Q.    You have stated that you felt, based on your training, it was inappropriate to use deadly force as he was going to the ground.  Correct?  And you're saying at that point you tried to stop shooting?

A.    Yes.

Q.    I take it you would also say, based on your training, it was inappropriate to shoot Mr. Gonzalez after he was on the ground.  Is that a fair statement?

A.    Yeah.  I would say had I known that he was on the

he was on the ground and unarmed, it would have been inappropriate to shoot him on the ground.

Q.    Well, getting back to your training, you would -- you would need that ability, opportunity, and apparent intent to immediately cause death; correct?

A.    Yes.

Q.    And that would apply even if someone was shot and on the ground?

A.    Depending on the circumstance, if they're still armed, they still have the ability, the opportunity, and the intent to shoot you.

Q.    Well, that's what I want to get at.  Let's just talk about -- first of all, would you agree, if you tell someone to drop the weapon and they drop it, then you wouldn't want to shoot them after that.  Would you at least agree with that?

A.    Yes.

Q.    Would you also agree, if they drop the weapon, they no longer have the ability or the opportunity to use it?

A.    Yes.

Q.    And regarding this intent thing, this intent requirement -- and I think we talked about this to some extent -- a weapon in the hand is not enough.  They have to appear to intend to want to use it against someone; true?

A.    Yes.

Q.    So, you know, pointing the weapon, taking a shooting

Q.    And I think it was Detective Sobaszek who kicked it away?

A.    Yes.

MR. GALIPO:  We're going to go for just another 3 minutes.  Is that correct?

May I confer with Mr. Sincich for a moment?

THE COURT:  Yes, of course.

(Off-the-record discussion between counsel.)

MR. GALIPO:  Your Honor, we're going to end with playing a portion of Exhibit 1, which is the body-worn camera footage of Officer Sobaszek just leading up -- during the foot pursuit, leading up to the shooting.

THE COURT:  Any objection?

MS. BEARS:  No, Your Honor.  We would reserve to show it in its entirety at a later point.

THE COURT:  Very well.  Exhibit 1 will be admitted and you may publish.

(Exhibit No. 1 for identification
and received into evidence.)

MR. GALIPO:  We're going to start it for purposes of this showing, 1 minute in, with the understanding that, you know, it's admitted prior to that, but we're just going to show it from 1 minute to the time of the shooting and stop it shortly thereafter, just so the jury has a chance to see the video in real-time.

UNITED STATES DISTRICT COURT

THE COURT:  Understood.

(Video recording played, not reported.)

MR. GALIPO:  Okay.  We stopped it -- we stopped it at 1:31, Your Honor.

THE COURT:  Thank you.

BY MR. GALIPO:

Q.    Is that a portion of Officer -- or Detective Sobaszek's body-worn camera footage, if you know?

A.    Yes.

Q.    And did that show the time frame just prior to the shooting, the shooting and shortly thereafter?

A.    Yes.

MR. GALIPO:  If this is a good time for our break, Your Honor.

THE COURT:  I think it is.

Ladies and gentlemen, we are going to go ahead and break for the day.  Please remember the admonitions.  Please do not speak to anybody about this case or anything having to do with it.  Please do not let anyone speak to you about this case or anything having to do with it.  Please do not conduct any independent research or investigation.  And if you become aware of any of those things, please let us know right away.

I hope all of you have a restful and good weekend and for those of you who are mothers, Happy Mother's Day.

THE COURTROOM DEPUTY:  All rise.

UNITED STATES DISTRICT COURT

# CERTIFICATE OF OFFICIAL REPORTER

COUNTY OF RIVERSIDE        )
                          )
STATE OF CALIFORNIA        )

         I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

                              DATED THIS 8TH DAY OF MAY, 2026.


                              /S/ MYRA L. PONCE
                          _____
                          MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                             FEDERAL OFFICIAL COURT REPORTER

# UNITED STATES DISTRICT COURT