# "EXHIBIT 2"

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

**HONORABLE KENLY KIYA KATO, U.S. DISTRICT JUDGE**

GEORGE GONZALEZ,                              )
                                              )
                      Plaintiff,              )
                                              )
     v.                                       )          Case No.
                                              )    CV 25-331 KK (DTBx)
CITY OF HEMET, et al.,                        )
                                              )          Volume 2
                      Defendants.             )    (Pages 195 - 454)
_____ )

**REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS**
**JURY TRIAL:  DAY TWO**
**MONDAY, MAY 11, 2026**
**8:24 AM**
**RIVERSIDE, CALIFORNIA**

**MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET
RIVERSIDE, CALIFORNIA  92501
MYRAPONCECSR@GMAIL.COM

**UNITED STATES DISTRICT COURT**

THE WITNESS:  First name is Scott, S-c-o-t-t; last name is Holdaway, H-o-l-d-a-w-a-y.

THE COURT:  Thank you.

Mr. Galipo, you may proceed.

MR. GALIPO:  Thank you, Your Honor.

SCOTT HOLDAWAY,

called as a witness by the plaintiff, was sworn and testified as follows:

### DIRECT EXAMINATION

BY MR. GALIPO:

Q.    Good morning, Mr. Holdaway.

A.    Good morning.

Q.    What is your occupation currently?

A.    My occupation, I am a forensic video analyst employed by --

THE REPORTER:  I'm sorry.  Can you repeat that?  Employed by --

BY MR. GALIPO:

Q.    Employed by?

A.    CVisualEvidence.

Q.    Thank you.

Make sure and keep your voice up just a little bit.

A.    Got it.

MR. GALIPO:  Was the court reporter able to get that last one?

THE COURT REPORTER:  Yes.  Thank you.

MR. GALIPO:  Okay.  You're welcome.

BY MR. GALIPO:

Q.    And, generally, what does a forensic video analyst do?

A.    Reviewing footage kind of through a forensic lens. It depends on what the project, you know, calls for.  But essentially looking at video in detail.

Q.    And you were retained at some point to look at videos in this case; is that correct?

A.    That is correct.

Q.    Did that include the body-worn camera footage from Detective Sobaszek and Sergeant Reynoso?

A.    Yes.  That is correct.

Q.    Did you also look at a surveillance video that was provided from the juice factory?

A.    I don't believe I saw that one.

Q.    You were concentrating on the body-worn camera footage?

A.    That's correct.

Q.    Can you tell the ladies and gentlemen of the jury a little bit about your educational background?

A.    Yeah.  So I went to California State, Dominguez Hills.  I got a bachelor's degree in digital media arts, and then after that, I, um, got this job at CVisualEvidence and I

continued a little bit more training through more of a forensic lens at that point.

Q.    Can you tell the ladies and gentlemen of the jury about some of your additional training in your line of work?

A.    Yeah.  So I've had, I believe it's 168 hours' worth of training through LEVA, which is a law enforcement agency that trains people, you know, in forensic video analysis and stuff.  And then I have -- I think it's somewhere around 25 or so hours through Axon Investigate, which is the company that produces a lot of the body-worn cameras.

Q.    Can you just give us an idea of some of the training -- some of the topics of training within all of those hours?

A.    Oh, there's a lot of different ones.  Um, I mean, anything from metadata analysis to video enlargement, stabilization, color correction; um, all kinds of different stuff, yeah.

Q.    Okay.  Since you threw out a few terms that some people may be familiar with and others not, "video enlargement," what is that in -- generally speaking?

A.    Generally speaking, that would be where you take a portion of the video and enlarge it so you can see that portion of the video enlarged.

Q.    And you mentioned the term "stabilization."  What does that mean?

A.    Stabilization is when the video is really shaky, you can stabilize it, um, so that it doesn't jump around as much so you can get a better idea of what is going on.

Q.    Have you worked on other officer-involved shooting cases as a video expert?

A.    Yes.

Q.    My office has retained you on some prior occasions?

A.    Yes.   That is correct.

Q.    One, I think, was -- strike that.

And you've testified in court before in your area of expertise?

A.    Yes, that is correct.

Q.    So I want to talk to you a little bit about your assignment in this case.

Were you assigned in part to see if you could figure out when the shots occurred and what was happening with respect to the body position of Mr. Gonzalez at the time of the shots?

A.    Yeah.   I reviewed the footage to find indications of gunshots being fired and, um, tried to figure out which officer fired each one of those shots.

Q.    And was the footage that you primarily relied upon the body-worn camera footage that you mentioned earlier?

A.    Yes.

Q.    Can you explain to the jury, when you reviewed the footage, what were you looking for to try to figure out who was

shooting when?

A.    Right.  So when I review the footage, I'm able to go through the footage frame by frame.  I can kind of toggle through it.  It's 30 frames per second, these body cams.  So you have about 30 pictures per second in these videos.

And I'm able to toggle through it left and right to look at each individual frame, kind of go back and forth if I'd like.  I can loop little sections and just watch them over and over.

So I'll go through this portion of the video where the shooting occurs and I will look for indications of gunshots being fired, whether that is a muzzle flash from a firearm or a plume of smoke coming out of the firearm, um, or an abrupt, you know, recoil of the firearm.

Q.    What, in essence -- when you say "recoil," what are you referring to?

A.    That would be when the firearm is fired, the firearm would -- the bullets going this way so the firearm kicks back this way, sort of opposing the direction of the trajectory of the bullet.

Q.    So are -- sometimes you could see portions of the firearms in the video footage?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yes.  Yes.  Sorry.

277

Q.    Okay.  And you said you look for smoke, muzzle flash.  The recoil in essence would be movement of the firearm consistent with it being fired?

A.    Right.  And the slide coming back, you can see that sometimes as well.

Q.    Okay.  And you mentioned 30 frames per second.  At some point, did you do -- assign frame numbers to the analysis?

A.    I did.  Each frame was assigned a unique frame number.

Q.    And how does that help when you're looking at this?

A.    It gives each individual frame of video a way to identify it.  So the -- there is a time/date stamp on the screen, but it only has seconds.  And as we kind of went over, there's 30 pictures per second.  So all 30 of those pictures would have the same time/date stamp at the top.  So I put individual numbers on each frame so as I toggle it or anyone else toggles through it, they can identify which frame it is and everyone can kind of be on the same page with -- with what we're talking about.

Q.    And did you also put a timer on the analysis at some point?

A.    Yes.  That is correct.  I did a timer that counted up until the first indication of a gunshot being fired and then it counts up after that.

Q.    Can you turn to Exhibit 117?  I think there's an

exhibit book in front of you.

(Exhibit No. 117 for identification.)

THE WITNESS:  Okay.

BY MR. GALIPO:

Q.    Do you have that exhibit before you, Exhibit 117?

A.    I do.

Q.    And what is -- did you create this exhibit?

A.    I did.  This looks -- yes.

Q.    And what -- and it has a frame number to it?

A.    That is correct, at the lower right-hand corner.

Q.    Okay.  And is there a timer referenced here?

A.    Yes.  In the bottom left-hand corner.

Q.    And what is the time reference to?

A.    That time reference is a timer that's counting up until the first indication of the first gunshot being fired.

Q.    And this image, Exhibit 117, is how many seconds before the first gunshot?

MS. BEARS:  Objection.  Lacks foundation.

THE COURT:  Sustained.

If you want to ask another question.

MR. GALIPO:  Yes.  Thank you, Your Honor.

BY MR. GALIPO:

Q.    How did you determine, with reference to Exhibit 117, how many seconds this was before the first gunshot?

UNITED STATES DISTRICT COURT

A.    In reviewing the video, I can see within the metadata that it is 30 frames per second in the video, and .03 is the duration between each of those frames -- or the duration of those frames, which comes down to 30 frames a second.  So each photo is .03 seconds, if that makes sense.

Q.    Okay.  So if -- for example, if you counted back 90 frames, how many seconds would that be?

A.    90 frames?

Q.    90.  Just for an example.

A.    That would be like a second and a half.

Q.    How did you --

A.    Oh, three seconds.  I'm sorry.

Q.    That's okay.

So 90 frames, just dividing by 30, 30 frames per second would be 3 seconds.

A.    That's correct, yes.

Q.    Okay.  And then 6 seconds would be 180 frames?

A.    Yes.

Q.    So first, how did you determine when the first gunshot occurred?

A.    Like I said, I have the ability to toggle through the video and, you know, just review it as long as it -- I need to, and toggling back and forth, you can kind of skip through the frames until you see some kind of visual indication that that is occurring, and that was a -- a plume of smoke coming

**UNITED STATES DISTRICT COURT**

from Officer Sobaszek's firearm.

Q.    Okay.  I'd like you just to move forward for a second to Exhibit 125.

(Exhibit No. 125 for identification.)

BY MR. GALIPO:

Q.    Do you have that in front of you?

A.    Yes, I do.

Q.    And did you create this image?

A.    Yes.

Q.    And do you believe this is the time of the first gunshot?

A.    Yes.

Q.    And, again, can you just specify how you determined this was the time of the first gunshot?

MS. BEARS:  Objection.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  So this is the enlarged version.  So it's a little harder -- or you actually can't see, um, Officer Sobaszek's plume of smoke that came from his firearm.

BY MR. GALIPO:

Q.    Okay.  There's a corresponding photo without it being enlarged?

A.    Yes.

Q.    Okay.  Let me see if I can find that.

I just got it -- Exhibit -- can you turn back to

**UNITED STATES DISTRICT COURT**

Exhibit 61, please.

(Exhibit No. 61 for identification.)

BY MR. GALIPO:

Q.    Do you have that in front of you?

A.    Yes.

Q.    And there's a frame number referenced here?

A.    Yes, that's correct.

Q.    Just for the record, what is the frame number?

A.    Frame 51829.

Q.    And did you determine that this was the -- when the first gunshot occurred?

A.    Yes.  That is correct.

Q.    And is there something that you saw when you were analyzing this frame that led you to that conclusion?

A.    Yes.  It was the -- the plume of smoke that occurred on that frame.

Q.    And where did the plume of smoke come from?

A.    It came from the firearm towards the top of the frame there.

Q.    And who did you understand that firearm belonged to?

MS. BEARS:  Objection.  Lacks foundation.

THE COURT:  Sustained.

BY MR. GALIPO:

Q.    Did you have an understanding whose firearm that was?  You could just say yes or no.

UNITED STATES DISTRICT COURT

282

A.    Yes.

Q.    And how did you gain that understanding?

A.    I believe I was provided that information when I was first contacted about the project.

Q.    Whose body-worn camera does it -- is this a frame from whose body-worn camera?

A.    Officer Sobaszek.

Q.    Okay.  And so knowing that this was Officer Sobaszek's body-worn camera, did that inform your knowledge as to who was firing this shot?

A.    Yeah.

Q.    And prior to this, did you see any plumes of smoke, muzzle flashes, or recoils from any of the officers' guns?

A.    No.  I did not.

Q.    This was the first one?

A.    Yeah.  That is correct.

Q.    And so if we could -- and you set the timer on this at 00:00 because this is the time of the first shot.  Is that correct?

A.    Correct.

Q.    And then you looked at other shots and what happened beforehand in reference to the first shot?

A.    Right.  I analyzed the shots that occurred after this one.

Q.    How much time did you spend in going through this

video to determine that this was the first shot fired by Officer Sobaszek?

A.    It might be hard to isolate just that task as far as time.  Um.  Yeah, I don't know if I can isolate just that into, like, how long that took by itself.

Q.    Are you confident, from your area of expertise, all the work you did in this case, that this is the time of the first shot?

A.    Yes.

Q.    And are you confident that the first shot was fired by Officer Sobaszek?

A.    Yes.

MR. GALIPO:  I would move to admit Exhibit 61.

MS. BEARS:  Object that this exhibit lacks foundation and under 702.

THE COURT:  Overruled.

But I think my ruling is that the unedited exhibits are coming in.  We had that discussion on the first day of trial.

MR. GALIPO:  Yes.  But can we use these to -- simply as -- oh, just -- so demonstrative.

THE COURT:  Yes.

MR. GALIPO:  Understood, Your Honor.  Thank you.

If we could, for demonstrative purposes, put up Exhibit 61, please.

UNITED STATES DISTRICT COURT

BY MR. GALIPO:

Q.    Does this show the timing of the first gunshot by Officer Sobaszek?

A.    Yes.   That is correct.

Q.    And the graphics on this in terms of Gunshot Wound *[sic]* Number 1, Officer Sobaszek, and time since first gunshot being 00:00:00, you put that on there?

A.    That's correct.

Q.    Okay.   Can you look at Exhibit 2, please -- Exhibit 62.

(Exhibit No. 62 for identification.)

BY MR. GALIPO:

Q.    What did you determine in this exhibit, 62?

A.    In 62, that was the -- the indication of a -- a second gunshot by Officer Sobaszek.

Q.    Okay.   And how long after the first gunshot did the second gunshot occur?

A.    .23 seconds.

MR. GALIPO:   And I would move to -- I would move to show this as a demonstrative, please.

THE COURT:   It's already on the screen.

MR. GALIPO:   Oh.   Okay.   If you can just -- this is Number 1.

THE COURT:   Then 62 may be used as a demonstrative and published.

MR. GALIPO:  Thank you.

BY MR. GALIPO:

Q.    Okay.  This would be the time frame of the second gunshot, based on your analysis?

A.    That is correct.

Q.    And going to Exhibit 63 --

MR. GALIPO:  Don't put it up yet, please.

BY MR. GALIPO:

Q.    Would this be the time frame of the third shot?

(Exhibit No. 63 for identification.)

THE WITNESS:  Yes.  That's correct.

BY MR. GALIPO:

Q.    And you -- who fired that shot, based on your analysis?

MS. BEARS:  Objection.  Lacks foundation.

THE COURT:  Sustained.

BY MR. GALIPO:

Q.    Were you able to determine -- and you could just say yes or no -- who fired the third shot?

A.    Yes.

Q.    How were you able to determine that?  Can you explain to the jury and the Court how you went about determining that?

A.    There is a plume of smoke again leaving Officer Sobaszek's camera in this frame, and I was toggling

**UNITED STATES DISTRICT COURT**

back and forth through the frames, um, looking for those visual cues.

Q.    And up to this time, did you see any smoke or muzzle flash or recoil from any of the other firearms?

A.    Not at this point, no.

MR. GALIPO:   Would -- request to show it as demonstrative.

THE COURT:   Yes.   You may publish.

BY MR. GALIPO:

Q.    So based on your analysis, this would be the third gunshot in the series also fired by Officer Sobaszek?

A.    Correct.

(Audio interruption.)

MR. GALIPO:   I'm not sure what that noise is, I'm sorry, but --

BY MR. GALIPO:

Q.    Exhibit 64.

MR. GALIPO:   Don't put it up yet.

(Exhibit No. 64 for identification.)

BY MR. GALIPO:

Q.    Could you look at it, please?

Does this relate to the fourth gunshot?

A.    Yes.

Q.    Were you able to determine who fired that shot?

A.    Yes.

Q.    How were you able to determine who fired the fourth shot?

A.    Just like the others, toggling through the frames and just looping the video and observing a plume of smoke leaving Officer Sobaszek's firearm.

Q.    Okay.

MR. GALIPO:  I would request to show that as a demonstrative, Your Honor.

THE COURT:  Yes.  You may publish.

BY MR. GALIPO:

Q.    And then you have time since first gunshot 00.67. What does that refer to?

A.    That is -- I'm just repeating the title of it, but that is the amount of time that has occurred since the indication of the first gunshot.

Q.    Okay.  And then just moving forward to Exhibit 65.

(Exhibit No. 65 for identification.)

BY MR. GALIPO:

Q.    Did you determine who fired the fifth shot?

A.    Yes.

Q.    How did you determine who fired the fifth shot?

A.    For this one, there is a muzzle flash seen coming from Officer Irick's firearm off to the side of the frame there on the left.

MR. GALIPO:  I would request to show this as a

demonstrative, please.

THE COURT:   Yes.   65 may be published.

BY MR. GALIPO:

Q.   And would this be the fifth shot in total?

A.   Yes.   That is correct.

Q.   But the first shot by Officer Irick?

A.   Correct.

Q.   And the 00.73 means what?

A.   Um, again, it's the -- it's the amount of time since the indication of the first gunshot being fired.

Q.   Going to Exhibit 66, please.

(Exhibit No. 66 for identification.)

BY MR. GALIPO:

Q.   Do you have that in front of you?

A.   Yes.

Q.   What was the significance of this particular image?

A.   So this image was the first frame where Mr. Gonzalez is seen releasing the firearm -- or dropping the firearm to the floor.

Q.   And did you circle that in this image, the dropping of the firearm?

A.   That is correct.

MR. GALIPO:   I would request to show Exhibit 66 as a demonstrative.

THE COURT:   Yes.   It may be published.

UNITED STATES DISTRICT COURT

BY MR. GALIPO:

Q.    That green circle is the firearm starting to go to the ground?

A.    Right.  When I was toggling through, this is the first frame where it became visible.

Q.    And it looks like, if I'm understanding this correctly, it's a little less than a second after the first shot?

A.    Correct.

Q.    Now, at some point -- we're going to get there in a moment -- did you do some enlargement and stabilization of these issues so that one could see Mr. Gonzalez closer up?

A.    Yeah.  I did a version where I did an enlargement and stabilization.

Q.    Okay.  Let's just get through these and then we'll look at those in a moment.

A.    All right.

Q.    Can you look at Exhibit 67, please.

        (Exhibit No. 67 for identification.)

BY MR. GALIPO:

Q.    What does this exhibit represent?

A.    This exhibit looks like the sixth gunshot being fired by Officer Irick.

Q.    Okay.  The sixth shot in total?

A.    Right.

UNITED STATES DISTRICT COURT

Q.    Second by Irick?

A.    Yes.  Correct.

Q.    And this is shortly after the gun had been released or dropped?

A.    Right.

MR. GALIPO:  I would ask to -- request to show as a demonstrative.

THE COURT:  Yes.  You may publish.

BY MR. GALIPO:

Q.    And this is approximately 1 second after the first shot by Officer Sobaszek?

A.    Yeah.  That is correct.

Q.    Going to Exhibit 68, please.

(Exhibit No. 68 for identification.)

BY MR. GALIPO:

Q.    What were you intending to show in this exhibit?

A.    Exhibit 68.  This -- this was the frame where the firearm Mr. Gonzalez dropped hit the floor.  So the last exhibit was when it was released from his hand, and this photo is right after when it hits the ground.

Q.    And did you circle it in this image with a green circle?

A.    Yes.  Correct.

MR. GALIPO:  Request to show as a demonstrative.

THE COURT:  Yes.

UNITED STATES DISTRICT COURT

BY MR. GALIPO:

Q.    And so this would be -- the green circle would signify the gun on the ground at this point?

A.    Yeah.  That's correct.

MR. GALIPO:  Can we look at Exhibit 69, please.

(Exhibit No. 69 for identification.)

BY MR. GALIPO:

Q.    What does this show?

A.    This one shows -- this is Officer Sobaszek's body-worn camera.  And this one shows Gunshots Number 7 and 8 being -- indications of Gunshots 7 and 8 being fired.

Q.    And were you able to determine who fired Gunshots 7 and 8?

A.    Yes.

Q.    How were you able to determine that?

A.    Again, going frame by frame through the video, I was able to see a plume of smoke appear in this frame in front of Officer Irick and Sobaszek.

Q.    Two separate plumes of smoke?

A.    Correct.

Q.    And these would have been Gunshots 7 and 8 in the sequence?

A.    Correct.

Q.    I'm counting right, the third by Irick, the fifth by Sobaszek?

UNITED STATES DISTRICT COURT

292

A.    Yes.

MR. GALIPO:   Request to show as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.    And this would be the timing of Gunshots 7 and 8?

A.    Correct.

MR. GALIPO:   Can we look at Exhibit 71, please -- actually, 70.

(Exhibit No. 70 for identification.)

THE WITNESS:   All right.

BY MR. GALIPO:

Q.    Have that in front of you?

A.    Yes, sir.

Q.    That would be a -- a gunshot by another officer?

A.    Yeah.   This was a gunshot fired by Officer Reynoso.

MR. GALIPO:   Can we go to Exhibit 71, please.

(Exhibit No. 71 for identification.)

BY MR. GALIPO:

Q.    Were you able to determine who fired Gunshot Number 10 in sequence?

A.    Yes.

Q.    And who was that?

A.    That was Officer Irick.

Q.    How did you determine that?

A.    In this frame, a -- a muzzle flash is seen on the

UNITED STATES DISTRICT COURT

border of the frame on the left-hand side.

MR. GALIPO:  Request to show as a demonstrative.

THE COURT:  Yes.

BY MR. GALIPO:

Q.    Are you able to see this on your screen?

A.    Yes.

Q.    And are you able to see in this image Mr. Gonzalez?

A.    Yes.

Q.    Can you turn to Exhibit 73, please.

(Exhibit No. 73 for identification.)

BY MR. GALIPO:

Q.    Were you able to determine who fired this gunshot?

A.    Yes.  This one was Officer Irick.

Q.    How did you determine that?

A.    Again, on the border of the left-hand side of the frame, there's another muzzle flash that is able to be seen.

MR. GALIPO:  Request to show as a demonstrative.

THE COURT:  Yes.

BY MR. GALIPO:

Q.    And can you see Mr. Gonzalez in this image?

A.    Yes.

Q.    Can you go to Exhibit 76, please.

(Exhibit No. 76 for identification.)

BY MR. GALIPO:

Q.    Do you have that in front of you?

A.      Yes, sir.

Q.      Were you able to determine who fired this shot?

A.      Yes.

Q.      Who?

A.      This one was Officer Irick.

MR. GALIPO:   Request to show as a demonstrative.

THE COURT:   Do you want to lay foundation as to how he determined that?

MR. GALIPO:   Oh.   Sorry, Your Honor.

BY MR. GALIPO:

Q.      How were you able to determine this was Officer Irick that fired this shot?

A.      Just like the last two that had the muzzle flash, this frame -- it's -- the orange is a little faint, but it's -- you can still see the orange tone from the muzzle flash in that area.

MR. GALIPO:   Okay.   Request to show as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.      This would be the time frame of additional shot by Officer Irick?

A.      Yes.

Q.      Is that correct?

A.      Yes.   That's correct.

UNITED STATES DISTRICT COURT

Q.    Can you see Mr. Gonzalez in this image?

A.    Yes.

Q.    Could you tell if he's on the ground or upright?

A.    He appears to be on the ground.

Q.    Can you turn to Exhibit 79, please.

        (Exhibit No. 79 for identification.)

BY MR. GALIPO:

Q.    Is this another one of the gunshots?

A.    Yes.  That is correct.

Q.    Were you able to determine who fired this shot?

A.    Yes.  I believe so.

Q.    How were you able to do so?

A.    This one was Officer Irick and, again, in the same general area as the last gunshots fired by Officer Irick, there is a plume of smoke that is seen contrasting that -- the dark background of the wall.

        MR. GALIPO:  I would request to show as a demonstrative.

        THE COURT:  Yes.

BY MR. GALIPO:

Q.    And Mr. Gonzalez is in what position here?

A.    It looks like he's on the ground.

Q.    Is there an indication in your timer as to how much time passed from the first shot until this shot?

A.    Yeah.  That's 2.17 seconds.

UNITED STATES DISTRICT COURT

Q.    Can you turn to Exhibit 82, please.

(Exhibit No. 82 for identification.)

BY MR. GALIPO:

Q.    Is this another gunshot?

A.    Yes.  That is correct.

Q.    Were you able to determine who fired this shot?

A.    This one was Officer Irick.

Q.    How did you determine that was Officer Irick's shot?

A.    Similar to the last couple shots, I can see the plume of smoke being contrasted on the dark background.  And it does get a little more subtle towards his last couple of shots being able to see the smoke against the background.  But like I said, toggling through it left and right, you can get a better idea of seeing it appear.

Q.    And Mr. Gonzalez is still on the ground at this time?

A.    Yes.  That is correct.

Q.    How much time since the first shot?

A.    2.4 seconds.

Q.    And then can you turn to Exhibit 84, please.

(Exhibit No. 84 for identification.)

MR. GALIPO:  Oh.  Yeah.  I'm sorry.  I forgot to request to show the last one as a demonstrative.

THE COURT:   Yes.

///

**UNITED STATES DISTRICT COURT**

BY MR. GALIPO:

Q.     That's the image we were just discussing?

A.     Right.

Q.     And then one more I want to show you from this set, Exhibit 84.

Can you turn to that, please?

And how many officers were shooting at this time?

A.     On this frame, it looks like I found indications of a gunshot being fired from all three officers -- Sobaszek, Irick, and Reynoso.

Q.     How did you determine that?

A.     Um, I had to synchronize the videos together so I could see both officers' cameras being played together in real-time.  And so I was able to toggle through that frame by frame, seeing both officers' cameras at the same time being played in real-time together at the same time.  And I could see Sobaszek and Reynoso's cameras, but Irick did not have a camera.

So it was reviewing the two officers that had cameras on that had a firearm that was kind of in the general vicinity of their camera direction and then seeing Irick kind of off to the side of Sobaszek's camera.

Q.     Okay.

MR. GALIPO:  I'd request to show that as a demonstrative, please.

UNITED STATES DISTRICT COURT

THE COURT: Yes.

BY MR. GALIPO:

Q. Okay. This is the image you were -- we were just speaking of?

A. Correct.

Q. Okay. Thank you for that.

Now, you -- you also did some of these same images, but you enlarged it and stabilized it so that we could see Mr. Gonzalez more clearly?

A. Correct.

Q. I want to show you just a few of these.

Okay. Can you turn to Exhibit 125?

Do you have that in front of you?

A. Yes.

Q. And was this stabilized and enlarged?

A. Yes. It looks like it, yeah.

Q. And we had already looked at a demonstrative of -- of this image without it being stabilized and enlarged?

A. Right. Correct.

Q. And what did you enlarge it to? What was the enlargement?

A. This is a 4X enlargement, four times.

Q. Okay. And does this more clearly show Mr. Gonzalez at the time of the first shot?

A. Yes.

MR. GALIPO:   I would request to show as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.    This would be the time of the first shot?

A.    Correct.

Q.    Looking at Exhibit 126.

(Exhibit No. 126 for identification.)

BY MR. GALIPO:

Q.    Would that be the same stabilization and enlargement at the time of the second shot?

A.    Yes.

MR. GALIPO:   Request to show as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.    Exhibit 127 would be the third shot with the zoom and the stabilization?

(Exhibit No. 127 for identification.)

THE WITNESS:   Correct.

MR. GALIPO:   Request to show as an enlargement -- I mean, as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.    Exhibit 128 would be Shot 4 with the zoom and the stabilization?

UNITED STATES DISTRICT COURT

300

(Exhibit No. 128 for identification.)

THE WITNESS:  Yes.  That is correct.  And it does have a frame number on it, too, that matches the non-zoomed-in version so you can always go look at that frame number and then go look at the original as well.

MR. GALIPO:  Okay.  Request to show as a demonstrative.

THE COURT:  Yes.

BY MR. GALIPO:

Q.    Exhibit 129, would that be what we looked at previously, the first shot from Officer Irick?

(Exhibit No. 129 for identification.)

THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    And, again, this would be stabilized and enlarged?

A.    Yes.  Correct.

MR. GALIPO:  Request to show as a demonstrative.

THE COURT:  Yes.

BY MR. GALIPO:

Q.    Exhibit 131.

(Exhibit No. 131 for identification.)

BY MR. GALIPO:

Q.    And this would be the second shot by Irick from his perspective, the sixth in total?

A.    I think this is the fifth one in total.

UNITED STATES DISTRICT COURT

MR. GALIPO:   Oh, maybe I'm at the wrong exhibit. I'm sorry.

THE WITNESS:   Oh.

BY MR. GALIPO:

Q.     Are you at 131?

A.     I'm sorry.   I was looking at the TV and not the -- right here.

Q.     Oh.

A.     Yes.   That would be Gunshot Number 6 for Irick.

Q.     Okay.   But Irick's second shot, sixth in total?

A.     Correct.   Yes.

MR. GALIPO:   Okay.   And I would request to show it as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.     And turning to Exhibit 133, please.

     (Exhibit No. 133 for identification.)

BY MR. GALIPO:

Q.     Again, stabilized and enlarged.   This should be the third shot from Irick, seventh in total?

A.     Correct.

MR. GALIPO:   Request to show as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.     Exhibit 135.

(Exhibit No. 135 for identification.)

BY MR. GALIPO:

Q.    That would be the fourth shot from Irick, the tenth in total?

A.    Correct.

MR. GALIPO:  Request to show as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.    Exhibit 137.

(Exhibit No. 137 for identification.)

BY MR. GALIPO:

Q.    The fifth shot from Irick?

A.    Correct.

MR. GALIPO:  Request to show as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.    Exhibit 140.

(Exhibit No. 140 for identification.)

BY MR. GALIPO:

Q.    Does that show the sixth shot from Irick, 15 in total?

A.    Yes.  That is correct.

MR. GALIPO:  Request to show as a demonstrative.

THE COURT:   Yes.

///

BY MR. GALIPO:

Q.      Exhibit 143.

(Exhibit No. 143 for identification.)

BY MR. GALIPO:

Q.      Seventh shot from Irick?

A.      Yes.   Correct.

MR. GALIPO:   Request to show as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.      Exhibit 146.

(Exhibit No. 146 for identification.)

BY MR. GALIPO:

Q.      That's another shot from Irick?

A.      Yes.   That is correct.

MR. GALIPO:   Request to show as a demonstrative.

THE COURT:   Yes.

BY MR. GALIPO:

Q.      Thank you.

And you also --

MR. GALIPO:   We could take that down, Mr. Sincich.

Thank you.

BY MR. GALIPO:

Q.      You also prepared a group of exhibits without the annotations and without the stabilization and enlargements; is that correct?

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    And if you could just look at Exhibit 85.

(Exhibit No.  85 for identification.)

BY MR. GALIPO:

Q.    This exhibit is enlarged and stabilized but no
graphics; is that right?

A.    That's correct.  It's just the text in the top and
the bottom corner.

MR. GALIPO:  May I confer with counsel for one
moment?

THE COURT:   Yes.

(Off-the-record discussion between counsel.)

MR. GALIPO:  May I confer with Mr. Sincich for one
moment?

THE COURT:   Yes.

(Off-the-record discussion between counsel.)

BY MR. GALIPO:

Q.    So I'm just going to show you a few of these because
some of these have already been admitted.

Do you still have 85 in front of you?

A.    Yes.

Q.    And that would be something that is from the
body-worn camera footage that's stabilized and enlarged?

A.    Yeah.  That is correct.

Q.    With no graphics?

A.    Correct.

Q.    And 86 would be the same, stabilized and enlarged with no graphics?

(Exhibit No. 86 for identification.)

THE WITNESS:  Correct.

BY MR. GALIPO:

Q.    87, also stabilized and enlarged with no graphics?

(Exhibit No. 87 for identification.)

THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    88 as well, stabilized, enlarged, no graphics?

(Exhibit No. 88 for identification.)

THE WITNESS:  Yeah.

BY MR. GALIPO:

Q.    89, the same; stabilized, enlarged, no graphics?

(Exhibit No. 89 for identification.)

THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    And just a few more.

90; stabilized, enlarged, no graphics?

(Exhibit No. 90 for identification.)

THE WITNESS:  Correct.

BY MR. GALIPO:

Q.    91; stabilized, enlarged, no graphics?

(Exhibit No. 91 for identification.)

UNITED STATES DISTRICT COURT

THE WITNESS:  Correct.

BY MR. GALIPO:

Q.    And, finally, 92; stabilized, enlarged, no graphics?

(Exhibit No. 92 for identification.)

THE WITNESS:  Correct.

MR. GALIPO:  I would move to -- I'm not going to publish this at this time, but I move to admit 85 through 92. The other exhibits related to these have already been admitted.

THE COURT:  Any objection?

MS. BEARS:  No, Your Honor.

THE COURT:  Then 85 through 92 will be admitted.

(Exhibit Nos. 85 - 91 received into evidence.)

MR. GALIPO:  Thank you.

Thank you, Your Honor.

I have no further questions.

THE COURT:  Thank you.

Ms. Bears, cross-examination.

**CROSS-EXAMINATION**

BY MS. BEARS:

Q.    Good afternoon -- morning still, Mr. Holdaway.

A.    Good morning.

Q.    We met briefly at your deposition.  My understanding is your background is in graphics?

A.    My background --

Q.    Yes, sir.

**UNITED STATES DISTRICT COURT**

A.    It is in -- well, I have an education -- a college education in digital media arts which entails more than just graphics.  It's, you know, preproduction, production, post production, um, you know.

Q.    And you said you have a -- is it LEVA's, video analysis training?

A.    Correct.

Q.    Was that law enforcement-related?

A.    Yes.

Q.    In what way is it law enforcement-related?

A.    LEVA stands for Law Enforcement and Emergency Vehicles Video Association, Incorporated *[sic]*.

Q.    As part of that training, are you trained in ballistics?

A.    No.

Q.    Are you trained in the identification of how to identify if a gun is shot on a video?

A.    I don't know if we specifically did a gunshot. Yeah.

Q.    Do you yourself have any firearms training?

A.    No.

Q.    Do you have any training on ballistic imaging?

A.    Not specifically, no.

Q.    When you say "not specifically," do you have any?

A.    Well, I have training in examining videos, you know,

through a forensic lens, but I have not had any training that is just specifically geared towards that.

Q.    So no specialized training on how to identify when a gunshot occurs on a video; is that correct?

A.    Correct.

Q.    Do you have any training on human reaction times?

A.    No.

Q.    Do you have any training particularly on the ballistics of a Glock semiautomatic pistol?

A.    No.

Q.    When you were assigned -- hired to look through these videos, what was your understanding of why you were retained in this matter?

A.    I was retained to review the body-worn cameras and try to identify indications of gunshots being fired and which officer that was attributed to.

Q.    You spoke on direct examination about things like "kickback," "smoke," "muzzle flash," and a "slide."  Where did you learn these terms?

A.    Just my experience in the field.

Q.    And what field would that be?

A.    Forensic video analysis.

Q.    So in your training in the field of video forensic analysis, are you specifically trained on when to see smoke coming from a muzzle?

A.    Like was I provided training -- like where we watched the video and said this is -- we all agreed it was smoke?

Q.    That could be something.   Were you trained on that?

A.    I've never done that.

Q.    Similarly, have you been trained on when to recognize a gun recoiling in a video?

A.    Not specifically, no.

Q.    Do you know what recoil is?

A.    It would be the movement of the gun coming back and the slide coming back after the gunshot has been fired.

Q.    When you say "the slide coming back after the gun has been fired," did you receive any training on how semiautomatic pistols operate?

A.    No.

Q.    In your analysis of these videos, you say the slide was coming back.   Where do you base that determination?

A.    I've seen that occur in body-worn camera videos.

Q.    You said you also had training with Axon.   And what is Axon?

A.    Axon Investigate is a company that makes a lot of the body-worn cameras and the various cameras, ones that go in the cars and stuff like that.

Q.    To your knowledge, was this the brand of cameras that were worn by the Hemet police officers that you were asked

to analyze?

A.    Yes.

Q.    Based on your training with Axon, how quickly do the videos capture the images?

A.    30 frames per second.

Q.    Do you have any training on how quickly the human eye perceives events?

A.    No.

Q.    Now, you said you were asked to analyze two videos. How did you come to know that there was a third person shooting in these videos?

A.    You can -- you can see three people.

Q.    During the entire course of Officer Sobaszek's video, can you see Officer Irick?

A.    I'm sorry.  One more time.

Q.    When you're looking at Officer Sobaszek's video during the entire time, can you see Officer Irick on that video?

A.    Not the entire time.

Q.    As part of your analysis, did you come to the conclusion that based on Officer Sobaszek's video, there were gunshots fired by Officer Irick?

A.    Yeah.  I could see indications of gunshots in that camera.

Q.    And you said in your examination one of those

indications was smoke.   Is that correct?

A.    Yes.

Q.    Could there be other explanations for smoke occurring at an industrial facility?

A.    There could.

Q.    So in your analysis, you said you saw smoke, but there could be other explanations for that; is that correct?

A.    Yes.

Q.    And in the -- in the pictures that were shown to the jury, it seems to me that they are -- please correct me if I'm wrong -- one tenth of a second apart; is that correct?

A.    A 30th of a second.

Q.    A 30th of a second.

A.    Because there's 30 frames in 1 second.

Q.    Okay.  So as you're going through those videos, they're each one-thirtieth of 1 second?

A.    Approximately, yes.

Q.    So looking at that analysis, I believe you said that there were approximately 2.17 seconds between shots.  Was that your analysis?

A.    Um, I -- I'd have to look -- look at it.  Um -- what was the number?  What was --

Q.    Was it 2.17?  Please correct me if I'm wrong.

A.    I'd have to see the timer, the start and end time. I'm not sure what you're talking about.

UNITED STATES DISTRICT COURT

Q.    Okay.   Now, you did a number of the stabilization pictures for this matter; correct?

A.    Yes.

Q.    Were you shown all of the pictures that you created during the course of your examination today?

A.    No.

MS. BEARS:   Okay.   Just one moment, please.

(Off-the-record discussion between counsel.)

MS. BEARS:   At this point, I would like to show --

BY MS. BEARS:

Q.    I'll show you one of your videos -- one of your screenshots that has been marked as Plaintiff's -- Plaintiff's Exhibit 122.

(Exhibit No. 122 for identification.)

THE COURT:   Counsel --

MS. BEARS:   And I believe this has already been entered into evidence.

THE COURT:   I don't believe it has.

MS. BEARS:   Okay.   Well, permission to publish, Your Honor.

THE COURT:   Are you going to lay the foundation?

MS. BEARS:   Yes.

BY MS. BEARS:

Q.    Could you please turn to -- I believe you have the binder in front of you -- Exhibit 122.

**UNITED STATES DISTRICT COURT**

313

Do you see it?

A.    Yes.

Q.    Do you recognize this as one of the still shots that you created for this matter?

A.    Yes.

Q.    Now, there is a counter at the bottom.  What does that counter mean?

A.    That is a timer that is counting up until the indication of a first gunshot being fired.

Q.    Okay.

MS. BEARS:  Permission to publish, Your Honor.

THE COURT:  Any objection?

MR. GALIPO:  No.

THE COURT:  511 can be published -- I'm sorry, 122 will be published.

BY MS. BEARS:

Q.    And what is depicted in this still shot?

A.    This is a frame from Officer Sobaszek's body-worn camera enlarged.

MS. BEARS:  Thank you.

No further questions.

THE COURT:  Mr. Galipo, anything further?

MR. GALIPO:  Yes.  Thank you.

///

///

UNITED STATES DISTRICT COURT

## CERTIFICATE OF OFFICIAL REPORTER

COUNTY OF RIVERSIDE      )
                         )
STATE OF CALIFORNIA      )

                I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

                            DATED THIS 11TH DAY OF MAY, 2026.


                            /S/ MYRA L. PONCE
      _____
                MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                  FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**